**No. 21-9509**

---

UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

---

HEAL UTAH, et al.,
*Petitioners*,

v.

U.S. ENVIRONMENTAL PROTECTION AGENCY, et al.,
*Respondents*.

---

Petition for Review of Action of the U.S. Environmental Protection Agency

---

**DEFERRED JOINT APPENDIX**
**Volume I of IV (App. 0001 - 0162)**

---

Of Counsel:

DANIEL P. SCHRAMM
STEPHANIE J. TALBERT
*Attorneys*
U.S. Environmental Protection Agency

TODD KIM
*Assistant Attorney General*
MIRANDA M. JENSEN
*Attorney*
Environment and Natural Resources Division
U.S. Department of Justice
Post Office Box 7611
Washington, D.C. 20044
(202) 598-3071
miranda.jensen@usdoj.gov

*Counsel for Respondents*

## TABLE OF CONTENTS


| VOLUME I | | | |
|---|---|---|---|
| **A.R. DOC. NO.** | **DOCUMENT TITLE** | **EXCERPTS** | **BATES NO.** |
| EPA-R08-OAR-2015-0463-1143 | Final Rule, Approval and Promulgation of Air Quality Implementation Plans; Utah; Revisions to Regional Haze State and Federal Implementation Plans, 85 Fed. Reg. 75860 (Nov. 27, 2020) | Full document | 0008 |
| EPA-R08-OAR-2015-0463-0225 | Proposed Rule, Approval and Promulgation of Air Quality Implementation Plans; Utah Regional Haze State and Federal Implementation Plans, 85 Fed. Reg. 3558 (Jan. 22, 2020) | Full document | 0023 |
| EPA-R08-OAR-2015-0463-0001 | Proposed Rule, Air Quality State Implementation Plans; Approvals and Promulgations: Utah; Revisions to Regional Haze State Implementation Plan; Federal Implementation Plan for Regional Haze; Partial Approval and Partial Disapproval, 81 Fed. Reg. 20004 (Jan. 14, 2016) | Full document | 0044 |
| EPA-R08-OAR-2015-0463-0020, Attachment 1 | Letter from National Park Service to EPA (April 2, 2015) | Full document | 0094 |
| EPA-R08-OAR-2015-0463-0154, Attachment 1 | Comment Letter from National Park Service (March 14, 2016) | Full document | 0102 |
| EPA-R08-OAR-2015-0463-0154, Attachment 2 | National Park Service Air Resources Division Technical Comments (March 14, 2016) | Full document | 0108 |

| | | | |
|---|---|---|---|
| EPA-R08-OAR-2015-0463-0157, Attachment 1 | Technical Support Document to Comments of Conservation Organizations, prepared by V. Stamper (Mar. 14, 2016) | Cover page, pg. 2, 43-45 | 0149 |
| EPA-R08-OAR-2015-0463-0167, Attachment 1 | Conservation Organizations' Comments on EPA's 2016 Proposed Rule (March 14, 2016) | Pages 1, 27-29 | 0154 |
| EPA-R08-OAR-2015-0463-0169 | PacifiCorp's Comments on EPA's 2016 Proposed Rule (March 14, 2016) | Pages 1-3; Attachment 1 (Corrected) cover page, pg. 1 | 0158 |
| VOLUME II | | | |
| EPA-R08-OAR-2015-0463-0208 | EPA Response to Comments for Federal Register Notice for Air Quality State Implementation Plans; Approvals and Promulgations; Utah; Revisions to Regional Haze State Implementation Plan; Federal Implementation Plan for Regional Haze; Partial Approval and Partial Disapproval (June 1, 2016) | Part 1, pages 1-290 | 0170 |
| VOLUME III | | | |
| EPA-R08-OAR-2015-0463-0208 | EPA Response to Comments for Federal Register Notice for Air Quality State Implementation Plans; Approvals and Promulgations; Utah; Revisions to Regional Haze State Implementation Plan; Federal Implementation Plan for Regional Haze; Partial Approval and Partial Disapproval (June 1, 2016) | Part 2, pages 291-440 | 0467 |

| | | | |
|---|---|---|---|
| EPA-R08-OAR-2015-0463-0216 | Email from Bryce C. Bird, Utah Division of Air Quality (UDAQ) to Scott Pruitt, Administrator, EPA, re: Request for Reconsideration of the Final Rule (June 30, 2017) | Transmittal email; pg. 1-7 | 0617 |
| EPA-R08-OAR-2015-0463-0221 | Letter from R. Jeff Richards, PacifiCorp to Scott Pruitt, Administrator, EPA, re: Information supporting reconsideration of EPA's Final Rule (June 30, 2017) | Full document | 0625 |
| EPA-R08-OAR-2015-0463-0222 | Letter from Scott Pruitt, Administrator, EPA, to Bryce Bird, UDAQ, re: Reconsideration of Final Rule (July 14, 2017) | Full document | 0640 |
| EPA-R08-OAR-2015-0463-0223 | Letter from Scott Pruitt, Administrator, EPA to R. Jeff Richards, PacifiCorp, re: Reconsideration of Final Rule (July 14, 2017) | Full document | 0642 |
| EPA-R08-OAR-2015-0463-0239 | Email from UDEQ to EPA and others, Fwd: Utah RH CAMx Update (Feb. 20, 2018), attaching "Photochemical Modeling Protocol to Assess Visibility Impacts for PacifiCorp Power Plants Located in Utah" | Transmittal email, Protocol cover page, pg. AA-1 through 2-13, 4-1 through 4-8 | 0644 |
| VOLUME IV | | | |
| EPA-R08-OAR-2015-0463-0249 | Letter from Gary R. Herbert, Governor, to Gregory Sopkin, Regional Administrator, EPA Region 8, Re: Utah State Implementation Plan Section XX. Regional Haze (July 2, 2019) (Utah's July 2019 SIP Submission) | Full document | 0682 |

| | | | |
|---|---|---|---|
| EPA-R08-OAR-2015-0463-0249, Attachment 4 | Utah State Implementation Plan, Section XX Regional Haze Parts A and D(6) Public Comments and Responses (Apr. 1-May 15, 2019) | Pages C001-C032 | 0683 |
| EPA-R08-OAR-2015-0463-0249, Attachment 11 | UDAQ, Staff Review of Recommended Alternative to BART for $NO_X$ (May 28, 2019) | Full document | 0715 |
| EPA-R08-OAR-2015-0463-1130, Attachment 1 | Conservation Organizations' Comments on EPA's 2020 Proposed Rule (Mar. 20, 2020) | Full document | 0840 |
| EPA-R08-OAR-2015-0463-1130, Attachment 3 | Technical Comments: State of Utah Draft Regional Haze State Implementation Plan Amendments, prepared by D. Howard Gebhart on behalf of the Conservation Organizations | Full document | 0870 |
| EPA-R08-OAR-2015-0463-1137, Attachment 1 | PacifiCorp's Comments on EPA's 2020 Proposed Rule (Mar. 23, 2020) | Full document | 0894 |
| EPA-R08-OAR-2015-0463-1152 | EPA Modeling Guidance for Demonstrating Air Quality Goals for Ozone, $PM_{2.5}$, and Regional Haze (Nov. 2018) | Pages 1-10 | 0911 |
| EPA-R08-OAR-2015-0463-1158 | Utah Air Quality Board, Utah State Implementation Plan Section XX | Cover page, pg. ii-ix, 16-22 (SIP001-SIP009, SIP025-SIP031) | 0921 |

| | | | |
|---|---|---|---|
| EPA-R08-OAR-2015-0463-1165 | EPA, Response to Comments for the Federal Register Notice for Approval and Promulgation of Air Quality Implementation Plans; Utah; Regional Haze State and Federal Implementation Plans (Oct. 7, 2020) | Cover page, Table of Contents, pg. 1-2, 19-20, 26-41, 51-54 | 0937 |

## CERTIFICATE OF DIGITAL SUBMISSION

I hereby certify that with respect to the foregoing:

(1) all required privacy redactions have been made per 10th Cir. R. 25;
(2) if required to file additional hard copies, that the ECF submission is an exact copy of those documents; and
(3) the digital submissions have been scanned for viruses with the native Microsoft Windows 10 Virus and Threat Protection service, last updated June 10, 2022, and, according to the program, they are free of viruses.

Dated: June 10, 2022

/s/ *Miranda M. Jensen*
MIRANDA M. JENSEN

*Counsel for Respondents*

## CERTIFICATE OF SERVICE

I certify that on June 10, 2022, I electronically filed the foregoing DEFERRED JOINT APPENDIX with the Clerk of the Court for the United States Court of Appeals for the Tenth Circuit by using the Court's CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

/s/ *Miranda M. Jensen*
MIRANDA M. JENSEN

*Counsel for Respondents*

1967(a)(1)(A)(ii) or (C)(ii) after the child becomes a member.

[FR Doc. 2020–25585 Filed 11–25–20; 8:45 am]

**BILLING CODE 8320–01–P**

## ENVIRONMENTAL PROTECTION AGENCY

### 40 CFR Part 52

**[EPA–R08–OAR–2015–0463; FRL–10015–75–Region 8]**

### Approval and Promulgation of Air Quality Implementation Plans; Utah; Regional Haze State and Federal Implementation Plans

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Final rule.

**SUMMARY:** The Environmental Protection Agency (EPA) is finalizing approval of State Implementation Plan (SIP) revisions submitted by the State of Utah on July 3, 2019, as supplemented on December 3, 2019, to satisfy certain regional haze requirements for the regional haze program's first implementation period (Utah SIP revisions). The EPA is approving the Utah SIP revision that provides an alternative to best available retrofit technology (BART) controls for nitrogen oxides ($NO_X$) at the PacifiCorp Hunter and Huntington power plants. The EPA finds that the $NO_X$ BART Alternative for Hunter and Huntington achieves greater reasonable progress toward natural visibility conditions than BART, in accordance with the requirements of the Clean Air Act (CAA) and the EPA's Regional Haze Rule. In conjunction with this approval, we are withdrawing the Federal Implementation Plan (FIP) that addresses $NO_X$ BART for the Hunter and Huntington power plants that EPA promulgated in 2016. The EPA is also approving Utah's December 3, 2019 SIP supplement that requires reporting of all deviations from compliance with the applicable requirements under particulate matter (PM) BART and the $NO_X$ BART Alternative, including the emission limits for Hunter and Huntington. The EPA is taking these actions pursuant to sections 110 and 169A of the CAA.

**DATES:** This rule is effective on December 28, 2020.

**ADDRESSES:** The EPA has established a docket for this action under Docket ID No. EPA–R08–OAR–2015–0463. All documents in the docket are listed on the *https://www.regulations.gov* website. Although listed in the index, some information is not publicly available, *e.g.,* CBI or other information whose disclosure is restricted by statute. Certain other material, such as copyrighted material, is not placed on the website and will be publicly available only in hard copy form. Publicly available docket materials are available through *https://www.regulations.gov,* or please call or email the person identified in the **FOR FURTHER INFORMATION CONTACT** section for additional availability information.

**FOR FURTHER INFORMATION CONTACT:** Aaron Worstell, Air and Radiation Division, EPA, Region 8, Mailcode 8ARD–IO, 1595 Wynkoop Street, Denver, Colorado 80202–1129, (303) 312–6073, *worstell.aaron@epa.gov.*

**SUPPLEMENTARY INFORMATION:**

Throughout this document wherever ''we,'' ''us,'' or ''our'' is used, we mean the EPA.

### Table of Contents

I. Proposed Action and the EPA's Conclusion
II. Public Comments and EPA Responses
A. Legal Issues
B. BART Alternative Requirements
C. BART Alternative ''Greater Reasonable Progress'' Determination
III. The EPA's Final Action
A. 2019 Utah Regional Haze SIP Revisions
B. FIP Withdrawal
C. Clean Air Act Section 110(l)
IV. Incorporation by Reference
V. Statutory and Executive Order Reviews
A. Executive Order 12866: Regulatory Planning and Review and Executive Order 13563: Improving Regulation and Regulatory Review
B. Executive Order 13771: Reducing Regulations and Controlling Regulatory Costs
C. Paperwork Reduction Act
D. Regulatory Flexibility Act
E. Unfunded Mandates Reform Act (UMRA)
F. Executive Order 13132: Federalism
G. Executive Order 13175: Consultation and Coordination with Indian Tribal Governments
H. Executive Order 13045: Protection of Children from Environmental Health Risks and Safety Risks
I. Executive Order 13211: Actions Concerning Regulations That Significantly Affect Energy Supply, Distribution, or Use
J. National Technology Transfer and Advancement Act
K. Executive Order 12898: Federal Actions To Address Environmental Justice in Minority Populations and Low-Income Populations
L. Determination Under Section Clean Air Act Section 307(d)
M. Congressional Review Act (CRA)
N. Judicial Review

### I. Proposed Action and the EPA's Conclusion

On July 5, 2016, the EPA promulgated a final rule titled ''Approval, Disapproval, and Promulgation of Air Quality Implementation Plans; Partial Approval and Partial Disapproval of Air Quality Implementation Plans and Federal Implementation Plan; Utah; Revisions to Regional Haze State Implementation Plan; Federal Implementation Plan for Regional Haze,'' which approved, in part, a regional haze SIP revision submitted by the State of Utah on June 4, 2015.[1] In the July 2016 final rule, the EPA also disapproved, in part, the Utah regional haze SIP submission, including the $NO_X$ BART Alternative (also ''BART Alternative'' or ''Alternative'') for Hunter Units 1 and 2 and Huntington Units 1 and 2, which are BART units as explained in more detail below. The BART Alternative relied on sulfur dioxide ($SO_2$), $NO_X$, and PM emission reductions from the 2015 closure of PacifiCorp's Carbon power plant, as well as $NO_X$ reductions achieved through combustion control upgrades at Hunter Units 1, 2 and 3 and Huntington Units 1 and 2, which were installed in 2006–2014 (Hunter Unit 3 is not a BART unit). The combustion control upgrades for Hunter Units 1 and 2 and Huntington Units 1 and 2 include an Alstom TSF 2000™ low-$NO_X$ firing system and two elevations of separated overfire air (SOFA). The combustion upgrades for Hunter Unit 3 include upgraded low-$NO_X$ burners (LNB) and overfire air (OFA). Concurrent with disapproving the $NO_X$ BART Alternative, EPA promulgated a FIP in the July 2016 final rule that imposed a $NO_X$ BART emission limit of 0.07 lb/MMBtu (30-day rolling average) for each of the four BART units based on the emission reductions achievable through the installation and operation of selective-catalytic reduction (SCR) plus upgraded combustion controls.

On July 3, 2019, Utah submitted a revised SIP that, based on new technical information and a different regulatory test, seeks to demonstrate that the previously submitted $NO_X$ BART Alternative achieves greater reasonable progress than BART. The SIP revision also includes amendments to Utah's $SO_2$ milestone reporting requirements under the $SO_2$ Backstop Trading Program pursuant to 40 CFR 51.309 such that $SO_2$ emission reductions resulting from the closure of the Carbon plant are not counted under both the $SO_2$ Backstop Trading Program and the $NO_X$ BART Alternative. On January 22, 2020, the EPA proposed to approve the State's July 3, 2019 SIP revision based on this new information.[2] Specifically, we

[1] 81 FR 43894 (July 5, 2016).

[2] 85 FR 3558 (Jan. 22, 2020).

proposed to incorporate the following into Utah's SIP:

- A $NO_X$ emission limit of 0.26 lb/MMBtu (30-day rolling average) each for Hunter Units 1 and 2 and Huntington Units 1 and 2.
- A $NO_X$ emission limit of 0.34 lb/MMBtu (30-day rolling average) for Hunter Unit 3.
- A requirement to permanently close and cease operation of the Carbon power plant by August 15, 2015.
- The associated amendments to the $SO_2$ milestone reporting requirements.

Because approval of the $NO_X$ BART Alternative satisfies Utah's BART obligation for Hunter Units 1 and 2 and Huntington Units 1 and 2, we also proposed to withdraw the FIP for $NO_X$ BART at these units. In particular, we proposed to find that the $NO_X$ BART Alternative would achieve greater reasonable progress towards natural visibility conditions than would be achieved through the installation and operation of BART at Hunter Units 1 and 2 and Huntington Units 1 and 2 under EPA's 2016 FIP.

The EPA also proposed to approve a December 3, 2019 SIP supplement to the July 3, 2019 SIP revision that includes monitoring, recordkeeping, and reporting (MRR) requirements for the units subject to the $NO_X$ BART Alternative and PM BART. The supplement also includes amendments that require each source to submit a report of any deviation from applicable emission limits and operating practices, including deviations attributable to upset conditions, the probable cause of such deviations, and any corrective actions or preventive measures taken.

Finally, contingent on our approval of these two SIP revisions, we proposed to find that Utah's SIP fully satisfies the requirements of section 309 of the Regional Haze Rule and that, therefore, the State has fully complied with the requirements for reasonable progress, including BART, for the first implementation period.

EPA requested comment on its proposed approval of Utah's regional haze SIP elements related to the $NO_X$ BART Alternative under 40 CFR 51.309(d)(4)(vii) and 51.308(e)(2) and (3), as well as the MRR elements for the units subject to that BART Alternative and to PM BART. EPA previously approved Utah's regional haze SIP as meeting all other requirements of 40 CFR 51.309,[3] and we neither reopened nor requested comment on previously approved elements.

The EPA conducted a public hearing for our proposed action in Price, Utah on February 12, 2020. Our public comment period closed on March 23, 2020.

Our January 2020 proposed rule provided background on the requirements of the CAA and EPA's Regional Haze Rule, a summary of Utah regional haze SIP submittals and related EPA actions, and the EPA's rationale for its proposed action. That background information and rationale will not be restated here. For the reasons stated in the proposed rule, this document, and in the accompanying Response to Comments (RTC) document, the EPA concludes that Utah's $NO_X$ BART Alternative achieves greater reasonable progress under 40 CFR 51.308(e)(2) and (3).

## II. Public Comments and EPA Responses

We received both written and oral comments at the public hearings we held in Price, Utah. We also received comments through the internet and mail. The full text of comments received from these commenters is included in the publicly posted docket associated with this action at *https://www.regulations.gov*. Our RTC document, which is also included in the docket associated with this action, provides detailed responses to all significant comments received except for those addressed below.[4] Our RTC document is organized similarly to the structure presented in this section. Therefore, if additional information is desired concerning how we addressed a particular comment, the reader should refer to the appropriate section in our RTC document.

PacifiCorp, conservation organizations (HEAL Utah, Sierra Club, National Parks Conservation Association, Utah Physicians for a Healthy Environment, and Natural Resources Defense Council), Edison Electric Institute, Ute Mountain Ute Tribe, and Salt Lake City's Capitol Hill Action Group submitted detailed written comments. Many general comments were made at the public hearing.

### *A. Legal Issues*

*Comment summary:* Some commenters argued that the modeling assumptions used for comparing the BART Benchmark (the controls required by the 2016 FIP)[5] to the $NO_X$ BART Alternative overstated emissions for non-BART units in the BART Benchmark scenario. Specifically, the commenters argued that emissions for the Carbon plant should have reflected compliance with the Mercury and Air Toxics Standards (MATS) rule, which was required by April 15, 2015. According to the commenters, compliance with MATS would have resulted in a greater than 50 percent reduction in $SO_2$ emissions at Carbon Units 1 and 2 compared to its historical emissions. Additionally, the commenters argued that emissions from Hunter Unit 3 in the BART Benchmark scenario should have reflected combustion controls installed in 2007. The modeling instead assumed that under this scenario, the Carbon plant and Hunter Unit 3 would emit pollutants consistent with the 2001–2003 baseline.[6] The commenters argued that such assumption overstates the emissions from these sources that would have occurred under the BART Benchmark and thus understates the visibility benefits that would occur under the BART Benchmark.

*Response:* Utah's modeling of emissions at Carbon and Hunter Unit 3 under the $NO_X$ BART Alternative and the BART Benchmark is reasonable and authorized under the EPA's regulations for BART alternatives. In particular, assuming continued emissions from sources that would not be subject to BART controls in the BART Benchmark scenario, when such emissions would be eliminated under the BART Alternative, is simply a necessary analytical step for making a proper comparison of the two scenarios to determine which achieves ''greater reasonable progress.''[7] This is authorized by the Regional Haze Rule, and it is consistent with the EPA's prior regulatory actions, EPA guidance, and case law.

[3] See 77 FR 74355 (Dec. 14, 2012); 81 FR 43894 (July 5, 2016).

[4] Most commenter citations and footnotes are excluded from this document.

[5] As described above, in the July 2016 FIP, EPA determined that $NO_X$ BART for each of the four BART units constituted an emission limit of 0.07 lb/MMBtu (30-day rolling average) based on the emission reductions achievable through the installation and operation of SCR plus upgraded combustion controls. Utah's July 2019 SIP submittal thus refers to the BART Benchmark controls as the ''EPA FIP,'' as do many of the commenters. While the controls represented by the BART Benchmark and EPA's 2016 FIP are indeed the same, the relevant comparison for this action is between the BART Benchmark and the $NO_X$ BART Alternative. 40 CFR 51.308(e)(2); see also 85 FR 3572. We therefore refer to the 2016 FIP as the BART Benchmark as appropriate in this document, the preamble to the proposed rule, and the RTC document.

[6] See 85 FR 3568.

[7] 40 CFR 51.308(e).

Appellate Case: 21-9509 Document: 101-2 Date Filed: 06/10/2022 Page: 10


First, Hunter Unit 3 and the Carbon Units are not BART sources.[8] Accordingly, reductions from these sources should not be included in determining emissions reductions from the BART Benchmark under 40 CFR 51.308(e)(2)(i)(C). Hunter Unit 3 and the Carbon Units are covered by Utah's BART Alternative, however, and thus emissions reductions from these sources properly are attributed to the BART Alternative under 40 CFR 51.308(e)(2)(i)(D). Were the EPA to include these same emission reductions in the BART Benchmark scenario, even though there would have been no enforceable obligation that they occur under that scenario, a proper comparison of the relative degree of visibility improvement between the two scenarios would not be possible.

Furthermore, Utah properly applied a 2001–2003 baseline to calculate emissions reductions under both scenarios. Pursuant to 40 CFR 51.308(e)(2)(iv), a state's SIP must demonstrate that emissions reductions resulting from an alternative measure will be surplus to those reductions resulting from measures adopted to meet requirements of the CAA ''as of the baseline date of the SIP.'' In promulgating the Regional Haze Rule in 1999, we explained that the ''baseline date of the SIP'' in this context means ''the date of the emissions inventories on which the SIP relies,'' [9] which is defined as 2002 for regional haze purposes.[10] Any measure adopted after 2002 is accordingly ''surplus'' under 40 CFR 51.308(e)(2)(iv). Indeed, in 2002, the EPA designated the baseline date of all regional haze SIPs as 2002.[11] The EPA explained that ''[p]rogress in improving visibility is tracked from baseline conditions (established using air quality monitoring for the 2000–2004 period). If 2002 is used as the base year for planning purposes, then States can take credit for emission reductions that are achieved before the 2007–2008 SIP due date.'' [12]

In other words, for purposes of calculating emissions reductions from BART alternatives, states assume a baseline of 2002 emissions and may take credit for emissions reductions after that date, even if those reductions occur as a result of, or to comply with, other CAA requirements, so long those requirements occur after that baseline. Thus, Utah's modeling properly credited emissions reductions from Carbon's 2015 shutdown and Hunter 3's 2007 controls towards the BART Alternative. Furthermore, in order to properly compare the BART Benchmark to the $NO_X$ BART Alternative under 51.308(e)(2) to determine if the Alternative achieves greater reasonable progress, common sense dictates that the EPA must compare emissions reductions under each scenario from the same baseline year. Thus, Utah's modeling also properly included Carbon and Hunter 3's emissions from the 2001–2003 baseline period (*i.e.,* not including any reductions from MATS compliance or 2007 controls) under the BART Benchmark because Carbon and Hunter 3 are not BART sources.

This approach is supported by case law.[13] In *Yazzie* v. *EPA,* the United States Court of Appeals for the Ninth Circuit reviewed and upheld EPA's FIP, which included a BART alternative instead of BART.[14] The petitioners argued that the EPA inconsistently credited the BART alternative, but not the BART benchmark, for emissions reductions from controls voluntarily installed in 2009–2011 for purposes of comparing the two.[15] Like here, the EPA used a 2001–2003 baseline from which to calculate emissions reductions under both scenarios for purposes of the comparison.[16] The Ninth Circuit deemed this approach reasonable under 40 CFR 51.308(e)(3).[17] Likewise, Utah's approach here with respect to Hunter 3 and Carbon is reasonable.

Commenters additionally argue that the State cannot take credit for the portion of the reductions from the Carbon shutdown that would have happened anyway had Carbon remained in operation but in compliance with the MATS rule. However, as the D.C. Circuit has recognized, EPA's regulations allow for BART alternatives even when the reductions are due to compliance with another CAA requirement. In *UARG* v. *EPA,* the United States Court of Appeals for the District of Columbia Circuit reviewed and upheld the EPA's rule finding that emission reductions attributable to the 2011 Cross-State Air Pollution Rule (CSAPR)—implemented under the ''good neighbor'' provision of the Act, CAA section 110(a)(2)(D)(i)(I)—may be treated as a BART alternative. The petitioners there argued that the EPA should not have compared BART on its own (*i.e.,* without CSAPR in place) to the BART alternative on its own (*i.e.,* CSAPR without BART in place), but should have instead compared BART *plus* CSAPR to CSAPR, because CSAPR (like the MATS rule here), was implemented under a separate provision of the CAA and would go into effect regardless of BART.[18] The D.C. Circuit rejected the petitioners' argument as effectively requiring more of BART alternatives than the EPA's rule requires. The court explained that under the Regional Haze Rule, the EPA properly compares BART without the alternative or other CAA requirements to the alternative without BART.[19] Underlying that holding is the fact that EPA's regulations authorize BART alternatives to take advantage of emission reductions achieved to meet some other CAA requirement so long as they are surplus to requirements as of the baseline.[20] Thus, as in *UARG,* the EPA here properly compared the BART Benchmark without MATS compliance at Carbon to the $NO_X$ BART Alternative.

This approach is also consistent with other EPA actions. See, *e.g.,* 79 FR 39322, 39325 (July 10, 2014) (approving Connecticut's use of emissions reductions from post-2002 regulations as surplus that could be credited to its BART alternative); 77 FR 34218, 34219 (June 11, 2012) (approving Indiana's credit to its BART alternative for reductions from a non-BART source); 78 FR 57487, 57489–91 (Sept. 19, 2013) (approving Massachusetts' comparison of the BART benchmark and the BART alternative from a common 2002 baseline, and approving the state's use of emissions reductions from post-2002 regulations as surplus that could be credited to its BART alternative); 79 FR 33438, 33441–42 (June 11, 2014) (approving Washington's credit to its BART alternative for reductions achieved through controls installed post-2002 in order to meet other CAA requirements).

In sum, in this final action approving Utah's $NO_X$ BART Alternative, the EPA finds that Utah properly compared the BART Benchmark to the BART Alternative, using its modeling of the emissions reductions of each without the other from the 2001–2003 baseline period, consistent with the Regional

[8] See 85 FR 3559; 81 FR 43895; Utah Air Quality Board, ''Utah State Implementation Plan Section XX,'' June 24, 2019, pages 28–29.

[9] 64 FR 35714, 35742 (July 1, 1999).

[10] 70 FR 39104, 39143 (July 6, 2005).

[11] See Memorandum dated November 18, 2002, from Lydia Wegman and Peter Tsirigotis, Subject: ''2002 Base Year Emission Inventory SIP Planning: 8-hr Ozone, $PM_{2.5}$, and Regional Haze Programs.''

[12] Id. at 3. The first regional haze SIPs were due December 17, 2007. See 40 CFR 51.308(b).

[13] See *Utility Air Regulatory Group* v. *EPA,* 885 F.3d. 714 (D.C. Cir. 2018); *Yazzie* v. *EPA,* 851 F.3d 960 (9th Cir. 2017).

[14] 851 F.3d at 975.

[15] 851 F.3d at 974.

[16] Id.

[17] See id.

[18] *UARG,* 885 F.3d at 720.

[19] See id.

[20] See 40 CFR 51.308(e)(2)(i)(C), (e)(2)(iv). See also *UARG,* 885 F.3d at 719, 720 (finding challenge to EPA's BART alternative regulations to be time-barred).

Appellate Case: 21-9509 Document: 101-2 Date Filed: 06/10/2022 Page: 11


Haze Rule, its regulatory history, EPA guidance, and case law.

*Comment summary:* Some commenters argued that there are three legal flaws with Utah's treatment of $SO_2$ emissions reductions from the Carbon plant shutdown. As explained in the preamble to the proposed rule, Utah's SIP revision continues to report historical emissions for the Carbon plant in annual milestone reports for the $SO_2$ Backstop Trading Program to ensure that $SO_2$ emissions reductions from the Carbon shutdown are not double-counted towards the $NO_X$ BART Alternative and the $SO_2$ Backstop Trading Program. First, the commenters argued that the approach violates 40 CFR 51.309(d)(4)(iii)'s requirement that reporting under the $SO_2$ Backstop Trading Program include ''actual'' emissions. Second, the commenters argued that the approach violates 40 CFR 51.309(d)(4)(i), which requires that participating states use the same compliance methodology during the first two years of the Program. Finally, the commenters argued that removing Carbon from the $SO_2$ Backstop Trading Program would undermine and potentially nullify the EPA's approval of that Program because the Program's inclusion of sources like Carbon was an underpinning of the EPA's approval.

*Response:* The EPA disagrees with this comment and the incorporated 2016 comments by the National Park Service. First, 40 CFR 51.309(d)(4)(iii)'s requirement that SIPs include provisions requiring ''annual reporting of actual stationary source $SO_2$ emissions'' must be read in context with the following sentence that such ''data must be sufficient to determine annually whether the milestone for each year through 2018 is achieved.'' [21] The provision goes on to require that the participating states submit the data to the EPA and the regional planning organization and that the data be kept for at least 10 years. Thus, read in context, § 51.309(d)(4)(iii) plainly is meant to require reporting that allows a determination of whether the milestones have been met.[22] Utah's approach to reporting Carbon's emissions under the $SO_2$ Backstop Trading Program serves this purpose because Utah will overstate actual emissions under the Program. This conservative approach ensures that the reported data are sufficient to determine whether the $SO_2$ milestone is achieved and is therefore consistent with and achieves the purpose of the provision, and the EPA finds it approvable.

As explained in the proposal, the participating states first achieved the 2018 milestone (the most stringent milestone) in 2011 when Carbon was fully operational. Between 2011 and Carbon's shutdown in 2015, emissions continued to stay below the 2018 milestone and decreased significantly each year. The most recent milestone report, for 2016, demonstrates that $SO_2$ emissions were 36 percent lower than the 2018 milestone.[23] At its highest reported $SO_2$ emissions level, Carbon's emissions made up only 10 percent of the participating states' three-year average $SO_2$ emissions (reported in 2014).[24] Thus, even with the additional emissions from Carbon, the participating states can easily achieve the 2018 milestone, and overstating Utah's emissions for purposes of the $SO_2$ Backstop Trading Program will not impair any determination of compliance with the milestones.

Second, Utah's approach does not violate 40 CFR 51.309(d)(4)(i). As an initial matter, the commenters selectively quote the provision. The complete sentence reads, ''*[d]uring the first two years of the program,* compliance with the milestone may be measured by a methodology of the States' choosing, so long as all States in the program use the same methodology.'' [25] The $SO_2$ Backstop Trading Program was approved in 2012, which is more than two years ago.[26] Thus, this sentence is no longer applicable.

Instead, after the first two years of the Program, § 51.309(d)(4)(i) requires that participating states measure compliance by comparing ''a three-year rolling average of actual emissions with a rolling average of the emissions milestones for the same three years.'' Utah's SIP revision remains consistent with this methodology. Under this methodology, each state reports its own emissions.[27] As explained above, using this methodology, the participating states achieved the 2018 milestone in 2011, and emissions are currently 36 percent below the 2018 milestone.[28] Accordingly, Wyoming and New Mexico are not prejudiced by Utah's continued reporting of the Carbon emissions, nor do they have any reason to amend their SIPs to account for Carbon's emissions. Indeed, the EPA approved a similar SIP revision for units in Wyoming in 2019.[29] Utah's approach is consistent with § 51.309(d)(4)(i) and with the other states' methodologies.

Finally, Utah's approach does not undermine or nullify the EPA's approval of the $SO_2$ Backstop Trading Program. In approving the Program as better than BART, the EPA relied on the fact that the Program, including the 2018 $SO_2$ emissions milestone, covered 63 non-BART sources, including Carbon.[30] It hardly undermines the EPA's approval that one of the sources that was included in the Program has now shut down. The Program was designed to encourage sources to reduce emissions so that the emissions milestones were and are never exceeded.[31] In any case, Utah has not removed Carbon from the Program, but rather has decided to continue counting its emissions at historical levels towards the 2018 milestone, even though the source is now actually emitting at zero. That is, emissions from Carbon remain covered by the $SO_2$ Backstop Trading Program. Even accounting for Carbon's historical emissions, the participating states' $SO_2$ emissions are far below the 2018 milestone and there is no indication that the 2018 milestone will ever be exceeded such that emissions under the Program would exceed projected emissions under BART, thereby rendering the Program less effective than BART.

Even it if was the case that Utah had removed Carbon from the $SO_2$ Backstop Trading Program, however, the inclusion of non-BART units like Carbon was just one of several reasons the EPA deemed the Program better than BART. Additional reasons included: (1) The trading program discouraged emissions from new sources more effectively than under BART; (2) the trading program included an aggregate cap on emissions, which decreased emissions more effectively than BART; and (3) the trading program encouraged earlier reductions than under BART.[32] The Tenth Circuit upheld the EPA's considerations as ''a reasonable basis for

[21] 40 CFR 51.309(d)(4)(iii).

[22] See 64 FR 35751–52 (''Section 51.309(d)(4) requires monitoring and reporting of stationary source emissions of $SO_2$ in order to assess compliance with these milestones during the period 2003 to 2018.'').

[23] 85 FR 3570.

[24] Id. at Table 6.

[25] 40 CFR 51.309(d)(4)(i) (emphasis added).

[26] See 77 FR 73926 (Dec. 12, 2012).

[27] See Utah Admin. Code R307–250–9(8); WY Rules and Regulations 020.0002.14 § 2(h)(viii); New Mexico Admin. Code 20.2.81.106(O) and 20.11.46.16(H) (all requiring quarterly and annual reports).

[28] 85 FR 3570 (Table 6).

[29] See 84 FR 22711, 22712, 22715 (May 20, 2019) (requiring Basin Electric to use inflated emission rates to calculate and report emissions from two units for the $SO_2$ Backstop Trading Program to ensure $SO_2$ emissions are not double counted for the $SO_2$ Program and the BART alternative).

[30] 77 FR 30953, 30965 (May 24, 2012).

[31] 77 FR 74360. Participating states must continue to meet the 2018 milestone until the Program is replaced with an EPA-approved SIP revision. See also 40 CFR 51.309(d)(4)(vi)(A).

[32] See 77 FR 30965; 77 FR 73927.

the EPA's approval of the 309 program.'' [33] Accordingly, Utah's continued accounting of the Carbon emissions in the $SO_2$ Backstop Trading Program, which arguably affects just one part of the EPA's rationale in a proportionally minor way (1/63), cannot possibly undermine or nullify the EPA's approval.

Finally, as noted above, Carbon has not been removed from the Program as the commenters contend. Rather, as explained above, Carbon's emissions continue to be included in the inventory of annual emissions notwithstanding the fact that it is shut down.[34] Thus, $SO_2$ emissions remain capped at the 2018 milestone, including Carbon's emissions. To the extent it may become necessary, future $SO_2$ reductions would have to come from other sources in order to allow the participating states to continue to meet the 2018 milestone.

*Comment summary:* Some commenters assert that the EPA may not approve the $NO_X$ BART Alternative because the $NO_X$ BART Alternative would allow increased emissions limits and visibility impairment without offsetting increased emissions elsewhere in Utah's SIP in violation of CAA section 110(*l*), 42 U.S.C. 7410(*l*). The commenters argue that case law supports an interpretation of CAA section 110(*l*) that prevents implementation plan revisions that would increase overall air pollution limits or worsen air quality. The commenters argue that the EPA's approval of the $NO_X$ BART Alternative and withdrawal of the FIP would violate CAA section 110(*l*) for two specific reasons. First, the commenters assert that the $NO_X$ BART Alternative would increase emissions limits and resulting $NO_X$ pollution compared to the FIP. They argue that the EPA's proposed analysis and conclusion that increased $NO_X$ emissions will not interfere with applicable CAA requirements is ''woefully insufficient to support compliance with section 110(*l*).'' Second, the commenters assert that Utah's treatment of the $SO_2$ emissions reductions from the Carbon plant, which continues to report Carbon's emissions under the $SO_2$ Backstop Trading Program so that they can be credited to the $NO_X$ BART Alternative, violates CAA section 110(*l*). The commenters argue that such treatment eliminates an applicable requirement under the CAA that results in an increase in overall allowed emissions.

*Response:* The EPA disagrees with these comments. CAA section 110(*l*) states in relevant part: ''The Administrator shall not approve a revision of a plan if the revision would interfere with any applicable requirement concerning attainment and reasonable further progress (as defined in section 7501 of this title), and any other applicable requirement of this chapter.'' [35] CAA section 110(*l*) applies to all requirements of the CAA and to all areas of the country, whether attainment, nonattainment, unclassifiable or maintenance for one or more of the six criteria pollutants. EPA interprets section 110(*l*) as applying to all National Ambient Air Quality Standards (NAAQS) that are in effect, including those for which SIP submissions have not been made.[36] However, the level of rigor needed for any CAA section 110(*l*) demonstration will vary depending on the nature and circumstances of the revision.

There are two possible paths for satisfying CAA section 110(*l*). First, a state may demonstrate through an air quality analysis that the revision will not interfere with attainment of the NAAQS, reasonable further progress, or any other applicable requirements. Second, a state may substitute equivalent emissions reductions to compensate for any change to a plan to ensure actual emissions to the air are not increased and thus preserve status quo air quality.[37] The second approach may be used, for example, where no attainment demonstrations are available to guide an analysis of whether the SIP revision would interfere with attainment of the NAAQS. However, nothing in the statute requires a state to rely on substitute emission reductions or alters the basic proposition that section 110(*l*) can be satisfied by an air quality analysis demonstrating that a plan revision will not interfere with any applicable requirement concerning attainment and reasonable further progress, or any other applicable CAA requirement. As explained in greater detail below, in this case, the EPA has concluded based on an air quality analysis that the revision will not interfere with attainment of the NAAQS or any other applicable CAA requirement and is not relying on substitute emission reductions.

Before addressing comments regarding the EPA's analysis, however, we address the commenters' suggestion that CAA section 110(*l*) *per se* prohibits approval of any SIP revision that allows an increase in emissions or weakens requirements relative to the existing implementation plan.[38] Such an interpretation is not supported by the statutory language or case law. First, the plain language of the provision does not prohibit every SIP revision that allows an increase in emissions or weakens the existing plan's requirements. Rather, the language prohibits EPA approval of such a SIP revision if it *would interfere with* attainment of the NAAQS, reasonable further progress, or any other applicable requirement of the CAA.[39] Thus, the language focuses on *interference* rather than on emissions increases or changed requirements.

Second, courts have upheld EPA's interpretation that the relevant inquiry under CAA section 110(*l*) is not whether the SIP revision allows an increase in emissions or weakens requirements, but whether there has been a demonstration that the SIP revision would interfere with the NAAQS, reasonable further progress, or any other applicable CAA requirement.

For example, in *Kentucky Resources Council* v. *EPA,* the petitioners argued that a new attainment demonstration, which was not due for years after action on the SIP revision, was required in order to show noninterference under CAA section 110(*l*). Instead, the examination in that case was based on whether the area, which was designated as a nonattainment area for the relevant NAAQS, would have more difficulty attaining and maintaining the NAAQS with the SIP revision (*i.e.,* whether the SIP revision would interfere with

[33] *WildEarth Guardians* v. *EPA,* 770 F.3d 919, 935 (10th Cir. 2014).

[34] See 85 FR 3574.

[35] 42 U.S.C. 7410(*l*).

[36] In general, a section 110(*l*) demonstration should address all pollutants whose emissions and/or ambient concentrations would change as a result of a plan revision. Here, commenters allege that emissions and/or ambient concentrations of $NO_X$ and $SO_2$ would change as a result of this plan revision.

[37] ''Equivalent'' emissions reductions are reductions that are equal to or greater than those reductions achieved by the control measure approved into the plan. To show that compensating emissions reductions are equivalent, adequate justification must be provided. The compensating, equivalent reductions should represent actual emissions reductions achieved in a contemporaneous time frame to the change of the existing control measure in order to preserve the status quo air quality. If the status quo is preserved, noninterference is demonstrated. In addition to being contemporaneous, the equivalent emissions reductions should also be permanent, enforceable, quantifiable, and surplus.

[38] While the EPA acknowledges that this action will allow for greater $NO_X$ emissions than the 2016 FIP, the EPA does not concede that this action weakens regional haze requirements or allows increased visibility impairment. Instead, as is explained in the preamble to the proposed rule, this document, and in the EPA's response to comments, Utah's $NO_X$ BART Alternative will achieve *greater* reasonable progress through combined $NO_X$, $SO_2$, and PM reductions and therefore results in a *stronger* regional haze requirement than the existing plan. See, *e.g.,* 85 FR 3566 (Table 3), 3569, 3573.

[39] See 42 U.S.C. 7410(*l*).

attainment and maintenance of the NAAQS). In upholding the EPA's interpretation and examination, the U.S. Court of Appeals for the Sixth Circuit explained, ''Congress did not intend that the EPA reject each and every SIP revision that presents some remote possibility for interference. Thus, where EPA does not find that a SIP revision would interfere with attainment, approval of the revision does no violence to the statute.'' [40] The Sixth Circuit further explained that, ''[i]n rejecting [a] strict interpretation in favor of one that allows [states] more flexibility, the EPA does service to a fundamental premise underlying the Clean Air Act scheme, which is that the states have the primary responsibility for ensuring that the NAAQS are met.'' [41] Likewise, the U.S. Court of Appeals for the Eleventh Circuit upheld the EPA's interpretation stating, ''[w]e agree that where interference is not demonstrated, approval of the state's SIP revision appropriately respects the state's choice to achieve air quality standards with 'whatever mix of emission limitations it deems best suited to its particular situation.' '' [42]

The commenters misconstrue other cases. In *El Comite Para El Bienestar de Earlimart* v. *EPA* and *WildEarth Guardians* v. *EPA,* the U.S. Court of Appeals for the Ninth Circuit dismissed petitioners' CAA section 110(*l*) challenges without addressing what is required to show that a SIP revision violates CAA section 110(*l*).[43] And contrary to the commenters' assertion, neither *Indiana* v. *EPA* nor *Kentucky Resources Council* v. *EPA* stand for the proposition that the EPA *must* require substitute emissions reductions when a SIP revision increases emissions so that overall net emissions do not increase. In those cases, the U.S. Courts of Appeal for the Sixth and Seventh Circuits simply held that the EPA reasonably concluded that CAA section 110(*l*) was not violated when substitute emissions reductions were included in the SIP revisions at issue.[44] But as explained above, the EPA has previously identified *two options* for demonstrating noninterference under CAA section 110(*l*): (1) Substitution of one measure by another with equivalent or greater emissions reductions/air quality benefit; and (2) an air quality analysis showing that removing the measure will not interfere with other applicable requirements (*i.e.,* without a substitute measure).[45] Here the SIP submission did not include substitute measures and the EPA chose to evaluate the air quality impact of the proposed revision. As we explain below, the EPA's air quality analysis shows that the Utah SIP revisions will not interfere with attainment of the NAAQS, reasonable further progress, or any other CAA requirement.

Importantly, the statute does not require any ''specific methodology'' for air quality analyses under CAA section 110(*l*).[46] In general, the level of rigor needed for any CAA section 110(*l*) demonstration will vary depending on the nature of the revision, its potential impact on emissions and air quality, and the air quality in the affected areas.

In the proposed rule, the EPA proposed to find that the SIP revisions satisfy section 110(*l*). The document explained how the proposed SIP revisions and associated FIP withdrawal will comply with and thus could not be said to interfere with applicable regional haze requirements and general implementation plan requirements such as enforceability. The proposal also addressed potential interference with requirements concerning attainment and reasonable further progress, stating that the Utah SIP revisions will allow for greater $NO_X$ emissions at the four subject-to-BART units as compared to the 2016 FIP (which is currently judicially stayed). The proposal went on to explain that the change in these emissions compared to the FIP, however, is not anticipated to interfere with any applicable requirements under the CAA. We explained that the geographic area where the BART units are located is not part of a nonattainment area for any NAAQS. Furthermore, we explained that the approved portions of the $PM_{2.5}$ attainment demonstrations and clean data determinations (CDD) for the Salt Lake City, Provo, and Logan, UT–ID nonattainment areas (NAAs) do not rely on the installation of SCR at Hunter or Huntington to achieve attainment of the NAAQS. Similarly, we explained that the EPA recently approved Utah's $PM_{10}$ redesignation requests and maintenance plans for Salt Lake County, Utah County, and Ogden City NAAs.[47] These $PM_{10}$ redesignation requests and maintenance plans do not rely on the installation of SCR at Hunter or Huntington to achieve attainment of the NAAQS. Finally, we explained that there are no other approved attainment demonstrations in other areas of the State or outside of the State that rely on the installation of SCR at Hunter or Huntington to achieve attainment of any of the NAAQS.[48]

The commenters contend that the EPA's air quality analysis is inadequate but did not provide any evidence that Utah's SIP revisions will interfere with any specific applicable requirement under the CAA. Here, for the reasons explained below, the EPA now confirms the proposed conclusions from the CAA section 110(*l*) analysis in the proposal.

First, the geographic area where the Hunter and Huntington Units are located is not part of a nonattainment area for any NAAQS. Also, monitors in the geographic area do not currently show exceedances of the ozone NAAQS.[49]

Second, since the publication of the proposal on January 22, 2020, the $PM_{10}$ areas for Salt Lake County, Utah County, and Ogden City were redesignated as attaining the $PM_{10}$ NAAQS.[50] The areas continue to attain the $PM_{10}$ NAAQS based on the most recent official ambient data (2017–2019).[51] This means that these areas attained the NAAQS at current emission levels, *i.e.,* the emission levels allowed by the $NO_X$ controls installed at Hunter and Huntington between 2006 and 2014 and which will be maintained under Utah's $NO_X$ BART Alternative. Because the FIP was judicially stayed and the $NO_X$ emission controls required by the FIP (SCRs) were never installed, current emissions levels do not reflect emission levels that would have been achieved if the FIP had been implemented. In other words, the EPA's approval of the Utah $NO_X$ BART Alternative will not cause an increase in $NO_X$ emissions at Hunter

[40] 467 F.3d 986, 994 (6th Cir. 2006).

[41] Id. at 996.

[42] *Alabama Environmental Council* v. *EPA,* 711 F.3d 1277, 1293 (11th Cir. 2013) (quoting *Train* v. *NRDC, Inc.,* 421 U.S. 60, 79 (1975)). See also *Indiana* v. *EPA,* 796 F.3d 803, 811 (7th Cir. 2015) (''When deciding whether to approve Illinois's SIP revision, EPA was required to determine whether the revision would, *going forward,* interfere with attainment.'') (emphasis in original); *Galveston-Houston Ass'n for Smog Prevention* v. *EPA,* 289 Fed. Appx. 745, 754 (5th Cir. 2008) (''[C]hanges to a SIP, either dropping measures or reducing measurement requirements, are not by themselves sufficient to prove interference. Rather, one must show that the substitute measures are not at least equivalent to the previous measures in achieving attainment.'').

[43] See *El Comite Para El Bienestar de Earlimart* v. *EPA,* 786 F.3d 688, 696–97 (9th Cir. 2015); *WildEarth Guardians* v. *EPA,* 759 F.3d 1064, 1074 (9th Cir. 2014).

[44] See *Kentucky Resources Council,* 467 F.3d at 995–96; *Indiana,* 796 F.3d at 812–13.

[45] See *Indiana,* 796 F.3d at 806.

[46] *Kentucky Resources Council,* 467 F.3d at 995.

[47] The $PM_{10}$ redesignations for Salt Lake County, Utah County, and Ogden City nonattainment areas revised 40 CFR 81.345 to signify that these areas are in attainment. Utah demonstrated maintenance of the $PM_{10}$ standard to 2035 through the maintenance plans.

[48] 85 FR 3574.

[49] EPA, ''Air Quality System Preliminary Design Value Report,'' October 7, 2020.

[50] 85 FR 10989 (Feb. 26, 2020).

[51] EPA, ''Air Quality System Preliminary Design Value Report,'' September 15, 2020.

or Huntington compared to current conditions. Therefore, the SIP approval will not interfere with already-achieved NAAQS attainment for $PM_{10}$, and there is no evidence, including none provided by the commenters, to suggest that $PM_{10}$ areas for Salt Lake County, Utah County, and Ogden City will not continue to attain the NAAQS following our approval of the SIP and concurrent withdrawal of the FIP.

Third, the Northern Wasatch Front, Southern Wasatch Front, and Uinta Basin ozone non-attainment areas were designated nonattainment for the 2015 ozone NAAQS on August 3, 2018.[52] As part of the 2018 ozone designation process, the EPA conducted a meteorological Hybrid Single-Particle Lagrangian Integrated Trajectory (HYSPLIT) analysis to determine whether sources near the monitors violating the NAAQS contribute to the Northern and Southern Wasatch Front ozone non-attainment areas. Evaluation of such meteorological data helps to assess the fate and transport of emissions contributing to ozone concentrations and to identify areas potentially contributing to the monitored violations. Results of the HYSPLIT analysis for the Northern and Southern Wasatch Front ozone nonattainment areas show that back trajectories rarely originated or passed through Carbon and Emery counties on high ozone days in the Wasatch Front (where Hunter and Huntington are located).[53] Instead, the HYSPLIT analysis indicates that emissions originating within Davis and Salt Lake Counties, the southern portion of Weber County, the northern portion of Utah County, and the eastern portion of Tooele County primarily contribute to monitor violations.[54] Furthermore, the monitors in the Southern Wasatch Front ozone nonattainment area (closest to the BART sources) are currently attaining the ozone standard using 2017–2019 and preliminary 2018–2020 data.[55]

For the Uinta Basin non-attainment area, the EPA has determined that ozone production is a highly localized phenomenon. The Uinta Basin is a winter ozone area, where violating ozone concentrations are dependent on stagnant winter conditions associated with strong temperature inversions. During the ozone designations process, the EPA used the latest data and information available to the agency (and to the states and tribes through the Ozone Designations Mapping Tool and the EPA Ozone Designations Guidance and Data web page),[56] to evaluate emissions and air quality data and other information for counties in the Uinta Basin. The EPA determined that the stagnant winter conditions associated with strong temperature inversions limit the influence of areas outside of the topographic Uinta Basin.[57] Thus, at the time of the 2018 designation, the EPA determined that sources in surrounding counties (like Hunter and Huntington) do not contribute to the violating area because of these unique geographic features and the associated winter temperature inversion meteorology.

Fourth, the Salt Lake City, Provo, and Logan, Utah-Idaho (UT–ID) $PM_{2.5}$ nonattainment areas were designated nonattainment for the 2006 24-hour $PM_{2.5}$ NAAQS on November 13, 2009.[58] On October 19, 2018, the EPA finalized a determination of attainment for the Logan, UT–ID $PM_{2.5}$ nonattainment area.[59] Based on the most recent 3 years of valid data at that time (2015–2017), the Logan, UT–ID nonattainment area attained the 2006 primary and secondary 24-hour $PM_{2.5}$ NAAQS by the attainment date of December 31, 2017. Likewise, on June 8, 2020, the EPA proposed a determination of attainment, based on the most recent 3 years of valid data (2017–2019), that the Salt Lake City and Provo nonattainment areas attained the 2006 primary and secondary 24-hour $PM_{2.5}$ NAAQS by the attainment date of December 31, 2019.[60] On January 13, 2020, Utah submitted redesignation requests for the Logan, UT–ID, Salt Lake City, and Provo $PM_{2.5}$ nonattainment areas and the EPA is actively reviewing this submittal for future action.

Because the Logan, UT–ID $PM_{2.5}$ nonattainment area is now attaining the $PM_{2.5}$ NAAQS and we proposed to find that the Salt Lake City and Provo $PM_{2.5}$ nonattainment areas are also now attaining the $PM_{2.5}$ NAAQS at *current* emission levels, which would not increase upon approval of Utah's SIP revisions, the SIP approval will not interfere with NAAQS attainment for $PM_{2.5}$. Additionally, there is no evidence, including none provided by the commenters, to suggest that these areas will not continue to attain the NAAQS following our approval of the SIP and concurrent withdrawal of the FIP.

Fifth, contrary to the commenters' argument, the EPA demonstrated that the SIP approval will not interfere with the CAA's BART requirements, including the $SO_2$ Backstop Trading Program. As explained elsewhere in this document, Utah's amendments to the $SO_2$ Backstop Trading Program do not alter the applicable 2018 $SO_2$ milestone or the sources covered by the Program, and thus maintain compliance with the Program and the Regional Haze Rule. The SIP amendments to Utah's $SO_2$ milestone reporting requirements under the $SO_2$ Backstop Trading Program are merely an accounting exercise to ensure that emission reductions resulting from the Carbon plant's closure are not credited towards both the $SO_2$ Backstop Trading Program and the $NO_X$ BART Alternative. The SIP amendments further do not result in an actual increase in emissions.

In summary, we find that Utah's SIP revisions will not interfere with attainment of the NAAQS, reasonable further progress, or other CAA requirements because: (1) The geographic area where the Hunter and Huntington Units are located is not part of a nonattainment area for any NAAQS; (2) the recently redesignated former $PM_{10}$ nonattainment areas in Salt Lake County, Utah County, and Ogden City are attaining the $PM_{10}$ NAAQS at current emission levels, which would remain unchanged with approval of Utah's SIP revisions; (3) we determined in 2018 that the Hunter and Huntington power plants do not contribute to the Northern Wasatch Front and Southern Wasatch Front ozone non-attainment areas, and that the Uinta Basin non-attainment area is a highly localized phenomenon and sources in surrounding counties, including the Hunter and Huntington power plants, do not contribute to the violating area; (4) the Logan, UT–ID $PM_{2.5}$ nonattainment area is attaining the

[52] 83 FR 25776, 25836 (June 4, 2018). At that time, the ozone monitors located closest to the two power plants, in Carbon County, did not violate the 2015 ozone standard. EPA, ''Utah: Northern Wasatch Front, Southern Wasatch Front, and Uinta Basin Intended Area Designations for the 2015 Ozone National Ambient Air Quality Standards Technical Support Document (TSD),'' page 6 (''Utah 2015 Ozone TSD''). Also found in docket EPA–HQ–OAR–2017–0548; posted January 5, 2018.

[53] Utah 2015 Ozone TSD, pages 18–25.

[54] Id. at 25.

[55] EPA, ''Air Quality System Preliminary Design Value Report,'' October 7, 2020.

[56] The EPA's Ozone Designations Guidance and Data web page can be found at *https://www.epa.gov/ozone-designations/ozone-designations-guidance-and-data.*

[57] Utah 2015 Ozone TSD, pages 29, 30.

[58] 74 FR 58688 (Nov. 13, 2009).

[59] 83 FR 52983 (Oct. 19, 2018). A nonattainment area may be issued a determination of attainment by the EPA only if monitored data demonstrate that air quality has improved enough that the NAAQS is now being achieved. These determinations are based upon complete, quality-assured data gathered at established state and local air monitoring stations and national air monitoring stations in the nonattainment area and must include a notice and comment rulemaking by the EPA determining that the area is attaining the relevant standard. Although a determination of attainment is not equivalent to a redesignation in 40 CFR part 81, a determination of attainment shows that monitored air quality no longer violates the NAAQS.

[60] 85 FR 35033 (June 8, 2020).

$PM_{2.5}$ NAAQS, and we proposed to find that the Salt Lake City and Provo $PM_{2.5}$ nonattainment areas are also attaining the $PM_{2.5}$ NAAQS, all at current emission levels that would not increase under Utah's SIP revisions; and (5) the Utah SIP revisions properly account for $SO_2$ emissions in accordance with applicable requirements. Furthermore, the commenters provided no analysis or information to indicate otherwise. Thus, we confirm our position in the proposed rule that Utah's SIP revisions are not anticipated to interfere with applicable requirements of the CAA and therefore CAA section 110(*l*) does not prohibit approval of this SIP and concurrent withdrawal of the FIP.

*B. BART Alternative Requirements*

*Comment summary:* Some commenters asserted that because the EPA's proposed rule would result in a significantly different distribution of emissions from BART, it fails to show ''greater reasonable progress'' under 40 CFR 51.308(e)(3) than the EPA's previously issued FIP. Specifically, the commenters assert that when alleged technical deficiencies including those in the CAMx dispersion modeling are corrected, the EPA is unable to prove ''greater reasonable progress'' because visibility will decline in one or more Class I areas and there is not an overall improvement in visibility over all affected Class I areas.

*Response:* We disagree with this comment. The three plants (Hunter, Huntington, and Carbon) are all located within 40 miles of each other in Central Utah and are therefore similarly situated to the affected Class I areas. But Utah chose to use CAMx dispersion modeling to assess whether the $NO_X$ BART Alternative achieves greater reasonable progress for the worst and best 20 percent of days (*i.e.,* the two-prong test). This is the regulatory test required under § 51.308(e)(3) if the distribution of emissions *were* substantially different.[61] Thus, the question of emissions distribution is not pertinent to the EPA's approval of Utah's $NO_X$ BART Alternative. Any influence that the respective geographic relationship of the emission reductions from BART and the $NO_X$ BART Alternative have on visibility impacts at the Class I areas is resolved by the CAMx modeling.

We respond to specific comments related to alleged technical deficiencies in the modeling in more detail below and in the RTC document. We find that the CAMx modeling used for the greater reasonable progress demonstration was performed consistent with EPA guidance and that the model performance was similar to applications of the CAMx model that the EPA and states have used in previous actions for regional haze.[62] The CAMx modeling results showed that the $NO_X$ BART Alternative met the requirements of the greater reasonable progress two-prong test, *i.e.,* visibility does not decline in any Class I area under the BART Alternative relative to the Baseline on both the 20% best and 20% worst days, and the average visibility improvement across all affected Class I areas is greater under the BART Alternative than under the BART Benchmark.[63]

*C. BART Alternative ''Greater Reasonable Progress'' Determination*

*Comment summary:* Some commenters asserted that the CAMx modeling supporting the Utah $NO_X$ BART Alternative is flawed because it continues to assume that the installation and operation of SCR on Hunter Units 1 and 2 and Huntington Units 1 and 2 would achieve a $NO_X$ emission rate of 0.07 lb/MMBtu on a 30-day rolling average, as approved by the EPA four years ago in its FIP. The commenters contend that there are several electric generating units (EGUs) that have achieved $NO_X$ emission rates of 0.04 lb/MMBtu or lower on an annual average basis. The commenters further contend that the EPA recently adopted a BART alternative for the Laramie River Station in Wyoming and acknowledged that a 0.04 lb/MMBtu $NO_X$ emission rate would be achieved with SCR on an annual average basis under a 0.06 lb/MMBtu $NO_X$ limit applicable on a 30-day average basis.

The commenters further assert that while the Hunter and Huntington BART units have been achieving 0.19–0.20 lb/MMBtu $NO_X$ rates on an annual average basis in the last two years, these units should be able to readily achieve a 0.04 lb/MMBtu annual average $NO_X$ rate with SCR. The commenters contend that such a $NO_X$ rate equates to a 74–80% $NO_X$ removal efficiency across the SCR, and SCR systems are routinely designed to achieve 90% $NO_X$ removal. The commenters therefore argue that it is improper to judge the Utah BART Alternative against a BART Benchmark that utilizes obsolete emissions information and that the EPA should not have assumed a controlled annual average $NO_X$ rate any higher than 0.04 lb/MMBtu for the Hunter and Huntington Units in BART modeling.

*Response:* We disagree with this comment. By way of background, the EPA's FIP used an assumed emission rate of 0.05 lb/MMBtu on an *annual* basis, but required compliance with a 0.07 lb/MMBtu, *30-day rolling average* limit.[64] The commenters here contend that EPA should have used a lower annual limit, which would in turn lower the 30-day rolling average limit, for purposes of the BART Benchmark. As an initial matter, emission limits associated with BART do not need to meet the lowest emission rate achieved with that technology at any coal-fired power plant. The Regional Haze Rule provides that ''[t]he determination of BART must be based on an analysis of the best system of continuous emission control technology available and associated emission reductions achievable for each BART-eligible source that is subject to BART.'' [65]

Additionally, the BART Guidelines state that: ''[i]n assessing the capability of the control alternative, latitude exists to consider special circumstances pertinent to the specific source under review, or regarding the prior application of the control alternative,'' [66] and that ''[t]o complete the BART process, you must establish enforceable emission limits that reflect the BART requirements.'' [67] The five factor BART analysis described in the Guidelines is a case-by-case analysis that considers site-specific factors in assessing the best technology for continuous emission controls. After a technology is determined as BART, the BART Guidelines require establishment of an emission limit that reflects the BART requirements, but does not specify that the emission limit must represent the maximum level of control achieved by the technology selected as BART.

While the BART Guidelines and the Regional Haze Rule do not preclude selection of the maximum level of control achieved by a given technology as BART, the emission limit must be set to reflect BART which in turn must be determined based on a consideration and weighing of the five statutory BART factors. Therefore, limits set in other BART determinations, Best Available Control Technology during Prevention of Significant Deterioration review, or emission rates achieved from the operation of individual facilities under

[61] See 40 CFR 51.308(e)(3).

[62] Previous actions that relied on CAMx modeling include the Cross-State Air Pollution Rule (CSAPR) (76 FR 48208 (Aug. 8, 2011)); the FIP revision for Laramie River Station in Wyoming (84 FR 22711 (May 20, 2019)); and the SIP revision for Coronado Generating Station in Arizona (82 FR 46903 (Oct. 10, 2017)).

[63] See 85 FR 3573.

[64] 81 FR 43903.

[65] 40 CFR 51.308(e)(1)(ii)(A).

[66] 40 CFR part 51, appendix Y, section IV.D.3.

[67] 40 CFR part 51, appendix Y, section V.

an emissions trading program (*e.g.,* CSAPR) may provide important information, but should not be construed to automatically represent the most appropriate BART limit for a given technology.

Additionally, while the commenters cite actual annual emission rates found in the EPA's Air Markets Program Database (AMPD) to support their claim that an annual emission rate of 0.04 lb/MMBtu is achievable with SCR, a more thorough review of the data supports the EPA's conclusion that an annual emission rate no lower than 0.05 lb/MMBtu is representative of what can be achieved when retrofitting SCR to an existing boiler. Of the 155 coal-fired EGUs equipped with SCR operating in 2019 with actual annual emission rates below 0.10 lb/MMBtu, 135 (87.1%) had actual annual emissions greater than 0.05 lb/MMBtu, 18 (11.6%) had actual annual emissions greater than 0.04 lb/MMBtu and less than or equal to 0.05 lb/MMbtu, and only 2 (1.3%) had actual annual emissions less than or equal 0.04 lb/MMBtu.[68] The figure in our RTC document shows the number of coal-fired EGUs equipped with SCR by actual annual emission range in increments of 0.01 lb/MMbtu. Notwithstanding the site-specific nature of SCR retrofits, these data support the conclusion that an annual emission rate of 0.05 lb/MMBtu is appropriate for the Utah BART units, and confirm that the assumption is relatively conservative because the majority of EGUs equipped with SCR have actual annual emission rates that are higher.

Moreover, the lowest emission rates found in the AMPD database may not be indicative of what can be expected at the Utah BART units for a number of reasons. As noted above, the site-specific characteristic of each SCR installation must be taken into account when determining the anticipated actual annual emission rate. For example, the commenter lists Dry Fork Unit 1 in Wyoming among units that are achieving an actual annual emission rate of 0.04 lb/MMBtu.[69] However, construction on Dry Fork Unit 1 began in 2007 and SCR was integrated into the original design, and not installed as a retrofit as would be the case with the Utah BART units.

Our use of an anticipated actual annual emission rate with SCR of 0.05 lb/MMBtu here is also consistent with our 2016 FIP.[70] The EPA is unaware of, and the commenters have not cited, any advancements in SCR retrofit technology that have occurred since our July 2016 final rule. Accordingly, we have no reason to conclude that the assumptions we made at that time regarding SCR performance are now obsolete.

Finally, the commenters have incorrectly assumed that a 90% control efficiency can be achieved in all SCR applications regardless of the input $NO_X$ emission rate or other parameters. In our July 2016 final rule, the EPA used an actual annual average emission rate for LNB/SOFA (*i.e.,* pre-SCR) at the Utah BART units of 0.20 lb/MMBtu to 0.22 lb/MMBtu.[71] A 90% reduction with SCR from these emission rates would yield annual emission rates of 0.020 lb/MMBtu to 0.022lb/MMBtu. As can be seen from the AMPD data discussed above, no EGU has achieved this level of control with SCR. Thus, because this level of control has not been achieved in practice, it is not a realistic expectation for the Utah BART units.

*Comment summary:* Some commenters criticized the selection of Class I areas for inclusion in the CAMx modeling domain. The commenters asserted that the modeling included Class I areas beyond 300 kilometers from the Carbon, Hunter, and Huntington power plants, and afforded equal weight to areas near and distant from the pollution sources even though there is higher confidence in the CAMx modeling at sites within 300 kilometers of the sources. The commenters further asserted that PacifiCorp included certain areas (*e.g.* San Pedro Parks Wilderness Area (New Mexico)) farther than 500km from the sources, while apparently omitting others a similar distance away (*e.g.* Craters of the Moon in Idaho; Jarbidge in Nevada; Yellowstone, Grand Teton, Washakie, Fitzpatrick, and Bridger in Wyoming; Petrified Forest and Sycamore Canyon in Arizona; and Rocky Mountain, Eagles Nest, Rawah, and Great Sand Dunes in Colorado, among others). The commenters also stated that while Utah appeared to give undue weight to visibility benefits at certain distant Class I areas, Utah gave zero weight (and did not even analyze) visibility impacts at similarly distant sites. The commenters therefore argue that the assessed Class I areas were selected in an arbitrary manner, and that the analysis does not account for visibility impacts ''over all affected Class I areas,'' as required by the Regional Haze Rule.[72] The commenters argue that if corrected, the alleged errors may flip the outcome of Utah's analysis; *i.e.,* if the Class I areas outside of 300 kilometers from the power plants are omitted, the modeling fails to demonstrate that the average visibility benefit of the BART Alternative will be greater than the 2016 FIP (BART Benchmark).

*Response:* The EPA disagrees with this comment. The draft modeling protocol prepared by PacifiCorp included a rectangular modeling domain that included all of the Class I areas within a distance of 300 km of the Hunter and Huntington Units that had been considered in previous CALPUFF modeling applications for these BART sources. The EPA reviewed the proposed modeling domain and recommended that the boundaries of the domain be extended farther east, north, and south to include terrain features that could affect the transport of pollutants from the BART sources.[73] PacifiCorp agreed to extend the size of the domain as requested by the EPA. Thus, for example, the domain was extended farther north to include the Uinta mountain range in northern Utah, and the domain was extended farther east such that the relevant Class I areas were fully included in the model domain and were not located close to the boundary of the domain. Because of the possibility of modeling artifacts at domain boundaries,[74] the EPA believed that the larger model domain was technically more defensible. The motivation for expanding the size of the model domain was to provide more accurate model results, not to include more Class I areas. However, given that additional Class I areas were included within the domain, the EPA determined that it was appropriate to consider visibility benefits at all Class I areas for which model results were available. The EPA determined that it would have been arbitrary to include some Class I areas

[68] See spreadsheet titled ''SCR Actual Annual Emissions by Range.xlsx'' in the docket. Note that AMPD query returned a total of 265 coal-fired EGUs equipped with SCR operating in 2019. However, many of these units had actual annual emission rates well in excess of what would be anticipated with an SCR when operated on a year-round basis. For that reason, the EPA eliminated all units with an actual annual emission rate in excess of 0.10 lb/MMBtu from consideration, leaving 155 units.

[69] AMPD data for 2019 show actual annual emissions of 0.0432 lb/MMBtu, above 0.04 lb/MMBtu.

[70] 81 FR 2034.

[71] See 81 FR 43903, Tables 2 through 5.

[72] 40 CFR 51.308(e)(3)(ii).

[73] Email dated September 20, 2017, from Aaron Worstell (EPA) to Jay Baker (UDAQ), Subject: Updated invitation: Utah Regional Haze CAMx Model Review, docket ID EPA–R08–OAR–2015–0463–0228.

[74] For example, if emissions plumes near the model domain boundaries are transported out of the model domain, those emissions are permanently lost to the model, even if meteorological recirculation patterns might cause those emissions to re-enter the domain. Selecting a large model domain reduces the possibility that emissions plumes will be transported out of the model domain.

but not to include other nearby Class I areas for which modeling results were available. The additional Class I areas (Mount Zirkel Wilderness Area [WA], Maroon Bells/Snowmass WA, West Elk WA, La Garita WA, Weminuche WA, and San Pedro Parks WA) are located close to and within the same air basins as the other Class I areas previously included in the CALPUFF modeling. While there are other Class I areas located within 500 km of the sources, prevailing wind patterns and terrain features make it less likely that emissions from Hunter and Huntington would impact those areas, and the EPA did not find that it was reasonable to recommend further expansion of the model domain to include these Class I areas. In addition, the calculation of the average difference between BART and the BART Alternative is most influenced by the Class I areas closest to and most impacted by Hunter, Huntington and Carbon. Therefore, small modeled impacts at additional distant Class I areas would likely have little or no impact on the average impact across all affected Class I areas.

We also disagree with the comment that there is higher confidence in the CAMx modeling at sites within 300 kilometers of the sources. Higher confidence in modeling for sites within 300 kilometers is a feature of the CALPUFF model. For example, the Interagency Workgroup on Air Quality Modeling report recommended the ''use of CALPUFF for transport distances of order 200 km and less. Use of CALPUFF for characterizing transport beyond 200 to 300 km should be done cautiously with an awareness of the likely problems involved.'' [75] The CAMx model is not subject to this limitation because it was developed and has been widely used and evaluated for applications at distances much greater than 300 kilometers, including modeling and regulatory analyses for interstate transport of ozone and $PM_{2.5}$. Photochemical grid models such as CAMx are recommended by the EPA in Appendix W [76] for long range transport modeling for secondary pollutants, including regional haze.

*Comment summary:* Some commenters asserted that the CAMx modeling cannot support the $NO_X$ BART Alternative because it employs the wrong metric for comparison. Specifically, the commenters argue that instead of using ''the worst and best 20 percent of days'' to demonstrate greater reasonable progress under 40 CFR 51.308(e)(3), Utah should have substituted an analysis for the 20% of days in a calendar year ''with the highest amount of anthropogenic visibility impairment'' under the EPA's 2017 revisions to the Regional Haze Rule. The commenters argue that without such modeling, the EPA cannot demonstrate in accordance with the regional haze requirements that the BART Alternative would result in greater reasonable progress than BART as determined in the EPA's FIP (BART Benchmark), and the BART Alternative is not approvable.

*Response:* We disagree that the CAMx modeling relied on in Utah's SIP submittal employs the wrong metric for comparison of the BART Benchmark and $NO_X$ BART Alternative. First, as explained elsewhere in the preamble to the proposed rule, the RTC document, and this document, Utah submitted its $NO_X$ BART Alternative, and the EPA proposed to approve it, under the two-prong test in 40 CFR 51.308(e)(3)(i) and (ii). The two-prong test requires that ''the State must conduct dispersion modeling to determine differences in visibility between BART and the [alternative] for each impacted Class I area, *for the worst and best 20 percent of days.*'' [77] The 2017 revisions to the Regional Haze Rule discussed by the commenter did not change 40 CFR 51.308(e)(3).[78] Indeed, § 51.308(e)(3) is a BART provision applicable to the first regional haze planning period, and the EPA explicitly did not make any changes to the Regional Haze Rule's BART provisions in the 2017 revisions.[79] Because Utah's SIP revisions are intended to satisfy first planning period BART requirements,[80] the CAMx modeling properly employed the haziest days metric rather than the new ''most impaired days'' metric.

*Comment summary:* Commenters assert that the most fundamental technical deficiency in the CAMx modeling is the emissions information used by Utah for the ''typical year'' scenario (also called the 2011 reference case). Commenters assert that the EPA provided no explanation as to why the 2011 reference case was modeled with the 2001–2003 baseline period emissions at Carbon, Hunter and Huntington. Commenters note that in the interval between the baseline period and the typical year, PacifiCorp installed significant emissions control improvements at both Hunter and Huntington, which resulted in substantial $SO_2$ reductions.

Commenters assert that the Hunter and Huntington emission controls are important because the associated impact of such controls on visibility conditions in Class I areas in Utah and neighboring states already would be reflected in the 2009–2013 five-year average Interagency Monitoring of Protected Visual Environments (IMPROVE) data used in the CAMx modeling. Commenters claim that by using the 2001–2003 baseline emissions to describe the Hunter and Huntington plants for the 2011 reference year, the post-2003 $SO_2$ reductions at Hunter and Huntington are essentially double counted. Commenters conclude that Utah's approach to typical year emissions for the Hunter, Huntington and Carbon power plants presents a fundamental error with the CAMx modeling and the resulting implication is that the modeling results cannot be used to support Utah's conclusion that the Utah $NO_X$ BART Alternative would result in greater visibility improvement compared to the EPA FIP (BART Benchmark).

*Response:* We disagree with this comment. As an initial matter, the commenters have not explained how the emissions data used in the 2011 Typical Year scenario results in a faulty outcome to the two-prong regulatory analysis required under 40 CFR 51.308(e)(3). Indeed, the modeling was appropriately designed to assess each prong in a reasonable and technically defensible way.[81]

As we explained in the proposed rule, CAMx was configured to simulate four modeling scenarios: the 2011 Typical Year, the 2025 Baseline, the BART Benchmark, and the Utah $NO_X$ BART Alternative. The 2011 Typical Year scenario includes emissions for Carbon, Hunter and Huntington at 2001–2003 levels, while all other sources remain at 2011 levels. The annual $NO_X$ and $SO_2$ emissions modeled for each of these scenarios are shown in Table 1 below.

[75] EPA, ''Interagency Workgroup on Air Quality Modeling (IWAQM) Phase 2 Summary Report and Recommendations for Modeling Long Range Transport Impacts,'' December 1998, pages 18 and D–11.

[76] 40 CFR part 51, appendix W.

[77] 40 CFR 51.308(e)(3) (emphasis added).

[78] See 82 FR 3078, 3124 (Jan. 10, 2017).

[79] See 81 FR 26942, 26947 (May 4, 2016) (''States undertook the BART determination process during the first implementation period. The BART requirement was a one-time requirement . . . . Consequently, we are not proposing any changes to the BART provisions in this rulemaking.'').

[80] See 85 FR 3575.

[81] See AECOM, ''Photochemical Modeling Protocol to Assess Visibility Impacts for PacifiCorp Power Plants Located in Utah,'' January 2018.

Appellate Case: 21-9509 Document: 101-2 Date Filed: 06/10/2022 Page: 18



TABLE 1—ANNUAL $NO_X$ AND $SO_2$ EMISSIONS BY MODELING SCENARIO

| Plant | Unit | 2011 Typical year | | 2025 Baseline | | 2025 BART benchmark | | 2025 Utah $NO_X$ BART alternative | |
|---|---|---|---|---|---|---|---|---|---|
| | | $NO_X$ (tpy) | $SO_2$ (tpy) | $NO_X$ (tpy) | $SO_2$ (tpy) | $NO_X$ (tpy) | $SO_2$ (tpy) | $NO_X$ (tpy) | $SO_2$ (tpy) |
| Carbon ............ | 1 | 1,312 | 2,286 | 1,312 | 2,286 | 1,312 | 2,286 | 0 | 0 |
| | 2 | 1,977 | 3,528 | 1,977 | 3,528 | 1,977 | 3,528 | 0 | 0 |
| Hunter ............. | 1 | 6,380 | 2,535 | 6,380 | 2,535 | 796 | 1,153 | 3,166 | 1,153 |
| | 2 | 6,092 | 2,531 | 6,092 | 2,531 | 798 | 1,408 | 3,028 | 1,408 |
| | 3 | 6,530 | 1,204 | 6,530 | 1,204 | 6,530 | 1,230 | 4,490 | 1,230 |
| Huntington ........ | 1 | 5,944 | 2,380 | 5,944 | 2,380 | 793 | 1,254 | 3,147 | 1,254 |
| | 2 | 5,817 | 12,308 | 5,816 | 12,308 | 753 | 1,201 | 3,366 | 1,201 |

The modeling relied on the 2011 emissions data because a robust, well-evaluated modeling platform was available only for 2011 and was not available for any other year.

The 2025 Baseline modeling scenario, which is based on the 2011 Typical Year scenario with emissions projected to 2025, also uses 2001–2003 emissions for PacifiCorp's units in order to reflect only those controls that were in place at those units in the baseline period (*i.e.,* pre-regional haze measures).[82] This allows for a straightforward comparison of the effects of the BART Benchmark versus the Utah $NO_X$ BART Alternative relative to the 2025 Baseline (*i.e.,* relative to conditions without any regional haze measures applied to the Utah BART sources). Because measures included in the BART Alternative were installed starting in 2006, using emissions from a later year to represent the baseline would not accurately reflect the impacts of each of the two scenarios. While Utah could have chosen to use different years to represent baseline emissions from Hunter, Huntington, and Carbon, it chose to use a consistent period for these Units that is also consistent with the baseline period of the regional haze SIP, and we find this to be a reasonable approach.[83]

The 2011 Typical Year and the 2025 Baseline scenarios were used in the development of relative response factors (RRFs) that were applied to publicly available IMPROVE monitoring data in order to predict future visibility conditions in 2025 for the BART Benchmark and the $NO_X$ BART Alternative scenarios. The BART Benchmark and BART Alternative results were then both compared to the 2025 Baseline scenario and to each other to determine whether the BART Alternative passes the two-prong test in § 51.308(e)(3).

The BART Benchmark scenario includes 2001–2003 Carbon and Hunter 3 emissions, because Carbon and Hunter 3 are not BART sources. But the BART Benchmark reflects predicted $NO_X$ emissions reductions from the installation of SCR controls on Hunter and Huntington Units 1 and 2 because those controls were required by EPA's 2016 FIP. The BART Benchmark scenario also includes $SO_2$ emissions from Hunter and Huntington from 2014–2016 in order to match the BART Alternative scenario, which as explained below, is important for the comparison in § 51.308(e)(3)(ii). The BART Alternative scenario includes emissions from Hunter and Huntington from 2014–2016 to reflect all emissions controls required by the Alternative, and zero emissions from Carbon because the Alternative requires Carbon's 2015 shutdown. As described below, these modeling scenarios allow an accurate comparison between the BART Benchmark and the Utah $NO_X$ BART Alternative under the two-prong test in § 51.308(e)(3).

The first step (prong 1) of the two-prong test requires a demonstration that the BART alternative does not result in a decline in visibility at any Class I area relative to a baseline.[84] The record clearly establishes that there is no decline in visibility under the $NO_X$ BART Alternative when visibility impacts of the $NO_X$ BART Alternative are compared to the 2025 Baseline scenario.[85] As we explained in the proposed rule under prong 1, while the post-2003 $SO_2$ reductions from Hunter and Huntington increase the apparent overall visibility benefit of the BART Alternative relative to the Baseline, there would not be an anticipated decline in visibility relative to the Baseline in the absence of those $SO_2$ reductions from Hunter and Huntington because the BART Alternative would still result in overall $NO_X$, $SO_2$, and PM emissions decreases compared to the Baseline.[86]

At the second step of the (e)(3) test (prong 2), the state must establish that there is ''an overall improvement in visibility, determined by comparing the average differences between BART and the alternative.'' [87] Thus, the purpose of the modeling at this step is to allow for a comparison between two control scenarios—the BART benchmark and the BART alternative—relative to a baseline. It is not critical that the baseline itself be entirely representative of what might be expected to happen in 2025 so long as the emissions and meteorological data used in the modeling allow for the comparison between the BART benchmark and BART alternative. As noted above, the commenters have not demonstrated that the 2025 Baseline scenario here does not serve that purpose.

As we explained in the proposed rule, the relative to the 2025 Baseline, the BART Benchmark and BART Alternative include actual $SO_2$ reductions from Hunter and Huntington that occurred after the 2001–2003 baseline due to scrubber upgrades. Thus, the CAMx modeling results for the BART Benchmark and BART Alternative shown in Tables 4 and 5 of the proposed rule reflect these $SO_2$ reductions. The treatment of these $SO_2$ reductions in the modeling does not affect the determination of greater reasonable progress under the two-prong test. Under prong 2, because the $SO_2$ reductions from Hunter and Huntington are equal under the BART Alternative and BART Benchmark, they do not advantage either control scenario.[88]

In other words, even if the CAMx modeling counts Huntington and

[82] Utah Regional Haze State Implementation Plan, Staff Review of Recommended Alternative to BART for $NO_X$, May 28, 2019, page 13.

[83] Contrary to the commenters' claim, EPA explained this approach in the proposed rule. 85 FR 3572.

[84] 40 CFR 51.308(e)(3)(i).

[85] See 85 FR 3568–69, 3573, and Tables 4 and 5 (column D).

[86] Id. at 3573.

[87] 40 CFR 51.308(e)(3)(ii).

[88] 85 FR 3572–73.

Hunter as creating an additional visibility improvement in the BART Benchmark and $NO_X$ BART Alternative scenarios relative to the 2025 Baseline scenario, this artifact of the data is present for both the BART Benchmark and BART Alternative scenarios. Thus, it does not have a meaningful effect on the comparison in *relative* improvement in visibility *between those scenarios.* The modeling does not, and need not, purport to establish actual, absolute improvements in visibility under the two scenarios; it simply needs to allow for a comparison between the scenarios. In order to pass the second prong under § 51.308(e)(3), a BART alternative must show an overall average improvement in visibility over the BART benchmark. Here, Utah's $NO_X$ BART Alternative demonstrated an overall average improvement over the BART benchmark of 0.00494 deciviews across all Class I areas on the 20 percent best days and 0.00058 deciviews on the 20 percent worst days.[89] Thus, Utah's $NO_X$ BART Alternative passes the second prong of 40 CFR 51.308(e)(3).

In sum, there is no merit to commenters' assertion that the data used in the CAMx modeling cannot be used to support Utah's conclusion that the Utah $NO_X$ BART Alternative would result in greater visibility improvement compared to the EPA FIP (BART Benchmark) under the two-prong test in § 51.308(e)(3).

## III. The EPA's Final Action

For the reasons stated in the preamble to the proposed rule, in the RTC document, and in this document, we are fully approving the SIP revisions submitted by the State of Utah on July 3, 2019, as supplemented on December 3, 2019.

### *A. 2019 Utah Regional Haze SIP Revisions*

We are approving these aspects of the 2019 Utah RH SIP revisions:

- $NO_X$ BART Alternative, including $NO_X$ emission reductions from Hunter Units 1, 2 and 3 and Huntington Units 1 and 2, and $SO_2$, $NO_X$ and PM emission reductions from Carbon Units 1 and 2.
- A $NO_X$ emission limit of 0.26 lb/MMBtu (30-day rolling average) each for Hunter Units 1 and 2 and Huntington Units 1 and 2.
- A $NO_X$ emission limit of 0.34 lb/MMBtu (30-day rolling average) for Hunter Unit 3.
- A requirement to permanently close and cease operation of the Carbon power plant by August 15, 2015.
- The associated amendments to the $SO_2$ milestone reporting requirements.
- MRR requirements for units subject to the $NO_X$ BART Alternative and the PM BART emission limits.

We also note that the regulatory text amendments contained in this document include incorporation of additional parts of SIP section XX (XX.B–C and XX.E–N) and section XXIII, which were not addressed in the proposed action or in this final action. The EPA approved these SIP sections as meeting the requirements of the CAA and applicable regulations in previous actions;[90] however, we inadvertently did not incorporate all approved sections in 40 CFR 52.2320(e). We are remedying this oversight and reorganizing 40 CFR 52.2320(e) to better reflect the structure of Utah's SIP submissions here. We did not reopen these previously approved SIP sections in this rulemaking.

Finally, consistent with our approval of Utah's July 2019 and December 2019 SIP submissions, we find that Utah's SIP fully satisfies the requirements of section 309 of the Regional Haze Rule and therefore the State has fully complied with the requirements for reasonable progress, including BART, for the first implementation period.

### *B. FIP Withdrawal*

Because we find that Utah's July 2019 and December 2019 SIP submissions satisfy the $NO_X$ BART and MRR requirements currently addressed by the EPA's 2016 FIP, we are also withdrawing in whole the Utah Regional Haze FIP at 40 CFR 52.2336 that imposes $NO_X$ BART requirements on Hunter Units 1 and 2 and Huntington Units 1 and 2.

### *C. Clean Air Act Section 110(l)*

As we explain in detail in section II.A of this document and in the RTC document that accompanies this action, we find that our approval of the 2019 Utah SIP revisions and concurrent withdrawal of the corresponding the FIP is consistent with CAA section 110(*l*), 42 U.S.C. 7410(*l*).

## IV. Incorporation by Reference

In this document, the EPA is finalizing regulatory text that includes incorporation by reference. In accordance with the requirements of 1 CFR 51.5, the EPA is finalizing the incorporation by reference of the SIP amendments described in section III.A of this preamble and set forth below. The EPA has made, and will continue to make, these materials generally available through *https://www.regulations.gov* (refer to docket EPA–R08–OAR–2015–0463) and at the EPA Region 8 Office (please contact the person identified in the **FOR FURTHER INFORMATION CONTACT** section of this preamble for more information).

Therefore, these materials have been approved by the EPA for inclusion in the SIP, have been incorporated by reference by the EPA into that plan, are fully federally enforceable under sections 110 and 113 of the CAA as of the effective date of the final rulemaking of the EPA's approval, and will be incorporated by reference by the Director of the Federal Register in the next update to the SIP compilation.[91]

## V. Statutory and Executive Order Reviews

### *A. Executive Order 12866: Regulatory Planning and Review and Executive Order 13563: Improving Regulation and Regulatory Review*

This action is not a ''significant regulatory action'' under the terms of Executive Order 12866 [92] and was therefore not submitted to the Office of Management and Budget (OMB) for review. This final rule applies to three facilities in the State of Utah. It is therefore not a rule of general applicability.

### *B. Executive Order 13771: Reducing Regulations and Controlling Regulatory Costs*

This action is not an Executive Order 13771 regulatory action because it is not significant under Executive Order 12866 for the reasons stated in section V.A above. Instead, it is a *Rule of Particular Applicability* that is exempted under Executive Order 12866.

### *C. Paperwork Reduction Act*

This action does not impose an information collection burden under the PRA. Because this rule revises regional haze reporting requirements for three facilities, the PRA does not apply.

### *D. Regulatory Flexibility Act*

I certify that this action will not have a significant economic impact on a substantial number of small entities under the RFA. This action will not impose any requirements on small entities. This rule does not impose any requirements or create impacts on small

[89] Id. at 3569.

[90] 73 FR 16543 (Mar. 28, 2008); 77 FR 74355 (Dec. 14, 2012); 78 FR 4072 (Jan. 18, 2013); 81 FR 43894 (July 5, 2016).

[91] 62 FR 27968 (May 22, 1997).

[92] 58 FR 51735, 51738 (Oct. 4, 1993).

entities as no small entities are subject to the requirements of this rule.[93]

*E. Unfunded Mandates Reform Act (UMRA)*

This action does not contain an unfunded mandate of $100 million or more as described in UMRA, 2 U.S.C. 1531–1538, and does not significantly or uniquely affect small governments.

*F. Executive Order 13132: Federalism*

This action does not have federalism implications. It will not have substantial direct effects on the states, on the relationship between the National Government and the states, or on the distribution of power and responsibilities among the various levels of government.

*G. Executive Order 13175: Consultation and Coordination With Indian Tribal Governments*

This action does not have tribal implications as specified in Executive Order 13175. It will not have substantial direct effects on tribal governments. Thus, Executive Order 13175 does not apply to this action.

In comments on the proposed rule, the Ute Mountain Ute Tribe requested consultation. In response, the EPA offered consultation, but the Ute Mountain Ute Tribe later waived the opportunity for consultation.

*H. Executive Order 13045: Protection of Children From Environmental Health Risks and Safety Risks*

This action is not subject to Executive Order 13045.[94] The EPA interprets Executive Order 13045 as applying only to those regulatory actions that concern environmental health or safety risks that the EPA has reason to believe may disproportionately affect children, per the definition of ''covered regulatory action'' in section 2–202 of the Executive order. This action is not subject to Executive Order 13045 because it does not concern an environmental health risk or safety risk.

*I. Executive Order 13211: Actions Concerning Regulations That Significantly Affect Energy Supply, Distribution, or Use*

This action is not subject to Executive Order 13211[95] because it is not a significant regulatory action under Executive Order 12866.

*J. National Technology Transfer and Advancement (NTTAA)*

This rulemaking does not involve technical standards.

*K. Executive Order 12898: Federal Actions To Address Environmental Justice in Minority Populations and Low-Income Populations*

The EPA believes that this action does not have disproportionately high and adverse human health or environmental effects on minority populations, low-income populations and/or indigenous peoples, as specified in Executive Order 12898 (59 FR 7629, February 16, 1994).

The documentation for this decision is contained in EPA's EJ analysis. The EPA's *Guidance on Considering Environmental Justice During the Development of Regulatory Actions*[96] is the Agency's guide for determining when environmental justice should be considered when developing regulations. In support of this guidance, the EPA used EJSCREEN[97] to identify areas of potential environmental justice (EJ) concerns associated with this rulemaking. A 300-kilometer radius zone of impact was used in the EJSCREEN analysis consistent with other regional haze actions. The results do not identify any areas of potential EJ concerns.[98] Moreover as explained in the preamble to the final rule and in response to comments, the Utah Regional Haze SIP, as revised by this action, will ensure a significant reduction in emissions compared to regional haze baseline levels (2002). Finally, the EPA's analysis under CAA section 110(*l*) shows that this action will not interfere with any applicable requirement concerning attainment and reasonable further progress or any other applicable CAA requirements. Thus, this final action will not create a disproportionately high and adverse effect on minority, low-income, and/or indigenous/tribal populations.

The availability of regulations.gov to submit written comments and a public hearing in Price, Utah provided meaningful opportunities for public participation in the proposed rulemaking. The EPA considered input received during the public comment period regarding environmental justice considerations.

*L. Determination Under Section Clean Air Act Section 307(d)*

Pursuant to CAA sections 307(d)(1)(B) and 307(d)(1)(V), the Administrator determines that this action is subject to the provisions of section 307(d). CAA section 307(d)(1)(B) provides that section 307(d) applies to, among other things, ''the promulgation or revision of an implementation plan by the Administrator under [CAA section 110(c)].''[99] Under section 307(d)(1)(V), the provisions of section 307(d) also apply to ''such other actions as the Administrator may determine.''[100] To the extent the approval of Utah's SIP submittals is not expressly identified under section 307(d), the Administrator hereby determines that section 307(d) applies to this aspect of this action. The agency has complied with the procedural requirements of CAA section 307(d) during the course of this rulemaking.

*M. Congressional Review Act (CRA)*

This rule is exempt from the CRA because it is a rule of particular applicability that only applies to three named facilities.

*N. Judicial Review*

Under section 307(b)(1) of the CAA, petitions for judicial review of this action must be filed in the United States Court of Appeals for the appropriate circuit by January 26, 2021. Filing a petition for reconsideration by the Administrator of this final rule does not affect the finality of this action for purposes of judicial review nor does it extend the time within which a petition for judicial review may be filed and shall not postpone the effectiveness of such rule or action. This action may not be challenged later in proceedings to enforce its requirements. See CAA section 307(b)(2).

**List of Subjects in 40 CFR Part 52**

Environmental protection, Air pollution control, Incorporation by reference, Intergovernmental relations, Nitrogen dioxide, Particulate matter, Sulfur oxides.

**Andrew Wheeler,**

*Administrator.*

For the reasons set forth in the preamble, 40 CFR part 52 is to be amended as follows:

[93] See 13 CFR 121.201, Sector 22, Subsector 221.

[94] 62 FR 19885 (Apr. 23, 1997).

[95] 66 FR 28355 (May 22, 2001).

[96] *https://www.epa.gov/sites/production/files/2015-06/documents/considering-ej-in-rulemaking-guide-final.pdf*

[97] EJSCREEN: Environmental Justice Screening and Mapping Tool is available at *https://www.epa.gov/ejscreen.*

[98] Results in the EJSCREEN Report for the Hunter and Huntington Power Plants show percentiles of less than 80 for all EJ Indexes evaluated. See EJSCREEN Report in the docket.

[99] 42 U.S.C. 7607(d)(1)(B).

[100] 42 U.S.C. 7607(d)(1)(V).

## PART 52—APPROVAL AND PROMULGATION OF IMPLEMENTATION PLANS

■ 1. The authority citation for part 52 continues to read as follows:

**Authority:** 42 U.S.C. 7401 *et seq.*

### Subpart TT—Utah

■ 2. In § 52.2320:

■ a. The table in paragraph (c) is amended by revising the entries ''R307–110–17,'' ''R307–110–28,'' and ''R307–150–03''.

■ b. The table in paragraph (e) is amended by:

■ i. Adding the entries ''Section IX.H.21. General Requirements: Control Measures for Area and Point Sources, Emission Limits and Operating Practices, Regional Haze Requirements'' and ''Section IX.H.22. Source Specific Emission Limitations: Regional Haze Requirements, Best Available Retrofit Technology'' in numerical order.

■ ii. Removing from under the center heading ''XVII. Visibility Protection'' the entries ''Progress Report for Utah's State Implementation Plan for Regional Haze,'' ''Section XX.D.6. Best Available Retrofit Technology (BART) Assessment for $NO_X$ and PM,'' and ''Section XX.G. Long-Term Strategy for Fire Programs.''

■ iii. Adding the center heading ''XX. Regional Haze'' and the entries ''Section XX.A. Executive Summary'', ''Section XX.B. Background on the Regional Haze Rule'', ''Section XX.C. Long-Term Strategy for the Clean-Air Corridor'', ''Section XX.D. Long-Term Strategy for Stationary Sources'', ''Section XX.E. Sulfur Dioxide Milestones and Backstop Trading Program'', ''Section XX.F. Long-Term Strategy for Mobile Sources'', ''Section XX.G. Long-Term Strategy for Fire Programs'', ''Section XX.H. Assessment of Emissions from Paved and Unpaved Road Dust'', ''Section XX.I. Pollution Prevention and Renewable Energy Programs'', ''Section XX.J. Other GCVTC Recommendations'', ''Section XX.K. Projection of Visibility Improvement Anticipated from Long-Term Strategy'', ''Section XX.L. Periodic Implementation Plan Revisions'', ''Section XX.M. State Planning/Interstate Coordination and Tribal Implementation'', ''Section XX.N. Enforceable Commitments for the Utah Regional Haze SIP'', and ''Progress Report for Utah's State Implementation Plan for Regional Haze'' in numerical order and after the entry ''Section XXIII. Interstate Transport''.

The revisions and additions read as follows:

### § 52.2320 Identification of plan.

* * * * *

(c) * * *

| Rule No. | Rule title | State effective date | Final rule citation, date | Comments |
|---|---|---|---|---|
| * * * | * | * | * | * |
| **R307–110. General Requirements: State Implementation Plan** | | | | |
| * * * | * | * | * | * |
| R307–110–17 ... | Section IX. Control Measures for Area and Point Sources, Part H, Emission Limits. | 11/25/2019 | [INSERT **Federal Register** CITATION] 11/27/2020. | |
| * * * | * | * | * | * |
| R307–110–28 ... | Section XX. Regional Haze ........................... | 8/15/2019 | [INSERT **Federal Register** CITATION] 11/27/2020. | |
| * * * | * | * | * | * |
| **R307–150. Emission Inventories** | | | | |
| * * * | * | * | * | * |
| R307–150–03 ... | Applicability .................................................... | 6/25/2019 | [INSERT **Federal Register** CITATION] 11/27/2020. | |
| * * * | * | * | * | * |

* * * * *

(e) * * *

| Rule title | State effective date | Final rule citation, date | Comments |
|---|---|---|---|
| * * * | * | * | * |
| **IX. Control Measures for Area and Point Sources** | | | |
| * * * | * | * | * |
| Section IX.H.21. General Requirements: Control Measures for Area and Point Sources, Emission Limits and Operating Practices, Regional Haze Requirements. | 11/25/2019 | [INSERT **Federal Register** CITATION] 11/27/2020. | |
| Section IX.H.22. Source Specific Emission Limitations: Regional Haze Requirements, Best Available Retrofit Technology. | 11/25/2019 | [INSERT **Federal Register** CITATION] 11/27/2020. | |

| Rule title | State effective date | Final rule citation, date | Comments |
|---|---|---|---|
| * * * * * * * | | | |
| **XX. Regional Haze** | | | |
| Section XX.A. Executive Summary | 8/15/2019 | [INSERT **Federal Register** CITATION] 11/27/2020. | |
| Section XX.B. Background on the Regional Haze Rule. | 8/15/2019 | [INSERT **Federal Register** CITATION] 11/27/2020. | |
| Section XX.C. Long-Term Strategy for the Clean-Air Corridor. | 8/15/2019 | [INSERT **Federal Register** CITATION] 11/27/2020. | |
| Section XX.D. Long-Term Strategy for Stationary Sources. | 8/15/2019 | [INSERT **Federal Register** CITATION] 11/27/2020. | |
| Section XX.E. Sulfur Dioxide Milestones and Backstop Trading Program. | 8/15/2019 | [INSERT **Federal Register** CITATION] 11/27/2020. | |
| Section XX.F. Long-Term Strategy for Mobile Sources. | 8/15/2019 | [INSERT **Federal Register** CITATION] 11/27/2020. | |
| Section XX.G. Long-Term Strategy for Fire Programs | 4/7/2011 | [INSERT **Federal Register** CITATION] 11/27/2020. | |
| Section XX.H. Assessment of Emissions from Paved and Unpaved Road Dust. | 8/15/2019 | [INSERT **Federal Register** CITATION] 11/27/2020. | |
| Section XX.I. Pollution Prevention and Renewable Energy Programs. | 8/15/2019 | [INSERT **Federal Register** CITATION] 11/27/2020. | |
| Section XX.J. Other GCVTC Recommendations | 8/15/2019 | [INSERT **Federal Register** CITATION] 11/27/2020. | |
| Section XX.K. Projection of Visibility Improvement Anticipated from Long-Term Strategy. | 8/15/2019 | [INSERT **Federal Register** CITATION] 11/27/2020. | |
| Section XX.L. Periodic Implementation Plan Revisions. | 8/15/2019 | [INSERT **Federal Register** CITATION] 11/27/2020. | |
| Section XX.M. State Planning/Interstate Coordination and Tribal Implementation. | 8/15/2019 | [INSERT **Federal Register** CITATION] 11/27/2020. | |
| Section XX.N. Enforceable Commitments for the Utah Regional Haze SIP. | 8/15/2019 | [INSERT **Federal Register** CITATION] 11/27/2020. | |
| Progress Report for Utah's State Implementation Plan for Regional Haze. | 2/4/2016 | 85 FR 64050, 10/9/2020 | |
| * * * * * * * | | | |

**§ 52.2336 [Removed and Reserved]**

■ 3. Remove and reserve § 52.2336.

[FR Doc. 2020–23994 Filed 11–25–20; 8:45 am]

BILLING CODE 6560–50–P

## DEPARTMENT OF THE INTERIOR

### Bureau of Land Management

### 43 CFR Part 2560

**[LLAK940000 L14100000.HM0000 20X]**

**RIN 1004–AE66**

## Alaska Native Vietnam-Era Veterans Allotments

**AGENCY:** Bureau of Land Management, Interior.

**ACTION:** Final rule.

**SUMMARY:** The Bureau of Land Management (BLM) is issuing final regulations to enable certain Alaska Native Vietnam-era veterans to apply for land allotments under Section 1119 of the John D. Dingell, Jr. Conservation, Management, and Recreation Act of March 12, 2019 (Dingell Act). The Dingell Act requires the BLM to issue regulations to implement the Act's land allotment provisions. This action will enable certain Alaska Native Vietnam-era veterans to apply for an allotment who, because of their military service, were not able to do so during the late 1960s and early 1970s.

**DATES:** The final rule is effective on December 28, 2020.

**FOR FURTHER INFORMATION CONTACT:** Paul Krabacher, Division of Lands and Cadastral, Bureau of Land Management, (907) 271–5681. Persons who use a telecommunications device for the deaf (TDD) may call the Federal Relay Service (FRS) at 1–800–877–8339, 24 hours a day, 7 days a week, to leave a message or question with the previously mentioned point of contact. You will receive a reply during normal business hours.

**SUPPLEMENTARY INFORMATION:**

I. Background
II. Discussion of the Final Rule, Section-by-Section Analysis, and Response to Comments on the Proposed Rule
III. Procedural Matters

## I. Background

On December 18, 1971, Congress enacted the Alaska Native Claims Settlement Act (ANCSA; 43 U.S.C. 1601, *et seq.*), which repealed the Alaska Native Allotment Act (34 Stat. 197, as amended). During the time leading up to the repeal of the Alaska Native Allotment Act, certain Alaska Natives who were eligible to apply for allotments were serving in the U.S. military and may have missed their opportunity to apply because of their military service.

In 1998, Congress enacted a law allowing certain Alaska Native veterans a new opportunity to apply for allotments under the Alaska Native Allotment Act, as it was in effect before its repeal (Alaska Native Veterans Allotment Act of 1998; 43 U.S.C. 1629g). Those Alaska Native veterans were able to apply for allotments from July 31, 2000 to January 31, 2002. Under the Alaska Native Veterans Allotment Act of 1998, about 250 allotments were issued to Alaska Native veterans or their heirs.

On March 12, 2019, Congress enacted Section 1119 of the Dingell Act (codified at 43 U.S.C. 1629g–1) to

AUTHENTICATED U.S. GOVERNMENT INFORMATION GPO



**ENVIRONMENTAL PROTECTION AGENCY**

**40 CFR Part 52**

**[EPA–R08–OAR–2015–0463; FRL–10003–90–Region 8]**

# Approval and Promulgation of Air Quality Implementation Plans; Utah; Regional Haze State and Federal Implementation Plans

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Proposed rule.

**SUMMARY:** The Environmental Protection Agency (EPA) is proposing to take action pursuant to section 110 of the Clean Air Act (CAA or Act) on State Implementation Plan (SIP) revisions submitted by the State of Utah on July 3, 2019, as supplemented on December 3, 2019, to satisfy certain regional haze requirements for the program's first implementation period. The EPA is proposing to approve the July 2019 SIP revision that provides an alternative to best available retrofit technology (BART) controls for nitrogen oxides ($NO_X$) at the PacifiCorp Hunter and Huntington power plants. The EPA proposes to find that the Utah $NO_X$ BART Alternative for Hunter and Huntington would provide greater reasonable progress toward natural visibility conditions than BART, in accordance with the requirements of the CAA and the EPA's Regional Haze Rule (RHR). In conjunction with this proposed approval, we propose to withdraw the federal implementation plan (FIP) that addresses $NO_X$ BART for the Hunter and Huntington power plants. The EPA also proposes to approve the December 3, 2019 SIP supplement that would require reporting of all deviations from compliance with the applicable requirements under BART and the BART Alternative, including the emission limits for Hunter and Huntington.

**DATES:**

*Comments:* Written comments must be received on or before March 23, 2020.

*Public Hearing:* A public hearing for this proposal is scheduled to be held on Wednesday, February 12, 2020, in Price, Utah from 1 p.m. until 5 p.m., and again from 6 p.m. until 8 p.m. mountain standard time (MST). See the **SUPPLEMENTARY INFORMATION** section below for the venue address.

**ADDRESSES:** Submit your comments, identified by Docket ID No. EPA–R08–OAR–2015–0463, to the Federal Rulemaking Portal: *https://www.regulations.gov.* Follow the online instructions for submitting comments. Once submitted, comments cannot be edited or removed from *www.regulations.gov.* The EPA may publish any comment received to its public docket. Do not submit electronically any information you consider to be Confidential Business Information (CBI) or other information whose disclosure is restricted by statute. Multimedia submissions (audio, video, etc.) must be accompanied by a written comment. The written comment is considered the official comment and should include discussion of all points you wish to make. The EPA will generally not consider comments or comment contents located outside of the primary submission (*i.e.,* on the web, cloud, or other file sharing system). For additional submission methods, the full EPA public comment policy, information about CBI or multimedia submissions, and general guidance on making effective comments, please visit *http://www.epa.gov/dockets/commenting-epa-dockets.*

*Docket:* All documents in the docket are listed in the *www.regulations.gov* index. Although listed in the index, some information is not publicly available, *e.g.,* CBI or other information whose disclosure is restricted by statute. Certain other material, such as copyrighted material, will be publicly available only in hard copy. Publicly available docket materials are available either electronically in *www.regulations.gov* or in hard copy at the Air Program, Environmental Protection Agency (EPA), Region 8, 1595 Wynkoop Street, Denver, Colorado 80202–1129. The EPA requests that, if at all possible, you contact the individual listed in the **FOR FURTHER INFORMATION CONTACT** section to view the hard copy of the docket. You may view the hard copy of the docket Monday through Friday, 8:00 a.m. to 4:00 p.m., excluding federal holidays.

**FOR FURTHER INFORMATION CONTACT:**
Aaron Worstell, Air Program, EPA, Region 8, Mailcode 8P–AR, 1595 Wynkoop Street, Denver, Colorado 80202–1129, (303) 312–6073, *worstell.aaron@epa.gov.*

**SUPPLEMENTARY INFORMATION:**

## Public Hearing

A public hearing will be held at the Jennifer Leavitt Student Center (JLSC),[1] Utah State University Eastern, 400 North 410 East, Price, UT 84501, on Wednesday, February 12, 2020. The hearing will convene at 1 p.m. and run from 1 p.m. until 5 p.m., and again from 6 p.m. until 8 p.m. (MST). Persons wishing to preregister may be assigned a time according to this schedule. Please register at *https://utah-regional-haze-2020.eventbrite.com* to speak at the hearing. The last day to preregister in advance to speak at the hearing is February 3, 2020. Additionally, requests to speak may be taken the day of the hearing at the hearing registration desk on a first come first serve basis, as time allows. The EPA will make every effort to accommodate all walk-in speakers, however we highly encourage the public to preregister for the hearing in order to be guaranteed speaking time. For questions regarding the public hearing, please contact Clayton Bean at *bean.clayton@epa.gov* or (303) 312–6143.

The public hearing will provide interested parties the opportunity to present data, views, or arguments concerning the proposed action. The EPA may ask clarifying questions during the oral presentations, but will not respond to the presentations at that time. Written statements and supporting information submitted during the comment period will be considered with the same weight as oral comments and supporting information presented at the public hearing. The hearing officer may limit the time available for each commenter to address the proposal to 5 minutes or less if the hearing officer determines it to be appropriate. The limitation is to ensure that everyone who wants to make a comment has the opportunity to do so. We will not be providing equipment for commenters to show overhead slides or make computerized slide presentations. Any person may provide written or oral comments and data pertaining to our proposal at the public hearings. Verbatim transcripts, in English, of the hearings and written statements will be included in the rulemaking docket.

Throughout this document wherever ''we,'' ''us,'' or ''our'' is used, we mean the EPA.

## Table of Contents

I. What action is the EPA proposing?
II. Background
- A. Requirements of the Clean Air Act and the EPA's Regional Haze Rule
- B. Best Available Retrofit Technology (BART)
- C. BART Alternatives
- D. Requirements for Regional Haze SIPs Submitted Under 40 CFR 51.309
- E. Monitoring, Recordkeeping and Reporting
- F. Consultation With Federal Land Managers (FLMs)

[1] *See https://usueastern.edu/about/map/_documents/PriceCampusMap.pdf* for a detailed campus map.

Appellate Case: 21-9509 Document: 101-2 Date Filed: 06/10/2022 Page: 24


G. Summary of State Regional Haze Submittals and EPA Actions
1. 2008 and 2011 Utah Regional Haze SIP Submissions
2. 2012 EPA Action on 2011 and 2008 Utah Regional Haze SIP Submissions
3. Petitions for Review of the EPA's Approval of the $SO_2$ Backstop Trading Program
4. 2015 Utah Regional Haze SIP Submissions
5. 2016 EPA Action on 2015 Utah RH SIP Submissions
6. Petitions for Review of EPA's 2016 SIP Disapproval and FIP
7. 2019 Utah RH SIP Revisions
III. Utah's Regional Haze SIP Revisions
A. Summary of the Utah $NO_X$ BART Alternative SIP Revision
1. Utah $NO_X$ BART Alternative
B. Summary of Utah's Demonstration for Alternative Program
1. List of All BART-Eligible Sources Within the State
2. List of All BART-Eligible Sources and All BART Source Categories Covered by the Alternative Program
3. Analysis of BART and Associated Emission Reductions Achievable
4. Analysis of Projected Emissions Reductions Achievable Through the BART Alternative
5. A Determination That the Alternative Achieves Greater Reasonable Progress Than Would Be Achieved Through the Installation and Operation of BART
6. Requirement That Emission Reductions Take Place During Period of First Long-Term Strategy
7. Demonstration That Emissions Reductions From Alternative Measure Will Be Surplus
C. Monitoring, Recordkeeping and Reporting
D. Consultation With FLMs
IV. EPA's Evaluation and Proposed Approval of Utah's Regional Haze SIP
A. Basis for Proposed Approval
B. Demonstration of Greater Reasonable Progress for the Alternative Program
1. A List of All BART-Eligible Sources Within the State
2. A List of All BART-Eligible Sources and All BART Source Categories Covered by the Alternative Program
3. Analysis of BART and Associated Emission Reductions
4. Analysis of Projected Emissions Reductions Achievable Through the BART Alternative
5. A Determination That the Alternative Achieves Greater Reasonable Progress Than Would Be Achieved Through the Installation and Operation of BART
6. Requirement That Emission Reductions Take Place During Period of First Long-Term Strategy
7. Demonstration That Emission Reductions From Alternative Measure Will Be Surplus
C. Monitoring, Recordkeeping, and Reporting
D. Consultation With FLMs
V. Clean Air Act Section 110(*l*)
VI. The EPA's Proposed Action
A. 2019 Utah Regional Haze SIP Revision
B. FIP Withdrawal
C. Clean Air Section 110(l)
VII. Incorporation by Reference
VIII. Statutory and Executive Order Reviews
A. Executive Order 12866: Regulatory Planning and Review and Executive Order 13563: Improving Regulation and Regulatory Review
B. Executive Order 13771: Reducing Regulations and Controlling Regulatory Costs
C. Paperwork Reduction Act
D. Regulatory Flexibility Act
E. Unfunded Mandates Reform Act (UMRA)
F. Executive Order 13132: Federalism
G. Executive Order 13175: Consultation and Coordination With Indian Tribal Governments
H. Executive Order 13045: Protection of Children From Environmental Health Risks and Safety Risks
I. Executive Order 13211: Actions Concerning Regulations That Significantly Affect Energy Supply, Distribution, or Use
J. National Technology Transfer and Advancement Act
K. Executive Order 12898: Federal Actions To Address Environmental Justice in Minority Populations and Low-Income Populations

## I. What action is the EPA proposing?

On July 5, 2016, the EPA promulgated a final rule titled ''Approval, Disapproval and Promulgation of Air Quality Implementation Plans; Partial Approval and Partial Disapproval of Air Quality Implementation Plans and Federal Implementation Plan; Utah; Revisions to Regional Haze State Implementation Plan; Federal Implementation Plan for Regional Haze,'' which approved, in part, a regional haze SIP revision submitted by the State of Utah on June 4, 2015.[2] In the July 2016 final rule, the EPA also disapproved, in part, the Utah regional haze SIP submission, including the $NO_X$ BART Alternative (also ''BART Alternative'' or ''Alternative'') for Hunter Units 1 and 2 and Huntington Units 1 and 2, which are BART units as explained in more detail below. The BART Alternative relied on sulfur dioxide ($SO_2$), $NO_X$, and particulate matter (PM) emission reductions stemming from the 2015 closure of PacifiCorp's Carbon power plant, as well as $NO_X$ reductions achieved through combustion control upgrades at Hunter Units 1, 2, and 3 and Huntington Units 1 and 2. (Hunter Unit 3 is not a BART unit.) The combustion control upgrades for Hunter Units 1 and 2 and Huntington Units 1 and 2 include an Alstom TSF 2000™ low-$NO_X$ firing system and two elevations of separated overfire air (SOFA). The combustion upgrades for Hunter Unit 3 include upgraded low-$NO_X$ burners (LNB) and overfire air (OFA). Concurrent with disapproving the $NO_X$ BART Alternative, EPA promulgated a FIP in the July 2016 final rule that imposed a $NO_X$ BART emission limit of 0.07 lb/MMBtu (30-day rolling average) for each of the four BART units based on the emission reductions achievable through the installation and operation of selective-catalytic reduction (SCR) plus upgraded combustion controls.

On July 3, 2019, Utah submitted a revised SIP that, based on new technical information and a different regulatory test, seeks to demonstrate that the previously submitted $NO_X$ BART Alternative achieves greater reasonable progress than BART. The SIP revision also includes amendments to Utah's $SO_2$ milestone reporting requirements under the $SO_2$ Backstop Trading Program pursuant to 40 CFR 51.309 so that $SO_2$ emission reductions resulting from the closure of the Carbon plant are not counted under both the $SO_2$ Backstop Trading Program and the $NO_X$ BART Alternative. The EPA is proposing to approve the State's July 3, 2019 SIP revision based on this new information and to incorporate the following into Utah's SIP:

- A $NO_X$ emission limit of 0.26 lb/MMBtu (30-day rolling average) each for Hunter Units 1 and 2 and Huntington 1 and 2.
- A $NO_X$ emission limit of 0.34 lb/MMBtu (30-day rolling average) for Hunter Unit 3.
- A requirement to permanently close and cease operation of the Carbon power plant by August 15, 2015.
- The associated amendments to the $SO_2$ milestone reporting requirements.

Because approval of the $NO_X$ BART Alternative would satisfy Utah's BART obligation for Hunter Units 1 and 2 and Huntington Units 1 and 2, we are also proposing to withdraw the FIP for $NO_X$ BART at these units.

The EPA is also proposing to approve a December 3, 2019 SIP supplement to the July 3, 2019 SIP revision that includes monitoring, recordkeeping and reporting (MRR) requirements for the units subject to the $NO_X$ BART Alternative and PM BART. The supplement also includes amendments that require each source to submit a report of any deviation from applicable emission limits and operating practices, including deviations attributable to upset conditions, the probable cause of such deviations, and any corrective actions or preventive measures taken.

Finally, contingent on our approval of these two SIP revisions, we propose to find that Utah's SIP fully satisfies the

[2] 81 FR 43894 (July 5, 2016).

requirements of section 309 of the RHR and, therefore, that the State has fully complied with the requirements for reasonable progress, including BART, for the first implementation period.

EPA is requesting comment on its proposed approval of Utah's regional haze SIP elements related to the $NO_X$ BART Alternative under 40 CFR 51.309(d)(4)(vii) and 51.308(e)(2)–(3), as well as the MRR elements for the units subject to that BART Alternative and to PM BART. EPA previously approved Utah's regional haze SIP as meeting all other requirements of 40 CFR 51.309,[3] and we are neither reopening nor requesting comment on previously approved elements here.

## II. Background

### *A. Requirements of the Clean Air Act and the EPA's Regional Haze Rule*

In section 169A of the 1977 Amendments to the CAA, Congress created a program for protecting visibility in the nation's national parks and wilderness areas. This section of the CAA establishes ''as a national goal the prevention of any future, and the remedying of any existing, impairment of visibility in mandatory Class I Federal areas which impairment results from manmade air pollution.''[4] Section 169A directs the EPA to establish regulations for states to submit SIPs to make ''reasonable progress'' toward the national visibility goal through long-term strategies and to implement BART at certain BART-eligible sources. Recognizing the complexity of addressing visibility impacts, Congress enacted section 169B in the 1990 Amendments to the CAA, which, among other things, dedicated greater resources to ''regional haze'' and the problem of visibility impairment due to pollution transport over large distances. Section 169B provided for the creation of ''visibility transport'' regions and commissions, and specifically directed the establishment of a Grand Canyon visibility transport commission at section 169B(f).

The EPA promulgated a rule to address regional haze on July 1, 1999.[5] This RHR revised the existing visibility regulations[6] to integrate provisions addressing regional haze and established a comprehensive visibility protection program for Class I areas. The requirements for regional haze, found at 40 CFR 51.308 and 40 CFR 51.309, are included in the EPA's visibility protection regulations at 40 CFR 51.300 through 40 CFR 51.309. As discussed in more detail below, section 309 is available to certain western states, including Utah, in lieu of certain requirements in section 308. The EPA revised the RHR most recently on January 10, 2017.[7]

The CAA requires each state to develop a SIP to meet various air quality requirements, including protection of visibility.[8] Regional haze SIPs must assure reasonable progress toward the national goal of achieving natural visibility conditions in Class I areas, which, for the first implementation period, includes satisfying the BART requirements. A state must submit its SIP and SIP revisions to the EPA for approval. EPA reviews SIP submissions against the requirements of the CAA and applicable regulations. If EPA finds that a state has failed to make a required submission or that a submission does not satisfy the minimum criteria for completeness, or if EPA disapproves a SIP submission in whole or in part, EPA is required to promulgate a FIP within two years of such finding or disapproval unless the State corrects the deficiency, and the Administrator approves the plan or plan revision, before the Administrator promulgates such FIP.[9] Once approved, a SIP is enforceable by the EPA and citizens under the CAA; that is, the SIP is federally enforceable.

### *B. Best Available Retrofit Technology (BART)*

Section 169A of the CAA directs states as part of their SIPs, or the EPA when developing a FIP in the absence of an approved regional haze SIP, to evaluate the use of retrofit controls at certain larger, often uncontrolled, older stationary sources in order to address visibility impacts from these sources. Specifically, section 169A(b)(2)(A) of the CAA requires states' implementation plans to contain such measures as may be necessary to make reasonable progress toward the natural visibility goal, including a requirement that certain categories of existing major stationary sources built between 1962 and 1977 procure, install, and operate the ''Best Available Retrofit Technology'' as determined by the states through their SIPs, or as determined by the EPA when it promulgates a FIP. Under the RHR, states (or the EPA) are directed to conduct BART determinations for such ''BART-eligible'' sources that may reasonably be anticipated to cause or contribute to any visibility impairment in a Class I area.[10] Sources that are determined to cause or contribute to such impairment pursuant to the BART Guidelines are referred to as ''subject-to-BART'' sources and must undergo a BART determination applying the five BART factors.[11] Rather than requiring source-specific BART controls, states also have the flexibility to adopt an emissions trading program or other alternative program for their subject-to-BART sources, so long as the alternative provides greater reasonable progress towards improving visibility than BART (sometimes referred to as the ''better-than-BART'' test).[12]

### *C. BART Alternatives*

States opting to submit an alternative program in lieu of source-specific BART, whether for a SIP submitted under 40 CFR 51.308 or 51.309,[13] must meet requirements under 40 CFR 51.308(e)(2) and, if applicable, (e)(3). These requirements for alternative programs relate to the ''better-than-BART'' test and fundamental elements of any alternative program.

In order to demonstrate that the alternative program achieves greater reasonable progress than source-specific

[3] See 77 FR 74355 (Dec. 14, 2012); 81 FR 43894 (July 5, 2016).

[4] 42 U.S.C. 7491(a). Areas designated as mandatory Class I Federal areas consist of national parks exceeding 6,000 acres, wilderness areas and national memorial parks exceeding 5,000 acres, and all international parks that were in existence on August 7, 1977. 42 U.S.C. 7472(a). In accordance with section 169A of the CAA, EPA, in consultation with the Department of Interior, promulgated a list of 156 areas where visibility is identified as an important value. 44 FR 69122 (November 30, 1979). The extent of a mandatory Class I area includes subsequent changes in boundaries, such as park expansions. 42 U.S.C. 7472(a). Although states and tribes may designate as Class I additional areas whose visibility they consider to be an important value, the requirements of the visibility program set forth in section 169A of the CAA apply only to ''mandatory Class I Federal areas.'' Each mandatory Class I Federal area is the responsibility of a ''Federal Land Manager.'' 42 U.S.C. 7602(i). When we use the term ''Class I area'' in this section, we mean a ''mandatory Class I Federal area.'' The list of mandatory Class I Federal areas is located in 40 CFR part 81 subpart D.

[5] 64 FR 35714 (July 1, 1999) (codified at 40 CFR part 51, subpart P).

[6] The EPA had previously promulgated regulations to address visibility impairment in Class I areas that is ''reasonably attributable'' to a single source or small group of sources, *i.e.,* reasonably attributable visibility impairment (RAVI). 45 FR 80084 (December 2, 1980).

[7] 82 FR 3078 (January 10, 2017).

[8] 42 U.S.C. 7410(a), 7491, and 7492(a); CAA sections 110(a), 169A, and 169B.

[9] 42 U.S.C. 7410(c)(1).

[10] 40 CFR 51.308(e). The EPA designed the Guidelines for BART Determinations Under the RHR (Guidelines), 40 CFR part 51, Appendix Y, ''to help States and others (1) identify those sources that must comply with the BART requirement, and (2) determine the level of control technology that represents BART for each source.'' Guidelines, Section I.A. Section II of the Guidelines describes the four steps to identify BART sources, and Section III explains how to identify BART sources (*i.e.,* sources that are ''subject to BART'').

[11] CAA section 169A(g)(2); 40 CFR 51.308(e)(1)(ii)(A).

[12] 40 CFR 51.308(e)(2); *WildEarth Guardians* v. *EPA,* 770 F.3d 919 (10th Cir. 2014).

[13] *See* 40 CFR 51.309(d)(4).

Appellate Case: 21-9509 Document: 101-2 Date Filed: 06/10/2022 Page: 26


BART, a state, or the EPA if developing a FIP, must demonstrate that its SIP meets the requirements, as applicable, in 40 CFR 51.308(e)(2)(i) through (vi). Among other things, the state or the EPA must conduct an analysis of the best system of continuous emission control technology available and the associated emission reductions achievable for each source subject to BART covered by the alternative program, termed a ''BART benchmark.'' Where the alternative program has been designed to meet requirements other than BART, simplifying assumptions may be used to establish a BART benchmark. The BART benchmark is the basis for comparison in the ''better-than-BART'' test for BART alternatives.

Pursuant to 40 CFR 51.308(e)(2)(i)(E), the state or the EPA must provide a determination that the alternative program achieves greater reasonable progress than BART under 40 CFR 51.308(e)(3) or otherwise based on the clear weight of evidence. 40 CFR 51.308(e)(3), in turn, provides specific tests applicable under specific circumstances for determining whether the alternative achieves greater reasonable progress than BART. If the distribution of emissions under the alternative program is not substantially different than for BART, and the alternative program results in greater emissions reductions of each relevant pollutant than BART, then the alternative program may be deemed to achieve greater reasonable progress. If the distribution of emissions is significantly different, the differences in visibility improvement between BART and the alternative program must be determined by conducting dispersion modeling for each impacted Class I area for the best and worst 20 percent of days. This modeling demonstrates ''greater reasonable progress'' if both of the two following criteria are met: (1) Visibility does not decline in any Class I area; and (2) there is overall improvement in visibility when comparing the average differences between BART and the alternative program across all the affected Class I areas.

Alternately, pursuant to 40 CFR 51.308(e)(2)(i)(E), a third test is available under which States may show that the BART alternative achieves greater reasonable progress than BART ''based on the clear weight of evidence.'' As stated in in the EPA's revisions to the RHR governing alternative to source-specific BART determinations, such demonstrations

attempt to make use of all available information and data which can inform a decision while recognizing the relative strengths and weaknesses of that information in arriving at the soundest decision possible. Factors which can be used in a weight of evidence determination in this context may include, but not be limited to, future projected emissions levels under the program as compared to under BART, future projected visibility conditions under the two scenarios, the geographic distribution of sources likely to reduce or increase emissions under the program as compared to BART sources, monitoring data and emissions inventories, and sensitivity analyses of any models used. This array of information and other relevant data may be of sufficient quality to inform the comparison of visibility impacts between BART and the alternative program. In showing that an alternative program is better than BART and when there is confidence that the difference in visibility impacts between BART and the alternative scenarios are expected to be large enough, a weight of evidence comparison may be warranted in making the comparison. The EPA will carefully consider the evidence before us in evaluating any SIPs submitted by States employing such an approach.[14]

Under 40 CFR 51.308(e)(2)(iii) and (iv), all emission reductions for the alternative program must take place during the period of the first long-term strategy for regional haze, and all the emission reductions resulting from the alternative program must be surplus to those reductions resulting from measures adopted to meet requirements of the CAA as of the baseline date of the SIP. Pursuant to 40 CFR 51.309(e)(2)(v), states have the option of including a provision that the emissions trading program or other alternative measure include a geographic enhancement to the program to address the requirement under 40 CFR 51.302(c) related to BART for RAVI from the pollutants covered under the emissions trading program or other alternative measure.

A SIP or FIP addressing regional haze must include emission limits and compliance schedules for each visibility-impairing pollutant emitted from each source subject to BART. In addition to the RHR's requirements, general SIP requirements mandate that the SIP or FIP include all regulatory requirements related to MRR needed to make emission limits practically enforceable.[15]

*D. Requirements for Regional Haze SIPs Submitted Under 40 CFR 51.309*

EPA's RHR provides two paths to address regional haze for the first implementation period of the regional haze program. One is through 40 CFR 51.308, requiring, among other things, SIPs to include source-specific BART determinations or BART alternatives, and to contain long-term strategies that include enforceable emission limitations, compliance schedules, and other measures as necessary to achieve reasonable progress in Class I areas inside the state and in Class I areas outside the state that may be affected by emissions from the state. In addition to these requirements, each regional haze SIP or FIP under section 308 must contain measures as necessary to make reasonable progress towards the national visibility goal.[16] The other method for addressing regional haze for the first implementation period is through 40 CFR 51.309, which provides an option for nine states termed the ''Transport Region States'': Arizona, California, Colorado, Idaho, Nevada, New Mexico, Oregon, Utah, and Wyoming. Among other things, by meeting the requirements under 40 CFR 51.309, these states can be deemed to be making reasonable progress toward the national goal of achieving natural visibility conditions for the 16 Class I areas on the Colorado Plateau.[17]

Section 309 requires those Transport Region States that choose to participate to adopt regional haze strategies that are based on recommendations from the Grand Canyon Visibility Transport Commission (GCVTC) established under CAA 169B(f) for protecting the 16 Class I areas on the Colorado Plateau. The purpose of the GCVTC was to assess information about the adverse impacts on visibility in and around the 16 Class I areas on the Colorado Plateau and provided policy recommendations to the EPA to address such impacts. The GCVTC determined that all Transport Region States could potentially impact the Class I areas on the Colorado Plateau. The GCVTC submitted a report to the EPA in 1996 containing recommendations for protecting visibility for the Class I areas on the Colorado Plateau, and the EPA codified these recommendations in section 309 as an option available to states as part of the RHR.[18]

The EPA determined that the GCVTC strategies would provide for reasonable progress in mitigating regional haze if supplemented by an annex containing quantitative emission reduction milestones and provisions for a trading program or other alternative measure for $SO_2$.[19] In September 2000, the Western Regional Air Partnership (WRAP), which is the successor organization to the GCVTC, submitted an annex to EPA.

[14] 71 FR 60612, 60622 (Oct. 13, 2006).

[15] CAA section 110(a); 40 CFR part 51, subpart K; 40 CFR part 51, appendix V.

[16] 40 CFR 51.308(d), (f).

[17] 40 CFR 51.309(a).

[18] 64 FR 35714, 35749 (July 1, 1999).

[19] 64 FR 35714, 35749, 35756 (July 1, 1999).

The annex contained $SO_2$ emissions reduction milestones and detailed provisions of a backstop trading program to be implemented automatically if voluntary measures failed to achieve the $SO_2$ milestones (the $SO_2$ Backstop Trading Program). The EPA codified the annex on June 5, 2003 at 40 CFR 51.309(h).[20]

Five western states, including Utah, submitted implementation plans under section 309 in 2003.[21] However, the EPA was challenged by the Center for Energy and Economic Development (CEED) on the validity of the annex provisions contained in section 309(h). In *CEED* v. *EPA,* the D.C. Circuit Court of Appeals vacated the EPA approval of the WRAP annex.[22] In response to the court's decision, the EPA removed the annex requirements from 40 CFR 51.309(h), but incorporated the provisions allowing for an $SO_2$ Backstop Trading Program under the stationary source requirements in 40 CFR 51.309(d)(4).[23] The requirements under 40 CFR 51.309(d)(4) contain general requirements pertaining to stationary sources and market trading, and allow states to adopt alternatives to source-specific application of BART.

Under 40 CFR 51.309, states can satisfy the $SO_2$ BART requirements by adopting $SO_2$ emissions milestones and the $SO_2$ Backstop Trading Program as described in 51.309(d)(4)(i)–(vi). Under this approach, states must establish declining $SO_2$ emissions milestones for each year of the program through 2018. The milestones must be consistent with the GCVTC's goal of 50 to 70 percent reduction in $SO_2$ emissions by 2040. The $SO_2$ Backstop Trading Program would be implemented if a milestone is exceeded and the program is triggered.[24]

Section 51.309(d)(4) includes not only provisions for stationary source emissions of $SO_2$, but also a requirement that Transport Region States' implementation plans contain any necessary long-term strategies and BART requirements for stationary source PM and $NO_X$ emissions. Pursuant to 40 CFR 51.309(d)(4)(vii), any BART provisions may be submitted pursuant to either 51.308(e)(1) or 51.308(e)(2); that is, states may submit either source-specific BART determinations or BART alternatives for PM and $NO_X$.

*E. Monitoring, Recordkeeping and Reporting*

The CAA requires that SIPs, including regional haze SIPs, contain elements sufficient to ensure emission limits are practically enforceable. CAA section 110(a)(2) states that the MRR provisions of states' SIPs must:

> (A) include enforceable emission limitations and other control measures, means, or techniques (including economic incentives such as fees, marketable permits, and auctions of emissions rights), as well as schedules and timetables for compliance, as may be necessary or appropriate to meet the applicable requirements of this chapter; . . . (C) include a program to provide for the enforcement of the measures described in subparagraph (A), and regulation of the modification and construction of any stationary source within the areas covered by the plan as necessary to assure that national ambient air quality standards are achieved, including a permit program as required in parts C and D of this subchapter; . . . (F) require, as may be prescribed by the Administrator—(i) the installation, maintenance, and replacement of equipment, and the implementation of other necessary steps, by owners or operators of stationary sources to monitor emissions from such sources, (ii) periodic reports on the nature and amounts of emissions and emissions-related data from such sources, and (iii) correlation of such reports by the State agency with any emission limitations or standards established pursuant to this chapter, which reports shall be available at reasonable times for public inspection.

Accordingly, 40 CFR part 51, subpart K, Source Surveillance, requires the SIP to provide for monitoring the status of compliance with the regulations in it, including ''[p]eriodic testing and inspection of stationary sources,''[25] and ''legally enforceable procedures'' for recordkeeping and reporting.[26] Furthermore, 40 CFR part 51, appendix V, Criteria for Determining the Completeness of Plan Submissions, states in section 2.2 that complete SIPs contain: ''(g) Evidence that the plan contains emission limitations, work practice standards and recordkeeping/reporting requirements, where necessary, to ensure emission levels''; and ''(h) Compliance/enforcement strategies, including how compliance will be determined in practice.''

*F. Consultation With Federal Land Managers (FLMs)*

The statute and the RHR require that a state, or the EPA if promulgating a FIP that fills a gap in the SIP with respect to the applicable requirements, consult with FLMs before adopting and submitting a required SIP or SIP revision, or a required FIP or FIP revision.[27] Further, the state when considering a SIP revision (or EPA in a FIP) must include in its proposal a description of how it addressed any comments provided by the FLMs.

*G. Summary of State Regional Haze Submittals and EPA Actions*

1. 2008 and 2011 Utah Regional Haze SIP Submissions

On May 26, 2011, the State of Utah submitted to EPA a regional haze SIP under 40 CFR 51.309 (''2011 Utah RH SIP''). Consistent with 40 CFR 51.309(d)(4)(vii), this submittal included BART determinations for $NO_X$ and PM at Utah's four subject-to-BART sources: PacifiCorp's Hunter Units 1 and 2 and Huntington Units 1 and 2. All four units are tangentially-fired fossil-fuel electric generating units (EGUs), each with a net generating capacity of 430 MW, permitted to burn bituminous coal. This submittal also included quantitative emissions milestones through 2018 and a backstop trading program for $SO_2$ intended to meet the requirements of 40 CFR 51.309(d)(4)(i)–(vi). The $SO_2$ backstop trading program covers Utah, Wyoming, New Mexico and the City of Albuquerque.

Utah had also previously submitted SIPs on December 12, 2003, August 8, 2004, and September 9, 2008, to meet the requirements of the RHR. These submittals were, for the most part, superseded and replaced by the May 26, 2011 submittal as further explained in the next section.

2. 2012 EPA Action on 2011 and 2008 Utah Regional Haze SIP Submissions

On December 14, 2012, EPA partially approved and partially disapproved the 2011 Utah RH SIP.[28] We approved the 2011 Utah RH SIP as meeting the requirements of 40 CFR 51.309, with the exception of the requirements under 40 CFR 51.309(d)(4)(vii) pertaining to $NO_X$ and PM BART. EPA's partial disapproval action was based on the following: (1) Utah did not take into account the five statutory factors in its BART analyses for $NO_X$ and PM; and (2) the 2011 Utah RH SIP submission did not contain the provisions necessary to make the BART limits practically enforceable as required by section 110(a)(2) of the CAA and 40 CFR 51, appendix V.[29]

[20] 68 FR 33764, 33767 (June 5, 2003).

[21] Five states—Arizona, New Mexico, Oregon, Utah and Wyoming—and Albuquerque-Bernalillo County, New Mexico, initially exercised this option by submitting plans to the EPA in December 2003. Oregon elected to cease participation in 2006, and Arizona elected to cease participation in 2010.

[22] *Ctr. for Energy & Econ. Dev.* v. *EPA,* 398 F.3d 653, 654 (DC Cir. 2005).

[23] 71 FR 60612 (October 13, 2006).

[24] 40 CFR 51.309(d)(4)(v).

[25] 40 CFR 51.212(a).

[26] 40 CFR 51.211.

[27] CAA section 169A(d); 40 CFR 51.308(i).

[28] 77 FR 74355, 74357 (Dec. 14, 2012).

[29] *Id.*

Appellate Case: 21-9509 Document: 101-2 Date Filed: 06/10/2022 Page: 28


We also approved two sections of the 2008 Utah RH SIP submission in the December 13, 2012 action. Specifically, we approved state rules UAR R307–250—Western Backstop Sulfur Dioxide Trading Program and R307–150—Emission Inventories. We took no action on the rest of the 2008 submittal as the 2011 submittal superseded and replaced all other sections. We also took no action on the December 12, 2003 and August 8, 2004 submittals as these were superseded by the 2011 submittal.

On November 8, 2011, we separately proposed approval of Section G—Long-Term Strategy for Fire Programs of the May 26, 2011 submittal and finalized our approval of that action on January 18, 2013.[30]

3. Petitions for Review of the EPA's Approval of the $SO_2$ Backstop Trading Program

In 2013, conservation organizations challenged EPA's 2012 approval of the $SO_2$ Backstop Trading Program as an alternative to BART for certain Transport Region States, including Utah, in the U.S. Court of Appeals for the Tenth Circuit. On October 21, 2014, the Tenth Circuit upheld EPA's action, including EPA's finding that the trading program could serve as a BART alternative under a ''clear weight of evidence'' standard.[31]

4. 2015 Utah Regional Haze SIP Submissions

On June 4, 2015, the State of Utah submitted to EPA a revision to its Regional Haze SIP under 40 CFR 51.309 of the RHR (''June 2015 Utah RH SIP'') to address the requirements under 40 CFR 51.309(d)(4)(vii) pertaining to $NO_X$ and PM BART. Utah developed the June 2015 Utah RH SIP in response to EPA's December 14, 2012 partial disapproval of the 2011 Utah RH SIP submission. The June 2015 Utah RH SIP evolved from a draft SIP on which Utah sought public comment in October 2014. After receiving extensive public comments on that draft, Utah decided to pursue a $NO_X$ BART Alternative under the 40 CFR 51.308(e)(2) ''clear weight of evidence'' standard that takes credit for $NO_X$ reductions due to combustion controls installed at PacifiCorp's Hunter and Huntington power plants in addition to $NO_X$, $SO_2$, and PM reductions from the August 2015 retirement of PacifiCorp's nearby Carbon power plant. The June 2015 Utah RH SIP submission also included measures to make the SIP requirements practically enforceable and included additional information pertaining to the PM BART determinations for Hunter and Huntington to address deficiencies identified by EPA in our December 2012 partial disapproval.

On October 20, 2015, Utah submitted to EPA another revision to its Regional Haze SIP under 40 CFR 51.309 (''October 2015 Utah RH SIP''). This SIP included an enforceable commitment to provide an additional SIP revision by mid-March 2018 to address concerns raised in public comments that the State would be double counting certain $SO_2$ emissions reductions under both the Utah $NO_X$ BART Alternative and the milestone reporting for the $SO_2$ Backstop Trading Program.

5. 2016 EPA Action on 2015 Utah RH SIP Submissions

On July 5, 2016, we partially approved and partially disapproved the revisions to the Utah SIP submitted by the State of Utah on June 4, 2015.[32] We approved the following elements of the State's SIP submittals: [33]

- BART determinations and emission limits for PM at Hunter Units 1 and 2 and Huntington Units 1 and 2.
- MRR requirements for units subject to the PM emission limits, including conditional approval of the requirement that the PM emission limits apply at all times, subject to the state's commitment to adopt reporting requirements for deviations from the emission limits.

We disapproved these aspects of the State's June 4, 2015 SIP:

- $NO_X$ BART Alternative, including emission limits consistent with upgraded combustion controls at Hunter Units 1, 2, and 3 and Huntington Units 1 and 2, and the $SO_2$, NOx, and PM emission reductions resulting from the shutdown of Carbon Units 1 and 2.
- MRR requirements for units subject to the $NO_X$ BART Alternative.

As noted above, in June 2015 Utah submitted the $NO_X$ BART Alternative under 40 CFR 51.308(e)(2)(i)(E)'s clear-weight-of-evidence test. To support its conclusion that the $NO_X$ BART Alternative makes greater reasonable progress towards the national visibility goal, the SIP submission relied on nine metrics for comparing the Alternative to the BART Benchmark: Aggregate emission reductions, monitoring data, timing of emission reductions, energy and non-air quality impacts, cost, and four visibility-related metrics based on the results of a modeling exercise using the CALPUFF model. In the July 2016 final rule, EPA determined that the evidence provided did not clearly demonstrate that the BART Alternative achieves greater visibility improvement than BART. As part of this evaluation, we determined which metrics were relevant to the assessment of relative visibility benefit, evaluated the strengths and weaknesses of each metric in order to determine which merited more or less weight, and collectively considered the weights assigned to the individual pieces of information in determining whether, on balance, the evidence demonstrated that the $NO_X$ BART Alternative would clearly provide for greater reasonable progress.[34] Based on this assessment, we determined that the evidence before us did not satisfy the standard articulated under 40 CFR 51.308(e)(2)(i)(E) and disapproved the $NO_X$ BART Alternative.

We thus promulgated a FIP in the July 5, 2016 action to address the deficiencies in the Utah regional haze SIP submissions. EPA's FIP includes the following elements:

- $NO_X$ BART determinations and corresponding emission limits for Hunter Units 1 and 2 and Huntington Units 1 and 2 of 0.07 lb/MMbtu (30-day rolling average) each, reflecting installation and operation of SCR plus the existing upgraded combustion controls.
- Monitoring, recordkeeping, and reporting requirements applicable to Hunter Units 1 and 2 and Huntington Units 1 and 2 as needed to implement the $NO_X$ BART determinations and emission limits.

We took no action on the enforceable commitment to revise, at a minimum, SIP Section XX.D.3.c and state rule R307–150 addressing double counting of $SO_2$ emissions, because there was no need to do so once the $NO_X$ BART Alternative had been disapproved.

6. Petitions for Review of EPA's 2016 SIP Disapproval and FIP

In September 2016, the State of Utah, PacifiCorp, and several other parties challenged EPA's July 5, 2016 disapproval of the $NO_X$ BART Alternative and promulgation of a FIP in the U.S. Court of Appeals for the Tenth Circuit.[35] In addition, the State and PacifiCorp (on behalf of the co-owners of Hunter Units 1 and 2 and Huntington Units 1 and 2) submitted letters to EPA on June 30, 2017, identifying new

[30] 78 FR 4071, 4072 (Jan. 18, 2013).

[31] *WildEarth Guardians* v. *United States EPA,* 770 F.3d 919, 938 (10th Cir. 2014).

[32] 81 FR 43894 (July 5, 2016).

[33] EPA had already approved elements satisfying other applicable requirements in the December 14, 2012 action: Section XX.B.8, Figures 1 and 2, Affected Class I Areas, pp. 8–9; Section XX.D.6.b, Table 3, BART-Eligible Sources in Utah, p. 21; Section XX.D.6.c, Sources Subject to BART, pp. 21–23.

[34] See 81 FR 43894, 43896–43902.

[35] *State of Utah* v. *EPA,* No. 16–9541 (10th Cir.).

information that was not available at the time of EPA's action on Utah's 2015 SIP submission, providing additional explanation of existing information, and stating an intent to develop and submit to EPA additional technical analyses in support of the $NO_X$ BART Alternative.[36] On July 14, 2017, the EPA Administrator sent letters to the State of Utah and PacifiCorp announcing the Agency's intent to reconsider its disapproval of the $NO_X$ BART Alternative.[37] On this basis, EPA asked the Tenth Circuit to put the litigation in abeyance; on September 11, 2017, the court both granted EPA's request to abate the litigation and issued a stay of EPA's July 5, 2016 final rule.[38]

7. 2019 Utah RH SIP Revisions

On July 3, 2019, Utah submitted a SIP revision intended to replace EPA's 2016 FIP provisions for $NO_X$ BART. The measures in the $NO_X$ BART Alternative submitted in July 2019 are identical to those in the Alternative submitted in June 2015 (*i.e.,* Utah submitted the same $NO_X$ BART Alternative in the June 2015 and July 2019 SIPs). However, while the State had previously relied on the clear-weight-of-evidence test under 40 CFR 51.308(e)(2)(i)(E) to demonstrate that the Alternative achieves greater reasonable progress than BART in the June 2015 submission,[39] the July 2019 submission relies solely on the application of the two-prong test under 51.308(e)(3) using photochemical grid modeling. Background on these two approaches to demonstrating greater reasonable progress is provided in section II.C. above.

The July 3, 2019 SIP submittal includes the emission limitations and control measures associated with the $NO_X$ BART Alternative. It also includes the monitoring, recordkeeping, and reporting requirements that EPA previously approved for PM BART, but disapproved as applied to the emission limitations and control measures associated with the $NO_X$ BART Alternative.

[36] See docket IDs EPA–R08–OAR–2015–0463–0216 (letter from State of Utah) and EPA–R08–OAR–2015–0463–0221 (letter from PacifiCorp).

[37] See docket IDs EPA–R08–OAR–2015–0463–0222 (letter to State of Utah) and EPA–R08–OAR–2015–0463–0223 (letter to PacifiCorp).

[38] *State of Utah* v. *EPA,* No. 16–9541 (10th Cir.), Doc. No. 10496767.

[39] For a summary of the weight-of-evidence contained in Utah's June 2015 SIP, and EPA's evaluation thereof, refer to the July 2016 final rule at 81 FR 43897–43902.

On December 3, 2019, Utah submitted a supplement to the July 2019 SIP submission that includes an amendment to the monitoring, record keeping, and reporting requirements submitted on July 3, 2019. Specifically, the amendments require each source to submit a report of any deviation from applicable emission limits and operating practices, including deviations attributable to upset conditions, the probable cause of such deviations, and any corrective actions or preventive measures taken.

This proposed action pertains to the July 3, 2019 SIP submittal as supplemented on December 3, 2019.

Sections 110(a)(2) and 110(*l*) of the CAA and 40 CFR 51.102 and appendix V to part 51 require that a state provide reasonable notice and public hearing before adopting a SIP revision and submitting it to EPA. Utah, after providing notice, accepted comments on the July 2019 Utah RH SIP submission from April 1, 2019 through May 15, 2019. Similarly, Utah accepted comments on the December 3, 2019 RH SIP supplement from October 1, 2019 to October 31, 2019.

## III. Utah's Regional Haze SIP Revisions

*A. Summary of the Utah $NO_X$ BART Alternative SIP Revision*

As noted elsewhere, the EPA previously approved Utah's SIP elements satisfying the requirements of 40 CFR 51.309 to address the State's regional haze obligations for the first implementation period, other than emission limitations corresponding to $NO_X$ BART or an alternative to BART for $NO_X$ and the associated MRR requirements, and certain requirements for MRR related to PM BART.[40] Therefore, in this action we are addressing only these outstanding elements and certain ancillary SIP revisions necessary to effectuate them.

Utah's July 3, 2019 SIP RH submittal, as supplemented on December 3, 2019, includes changes to the following provisions, on which we are proposing to take action:

• Revised SIP Section XX, Regional Haze, Parts A, Executive Summary, and D, Long-Term Strategy for Stationary Sources (revised SIP narrative sections including the BART Assessment for $NO^X$); adopted by the Utah Air Quality Board on June 24, 2019.

[40] EPA conditionally approved Utah's MRR requirements for the PM BART emission limitations under CAA section 110(k)(4). 81 FR at 43921.

• Revised R307–110–28, General Requirements: State Implementation Plan, Regional Haze (state rule that incorporates by reference most recently amended SIP Section XX); effective August 15, 2019.

• SIP Section IX.H.21 General Requirements: Control Measures for Area and Point Sources, Emission Limits and Operating Practices, Regional Haze Requirements (SIP section laying out MRR requirements for control measures); adopted by the Utah Air Quality Board on November 20, 2019.

• SIP Section IX.H.22 Source Specific Emission Limitations: Regional Haze Requirements, Best Available Retrofit Technology (SIP section containing emission limitations necessary for $NO_X$ BART Alternative); adopted by the Utah Air Quality Board on November 20, 2019.

• Revised R307–110–17, General Requirements: State Implementation Plan. Section IX, Control Measures for Area and Point Sources, Part H, Emissions Limits (state rule that incorporates by reference most recently amended SIP Section IX, Part H); effective on November 25, 2019.

• Revised R307–150–3, Emission Inventories, Applicability (state rule that addresses reporting of $SO_2$ emissions for Carbon power plant under the Western Backstop $SO_2$ Trading Program); effective June 25, 2018.

These six provisions are related to the following two outstanding requirements for the first implementation period: $NO_X$ BART for Hunter Units 1 and 2 and Huntington Units 1 and 2; and MRR requirements for the Utah $NO_X$ BART Alternative and PM BART emission limits to make the SIP requirements practically enforceable.

1. Utah $NO_X$ BART Alternative

To satisfy the requirement of 40 CFR 51.309(d)(4)(vii), Utah has opted to establish an alternative to BART for $NO_X$ under 40 CFR 51.308(e)(2). The State's $NO_X$ BART Alternative consists of upgraded combustion controls on all four subject-to-BART units, upgraded combustion controls on Hunter Unit 3, and the shutdown of Carbon Units 1 and 2. The emission limits in the July 3, 2019 Utah RH SIP submittal, as supplemented on December 3, 2019, are provided in Table 1. We further explain the components of the SIP submissions below.

TABLE 1—EMISSION LIMITS AND SHUTDOWN IN THE UTAH BART ALTERNATIVE AND PM SIP [1]

| Source | Unit | PM limit [2 3] (lb/MMBtu, three-run test average) | $NO_X$ limit [4] (lb/MMBtu, 30-day rolling average) | $SO_2$ limit |
|---|---|---|---|---|
| Hunter | 1 | 0.015 | 0.26 | NA. |
| | 2 | 0.015 | 0.26 | NA. |
| | 3 | NA | 0.34 | NA. |
| Huntington | 1 | 0.015 | 0.26 | NA. |
| | 2 | 0.015 | 0.26 | NA. |
| Carbon | 1 | Shutdown by August 15, 2015 | Shutdown by August 15, 2015 | Shutdown by August 15, 2015. |
| | 2 | Shutdown by August 15, 2015 | Shutdown by August 15, 2015 | Shutdown by August 15, 2015. |

[1] Obtained from the July 2019 Utah RH SIP, Section IX.H.22.
[2] Based on annual stack testing.
[3] The BART PM emission limits were previously approved by in our July 2016 final rule. 81 FR 43894 (July 5, 2016).
[4] Based on continuous emission monitoring system (CEMS) measurement.

The State compared the $NO_X$ BART Alternative against a BART Benchmark that consists of SCR plus upgraded combustion controls on all four BART units. The State noted SCR plus upgraded combustion controls would require careful consideration through a source-specific five-factor analysis before determining it is BART for these units. However, the State used those controls as a stringent benchmark for comparison with the $NO_X$ BART Alternative. The State remarked that its use of SCR plus upgraded combustion controls as a benchmark is not a determination that this technology is BART; it is merely a conservative approach to evaluating the effectiveness of the alternative program. The Utah $NO_X$ BART Alternative is generally described in SIP Section XX.D.6 with a detailed demonstration included in the *Staff Review* to support the State's assertion that the Alternative achieves greater reasonable progress than BART.

In addition to combustion controls at the Hunter and Huntington units, the State intends to rely on the emission reductions resulting from the shutdown of a coal-fired power plant. Utah indicated that PacifiCorp shut down the Carbon Power Plant in 2015, due to the high cost to control mercury to meet the requirements of EPA's Mercury and Air Toxics Standards (MATS).[41] The State noted that the MATS rule was finalized in 2011, and the Utah RH SIP contains the requirement for the Carbon Power Plant to shut down in August 2015. The emission reductions occur after the 2002 base year for Utah's RH SIP and thus, Utah asserts, the reductions may be considered as part of an alternative strategy under 40 CFR 51.308(e)(2)(iv).

The State's demonstration is described in more detail in section III.B below. The State's estimates of emissions for the Utah $NO_X$ BART Alternative and the BART Benchmark are provided in Table 2 of section III.B.4 below. EPA developed a summary of the emissions reductions based on Utah's emission estimates and this is presented in Table 3 of section III.B.4 below.

*B. Summary of Utah's Demonstration for Alternative Program*

As discussed above in Section II, a state may opt to implement an alternative measure rather than to require sources subject to BART to install, operate, and maintain source-specific BART. BART alternatives such as the Utah $NO_X$ BART Alternative that are not emissions trading programs must meet the requirements of 40 CFR 51.308(e)(2)(i)–(iv).[42] Utah has included the following information in its July 2019 SIP revision to address the regulatory criteria for an alternative program:[43]

1. List of All BART-Eligible Sources Within the State

Pursuant to 40 CFR 51.308(e)(2)(i)(A), the SIP must include a list of all BART-eligible sources within the State. Utah included a list of BART-eligible sources and noted the following sources are all covered by the alternative program:

- PacifiCorp Hunter, Unit 1
- PacifiCorp Hunter, Unit 2
- PacifiCorp, Huntington, Unit 1
- PacifiCorp, Huntington, Unit 2

2. List of All BART-Eligible Sources and All BART Source Categories Covered by the Alternative Program

Pursuant to 40 CFR 51.308(e)(2)(i)(B), each BART-eligible source in the State must be subject to the requirements of the alternative program, have a federally enforceable emission limitation determined by the State and approved by EPA as meeting BART, or be otherwise addressed under paragraphs 51.308(e)(1) or (e)(4). In this instance, the alternative program covers all the BART-eligible sources in the state—Hunter Units 1 and 2 and Huntington Units 1 and 2—in addition to three non-BART units—PacifiCorp's Hunter Unit 3 and Carbon Units 1 and 2.

3. Analysis of BART and Associated Emission Reductions Achievable

Pursuant to 40 CFR 51.308(e)(2)(i)(C), the SIP must include an analysis of BART and associated emission reductions achievable at the subject-to-BART units covered by the alternative program, here Hunter Units 1 and 2 and Huntington Units 1 and 2. In the July 2019 Utah RH SIP, the State compared the Utah $NO_X$ BART Alternative to the most stringent $NO_X$ controls, SCR plus upgraded combustion controls, at the four BART units, referred to here as the BART Benchmark. This is consistent with the BART determination made by EPA in our July 2016 final rule.[44]

4. Analysis of Projected Emissions Reductions Achievable Through the BART Alternative

Pursuant to 40 CFR 51. 308(e)(2)(i)(D), the SIP must include ''[a]n analysis of the projected emissions reductions achievable through the . . . alternative measure.'' A summary of the State's estimates of emissions in tons per year (tpy) for the Baseline, $NO_X$ BART Alternative and the BART Benchmark is provided in Table 2. A summary of the emissions reductions based on those emission estimates is presented in Table 3. The emissions and emission reductions were projected for the year

[41] Utah Regional Haze State Implementation Plan, Staff Review of Recommended Alternative to BART for $NO_X$, May 28, 2019, p. 24.

[42] States may address 40 CFR 51.308(e)(2)(v) at their option.

[43] See Staff Review.

[44] In the July 2016 FIP, EPA determined these same controls—SCR plus LNB/SOFA—constitute BART for each of the four subject-to-BART units. Utah's July 2019 SIP submittal thus refers to the BART Benchmark controls as the ''EPA FIP''; while the controls represented by the BART Benchmark and EPA's FIP are indeed the same, the relevant comparison for the purpose of this analysis is between the BART Benchmark and the BART alternative.

Appellate Case: 21-9509 Document: 101-2 Date Filed: 06/10/2022 Page: 31


2025 to align with the future year modeling scenarios used to calculate visibility benefits under the BART Benchmark and BART Alternative, as described in the section that follows.[45]

TABLE 2—ESTIMATED EMISSIONS IN 2025 UNDER THE BASELINE SCENARIO, BART BENCHMARK (BART BENCHMARK), AND THE BART ALTERNATIVE [45]

| Units | $NO_X$ (tpy) | | | | $SO_2$ (tpy) | | | PM (tpy) | | | Combined | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Baseline | BART benchmark | BART alt. | | Baseline | BART benchmark | BART alt. | Baseline | BART benchmark | BART alt. | Baseline | BART benchmark |
| Carbon 1 | 1,312 | 1,312 | 0 | 2,286 | 2,286 | 0 | 120 | 120 | 0 | 3,718 | 3,718 | 0 |
| Carbon 2 | 1,977 | 1,977 | 0 | 3,528 | 3,528 | 0 | 183 | 183 | 0 | 5,688 | 5,688 | 0 |
| Hunter 1 | 6,380 | 796 | 3,166 | 2,535 | 1,153 | 1,153 | 733 | 733 | 733 | 9,648 | 2,682 | 5,052 |
| Hunter 2 | 6,092 | 798 | 3,028 | 2,531 | 1,408 | 1,408 | 717 | 717 | 717 | 9,340 | 2,923 | 5,153 |
| Hunter 3 | 6,530 | 6,530 | 4,490 | 1,204 | 1,230 | 1,230 | 531 | 531 | 531 | 8,265 | 8,291 | 6,251 |
| Huntington 1 | 5,944 | 793 | 3,147 | 2,380 | 1,254 | 1,254 | 517 | 517 | 517 | 8,841 | 2,564 | 4,918 |
| Huntington 2 | 5,816 | 753 | 3,366 | 12,308 | 1,201 | 1,201 | 1,033 | 1,033 | 1,033 | 19,157 | 2,987 | 5,600 |
| Total | 34,051 | 12,959 | 17,197 | 26,772 | 12,060 | 6,246 | 3,834 | 3,834 | 3,531 | 64,657 | 28,853 | 26,974 |

TABLE 3—EPA SUMMARY OF 2025 PROJECTED EMISSION REDUCTIONS ACHIEVABLE WITH THE UTAH $NO_X$ BART ALTERNATIVE AS COMPARED TO THE BART BENCHMARK

| Description | Combined emissions for all units (tpy) | | | |
|---|---|---|---|---|
| | $NO_X$ | $SO_2$ | PM | Combined |
| BART Benchmark | 12,959 | 12,060 | 3,834 | 28,853 |
| BART Alternative | 17,197 | 6,246 | 3,531 | 26,974 |
| Emission Reduction (BART Benchmark Minus BART Alternative) [1] | −4,238 | 5,814 | 303 | 1,879 |

[1] A negative value indicates the BART Alternative results in more emissions of the specified pollutant in comparison to the BART Benchmark.

### 5. A Determination That the Alternative Achieves Greater Reasonable Progress Than Would Be Achieved Through the Installation and Operation of BART

Pursuant to 40 CFR 51.308(e)(2)(i)(E), the State must provide a determination that the alternative program achieves greater reasonable progress than BART under 40 CFR 51.308(e)(3) or otherwise based on the clear weight of evidence.

Utah noted that the Hunter, Huntington, and Carbon plants are all located within 40 miles of each other in central Utah. Because of the close proximity of the three plants, the geographic distribution of emissions will not be substantially different under the alternative program. The combined emissions of $NO_X$, $SO_2$, and PM are 1,879 tons/yr lower under the alternative measure. However, the $NO_X$ BART Alternative measure does not result in greater emission reductions of all pollutants—$SO_2$ emissions are lower by 5,814 tons/yr, PM are lower by 303 tons/yr, but $NO_X$ emissions are higher by 4,238 tons/yr. Therefore, because the $NO_X$ BART Alternative relies on $SO_2$ reductions, and to a lesser extent PM reductions, in lieu of $NO_X$ reductions, Utah determined that greater reasonable progress must be demonstrated through the two-prong test based on dispersion modeling in 40 CFR 51.308(e)(3) or a clear weight of evidence analysis. The State chose to make this demonstration in the July 3, 2019 submittal using the two-prong test allowed for under 40 CFR 51.308(e)(3). To evaluate the two prongs, Utah relied on air quality modeling performed by a contractor for PacifiCorp using the Comprehensive Air Quality Model with Extensions (CAMx).[46]

The CAMx model is a photochemical grid model that uses and produces complex scientific data, including emissions from all sources, with a realistic representation of formation, transport, and processes that cause visibility degradation, estimating downwind concentrations paired in space and time. The EPA's guidance supports use of this particular model for evaluation of visibility impacts from sources or source categories, such as application of the two-prong test under 40 CFR 51.308(e)(3).[47] The CAMx model simulates air quality over many geographic scales and treats a wide variety of inert and chemically active pollutants, including ozone, PM, inorganic and organic $PM_{2.5}/PM_{10}$, and mercury and other toxics. CAMx also has plume-in-grid and source apportionment capabilities.[48] CAMx has a scientifically current treatment of chemistry to simulate transformation of emissions into visibility-impairing particles of species such as ammonium nitrate and ammonium sulfate, and is often employed in large-scale modeling when many sources of pollution and/or long transport distances are involved. Photochemical grid models like CAMx

[45] Staff Review, Table 2, p. 12. Values rounded to the nearest ton.

[46] CAMx modeling software and User's Guide are available at *http://www.camx.com/download/default.aspx.* CAMx version 6.10 was used for April to December, and CAMx version 6.40 was used for January to March.

[47] *Modeling Guidance for Demonstrating Attainment of Air Quality Goals for Ozone, $PM_{2.5}$, and Regional Haze, EPA Office of Air Quality Planning and Standards*, Research Triangle Park, NC (November 2018). The main regional haze section of the guidance is related to setting reasonable progress goals. However, the guidance methods may also be applicable to other regional haze related modeling, including, but not limited to, evaluation of visibility impacts from sources and/or source sectors. *See id.* at 143–145. *https://www3.epa.gov/ttn/scram/guidance/guide/O3-PM-RH-Modeling_Guidance-2018.pdf.* 40 CFR pt. 51, app. Y: IV.D.5 (how to determine visibility impacts from the BART determination); 40 CFR 51.308(e)(3) (use of dispersion modeling for BART alternatives).

[48] Photochemical Air Quality Modeling (*https://www.epa.gov/scram/photochemical-air-quality-modeling*). CAMx is a photochemical grid model, which the EPA describes as follows: Photochemical air quality models have become widely recognized and routinely utilized tools for regulatory analysis and attainment demonstrations by assessing the effectiveness of control strategies. These photochemical models are large-scale air quality models that simulate the changes of pollutant concentrations in the atmosphere using a set of mathematical equations characterizing the chemical and physical processes in the atmosphere. These models are applied at multiple spatial scales, including from local, regional, national and global.

Appellate Case: 21-9509 Document: 101-2 Date Filed: 06/10/2022 Page: 32


include all emissions sources and have realistic representation of formation, transport, and removal processes of the particulate matter that causes visibility degradation. The use of the CAMx model for analyzing potential cumulative air quality impacts has been well established: The model has been used for previous visibility modeling studies in the U.S., including SIPs.[49] The modeling followed a modeling protocol that was reviewed by the EPA.[50]

The Western Air Quality Study (WAQS)[51] developed and evaluated a photochemical modeling platform for calendar year 2011[52] for use in air quality planning studies in the western U.S. The modeling data sets, called the ''WAQS 2011b platform,'' are available to the public and served as the starting point for the CAMx modeling exercise. The WAQS 2011b modeling included a 2025 future year scenario that was used here to assess visibility impacts from the Baseline, BART Benchmark, and $NO_X$ BART Alternative emissions scenarios.

Because regional haze is affected by natural and anthropogenic emissions from international sources, the WAQS 2011b modeling platform used a series of nested model simulations from the global to the regional scale. Global scale modeling was performed by the National Center for Atmospheric Research (NCAR) using the Model for OZone And Related chemical Tracers (MOZART).[53] The WAQS 2011b used boundary concentrations data from the NCAR MOZART simulation to perform regional scale CAMx simulations using a coarse grid 36x36 km grid resolution for a model domain that included most of North America, a nested 12x12 km grid for a model domain that included all of the western U.S., and a fine scale 4x4 grid for a model domain that included the intermountain west region. The three nested CAMx modeling domains are illustrated in Figure 3.1 of WAQS 2011b model evaluation report.[54]

The PacifiCorp CAMx modeling was based on the WAQS 2011b 4x4 grid modeling domain, but PacifiCorp initially used a smaller modeling domain designed to focus on the nine Class I areas within 300 km of the Hunter and Huntington BART sources that had been used in previous Utah DEQ CALPUFF modeling.[55] In response to comments from the EPA Region 8, PacifiCorp expanded the size of their proposed 4x4 km grid modeling domain to ensure that air parcel trajectories would remain within the model domain as they were transported from the BART sources to the nine Class I areas. The expanded PacifiCorp 4x4 km model domain included 15 Class I areas, as shown in Figure 6 of the Utah DEQ staff report.[56] While some Class I areas are more than 300 km from the BART sources, CAMx is accurate for long range transport and has been used by the EPA for analysis of long range transport of ozone and fine particulates at distances greater than 1,000 km. For completeness, the EPA recommended that PacifiCorp evaluate model results for all 15 Class I areas in the CAMx modeling domain.

The EPA provides guidance for the use of photochemical grid models such as CAMx for evaluating source contributions to regional haze. Because this notice addresses requirements for BART sources as part of the first regional haze planning period, the model results are being evaluated using procedures designed specifically for these requirements as outlined in the RHR and in a EPA Guidance published in 2007.[57] The RHR, 40 CFR 51.308(e)(3), requires that greater reasonable progress demonstrations for BART alternatives be evaluated for the best and worst 20% total haze days, which are selected for Class I areas using data from the IMPROVE monitoring network.[58] The IMPROVE network consists of 110 monitoring sites designed to measure visibility impairment at the 155 mandatory Class I areas. While not all Class I areas have an IMPROVE monitor, the network was designed so that, where needed, measurements of one monitor would be representative of the regional haze conditions at more than one nearby Class I area.[59]

Because models can be subject to bias and error in the simulation of the individual components of $PM_{2.5}$ that contribute to regional haze, the EPA guidance recommends that photochemical model results be used by multiplying the model simulated change in each component of $PM_{2.5}$ by the $PM_{2.5}$ concentration measured by the IMPROVE monitoring network. The EPA has developed software, the Speciated Model Attainment Test (SMAT), that can be used to calculate the model relative response factor (RRF) for each $PM_{2.5}$ species in an emissions control simulation compared to a base case simulation, and to multiply the model RRF by the observed IMPROVE $PM_{2.5}$ concentrations for a five year period at the representative monitor for each Class I area.

As described in the model performance evaluation report for the WAQS 2011b platform, the model generally performed well at most sites in the western U.S. However, CAMx was biased low for ammonia and ammonium nitrate at some sites on the Colorado Plateau, *i.e.,* CAMx predicted lower concentrations of ammonia and ammonium nitrate than were measured at some monitoring sites. Because model predictions for ammonium nitrate at these sites are directly relevant to the comparison of the ammonium nitrate- and ammonium sulfate-related visibility benefits of the BART and BART Alternative scenarios, the EPA recommended that PacifiCorp perform additional model sensitivity simulations and performance evaluation to improve model performance for ammonia and ammonium nitrate on the Colorado Plateau. The EPA recommended that ammonia concentration be increased at the northern boundary of the model domain, located in the Salt Lake City area. Previous winter $PM_{2.5}$ modeling studies performed by Utah DEQ found that winter ammonia emissions were underestimated in the Cache Valley in northern UT, and that model performance for ammonium nitrate improved when ammonia emissions

[49] *See, e.g.,* 84 FR 22711 (May 20, 2019) (Final action for the Laramie River Station in the Regional Haze Plan for Wyoming); 82 FR 46903 (October 10, 2017) (Final action for the Coronado Generating Station in the Regional Haze Plan for Arizona); 81 FR 296 (January 5, 2016) (Final action for Texas and Oklahoma Regional Haze Plans).

[50] *Photochemical Modeling Protocol to Assess Visibility Impacts for PacifiCorp Power Plants Located in Utah.* AECOM Environment, January 2018.

[51] *Memorandum: Recommendations on Use of Intermountain West Data Warehouse for Air Quality 2011b Model Platform.* Intermountain West Data Warehouse—Western Air Quality Study Oversight Committee. July 6, 2016. Available *http://views.cira.colostate.edu/wiki/Attachments/Modeling/IWDW-WAQS_2011b_ModelingPlatform_Release_Memo%20July6_2016final.pdf.*

[52] ''Western Air Quality Modeling Study Photochemical Grid Model Final Model Performance Evaluation'', available in the docket and at: *http://views.cira.colostate.edu/wiki/Attachments/Modeling/WAQS_Base11b_MPE_Final.pdf.*

[53] The MOZART model formulation is described at *https://en.wikipedia.org/wiki/MOZART_.*

[54] *Id.* 56, p. 5.

[55] Model applications using CALPUFF for BART sources typically—but not in all cases—have included Class I areas only up to a distance 300 km because uncertainty in CALPUFF results increases at distances greater than 300 km.

[56] Staff Review, Figure 6, p. 18.

[57] *Guidance for Setting Reasonable Progress Goals Under the Regional Haze Program,* available at: *https://www3.epa.gov/ttn/naaqs/aqmguide/collection/cp2/20070601_wehrum_reasonable_progress_goals_reghaze.pdf.*

[58] The IMPROVE monitoring network is described at: *http://vista.cira.colostate.edu/Improve/improve-program/.*

[59] The use of a representative IMPROVE monitor for groups of nearby Class I areas is described at: *http://vista.cira.colostate.edu/Improve/wp-content/uploads/2016/04/Chapter1.pdf.*

Appellate Case: 21-9509 Document: 101-2 Date Filed: 06/10/2022 Page: 33


were increased so that the model-simulated ammonia matched observed ammonia concentrations. For the sensitivity study, PacifiCorp used the Utah DEQ winter $PM_{2.5}$ model results to define the ammonia concentrations at the northern boundary of the PacifiCorp modeling domain. Additionally, the EPA recommended changes to a model parameter that affects ammonia dry deposition to surfaces.[60]

PacifiCorp adopted both of these recommendations and performed a new base case model simulation and performance evaluation. This resulted in substantial improvements in model performance for ammonia and ammonium nitrate on the Colorado Plateau. Because the new base case model more accurately simulates the observed ammonia and ammonium nitrate concentrations, it is also expected to provide more accurate predictions of the visibility benefits of changes in $NO_X$ emissions for the EPA BART Benchmark and Utah $NO_X$ BART Alternative. These model results are described in Appendix A of the Utah DEQ *Staff Review.* The revised base case model configuration was then used for the 2011 Typical Year model simulation, the 2025 Baseline model simulation, and for the 2025 BART Benchmark and 2025 Utah $NO_X$ BART Alternative model simulations, described below.

Using the WAQS 2011b platform, CAMx was configured to simulate the following modeling scenarios:

- 2011 Typical Year. This 2011 scenario allows for the development of RRFs that are applied to observed concentrations in order to predict future visibility conditions. The Carbon, Hunter and Huntington power plants were modeled at levels representative of the period 2001 to 2003, while all other sources remain at the levels of the 2011 WAQS base year simulation.
- 2025 Baseline. Emissions from Carbon, Hunter and Huntington are identical to the Typical Year modeling Scenario (*i.e.,* 2001–2003). All other emissions sources remain at the levels of the 2025 WAQS future-year simulation.
- BART Benchmark. This 2025 scenario represents the BART Benchmark and simulates the emission control strategy for Hunter and Huntington units required in the 2016 FIP. Specifically, emissions for the four BART units reflect a 30-day rolling average $NO_X$ emission limit of 0.07 lb/MMBtu consistent with the installation and operation of SCR plus upgraded combustion controls. $SO_2$ emissions for the Hunter and Huntington units reflect representative emissions from 2014–2016 in order to match the BART Alternative scenario. The BART Benchmark scenario also includes the Carbon power plant using the same level of emissions as the Baseline scenario (*i.e.,* 2001–2003). All other emissions sources remain at the levels of the 2025 WAQS future-year simulation.
- Utah $NO_X$ BART Alternative. This 2025 scenario simulates the emission control strategy for Carbon, Hunter and Huntington units required by the BART Alternative SIP as represented in Table 2 above. This scenario simulates representative emissions of $NO_X$ and $SO_2$ from Hunter and Huntington units during the period 2014 to 2016, which include the emissions controls required under the Alternative (*i.e.,* the upgraded combustion controls). For this scenario, the Carbon power plant emissions were zero since the power plant was decommissioned in April 2015, as required under the Alternative. All other emissions sources remain at the levels of the 2025 WAQS future-year simulation.

All other model inputs, including other regional emissions sources, were held constant for the future-year (Baseline, BART Benchmark, and BART Alternative) scenarios. Thus, any differences in the visibility impacts between the modeled control scenarios and the Baseline, and between the two control scenarios (*i.e.,* BART and the BART Alternative), are attributable solely to differences in the associated emission inputs for the seven PacifiCorp units. The CAMx-modeled concentrations for sulfate, nitrate, and other chemical species were tracked for the Hunter, Huntington, and Carbon power plants using the CAMx Particulate Source Apportionment Technology (PSAT) so that the concentrations and visibility impacts due to the seven PacifiCorp units could be separated out from those due to the total of all other modeled sources. Visibility impacts were assessed at the 15 Class I areas contained inside of the modeling domain.[61] [62]

The visibility impacts derived from the CAMx modeling results are summarized in Tables 4 and 5 of this notice.[63] The tables show the projected contribution to visibility impairment due to emissions from the seven EGUs covered by the Alternative on the 20 percent best days and worst days respectively for the Baseline, the BART Benchmark, and the proposed BART Alternative scenarios at each of the Class I areas analyzed. The last two columns show the predicted visibility benefits from the BART Alternative scenario relative to both the Baseline and the BART Benchmark. At the bottom of each table are the average visibility values from all the Class I areas. Negative values in the last two columns indicate that the BART Alternative has smaller modeled contributions to visibility impairment relative to the Baseline and the BART Benchmark.

Column D in Table 4 shows that emissions from the seven EGUs under the BART Alternative will not result in degradation of visibility on the 20 percent best days compared to the Baseline at any one of the 15 Class I areas. Similarly, Column D in Table 5 shows that, on the 20 percent worst days, visibility impairment is less under the BART Alternative than the Baseline in each of the Class I areas. Based on these results, the State concluded that visibility does not decline at any of the 15 Class I areas and therefore the BART Alternative meets prong 1 of the ‘‘greater reasonable progress using dispersion modeling’’ test found in 40 CFR 51.308(e)(3).

The State next made a determination that the BART Alternative meets prong 2 of the ‘‘greater reasonable progress using dispersion modeling’’ test found in 40 CFR 51.308(e)(3) by comparing the average difference between the BART Alternative and the BART Benchmark.

[60] In an email dated 9/26/2017, Chris Emery of Ramboll, the developer of the CAMx model, identified an error in the model settings that caused it to overestimate the deposition and removal of gas phase ammonia in the model. The default model configuration included a setting that specified zero surface resistance to ammonia deposition which tends to overestimate ammonia deposition to surfaces and to underestimate the ambient concentrations of ammonia and ammonium nitrate. Mr. Emery recommended changing the model configuration to include surface resistance to ammonia deposition.

[61] *Staff Review,* pp. 17–18. Specifically, see rectangular CAMx modeling domain with 4-kilometer grid resolution in Figure 4–1.

[62] By contrast, in the CALPUFF modeling supporting EPA's 2016 FIP, visibility impacts were assessed for the nine Class I areas within 300 kilometers of the BART units. The rectangular CAMx modeling domain was designed to be large enough to include these nine Class I areas and to include air parcel trajectories from those sources to the Class I areas. In response to EPA Region 8 comments on a draft modeling protocol, the rectangular CAMx model domain was expanded further to the east, north and south to ensure that emissions from the sources would remain within the model domain as they were transported from the sources to the affected Class I areas. For completeness, results for all Class I areas located within the rectangular CAMx domain were included in the analysis.

[63] Staff Review, pp. 16–21.

Appellate Case: 21-9509     Document: 101-2     Date Filed: 06/10/2022     Page: 34


The last row of column E in Tables 4 and 5 show the average difference in visibility between the BART Alternative and the BART Benchmark for the 20 percent best and worst days respectively. The negative number indicates that the average visibility improvement of the BART Alternative is better than the BART Benchmark in both cases. Relative to the BART Benchmark, the BART Alternative achieves an average visibility improvement of 0.00494 dv across all Class I areas on the 20 percent best days, and of 0.00058 dv on the 20 percent worst days. Therefore, Utah determined that the BART Alternative meets prong 2 of the 40 CFR 51.308(e)(3) test.

Utah noted that the language in 40 CFR 51.308(e)(3)(i) and (ii) indicates allowance of a straight numerical test. The State explained that the regulation does not specify that a minimum difference in deciview between the scenarios must be achieved to determine that a BART Alternative achieves greater reasonable progress. Because the modeling results show that visibility under the BART Alternative does not decline at any of the 15 affected Class I areas compared to the Baseline (prong 1) and will result in improved visibility, on average, across all 15 Class I areas compared to the BART Benchmark (prong 2), Utah asserted that the BART Alternative will achieve greater reasonable progress than the BART Benchmark under the two-prong modeling test in 40 CFR 51.308(e)(3).

TABLE 4—VISIBILITY IMPACTS IN 2025 FOR THE BASELINE, BART BENCHMARK AND BART ALTERNATIVE SCENARIOS ON THE 20 PERCENT BEST DAYS [64]

| Class I area | Baseline (dv) [A] | BART Benchmark (dv) [B] | BART alternative (dv) [C] | BART alternative—baseline [D] | BART alternative—BART benchmark [E] |
|---|---|---|---|---|---|
| Arches NP | 0.10300 | 0.05607 | 0.03851 | −0.06449 | −0.01756 |
| Black Canyon of the Gunnison NM | 0.02769 | 0.01611 | 0.01162 | −0.01607 | −0.00449 |
| Bryce Canyon NP | 0.00528 | 0.00254 | 0.00228 | −0.00300 | −0.00026 |
| Canyonlands NP | 0.10300 | 0.05607 | 0.03851 | −0.06449 | −0.01756 |
| Capitol Reef NP | 0.14218 | 0.07222 | 0.07140 | −0.07078 | −0.00082 |
| Flat Tops WA | 0.02834 | 0.01488 | 0.01115 | −0.01719 | −0.00373 |
| Grand Canyon NP | 0.07136 | 0.03567 | 0.03611 | −0.03525 | 0.00044 |
| La Garita WA | 0.02769 | 0.01611 | 0.01162 | −0.01607 | −0.00449 |
| Maroon Bells-Snowmass WA | 0.02834 | 0.01488 | 0.01115 | −0.01719 | −0.00373 |
| Mesa Verde NP | 0.06356 | 0.03381 | 0.02749 | −0.03607 | −0.00632 |
| Mount Zirkel WA | 0.04209 | 0.02060 | 0.01471 | −0.02738 | −0.00589 |
| San Pedro Parks WA | 0.03627 | 0.01742 | 0.01593 | −0.02034 | −0.00149 |
| Weminuche WA | 0.02769 | 0.01611 | 0.01162 | −0.01607 | −0.00449 |
| West Elk WA | 0.02834 | 0.01488 | 0.01115 | −0.01719 | −0.00373 |
| Zion NP [1] | 0.00612 | 0.00291 | 0.00300 | −0.00312 | 0.00009 |
| All Class I area Average | 0.04940 | 0.02602 | 0.02108 | N/A | −0.00494 |

[1] Results based on incomplete dataset. Zion NP monitor did not meet the 75% data completion SMAT requirement for year 2011.

TABLE 5—VISIBILITY IMPACTS IN 2025 FOR THE BASELINE, BART BENCHMARK, AND BART ALTERNATIVE SCENARIOS ON THE 20 PERCENT WORST DAYS [65]

| Class I area | Baseline (dv) [A] | BART Benchmark (dv) [B] | BART alternative (dv) [C] | BART alternative—baseline [D] | BART alternative—BART benchmark [E] |
|---|---|---|---|---|---|
| Arches NP | 0.25740 | 0.13780 | 0.12584 | −0.13156 | −0.01196 |
| Black Canyon of the Gunnison NM | 0.01265 | 0.00682 | 0.00540 | −0.00725 | −0.00142 |
| Bryce Canyon NP | 0.04945 | 0.02184 | 0.02470 | −0.02475 | 0.00286 |
| Canyonlands NP | 0.25740 | 0.13780 | 0.12584 | −0.13156 | −0.01196 |
| Capitol Reef NP | 0.26010 | 0.11672 | 0.14568 | −0.11442 | 0.02896 |
| Flat Tops WA | 0.02703 | 0.01387 | 0.01011 | −0.01692 | −0.00376 |
| Grand Canyon NP | 0.00186 | 0.00089 | 0.00056 | −0.00130 | −0.00033 |
| La Garita WA | 0.01265 | 0.00682 | 0.00540 | −0.00725 | −0.00142 |
| Maroon Bells-Snowmass WA | 0.02703 | 0.01387 | 0.01011 | −0.01692 | −0.00376 |
| Mesa Verde NP | 0.06203 | 0.02524 | 0.02959 | −0.03244 | 0.00435 |
| Mount Zirkel WA | 0.03312 | 0.01705 | 0.01198 | −0.02114 | −0.00507 |
| San Pedro Parks WA | 0.00154 | 0.00074 | 0.00073 | −0.00081 | −0.00001 |
| Weminuche WA | 0.01265 | 0.00682 | 0.00540 | −0.00725 | −0.00142 |
| West Elk WA | 0.02703 | 0.01387 | 0.01011 | −0.01692 | −0.00376 |
| Zion NP[1] | 0.00155 | 0.00051 | 0.00051 | −0.00104 | 0.00000 |
| All Class I area Average | 0.06957 | 0.03471 | 0.03413 | N/A | −0.00058 |

[1] Results based on incomplete dataset. Zion NP monitor did not meet the 75% data completion SMAT requirement for year 2011.

Appellate Case: 21-9509 Document: 101-2 Date Filed: 06/10/2022 Page: 35


6. Requirement That Emission Reductions Take Place During Period of First Long-Term Strategy

Pursuant to 40 CFR 51.308(e)(2)(iii), the State must ensure that all necessary emission reductions take place during the period of the first long-term strategy for regional haze. The RHR further provides that, ''[t]o meet this requirement, the State must provide a detailed description of the . . . alternative measure, including schedules for implementation, the emission reductions required by the program, all necessary administrative and technical procedures for implementing the program, rules for accounting and monitoring emissions, and procedures for enforcement.'' [66]

As noted above, the December 3, 2019 supplement includes revisions to R307–110–17, the State rule that in turn incorporates Section IX, Control Measures for Area and Point Sources, Part H, Emissions Limits, which includes provisions for implementing the Utah $NO_X$ BART Alternative. In addition to the emission limitations for $NO_X$ and PM at Hunter and Huntington [67] and the requirement for shutdown of the Carbon Plant listed in Table 1 above (which the State notes was made enforceable by August 15, 2015), the SIP submission includes compliance dates, operation and maintenance requirements, and MRR requirements. Utah asserts that the alternative measure was fully implemented prior to 2018.

7. Demonstration That Emissions Reductions From Alternative Measure Will Be Surplus

Pursuant to 40 CFR 51.308(e)(2)(iv), the SIP must demonstrate that the emissions reductions resulting from the alternative measure will be surplus to those reductions resulting from measures adopted to meet requirements of the CAA as of the baseline date of the SIP. The baseline date for regional haze SIPs is 2002.[68] Utah developed the 2002 baseline inventory in its 2008 RH SIP for regional modeling, evaluating the impact on Class I areas outside of the Colorado Plateau, and BART as outlined in the EPA Guidance and the BART Guidelines, issued on July 6, 2005. Utah noted that 2002 is the baseline inventory that was used by other states throughout the country when evaluating BART under the provisions of 40 CFR 51.308 and that any measure adopted after 2002 is considered ''surplus'' under 40 CFR 51.308(e)(2)(iv). Utah referenced other EPA actions that are consistent with this interpretation.[69] Utah stated that the BART Benchmark scenario includes measures required before the baseline date of the SIP (*i.e.,* 2002) but does not include later measures that are credited as part of the BART Alternative scenario.

Utah explained that, to address potential concerns with double counting $SO_2$ emission reductions from the Carbon plant closure under both the 308 and 309 programs, the July 2019 SIP submission includes revisions to the applicability provisions of State Rule State Rule R307–150, Emission Inventories, to prevent double counting. Utah also provided explanation why the emission reductions counted towards the $NO_X$ BART Alternative are surplus to those needed to satisfy the requirements of the $SO_2$ Backstop Trading Program.[70] The State explained that the WRAP modeling done to support the Utah RH backstop trading program SIP included regional $SO_2$ emissions based on the 2018 $SO_2$ milestone and also included $NO_X$ and PM emissions from the Carbon plant. Actual emissions in the three-state region (Utah, Wyoming, and New Mexico) are calculated each year and compared to the milestones. Utah provided the information in Table 6 below to show that since 2011, $SO_2$ emissions in the three-state region have been below the 2018 milestone (141,849 tpy). Utah noted that the most recent milestone report for 2016 demonstrates that $SO_2$ emissions are currently 36 percent lower than the 2018 milestone. Utah stated that the Carbon plant was fully operational in the years 2011–2013 when the 2018 milestone was initially achieved for those years. The State noted that the $SO_2$ emission reductions from the closure of the Carbon plant are surplus to what is needed to meet the 2018 milestone established in Utah's RH SIP.

TABLE 6—$SO_2$ MILESTONE TRENDS [71]

| Year | Milestone (tpy) | Three-year average $SO_2$ emissions [1] (tpy) | Carbon plant $SO_2$ emissions (tpy) |
|---|---|---|---|
| 2003 | 303,264 | 214,780 | 5,488 |
| 2004 | 303,264 | 223,584 | 5,642 |
| 2005 | 303,264 | 220,987 | 5,410 |
| 2006 | 303,264 | 218,499 | 6,779 |
| 2007 | 303,264 | 203,569 | 6,511 |
| 2008 | 269,083 | 186,837 | 5,057 |
| 2009 | 234,903 | 165,633 | 5,494 |
| 2010 | 200,722 | 146,808 | 7,462 |
| 2011 | 200,722 | 130,935 | 7,740 |
| 2012 | 200,722 | 115,115 | 8,307 |
| 2013 | 185,795 | 105,084 | 7,702 |
| 2014 | 170,868 | 96,302 | 9,241 |
| 2015 | 155,940 | 91,310 | 2,816 |
| 2016 | 155,940 | 90,591 | 0 |
| 2017 | 155,940 | .......................... | .......................... |
| 2018 | 141,849 | .......................... | .......................... |

[1] The three-year average is based on the emissions averaged for the current and two preceding years.

[64] *Staff Review,* Table 4, p. 19.

[65] *Staff Review,* Table 5, p. 20.

[66] 40 CFR 51.308(e)(2)(iii).

[67] EPA previously approved the BART PM emission limits in our July 2016 final rule. 81 FR 43894 (July 5, 2016).

[68] See Memorandum from Lydia Wegman and Peter Tsirigotis, *2002 Base Year Emission Inventory SIP Planning: 8-hr Ozone,* $PM_{2.5}$, *and Regional Haze Programs* (Nov. 18, 2002), available at *https://www3.epa.gov/ttn/naaqs/aqmguide/collection/cp2/20021118_wegman_2002_base_year_emission_sip_planning.pdf.*

[69] *E.g.,* 79 FR 33438, 33441–33442 (June 11, 2014); 79 FR 56322, 56328 (Sept. 9, 2014).

[70] *Staff Review* at 23–25.

For Hunter Unit 3, Utah also explained that PacifiCorp upgraded the LNB controls in 2008 and that the upgrade was not required under any applicable requirements of the CAA as of the 2002 baseline date of the SIP; the emission reductions from the upgrade are therefore considered surplus and creditable for the BART Alternative under 40 CFR 51.308(e)(2)(iv). Utah noted that prior to the 2008 upgrade, the emission rate for Hunter Unit 3 was 0.46 lb/MMBtu on a 30-day rolling average as required by Phase II of the Acid Rain Program.[72]

To address potential concerns that Utah would be double counting $SO_2$ emissions reductions for the Carbon plant closure under both the 40 CFR 51.308 and 309 programs, the July 2019 SIP revisions require that the State continue to report the historical emissions for the Carbon plant in the annual milestone reports. Specifically, revisions to the applicability provisions of State rule R307–150 (''Emission Inventories Program'') require that Utah include emissions of 8,005 tons/yr[73] of $SO_2$ for the Carbon Power Plant in the annual milestone reports.

*C. Monitoring, Recordkeeping and Reporting*

To address EPA's partial disapproval of the 2011 Utah RH SIP for lack of enforceable measures and MRR requirements,[74] in 2015 Utah added two new subsections to SIP Sections IX, H.21 (General Requirements: Control Measures for Area and Point Sources, Emission Limits and Operating Practices, Regional Haze Requirements) and H.22 (Source Specific Emission Limitations: Regional Haze Requirements, Best Available Retrofit Technology).

Specifically, to remedy the SIP's lack of provisions for ensuring that emission limits are practically enforceable, under H.21 Utah added a new definition for boiler operating day. Utah noted that state rules R307–107–1 and R307–107–2 (applicability, timing, and reporting of breakdowns) apply to sources subject to regional haze requirements under H.22. Utah required that information used to determine compliance shall be recorded for all periods when the source is in operation, and that such records shall be kept for a minimum of five years. Under H.21, Utah specified that emission limitations listed in H.22 shall apply at all times and identified stack testing requirements to show compliance with those emission limitations. Finally, H.21 also specifies the requirements for continuous emission monitoring by listing the requirements and cross-referencing the State's rule for continuous emission monitoring system requirements, R307–170, as well as 40 CFR 13[75] and 40 CFR 60, appendix B—Performance Specifications. Utah included the requirements to calculate hourly average $NO_X$ concentrations for any hour in which fuel is combusted and a new 30-day rolling average emission rate at the end of each boiler operating day. Utah also noted that the hourly average $NO_X$ emission rate is valid only if the minimum number of data points specified in R307–170 is acquired for both the pollutant concentration monitor and diluent monitor.

Under H.22, Utah provided the emission limitations associated with the $NO_X$ BART Alternative and PM BART for Hunter Units 1 through 3 and Huntington Units 1 and 2, a requirement to perform annual stack testing for PM, and a requirement to measure $NO_X$ via continuous emission monitoring for the sources covered under the Utah $NO_X$ BART Alternative. Under H.22, Utah also listed the enforceable conditions related to closing Carbon Units 1 and 2 by August 15, 2015, including PacifiCorp's and Utah's notification and permit rescission obligations.

In our 2016 final rule, EPA approved subsection H.21 and H.22 as they pertain to PM BART, including conditional approval of the reporting requirements. We did not act on the elements of those subsections relating to the $NO_X$ BART Alternative, as EPA disapproved the Alternative in that action. Utah resubmitted subsections H.21 and H.22 as part of their July 3, 2019 SIP submittal. In its December 3, 2019 supplemental submission, to address the issue implicated in the conditional approval, under H.21(e) Utah required each source to submit a report of any deviation from applicable emission limits and operating practices, including deviations attributable to upset conditions, the probable cause of such deviations, and any corrective actions or preventive measures taken.

*D. Consultation With FLMs*

Utah's SIP submittals do not specifically discuss how it addressed the requirements of 40 CFR 308(i)(2) for providing the FLMs with an opportunity for consultation at least 60 days prior to holding the public hearing for the July 2019 RH SIP. However, we are aware that Utah consulted with the FLMs as explained in section IV.D, and the relevant exchange is included in the docket for this action.

**IV. EPA's Evaluation and Proposed Approval of Utah's Regional Haze SIP**

*A. Basis for Proposed Approval*

For the reasons described below, EPA proposes to approve the Utah 2019 RH SIP revisions. Our proposed action is based on an evaluation of Utah's regional haze SIP submittals against the regional haze requirements at 40 CFR 51.300–51.309 and CAA sections 169A and 169B. The revisions were also evaluated against the general SIP requirements contained in CAA section 110, other provisions of the CAA, and our regulations applicable to this action. The EPA proposes to approve these SIP revisions as meeting the relevant CAA requirements. Where appropriate, we provide additional rationale to supplement to the state's analysis and to support our conclusions below.

*B. Demonstration of Greater Reasonable Progress for the Alternative Program*

As provided under 40 CFR 51.309(d)(4)(vii), Utah has opted to establish an alternative measure (or program) for $NO_X$ emissions from the four subject-to-BART units in accordance with 40 CFR 51.308(e)(2). A description of the Utah $NO_X$ BART Alternative is provided above in section III.A.1. The RHR requires that a SIP revision establishing a BART alternative meet three key requirements (in addition to other elements in section 308(e)(2)) as listed below. We have evaluated the Utah $NO_X$ BART Alternative with respect to each of these requirements.

- A demonstration that the emissions trading program or other alternative measure will achieve greater reasonable progress than would have resulted from the installation and operation of BART at all sources subject to BART in the

[71] *Staff Review,* p 24.

[72] There is an error on page 25 of the *Staff Review.* The reference to Hunter Unit 2 should be Unit 3 based on the section heading as well as confirmed emission limits in Utah Approval Order DAQE–AN0102370012–08.

[73] Note that this value is based on the 2012–2013 actual annual average $SO_2$ emissions for the Carbon power plant as used in Utah's June 4, 2015 SIP submission. By contrast, Utah's July 3, 2019 SIP submission uses a consistent baseline for Hunter, Huntington and Carbon based on actual annual average emissions from 2001–2003 when the $SO_2$ emissions for Carbon were 5,814 tons/year. That is, the revisions to the $SO_2$ milestone reporting requirements attribute a greater amount of tons of $SO_2$ to the Carbon plant than the State assumed will be reduced from the plant's retirement, for purposes of making the demonstration that the BART Alternative achieves greater reasonable progress than BART. As such, Utah's analysis of its compliance with the $SO_2$ milestone as well as its demonstration of greater reasonable progress for the BART Alternative are both conservative.

[74] 77 FR 28825, 28842 (May 16, 2012).

[75] This appears to be a typo, and the correct reference should be to 40 CFR 60.13.

State and covered by the alternative program.[76]

- A requirement that all necessary emissions reductions take place during the period of the first long-term strategy for regional haze.[77]
- A demonstration that the emissions reductions resulting from the alternative measure will be surplus to those reductions resulting from measures adopted to meet requirements of the CAA as of the baseline date of the SIP.[78]

As discussed above in section II.C, pursuant to 40 CFR 51.308(e)(2)(i), Utah must demonstrate that the alternative measure will achieve greater reasonable progress than would have resulted from the installation and operation of BART at all sources subject to BART in the State and covered by the alternative program. This demonstration has five parts, each of which is addressed in the July 2019 SIP submittal, including the *Staff Review* support document.

1. List of All BART-Eligible Sources Within the State

As discussed above in section III.B.1, Utah included a list of all BART-eligible sources:

- PacifiCorp Hunter, Unit 1
- PacifiCorp Hunter, Unit 2
- PacifiCorp, Huntington, Unit 1
- PacifiCorp, Huntington, Unit 2

EPA previously approved Utah's BART eligibility determinations in our 2012 rulemaking,[79] and we are now proposing that this same list satisfies the requirements of 40 CFR 51.308(e)(2)(i)(A).

2. List of All BART-Eligible Sources and All BART Source Categories Covered by the Alternative Program

As discussed above in section III.B.2, the Utah $NO_X$ BART Alternative covers all of the BART-eligible sources in the State, Hunter Units 1 and 2 and Huntington Units 1 and 2, in addition to three non-BART units, PacifiCorp's Hunter Unit 3 and Carbon Units 1 and 2. We propose that Utah has satisfied the requirement of 40 CFR 51.308(e)(2)(i)(B).

3. Analysis of BART and Associated Emission Reductions

As noted above in section III.B.3, in the July 2019 Utah RH SIP submittal, the State compared the Utah $NO_X$ BART Alternative to a BART Benchmark that included the most stringent $NO_X$ BART controls, SCR plus upgraded combustion controls, at the four BART units. While the State explicitly noted that it was not determining that SCR plus upgraded combustion controls would constitute source-specific BART at the four subject-to-BART units, it explained that this technology ''can be used as a stringent benchmark for comparison with an alternative program'' and it is ''a conservative approach.''[80] We are proposing to find that this is a reasonable approach to setting the BART Benchmark for purposes of comparison to a BART alternative program, and is consistent with the streamlined approach described in Step 1 of the BART Guidelines. The BART Guidelines note that a comprehensive BART analysis can be forgone if a source adopts the most stringent controls available for the purpose of implementing BART.[81] Moreover, when EPA established $NO_X$ BART in our 2016 FIP, we also selected SCR plus upgraded combustion controls (with an emission limit of 0.07 lb/MMBtu as a 30-day rolling average), which further reinforces the reasonableness of Utah's decision to treat the most stringent controls as the BART Benchmark.

Utah then used modeling projections for the year 2025 to determine the associated emission reductions that would result under the BART Benchmark. These results are provided above in Table 2 of this notice. The EPA proposes to find that the methodology Utah used to develop the projection of emissions under the BART Benchmark is reasonable because it reflects the most stringent control option.

We propose to find that Utah has met the requirement for an analysis of BART and associated emission reductions achievable at Hunter Units 1 and 2 and Huntington Units 1 and 2 under 40 CFR 51.308(e)(2)(i)(C).

4. Analysis of Projected Emissions Reductions Achievable Through the BART Alternative

Utah's $NO_X$ BART Alternative consists of the following enforceable measures:

- A $NO_X$ emission limit of 0.26 lb/MMBtu (30-day rolling average) each for Hunter Units 1 and 2 and Huntington 1 and 2.
- A $NO_X$ emission limit of 0.34 lb/MMBtu (30-day rolling average) for Hunter Unit 3.
- A requirement to permanently close and cease operation of the Carbon power plant by August 15, 2015.

As discussed above in section III.B.4, a summary of Utah's estimates of emissions for the Utah $NO_X$ BART Alternative and the BART Benchmark is provided above in Table 2. Note that the values in Table 2 differ from the analogous table in our 2016 proposed rule[82] for the following reasons. First, in addition to the BART Benchmark and BART Alternative, the table now includes projections for the Baseline emissions scenario. All three of these projected 2025 scenarios relate to the CAMx modeling used to demonstrate that the BART Alternative will achieve greater progress than BART under the two-prong test of 40 CFR 51.308(e)(3), as discussed in sections III.B.5 and IV.B.5 of this notice. The 2025 Baseline is used in the first prong of the two-prong test to demonstrate that visibility under the BART Alternative does not decline at any of the 15 affected Class I areas. Second, to ensure that the selection of baseline emissions does not bias the determination of whether the BART Alternative achieves greater reasonable progress, the projected emissions for all three 2025 scenarios are calculated from a consistent baseline of 2001–2003 for all BART-eligible and non-BART units covered by the BART Alternative. That is, when establishing emission assumptions for the 2011 Typical Year modeling scenario, annual emission rates for the seven units were set equal to 2001–2003 actual average emissions, and these annual emission rates were then projected to 2025 to reflect the $NO_X$ controls anticipated under each future year scenario. Note that although the 2025 Baseline scenario is a projection of 2025 emissions for all other sources in the modeling domain, the Baseline emissions for the seven units in Table 2 reflect 2001–2003 emissions. This approach was chosen so that the 2025 Baseline reflects emissions at the subject-to-BART units at the Hunter and Hunter power plants prior to the installation of any controls or other measures intended to meet BART requirements. Finally, the 2001–2003 baseline period also aligns with that used by EPA in our evaluation of BART under the FIP in our 2016 final rule.

Relative to the 2025 Baseline, the BART Benchmark and BART Alternative include actual $SO_2$ reductions from Hunter and Huntington that occurred after the 2001–2003 baseline due to scrubber upgrades. Thus, the CAMx modeling results for the BART Benchmark and BART Alternative shown in Tables 4 and 5 of this notice reflect these $SO_2$ reductions. The treatment of these $SO_2$ reductions in the modeling does not affect the determination of greater reasonable

[76] 40 CFR 51.308(e)(2)(i).

[77] 40 CFR 51.308(e)(2)(iii).

[78] 40 CFR 51.308(e)(2)(iv).

[79] 77 FR 74355, 74357 (Dec. 14, 2012).

[80] *Staff Review* at 12.

[81] 40 CFR 51, appendix Y, section IV.D.1.9.

[82] Table 3; 81 FR 2015.

progress under the two-prong test. Under prong 1, while the $SO_2$ reductions from Hunter and Huntington increase the apparent overall visibility benefit of the BART Alternative relative to the Baseline, there would not be an anticipated decline in visibility relative to the Baseline in the absence of those $SO_2$ reductions from Hunter and Huntington because the BART Alternative would still result in overall $NO_X$, $SO_2$, and PM emissions decreases compared to the Baseline. Under prong 2, because the $SO_2$ reductions from Hunter and Huntington are equal under the BART Alternative and BART Benchmark, they do not advantage either control scenario. Accordingly, the EPA proposes to find that the methodology Utah used to develop the modeling scenarios, including the projection of emissions under the Utah $NO_X$ BART Alternative, is reasonable and that Utah has met the requirement for an analysis of the projected emissions reductions achievable through the alternative measure under 40 CFR 51.308(e)(2)(i)(D).

5. Determination That the Alternative Achieves Greater Reasonable Progress Than Would Be Achieved Through the Installation and Operation of BART

As discussed above in section III.B.5, Utah used CAMx modeling to assess whether the $NO_X$ BART alternative will achieve greater reasonable progress than the BART Benchmark under the two-prong quantitative test provided for in 40 CFR 51.308(e)(3)(i) and (ii). The CAMx modeling results in Tables 4 and 5 show both prongs of the two-prong test are satisfied: Visibility does not decline in any Class I area under the BART Alternative relative to the Baseline on both the 20% best or 20% worst days, and the average visibility improvement across all affected Class I areas is greater under the BART Alternative than under the BART Benchmark. EPA reviewed the CAMx protocol before the modeling was undertaken. PacifiCorp revised the modeling methods and assumptions to address EPA's concerns. Notably, as discussed above in section III.B.5, PacifiCorp revised the ammonia emission inventory and related input parameters to improve the model's ability to simulate ammonia and ammonium nitrate concentrations on the Colorado Plateau, thus also improving the model's ability to estimate visibility impacts resulting from $NO_X$ emissions. In addition, the analysis was expanded to assess all 15 class I areas in the modeling domain.

As noted above, Utah submitted the same proposed $NO_X$ BART Alternative in its June 2015 submission under the qualitative clear-weight-of-evidence test in 40 CFR 51.308(e)(2)(i)(E). In July 2016, EPA determined that, based on the weight-of-evidence demonstration before us at that time, Utah had not demonstrated that the BART Alternative resulted in greater visibility improvement than would BART. However, as noted by the U.S. Court of Appeals for the Tenth Circuit, under EPA's interpretation of its regulations a state can choose either the quantitative tests (as applicable) in 51.308(e)(3) or the qualitative test in 51.308(e)(2)(i)(E).[83] We believe it follows that a reasonable interpretation of our regulatory scheme allows for a situation in which certain evidence would not be sufficient to make a showing under one ''better-than-BART'' test, but different evidence could support that showing under a separate test. That is, we believe that just because a certain set of evidence failed to show that a BART alternative would achieve greater visibility improvement under the ''clear weight of evidence'' test, that does not necessarily mean that the alternative does not in fact make greater reasonable progress than BART, as demonstrated through dispersion modeling under the two-prong test in section 308(e)(3). Accordingly, we propose to approve Utah's determination that the Utah $NO_X$ BART Alternative would achieve greater reasonable progress than BART under 40 CFR 51.308(e)(3).

6. Requirement That Emission Reductions Take Place During Period of First Long-Term Strategy

As discussed above in section III.B.6, pursuant to 40 CFR 51.308(e)(2)(iii), the State must ensure that all necessary emission reductions take place during the period of the first long-term strategy for regional haze. The RHR further provides that, to meet this requirement, the State must provide a detailed description of the alternative measure, including schedules for implementation, the emission reductions required by the program, all necessary administrative and technical procedures for implementing the program, rules for accounting and monitoring emissions, and procedures for enforcement.[84]

The $NO_X$ controls on which the BART Alternative relies were installed at Hunter and Huntington over a period of years starting in 2006 and finishing in 2014.[85] The associated emissions limits were effective upon installation of the $NO_X$ controls.[86] Carbon shut down in 2015 and its Approval Order has been revoked.[87] Further, as noted above, the Utah SIP submittals include revisions to R307–110–17 and Section IX, Control Measures for Area and Point Sources, Part H, Emissions Limits, which include enforceable provisions for implementing the Utah $NO_X$ BART Alternative. In addition to the emission limitations for $NO_X$ and PM, and the requirement for shutdown of the Carbon plant listed in Table 1 above, the SIP includes compliance dates, operation and maintenance requirements, and monitoring, recordkeeping, and reporting requirements. We propose to find that these provisions meet the requirements of 40 CFR 51.308(e)(2)(iii).

7. Demonstration That Emission Reductions From Alternative Measure Will Be Surplus

As discussed above in section III.B.7, pursuant to 40 CFR 51.308(e)(2)(iv), the SIP must demonstrate that the emissions reductions resulting from the alternative measure will be surplus to those reductions resulting from measures adopted to meet requirements of the CAA as of the baseline date of the SIP. The baseline date for regional haze SIPs is 2002.[88] As discussed in section III.B.7, all of the emission reductions required by the Utah $NO_X$ BART Alternative result from measures applicable to Hunter, Huntington and Carbon that were required pursuant to measures adopted after 2002.

Furthermore, the State's SIP explains that the WRAP modeling for the 2018 Reasonable Progress Goals that was done to support the Utah RH SIP assumed that Carbon would still be operating and emitting $SO_2$ when it

[83] *WildEarth Guardians* v. *EPA,* 770 F.3d 919, 934 (10th Cir. 2014).

[84] 40 CFR 51.308(e)(2)(iii).

[85] Refer to the Staff Report, Table 6, Implementation Schedule.

[86] Hunter Power Plant Approval Order: Installation of Pollution Control Equipment, Established Plantwide Applicability Limitations and Approval Orders Consolidation, Emery County—CDS A; NSPS; PSD; Title IV; Title V Major; HAPs, March 13, 2018; Huntington Plant Approval Order: Installation of Pollution Control Equipment and Establishing Plant-wide Applicability Limitations, Emery County; CDS A; NSPS (Part 60), PSD, Title IV (Part 72/Acid Rain), Title V (Part 70), Project Number: N010238–0019 (August 6, 2009).

[87] Letter from Utah Department of Environmental Quality, Division of Air Quality, to PacifiCorp, Re: Revocation of Approval Order DAQE–ANO 100810005–08 dated May 16, 2008, Project Number: N10081–0007, January 8, 2016.

[88] See Memorandum from Lydia Wegman and Peter Tsirigotis, 2002 Base Year Emission Inventory SIP Planning: 8-hr Ozone, $PM_{2.5}$, and Regional Haze Programs, November 18, 2002. *https://www3.epa.gov/ttn/naaqs/aqmguide/collection/cp2/20021118_wegman_2002_base_year_emission_sip_planning.pdf.*

Appellate Case: 21-9509 Document: 101-2 Date Filed: 06/10/2022 Page: 39


modeled the 2018 $SO_2$ milestone; the modeling also included $NO_X$ and PM emissions from the Carbon plant. Thus, WRAP did not rely on post-2002 emission reductions from the Carbon plant in establishing the 2018 $SO_2$ milestone.

The State's SIP also includes $SO_2$ trend data that further demonstrate emission reductions from the Carbon plant are most likely not needed for meeting the three-state 2018 milestone of 141,849 tpy. Actual emissions in the three-state region are calculated each year and compared to the milestones. As can be seen in Table 6 above, $SO_2$ emissions reported each year since 2011 were below the 2018 milestone and the most recent milestone report for 2016 demonstrates that $SO_2$ emissions are currently 36 percent lower than the 2018 milestone. The Carbon plant was fully operational in the years 2012–2014 when the emissions from the three-state region were below the milestone for those years. In its amendments to the Backstop Trading Program to ensure there would be no double-counting of $SO_2$ emission reductions from the Carbon plant closure, the State attributed 8,005 tons of $SO_2$ emissions to the Carbon plant for purposes of demonstrating that even if Carbon continued to emit at that level, the three-state region would still be well below the 2018 Milestone. Therefore, the $SO_2$ emission reductions from the closure of the Carbon plant are surplus to what is needed to meet the 2018 milestone established in Utah's RH SIP, and can therefore be credited to the Utah $NO_X$ BART Alternative.

As discussed above in section III.B.7, the amendments to the applicability provisions of State rule R307–150–3, Emissions Inventories, Applicability, ensure that there is no double counting $SO_2$ emissions reductions for the Carbon plant closure under both the 40 CFR 51.308 and 309 programs.

We propose to concur that the reductions from Carbon are surplus and can be considered as part of an alternative strategy under 40 CFR 51.308(e)(2)(iv). We also propose to approve Utah's revision to R307–150–3, amending the $SO_2$ emissions reported under the milestone, which ensures that these reductions are not double counted.

*C. Monitoring, Recordkeeping, and Reporting*

EPA has reviewed the MRR measures in Utah's July 3, 2019 SIP submittal, as supplemented on December 3, 2019, which revises Section IX, Part H, of Utah's SIP, and which apply for units subject to the $NO_X$ BART Alternative and PM BART. EPA proposes to approve these measures as meeting the requirements of section 110(a)(2) of the CAA and 40 CFR part 51, subpart K, Source Surveillance, and 40 CFR part 51, appendix V. Generally, these provisions require that SIPs must contain enforceable emission limitations and schedules for compliance, including MRR provisions that allow for the enforcement of those emission limitations. EPA previously approved state rule provisions that Utah has cross-referenced in these new regional haze measures, including terms, conditions and definitions in R307–101–1 (General Requirements—Forward), R307–101–2 General Requirements—Definitions), and R307–170–4 (Continuous Emission Monitoring Program—Definitions), as well as other continuous emission monitoring system (CEMS) requirements referenced in R307–107. These measures contain the requirements that were missing from Utah's prior regional haze submittals [89] and are furthermore consistent with similar MRR requirements that EPA has approved for other states RH SIPs or that we have adopted in federal implementation plans.[90] As described above in section III.C, Utah has provided the emission limitations, MRR requirements for all the units that are part of Utah's BART Alternative for the Hunter, Huntington, and Carbon plants, and we are proposing to approve these provisions as satisfying CAA section 110(a)(2), 40 CFR part 51, subpart K, and 40 CFR part 51, appendix V with regard to MRR requirements to make emission limitations in the SIP practically enforceable.

*D. Consultation With FLMs*

On December 19, 2018, the State provided the opportunity for the FLMs to review the preliminary draft SIP documents. This was approximately 120 days prior to the public hearing that was held on April 17, 2019, and prior to the public comment period for the proposed SIP revisions submitted to EPA in July 2019, which ran from April 1 through May 15, 2019. The FLMs did not submit comments prior to or during the public comment period. Copies of the correspondence documenting the State's outreach to the FLMs are included in the docket. We propose to find that Utah has met the requirements of 40 CFR 308(i)(2).

[89] 77 FR 74365–74366 (Dec. 14, 2012).

[90] *See, e.g.,* 77 FR 57864 (Sept. 18, 2012); 79 FR 5032 (Jan. 30, 2014).

**V. Clean Air Act Section 110(*l*)**

Under CAA section 110(*l*), the EPA cannot approve a plan revision ''if the revision would interfere with any applicable requirement concerning attainment and reasonable further progress (as defined in section 7501 of this title), or any other applicable requirement of this chapter.'' [91] We propose to find that these revisions satisfy section 110(*l*). The previous sections of the notice explain how the proposed SIP revision and FIP withdrawal will comply with applicable regional haze requirements and general implementation plan requirements such as enforceability. With respect to requirements concerning attainment and reasonable further progress, the Utah Regional Haze SIP, as revised by this action, will allow for greater $NO_X$ emissions at the four subject-to-BART units as compared to the 2016 FIP (which is currently judicially stayed). The change in these emissions compared to the FIP, however, is not anticipated to interfere with any applicable requirements under the CAA. The geographic area where the BART units are located is not part of a nonattainment area for any National Ambient Air Quality Standards (NAAQS). The approved portions of the $PM_{2.5}$ attainment demonstrations and clean data determinations (CDD) for the Salt Lake City, Provo, and Logan, UT–ID nonattainment areas (NAAs) do not rely on the installation of SCR at Hunter or Huntington to achieve attainment of the NAAQS. Similarly, the approved $PM_{10}$ attainment demonstrations for Salt Lake County and Utah County NAAs, and CDD for Ogden City NAA do not rely on the installation of SCR at Hunter or Huntington to achieve attainment of the NAAQS. In addition, there are no other approved attainment demonstrations in other areas of the State or outside of the State that rely on the installation of SCR at Hunter or Huntington to achieve attainment of any of the NAAQS.

[91] Note that ''reasonable further progress'' as used in CAA section 110(*l*) is a reference to that term as defined in section 301(a) (*i.e.,* 42 U.S.C. 7501(a)), and as such means reductions required to attain the National Ambient Air Quality Standards (NAAQS) set for criteria pollutants under CAA section 109. This term as used in section 110(*l*) (and defined in section 301(a)) is *not* synonymous with ''reasonable progress'' as that term is used in the regional haze program. Instead, section 110(*l*) provides that EPA cannot approve plan revisions that interfere with regional haze requirements (including reasonable progress requirements) insofar as they are ''other applicable requirement[s]'' of the Clean Air Act.

Appellate Case: 21-9509     Document: 101-2     Date Filed: 06/10/2022     Page: 40


## VI. The EPA's Proposed Action

### *A. 2019 Utah Regional Haze SIP Revision*

We are proposing to approve these aspects of the 2019 Utah RH SIP revisions:

• $NO_X$ BART Alternative, including $NO_X$ emission reductions from Hunter Units 1, 2, and 3 and Huntington Units 1 and 2, and $SO_2$, $NO_X$ and PM emission reductions from Carbon Units 1 and 2.

• A $NO_X$ emission limit of 0.26 lb/MMBtu (30-day rolling average) each for Hunter Units 1 and 2 and Huntington 1 and 2.

• A $NO_X$ emission limit of 0.34 lb/MMBtu (30-day rolling average) for Hunter Unit 3.

• A requirement to permanently close and cease operation of the Carbon power plant by August 15, 2015.

• The associated amendments to the $SO_2$ milestone reporting requirements.

• MRR requirements for units subject to the $NO_X$ BART Alternative and the PM BART emission limits.

We also note that the regulatory text amendments contained in this notice include incorporation of additional parts of SIP section XX (XX.B–C and XX.E–N) and section XXIII, which were not addressed in this proposed action. EPA approved these SIP sections as meeting the requirements of the CAA and applicable regulations in previous actions;[92] however, we inadvertently did not incorporate all approved sections in 40 CFR 52.2320(e). We are remedying this oversight and reorganizing 40 CFR 52.2320(e) to better reflect the structure of Utah's SIP submissions here; however, we are not reopening any of these previously approved SIP sections for comment.

Finally, contingent on our approval of Utah's July 2019 and December 2019 SIP submissions, we propose to find that Utah's SIP fully satisfies the requirements of section 309 of the RHR and therefore the State has fully complied with the requirements for reasonable progress, including BART, for the first implementation period.

### *B. FIP Withdrawal*

Because we are proposing to find that Utah's July 2019 and December 2019 SIP submissions satisfy the $NO_X$ BART and MRR requirements currently addressed by EPA's 2016 FIP, we are also proposing to withdraw in whole the Utah Regional Haze FIP at 40 CFR 52.2336 that imposes $NO_X$ BART requirements on Hunter Units 1 and 2 and Huntington Units 1 and 2.

[92] 73 FR 16543 (Mar. 28, 2008); 77 FR 74355 (Dec. 14, 2012); 78 FR 4072 (Jan. 18, 2013); 81 FR 43894 (July 5, 2016).

### *C. Clean Air Section 110(l)*

We are proposing to find that an approval of the 2019 Utah RH SIP revisions and concurrent withdrawal of the corresponding the FIP, as proposed, complies with the CAA's 110(*1*) provisions.

We are requesting comment on the proposed actions in section VI.A–C, *i.e.,* on our proposed approval of Utah's $NO_X$ BART Alternative and of the MRR elements for the units subject the BART Alternative and to PM BART. We are not reopening or requesting comment on any of the previously approved elements of Utah's regional haze SIP, except to the extent expressly reopened in this notice. If we finalize our approval of the July 2019 and December 2019 regional haze SIP submittals, Utah's regional haze SIP for the first implementation period will be fully approved.

## VII. Incorporation by Reference

In this document, EPA is proposing to include regulatory text in an EPA final rule that includes incorporation by reference. In accordance with the requirements of 1 CFR 51.5, EPA is proposing to incorporate by reference the SIP amendments described in Sections III.A and VI.A of this preamble and set forth below. The EPA has made, and will continue to make, these materials generally available through *www.regulations.gov* (refer to docket EPA–R08–OAR–2015–0463) and at the EPA Region 8 Office (please contact the person identified in the **FOR FURTHER INFORMATION CONTACT** section of this preamble for more information).

## VIII. Statutory and Executive Order Reviews

### *A. Executive Order 12866: Regulatory Planning and Review and Executive Order 13563: Improving Regulation and Regulatory Review*

This action is not a ''significant regulatory action'' under the terms of Executive Order 12866[93] and was therefore not submitted to the Office of Management and Budget (OMB) for review. This proposed rule applies to only 7 units at three facilities in Utah that are individually named in this action. It is therefore not a rule of general applicability.

### *B. Executive Order 13771: Reducing Regulations and Controlling Regulatory Costs*

This action is not an Executive Order 13771 regulatory action because this action is not significant under Executive Order 12866.

[93] 58 FR 51735, 51738 (October 4, 1993).

### *C. Paperwork Reduction Act*

This proposed action does not impose an information collection burden under the provisions of the Paperwork Reduction Act (PRA).[94] A ''collection of information'' under the PRA means ''the obtaining, causing to be obtained, soliciting, or requiring the disclosure to an agency, third parties or the public of information by or for an agency by means of identical questions posed to, or identical reporting, recordkeeping, or disclosure requirements imposed on, ten or more persons, whether such collection of information is mandatory, voluntary, or required to obtain or retain a benefit.''[95] Because this proposed rule revises regional haze requirements reporting requirements for three facilities, the PRA does not apply.

### *D. Regulatory Flexibility Act*

The Regulatory Flexibility Act (RFA) generally requires an agency to prepare a regulatory flexibility analysis of any rule subject to notice and comment rulemaking requirements under the Administrative Procedure Act or any other statute unless the agency certifies that the rule will not have a significant economic impact on a substantial number of small entities. Small entities include small businesses, small organizations and small governmental jurisdictions.

For purposes of assessing the impacts of this proposed rule on small entities, small entity is defined as: (1) A small business as defined by the Small Business Administration's (SBA) regulations at 13 CFR 121.201; (2) a small governmental jurisdiction that is a government of a city, county, town, school district or special district with a population of less than 50,000; and (3) a small organization that is any not-for-profit enterprise which is independently owned and operated and is not dominant in its field.

After considering the economic impacts of this proposed rule on small entities, I certify that this action will not have a significant economic impact on a substantial number of small entities under the RFA. This rule does not impose any requirements or create impacts on small entities as no small entities are subject to the requirements of this rule.

[94] 44 U.S.C. 3501 *et seq.*

[95] 5 CFR 1320.3(c) (emphasis added).

Appellate Case: 21-9509 Document: 101-2 Date Filed: 06/10/2022 Page: 41


*E. Unfunded Mandates Reform Act (UMRA)*

Title II of the Unfunded Mandates Reform Act of 1995 (UMRA), Public Law 104–4, establishes requirements for federal agencies to assess the effects of their regulatory actions on state, local and tribal governments and the private sector. Under section 202 of UMRA, the EPA generally must prepare a written statement, including a cost-benefit analysis, for final rules with ''Federal mandates'' that may result in expenditures to state, local, and tribal governments, in the aggregate, or to the private sector, of $100 million or more (adjusted for inflation) in any one year. Before promulgating an EPA rule for which a written statement is needed, section 205 of UMRA generally requires the EPA to identify and consider a reasonable number of regulatory alternatives and adopt the least costly, most cost-effective, or least burdensome alternative that achieves the objectives of the rule. The provisions of section 205 of UMRA do not apply when they are inconsistent with applicable law. Moreover, section 205 of UMRA allows the EPA to adopt an alternative other than the least costly, most cost-effective, or least burdensome alternative if the Administrator publishes with the final rule an explanation why that alternative was not adopted. Before the EPA establishes any regulatory requirements that may significantly or uniquely affect small governments, including tribal governments, it must have developed under section 203 of UMRA a small government agency plan. The plan must provide for notifying potentially affected small governments, enabling officials of affected small governments to have meaningful and timely input in the development of EPA regulatory actions with significant federal intergovernmental mandates, and informing, educating, and advising small governments on compliance with the regulatory requirements.

Under Title II of UMRA, the EPA has determined that this proposed rule does not contain a federal mandate that may result in expenditures that exceed the inflation-adjusted UMRA threshold of $100 million [96] by state, local, or tribal governments or the private sector in any one year. The proposed revisions to the 2014 FIP would reduce private sector expenditures. Additionally, we do not foresee significant costs (if any) for state and local governments. Thus, because the proposed revisions to the 2014 FIP reduce annual expenditures, this proposed rule is not subject to the requirements of sections 202 or 205 of UMRA. This proposed rule is also not subject to the requirements of section 203 of UMRA because it contains no regulatory requirements that might significantly or uniquely affect small governments.

*F. Executive Order 13132: Federalism*

Executive Order 13132, *Federalism,*[97] revokes and replaces Executive Orders 12612 (Federalism) and 12875 (Enhancing the Intergovernmental Partnership). Executive Order 13132 requires the EPA to develop an accountable process to ensure ''meaningful and timely input by State and local officials in the development of regulatory policies that have federalism implications.'' [98] ''Policies that have federalism implications'' is defined in the Executive Order to include regulations that have ''substantial direct effects on the States, on the relationship between the national government and the States, or on the distribution of power and responsibilities among the various levels of government.'' [99] Under Executive Order 13132, the EPA may not issue a regulation ''that has federalism implications, that imposes substantial direct compliance costs, . . . and that is not required by statute, unless [the federal government provides the] funds necessary to pay the direct [compliance] costs incurred by the State and local governments,'' or the EPA consults with state and local officials early in the process of developing the final regulation.[100] The EPA also may not issue a regulation that has federalism implications and that preempts state law unless the agency consults with state and local officials early in the process of developing the final regulation.

This action does not have federalism implications. The proposed FIP revisions will not have substantial direct effects on the states, on the relationship between the national government and the states, or on the distribution of power and responsibilities among the various levels of government, as specified in Executive Order 13132. Thus, Executive Order 13132 does not apply to this action.

*G. Executive Order 13175: Consultation and Coordination With Indian Tribal Governments*

Executive Order 13175, entitled ''Consultation and Coordination with Indian Tribal Governments,'' requires the EPA to develop an accountable process to ensure ''meaningful and timely input by tribal officials in the development of regulatory policies that have tribal implications.'' [101] This proposed rule does not have tribal implications, as specified in Executive Order 13175. It will not have substantial direct effects on tribal governments. Thus, Executive Order 13175 does not apply to this rule.

*H. Executive Order 13045: Protection of Children From Environmental Health Risks and Safety Risks*

This action is not subject to Executive Order 13045 (62 FR 19885, April 23, 1997). The EPA interprets Executive Order 13045 as applying only to those regulatory actions that concern environmental health or safety risks that the EPA has reason to believe may disproportionately affect children, per the definition of ''covered regulatory action'' in section 2–202 of the executive order. This action is not subject to Executive Order 13045 because it does not concern an environmental health risk or safety risk.

*I. Executive Order 13211: Actions Concerning Regulations That Significantly Affect Energy Supply, Distribution, or Use*

This action is not subject to Executive Order 13211 (66 FR 28355 (May 22, 2001)), because it is not a significant regulatory action under Executive Order 12866.

*J. National Technology Transfer and Advancement Act*

Section 12 of the National Technology Transfer and Advancement Act (NTTAA) of 1995 requires federal agencies to evaluate existing technical standards when developing a new regulation. Section 12(d) of NTTAA, Public Law 104–113, 12(d) (15 U.S.C. 272 note) directs the EPA to consider and use ''voluntary consensus standards'' in its regulatory activities unless to do so would be inconsistent with applicable law or otherwise impractical. Voluntary consensus standards are technical standards (*e.g.,* materials specifications, test methods, sampling procedures and business practices) that are developed or adopted by voluntary consensus standards bodies. NTTAA directs the EPA to

[96] Adjusted to 2019 dollars, the UMRA threshold becomes $164 million.

[97] 64 FR 43255, 43255–43257 (August 10, 1999).

[98] 64 FR 43255, 43257.

[99] *Id.*

[100] *Id.*

[101] 65 FR 67249, 67250 (November 9, 2000).

provide Congress, through OMB, explanations when the agency decides not to use available and applicable voluntary consensus standards.

This proposed rulemaking does not involve technical standards. Therefore, EPA is not considering the use of any voluntary consensus standards.

*K. Executive Order 12898: Federal Actions To Address Environmental Justice in Minority Populations and Low-Income Populations*

Executive Order 12898, establishes federal executive policy on environmental justice.[102] Its main provision directs federal agencies, to the greatest extent practicable and permitted by law, to make environmental justice part of their mission by identifying and addressing, as appropriate, disproportionately high and adverse human health or environmental effects of their programs, policies and activities on minority populations and low-income populations in the United States.

I certify that the approaches under this proposed rule will not have potential disproportionately high and adverse human health or environmental effects on minority, low-income or indigenous/tribal populations. As explained previously, the Utah Regional Haze SIP, as revised by this action, will ensure a significant reduction in emissions compared to regional haze baseline levels (2002). In addition, the area where the Hunter, Huntington, and Carbon power plants are located has not been designated nonattainment for any NAAQS. The proposed SIP revisions will not create a disproportionately high and adverse human health or environmental effect on minority, low-income, or indigenous/tribal populations. The EPA, however, will consider any input received during the public comment period regarding environmental justice considerations.

**List of Subjects in 40 CFR Part 52**

Environmental protection, Air pollution control, Incorporation by reference, Intergovernmental relations, Nitrogen dioxide, Particulate matter, Sulfur oxides.

Dated: January 9, 2020.

**Gregory Sopkin,**

*Regional Administrator, Region 8.*

For the reasons set forth in the preamble, 40 CFR part 52 is proposed to be amended as follows:

**PART 52—APPROVAL AND PROMULGATION OF IMPLEMENTATION PLANS**

■ 1. The authority citation for part 52 continues to read as follows:

**Authority:** 42 U.S.C. 7401 *et seq.*

**Subpart TT—Utah**

■ 2. Section 52.2320 paragraph (c) is amended as follows:

■ a. Under the heading ''R307–110. General Requirements: State Implementation Plan,'' revise the table entry ''R307–110–17.''

■ b. Under the heading ''R307–110. General Requirements: State Implementation Plan,'' add, in numerical order, the table entry ''R307–110–28.''

■ c. Under the heading ''R307–150. Emission Inventories,'' revise the table entry ''R307–150–3.''

The amendments read as follows:

**§ 52.2320 Identification of plan.**

* * * * *

(c) * * *

| Rule No. | Rule title | State effective date | Final rule citation, date | Comments |
|---|---|---|---|---|
| * * | * | * | * * | * |
| **R307–110. General Requirements: State Implementation Plan** | | | | |
| * * | * | * | * * | * |
| R307–110–17 | Section IX. Control Measures for Area and Point Sources, Part H, Emission Limits. | 11/25/2019 | [Insert **Federal Register** citation] 1/22/2020. | |
| * * | * | * | * * | * |
| R307–110–28 | Section XX. Regional Haze | 8/15/2019 | [Insert **Federal Register** citation] 1/22/2020. | |
| * * | * | * | * * | * |
| **R307–150. Emission Inventories** | | | | |
| * * | * | * | * * | * |
| R307–150–3 | Applicability | 6/25/2019 | [Insert **Federal Register** citation] 1/22/2020. | |
| * * | * | * | * * | * |

■ 3. In § 52.2320 amend paragraph (e) by:

■ a. Under the heading ''IX. Control Measures for Area and Point Sources,'' adding, in numerical order, table entries ''IX.H.21. General Requirements: Control Measures for Area and Point Sources, Emission Limits and Operating Practices, Regional Haze Requirements,'' and ''IX.H.22. Source Specific Emission Limitations: Regional Haze Requirements, Best Available Retrofit Technology.''

■ b. Under the heading ''XVII. Visibility Protection,'' removing the table entries ''Section XX.D.6. Best Available Retrofit Technology (BART) Assessment for

[102] 59 FR 7629 (February 16, 1994).

$NO_X$ and PM,'' and ''Section XX.G. Long-Term Strategy for Fire Programs.''

■ c. Adding a centered heading ''XX. Regional Haze'' after the table entry ''Section XXIII. Interstate Transport.''

■ d. Under the heading ''XX. Regional Haze'' adding the table entries ''Section XX.A. Executive Summary,'' ''Section XX.B. Background on the Regional Haze Rule,'' ''Section XX.C. Long-Term Strategy for the Clean-Air Corridor,'' ''Section XX.D. Long-Term Strategy for Stationary Sources,'' ''Section XX.E. Sulfur Dioxide Milestones and Backstop Trading Program,'' ''Section XX.F. Long-Term Strategy for Mobile Sources,'' ''Section XX.G. Long-Term Strategy for Fire Programs,'' ''Section XX.H. Assessment of Emissions from Paved and Unpaved Road Dust,'' ''Section XX.I. Pollution Prevention and Renewable Energy Programs,'' ''Section XX.J. Other GCVTC Recommendations,'' ''Section XX.K. Projection of Visibility Improvement Anticipated from Long-Term Strategy,'' ''Section XX.L. Periodic Implementation Plan Revisions,'' ''Section XX.M. State Planning/Interstate Coordination and Tribal Implementation,'' and ''Section XX.N. Enforceable Commitments for the Utah Regional Haze SIP.''

The revisions and additions read as follows:

**§ 52.2320 Identification of plan.**

* * * * *

(e) * * *

| Rule title | State effective date | Final rule citation, date | Comments |
|---|---|---|---|
| * * * | * | * * | * |
| **IX. Control Measures for Area and Point Sources** | | | |
| * * * | * | * * | * |
| IX.H.21. General Requirements: Control Measures for Area and Point Sources, Emission Limits and Operating Practices, Regional Haze Requirements. | 11/25/2019 | [Insert **Federal Register** citation] 1/22/2020. | |
| IX.H.22. Source Specific Emission Limitations: Regional Haze Requirements, Best Available Retrofit Technology. | 11/25/2019 | [Insert **Federal Register** citation] 1/22/2020. | |
| * * * | * | * * | * |
| Section XXIII. Interstate Transport | 2/9/2007 | 73 FR 16543, 3/28/2008 | |
| **XX. Regional Haze** | | | |
| Section XX.A. Executive Summary | 8/15/2019 | [Insert **Federal Register** citation] 1/22/2020. | |
| Section XX.B. Background on the Regional Haze Rule | 8/15/2019 | [Insert **Federal Register** citation] 1/22/2020 | |
| Section XX.C. Long-Term Strategy for the Clean-Air Corridor | 8/15/2019 | [Insert **Federal Register** citation] 1/22/2020. | |
| Section XX.D. Long-Term Strategy for Stationary Sources | 8/15/2019 | [Insert **Federal Register** citation] 1/22/2020. | |
| Section XX.E. Sulfur Dioxide Milestones and Backstop Trading Program. | 8/15/2019 | [Insert **Federal Register** citation] 1/22/2020. | |
| Section XX.F. Long-Term Strategy for Mobile Sources | 8/15/2019 | [Insert **Federal Register** citation] 1/22/2020. | |
| Section XX.G. Long-Term Strategy for Fire Programs | 4/7/2011 | 78 FR 4071, 1/18/2013 | |
| Section XX.H. Assessment of Emissions from Paved and Unpaved Road Dust. | 8/15/2019 | [Insert **Federal Register** citation] 1/22/2020. | |
| Section XX.I. Pollution Prevention and Renewable Energy Programs. | 8/15/2019 | [Insert **Federal Register** citation] 1/22/2020. | |
| Section XX.J. Other GCVTC Recommendations | 8/15/2019 | [Insert **Federal Register** citation] 1/22/2020. | |
| Section XX.K. Projection of Visibility Improvement Anticipated from Long-Term Strategy. | 8/15/2019 | [Insert **Federal Register** citation] 1/22/2020. | |
| Section XX.L. Periodic Implementation Plan Revisions | 8/15/2019 | [Insert **Federal Register** citation] 1/22/2020. | |
| Section XX.M. State Planning/Interstate Coordination and Tribal Implementation. | 8/15/2019 | [Insert **Federal Register** citation] 1/22/2020. | |
| Section XX.N. Enforceable Commitments for the Utah Regional Haze SIP. | 8/15/2019 | [Insert **Federal Register** citation] 1/22/2020. | |
| * * * | * | * * | * |

**§ 52.2336 [Removed]**

■ 4. Remove § 52.2336.

[FR Doc. 2020–00495 Filed 1–21–20; 8:45 am]

**BILLING CODE 6560–50–P**

AUTHENTICATED
U.S. GOVERNMENT
INFORMATION
GPO


# FEDERAL REGISTER

Vol. 81 Thursday,
No. 9 January 14, 2016

Part II

## Environmental Protection Agency

40 CFR Part 52

Approval, Disapproval and Promulgation of Air Quality Implementation Plans; Partial Approval and Partial Disapproval of Air Quality Implementation Plans and Federal Implementation Plan; Utah; Revisions to Regional Haze State Implementation Plan; Federal Implementation Plan for Regional Haze; Proposed Rule

Appellate Case: 21-9509 Document: 101-2 Date Filed: 06/10/2022 Page: 45



**ENVIRONMENTAL PROTECTION AGENCY**

**40 CFR Part 52**

**[EPA–R08–OAR–2015–0463; FRL—9939–43–Region 8]**

# Approval, Disapproval and Promulgation of Air Quality Implementation Plans; Partial Approval and Partial Disapproval of Air Quality Implementation Plans and Federal Implementation Plan; Utah; Revisions to Regional Haze State Implementation Plan; Federal Implementation Plan for Regional Haze

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Proposed rule.

**SUMMARY:** The Environmental Protection Agency (EPA) is proposing to take action pursuant to section 110 of the Clean Air Act (CAA or Act) on State Implementation Plan (SIP) revisions submitted by the State of Utah on June 4, 2015, and October 20, 2015 to implement the regional haze program. The State's SIP revisions establish an alternative to best available retrofit technology (BART) controls that would otherwise be required to control nitrogen oxides ($NO_X$) at PacifiCorp's Hunter and Huntington power plants. The June 2015 SIP revision also includes BART determinations for particulate matter with an aerodynamic diameter of less than 10 micrometers ($PM_{10}$) at these power plants and provisions for making the $NO_X$ and $PM_{10}$ BART emission limits federally enforceable. The CAA requires states to prevent any future and remedy any existing man-made impairment of visibility in national parks and wilderness areas designated as Class I areas. Air emissions from the four electric generating units (EGUs) at the two plants affected by this action cause or contribute to visibility impairment at nine Class I areas including Grand Canyon, Arches, Bryce Canyon and Zion National Parks. The EPA is issuing two co-proposals in order to fully evaluate the State's submittals and the public's input thereon. The EPA would work with the State on a revised State plan should a partial disapproval and FIP be finalized.

**DATES:** *Comments:* Written comments must be received on or before March 14, 2016.

*Public Hearing:* A public hearing for this proposal is scheduled to be held on Tuesday, January 26, 2016, at the Salt Lake City Public Library, Main Library, from 1 p.m. until 5 p.m., and again from 6 p.m. until 8 p.m. (local time).

**ADDRESSES:** The public hearing will be held at the Salt Lake City Public Library, Main Library, 210 East 400 South, Salt Lake City, Utah 84111.

Submit your comments, identified by Docket ID No. EPA–R08–OAR–2015–0463, to the Federal eRulemaking Portal: *http://www.regulations.gov*. Follow the online instructions for submitting comments. Once submitted, comments cannot be edited or removed from Regulations.gov. The EPA may publish any comment received to its public docket. Do not submit electronically any information you consider to be Confidential Business Information (CBI) or other information whose disclosure is restricted by statute. Multimedia submissions (audio, video, etc.) must be accompanied by a written comment. The written comment is considered the official comment and should include discussion of all points you wish to make. The EPA will generally not consider comments or comment contents located outside of the primary submission (*i.e.,* on the web, cloud, or other file sharing system). For additional submission methods, the full EPA public comment policy, information about CBI or multimedia submissions, and general guidance on making effective comments, please visit *http://www2.epa.gov/dockets/commenting-epa-dockets*.

*Instructions:* Direct your comments to Docket ID No. EPA–R08–OAR–2015–0463. The EPA's policy is that all comments received will be included in the public docket and may be made available online at *http://www.regulations.gov,* including any personal information provided, unless the comment includes information claimed to be Confidential Business Information (CBI) or other information whose disclosure is restricted by statute. Do not submit information that you consider to be CBI or otherwise protected through *www.regulations.gov* or email. The *www.regulations.gov* Web site is an ''anonymous access'' system, which means EPA will not know your identity or contact information unless you provide it in the body of your comment. If you send an email comment directly to EPA, without going through *www.regulations.gov* your email address will be automatically captured and included as part of the comment that is placed in the public docket and made available on the Internet. If you submit an electronic comment, EPA recommends that you include your name and other contact information in the body of your comment and with any disk or CD–ROM you submit. If EPA cannot read your comment due to technical difficulties and cannot contact you for clarification, EPA may not be able to consider your comment. Electronic files should avoid the use of special characters, any form of encryption, and be free of any defects or viruses. For additional information about EPA's public docket visit the EPA Docket Center homepage at *http://www.epa.gov/epahome/dockets.htm*. For additional instructions on submitting comments, go to section I, General Information, of the **SUPPLEMENTARY INFORMATION** section of this document.

*Docket:* All documents in the docket are listed in the *www.regulations.gov* index. Although listed in the index, some information is not publicly available, *e.g.,* CBI or other information whose disclosure is restricted by statute. Certain other material, such as copyrighted material, will be publicly available only in hard copy. Publicly available docket materials are available either electronically in *www.regulations.gov* or in hard copy at the Air Program, Environmental Protection Agency (EPA), Region 8, 1595 Wynkoop Street, Denver, Colorado 80202–1129. EPA requests that if at all possible, you contact the individual listed in the **FOR FURTHER INFORMATION CONTACT** section to view the hard copy of the docket. You may view the hard copy of the docket Monday through Friday, 8 a.m. to 4 p.m., excluding federal holidays.

**FOR FURTHER INFORMATION CONTACT:** Gail Fallon, Air Program, EPA, Region 8, Mailcode 8P–AR, 1595 Wynkoop Street, Denver, Colorado, 80202–1129, (303) 312–6281, *Fallon.Gail@epa.gov*.

**SUPPLEMENTARY INFORMATION:**

## Public Hearing

The public hearing will provide interested parties the opportunity to present data, views, or arguments concerning the proposed action. The EPA may ask clarifying questions during the oral presentations, but will not respond to the presentations at that time. Written statements and supporting information submitted during the comment period will be considered with the same weight as oral comments and supporting information presented at the public hearing. The hearing officer may limit the time available for each commenter to address the proposal to 5 minutes or less if the hearing officer determines it to be appropriate. The limitation is to ensure that everyone who wants to make a comment has the opportunity to do so. We will not be providing equipment for commenters to show overhead slides or make computerized slide presentations. Any person may provide written or oral

comments and data pertaining to our proposal at the public hearings. Verbatim transcripts, in English, of the hearings and written statements will be included in the rulemaking docket.

**Table of Contents**


I. General Information
II. Overview of Proposed Actions
A. Brief Description of These Co-Proposals
1. Summary of Proposal To Approve the SIP
2. Summary of Proposal To Partially Approve and Partially Disapprove the SIP and Propose a FIP
III. Background and Requirements for Regional Haze SIPs and Utah Submittals
A. Statutory and Regulatory Background
1. Regional Haze
2. Requirements of the CAA and EPA's Regional Haze Rule (RHR)
3. Roles of Agencies in Addressing Regional Haze
4. Development of the Requirements for 40 CFR 51.309
5. SIP and FIP Background
B. Requirements for Regional Haze SIPs Applicable to This Proposal
1. The CAA and the Regional Haze Rule
2. Determination of Baseline, Natural and Current Visibility Conditions
3. Best Available Retrofit Technology
4. Monitoring, Recordkeeping and Reporting
5. Consultation With States and Federal Land Managers (FLMs)
C. Requirements for Regional Haze SIPs Submitted Under 40 CFR 51.309
1. Projection of Visibility Improvement
2. Stationary Source Reductions
a. Sulfur Dioxide Emission Reductions
b. Provisions for Stationary Source Emissions of Nitrogen Oxides and Particulate Matter
D. General Requirements for $PM_{10}$ and $NO_X$ Alternative Programs Under the Regional Haze Rule and the "Better-Than-BART Demonstration"
E. Summary of State Regional Haze Submittals and EPA Actions
1. 2008 and 2011 Utah RH SIPs
2. 2012 EPA Action on 2011 and 2008 Utah RH SIPs
3. 2013 Litigation
4. 2015 Utah RH SIPs
IV. Utah's Regional Haze SIP
A. Summary of Elements Under EPA's Previous Actions Upon Which We Are Relying
1. Affected Class I Areas
2. BART-Eligible Sources
3. Sources Subject-to-BART
B. Summary of Utah's BART Alternative and $PM_{10}$ BART SIP Revision
1. Utah BART Alternative
2. $PM_{10}$ BART Determinations
3. Monitoring, Recordkeeping and Reporting
C. Summary of Utah's Demonstration for Alternative Program
1. A List of All BART-Eligible Sources Within the State
2. A List of All BART-Eligible Sources and All BART Source Categories Covered by the Alternative Program
3. Analysis of BART and Associated Emission Reductions Achievable
4. Analysis of Projected Emissions Reductions Achievable Through the BART Alternative
5. A Determination That the Alternative Achieves Greater Reasonable Progress Than Would Be Achieved Through the Installation and Operation of BART
a. Annual Emissions Comparison for Visibility-Impairing Pollutants
b. Improvement in the Number of Days With Significant Visibility Impairment
c. 98th Percentile Impact (dv)
d. Annual Average Impact (dv)
e. 90th Percentile Impact (dv)
f. Timing for the Emissions Reductions
g. IMPROVE Monitoring Data
h. Energy and Non-Air Quality Benefits
i. Cost
6. Requirement That Emission Reductions Take Place During Period of First Long-Term Strategy
7. Demonstration That Emission Reductions From Alternative Program Will Be Surplus
D. Summary of Utah's Enforceable Commitment SIP Revision
E. Consultation With FLMs
V. EPA's Evaluation and Proposed Approval of Utah's Regional Haze SIP
A. Basis for Proposed Approval
B. Utah BART Alternative
1. Summary of Utah BART Alternative
2. Demonstration of Greater Reasonable Progress for the Alternative Program
a. A List of All BART-Eligible Sources Within the State
b. A List of All BART-Eligible Sources and All BART Source Categories Covered by the Alternative Program
c. Analysis of BART and Associated Emission Reductions
d. Analysis of Projected Emissions Reductions Achievable Through the BART Alternative
e. A Determination That the Alternative Achieves Greater Reasonable Progress Than Would Be Achieved Through the Installation and Operation of BART
f. Evaluation of the Weight of Evidence
g. Requirement That Emission Reductions Take Place During Period of First Long-Term Strategy
h. Demonstration That Emission Reductions From Alternative Program Will Be Surplus
C. $PM_{10}$ BART Determinations
D. Monitoring, Recordkeeping, and Reporting
E. Consultation With FLMs
VI. EPA's Evaluation and Proposed Partial Approval and Partial Disapproval of Utah's Regional Haze SIP
A. Basis for Proposed Partial Disapproval and Partial Approval
B. Utah BART Alternative
1. Summary of Utah BART Alternative
2. Demonstration of Greater Reasonable Progress for Alternative Program
a. A List of All BART-Eligible Sources Within the State
b. A List of All BART-Eligible Sources and All BART Source Categories Covered by the Alternative Program
c. Analysis of BART and Associated Emission Reductions Achievable
d. Analysis of Projected Emissions Reductions Achievable Through the BART Alternative
e. A Determination That the Alternative Achieves Greater Reasonable Progress Than Would Be Achieved Through the Installation and Operation of BART
f. Evaluation of the Weight of Evidence
g. Evaluation That Emission Reductions Take Place During Period of First Long-Term Strategy
h. Demonstration That Emission Reductions From Alternative Program Will Be Surplus
C. Monitoring, Recordkeeping and Reporting for Utah's BART Alternative
D. Proposed Federal Implementation Plan
1. BART Evaluations
a. Costs of Compliance
b. Visibility Impact Modeling
2. Hunter Power Plant
a. Hunter Unit 1
b. Hunter Unit 2
3. Huntington Power Plant
a. Huntington Unit 1
b. Huntington Unit 2
4. Federal Monitoring, Recordkeeping, and Reporting
E. $PM_{10}$ BART Determinations
F. Consultation With FLMs
VII. EPA's Proposed Actions
A. Proposed Approval
B. Proposed Partial Disapproval/Approval and Federal Implementation Plan
VIII. Statutory and Executive Order Reviews
A. Executive Order 12866: Regulatory Planning and Review and Executive Order 13563: Improving Regulation and Regulatory Review
B. Paperwork Reduction Act
C. Regulatory Flexibility Act
D. Unfunded Mandates Reform Act (UMRA)
E. Executive Order 13132: Federalism
F. Executive Order 13175: Consultation and Coordination With Indian Tribal Governments
G. Executive Order 13045: Protection of Children From Environmental Health Risks and Safety Risks
H. Executive Order 13211: Actions Concerning Regulations That Significantly Affect Energy Supply, Distribution, or Use
I. National Technology Transfer and Advancement Act
J. Executive Order 12898: Federal Actions To Address Environmental Justice in Minority Populations and Low-Income Populations


## I. General Information

*What should I consider as I prepare my comments for EPA?*

1. *Submitting Confidential Business Information (CBI).* Do not submit CBI to EPA through *http://www.regulations.gov* or email. Clearly mark the part or all of the information that you claim to be CBI. For CBI information on a disk or CD–ROM that you mail to EPA, mark the outside of the disk or CD–ROM as CBI and then identify electronically within the disk or CD ROM the specific

information that is claimed as CBI. In addition to one complete version of the comment that includes information claimed as CBI, a copy of the comment that does not contain the information claimed as CBI must be submitted for inclusion in the public docket. Information so marked will not be disclosed except in accordance with procedures set forth in 40 CFR part 2.

2. *Tips for preparing your comments.* When submitting comments, remember to:

- Identify the rulemaking by docket number and other identifying information (subject heading, **Federal Register**, date, and page number);
- Follow directions and organize your comments;
- Explain why you agree or disagree;
- Suggest alternatives and substitute language for your requested changes;
- Describe any assumptions and provide any technical information and/ or data that you used;
- If you estimate potential costs or burdens, explain how you arrived at your estimate in sufficient detail to allow for it to be reproduced;
- Provide specific examples to illustrate your concerns, and suggest alternatives;
- Explain your views as clearly as possible, avoiding the use of profanity or personal threats; and
- Make sure to submit your comments by the comment period deadline identified.

## II. Overview of Proposed Actions

The State of Utah submitted SIP revisions on June 4, 2015, and October 20, 2015, to fulfill the CAA requirement to meet the requirements for the Best Available Retrofit Technology (BART) in the Regional Haze Rule (RHR) for the pollutants $NO_X$ and $PM_{10}$. As described more fully in Section III, the purpose of the RHR is to remedy and prevent impairment of visibility in Class I areas resulting from anthropogenic air pollution. Instead of establishing BART controls for $NO_X$, Utah's SIP revisions contain an alternative to BART. The revisions also include BART controls for $PM_{10}$. The idea of a BART alternative, which can take into account (and even encourage) plans that take into account state specific situations is a reasonable one, and one EPA supports where consistent with the CAA and RHR.

The State's SIP contains a $NO_X$ BART Alternative and metrics to evaluate the BART Alternative. In light of the variety of metrics Utah used, this is a complicated analysis and EPA considered the State's BART Alternative in the context of other previous decisions we and the states have made. EPA carefully analyzed the SIP revisions and the supporting information submitted by the State. We also conducted additional analyses, which are included with this proposal. Based on a careful consideration of all of this information, EPA is proposing and soliciting comments on two different actions: A proposal to approve the State SIP in its entirety,[1] and a proposal to partially approve and partially disapprove the State SIP and propose a FIP.[2] EPA takes seriously its decision to co-propose these two actions (disapprove part of the State's plan, alongside proposing to approve it), as it is preferable that the regional haze program be implemented through state plans. As part of its oversight responsibilities, EPA must be able to find that the state plan is consistent with the requirements of the Act. In this instance, we developed analyses and rationale supporting both a proposed approval and a proposed partial approval and partial disapproval, and we solicit input on each proposal. EPA intends to finalize only one proposal, although the details of our final action may differ somewhat from what is presented here based on any comments and additional information we receive.

Deciding whether to approve the State SIP entails an evaluation of Utah's SIP revision with respect to three elements in the RHR: (1) ''[a] demonstration that the emissions trading program or other alternative measure will achieve greater reasonable progress than would have resulted from the installation and operation of BART at all sources subject to BART in the State and covered by the alternative program'';[3] (2) ''[a] requirement that all necessary emission reductions take place during the period of the first long-term strategy for regional haze'';[4] and (3) ''[a] demonstration that the emissions reductions resulting from the alternative measure will be surplus to those reductions resulting from measures adopted to meet requirements of the CAA as of the baseline date of the SIP.''[5]

For the first element, the determination that the alternative measure will achieve greater reasonable progress than BART, the State must provide the following: (1) A list of all BART-eligible sources within the State; (2) a list of all BART-eligible sources and all BART source categories covered by the alternative program; (3) an analysis of BART and associated emission reductions; (4) an analysis of the projected emission reductions achievable through the BART alternative; and (5) a determination that the alternative achieves greater reasonable progress than would be achievable through the installation and operation of BART. A State has several options for making the greater reasonable progress determination;[6] in this instance, the State elected to use two separate approaches.

EPA's evaluation of the BART Alternative therefore entails consideration of both of the State's analyses. As described in our 2006 revisions to the RHR, concerning BART alternatives, ''[t]he State's discretion in this area is subject to the condition that it must be reasonably exercised and that its decisions be supported by adequate documentation of its analyses.''[7] As presented in section V, several of the metrics in the State's analyses appear to support a determination that a BART Alternative presented by the State achieves greater reasonable progress than BART. However, several other metrics in the State's analyses do not appear to support a conclusion that the BART Alternative achieves greater reasonable progress. The complexity of our evaluation leads us to propose and solicit comment on two conclusions and courses of action: (1) The State's submittal meets the test above and we approve the BART Alternative; or (2) the State's submittal falls short of meeting this test and we disapprove the BART Alternative and promulgate a FIP for $NO_X$ BART. We request comment on all aspects of each proposal.

Given the complexities in evaluating these co-proposals, EPA wants to ensure that our final decision is based on the best and most currently available data and information, and is taken with the fullest possible consideration of public input. Therefore, in addition to seeking comments on the co-proposals, we are

[1] Our proposed approval for one element, reporting for PM BART limits, is a conditional approval based on a commitment from Utah to provide a SIP revision to address this element. See section V.D of this document for a more detailed explanation.

[2] In March 2015, conservation groups sued EPA in the U.S. District Court for the District of Colorado alleging that EPA failed to promulgate a regional haze FIP for Utah within the two-year period allowed by CAA section 110(c). *See Wildearth Guardians* v. *McCarthy, Case No. 1:15–cv–oo630–MSK–KLM, at *1–2* (D. Colo. Mar. 27, 2015). EPA entered into a consent decree resolving this dispute requiring EPA to sign notices of proposed and final rulemaking for the regional haze requirements for Utah by December 16, 2015 and June 1, 2016, respectively. The signing of this proposed rule partially fulfills EPA's obligations under the consent decree. *See id.* (Doc. 60, Motion to Enter Consent Decree filed on December 8, 2015).

[3] 40 CFR 51.308(e)(2)(i).

[4] 40 CFR 51.308(e)(2)(iii).

[5] 40 CFR 51.308(e)(2)(iv).

[6] 40 CFR 51.308(e)(2)(i)(E); 40 CFR 51.308(e)(3).

[7] 71 FR 60612, 60621 (Oct. 13, 2006).

also asking if interested parties have additional information or analysis on the co-proposals, for example, analysis related to the modeled visibility benefits of the BART Alternative compared to BART. In light of any such information, we are asking whether interested parties think the Agency should consider BART Alternatives or BART control technology options that are related to what we propose and that could be finalized as our FIP (if we disapprove the Utah SIP submittal in our final action). The Agency is also asking if interested parties have additional information or comments on the proposed timing of compliance.

The Agency will take the comments and testimony received, as well as any further SIP revisions received from the State prior to our final action, into consideration in our final promulgation. As noted above, additional information and comments may lead the Agency to adopt final SIP and/or FIP regulations that differ somewhat from the co-proposals presented here regarding the BART Alternative, BART control technology option or emission limits, or impact other proposed regulatory provisions. EPA's final action will fully consider these complex issues and the comments received, which will result in the selection of a final action that meets the CAA and regulatory requirements requiring development and implementation of plans to ensure reasonable progress toward improving visibility in mandatory Class I areas by reducing emissions that cause or contribute to regional haze.

*A. Brief Description of These Co-Proposals*

1. Summary of Proposal To Approve the SIP

As explained more fully later, we are proposing to approve these aspects of the State's June 4, 2015 SIP submittal:

• $NO_X$ BART Alternative, including $NO_X$ emission reductions from Hunter Units 1, 2, and 3, Huntington Units 1 and 2, and Carbon Units 1 and 2, and sulfur dioxide ($SO_2$) and $PM_{10}$ emission reductions from Carbon Units 1 and 2.

• BART determinations and emission limits for $PM_{10}$ at Hunter Units 1 and 2 and Huntington Units 1 and 2.

• Monitoring, recordkeeping, and reporting requirements for units subject to the BART Alternative and the $PM_{10}$ emission limits.

We are proposing to approve these elements of the State's October 20, 2015 SIP submittal:

• Enforceable commitments to revise SIP section XX.D.3.c and state rule R307–150 by March 2018 to clarify emission inventory requirements for tracking compliance with the $SO_2$ milestone and properly accounting for the $SO_2$ emission reductions due to the closure of the Carbon plant.

2. Summary of Proposal to Partially Approve and Partially Disapprove the SIP and Propose a FIP

We are proposing to approve these elements of the State's SIP submittals:

• BART determinations and emission limits for $PM_{10}$ at Hunter Units 1 and 2, and Huntington Units 1 and 2.

• Monitoring, recordkeeping, and reporting requirements for units subject to the $PM_{10}$ emission limits.

We are proposing to disapprove these aspects of the State's June 4, 2015 SIP:

• $NO_X$ BART Alternative, including $NO_X$ emission reductions from Hunter Units 1, 2, and 3, Huntington Units 1 and 2, and Carbon Units 1 and 2, and $SO_2$ and $PM_{10}$ emission reductions from Carbon Units 1 and 2.

We are proposing to disapprove the State's October 20, 2015 SIP submittal.

We are proposing promulgation of a FIP to address the deficiencies in the Utah regional haze SIPs that are identified in this notice. The proposed FIP includes the following elements:

• $NO_X$ BART determinations and emission limits for Hunter Units 1 and 2 and Huntington Units 1 and 2.

• Monitoring, recordkeeping, and reporting requirements for $NO_X$ at Hunter Units 1 and 2, and Huntington Units 1 and 2.

If we partially disapprove the SIP, and promulgate a FIP, the State may submit a SIP revision to supersede the FIP. If we determine that the SIP revision is approvable, regardless of whether or not its terms match those of our final FIP, we would propose to approve such a SIP revision. If we issue a final FIP, we encourage the State to submit a SIP revision to replace the FIP.

## III. Background and Requirements for Regional Haze SIPs and Utah Submittals

*A. Statutory and Regulatory Background*

1. Regional Haze

Regional haze is visibility impairment that is produced by numerous sources that are located across a broad geographic area and emit fine particles ($PM_{2.5}$) (*e.g.,* sulfates, nitrates, organic carbon (OC), elemental carbon (EC), and soil dust), and their precursors (*e.g.,* $SO_2$, $NO_X$, and in some cases, ammonia ($NH_3$) and volatile organic compounds (VOC)). Coarse PM also impairs visibility. Fine particle precursors react in the atmosphere to form $PM_{2.5}$, which impairs visibility by scattering and absorbing light. Visibility impairment reduces the clarity, color, and visible distance that one can see, $PM_{2.5}$ can also cause serious health effects and mortality in humans and contributes to environmental effects such as acid deposition and eutrophication. Coarse PM also can cause adverse health effects.

Data from the existing visibility monitoring network, the ''Interagency Monitoring of Protected Visual Environments'' (IMPROVE) monitoring network, show that at the time the regional haze rule was finalized in 1999, visibility impairment caused by air pollution occurred virtually all the time at most national parks and wilderness areas. The average visual range [8] in many Class I areas (*i.e.,* national parks, wilderness areas, and international parks meeting certain size criteria) in the western U.S. was 62–93 miles, but in some Class I areas, these visual ranges may have been impacted by natural wildfire and dust episodes.[9] In most of the eastern Class I areas of the U.S., the average visual range was less than 19 miles, ''or about one-fifth of the visual range that would exist under estimated natural conditions.'' [10]

2. Requirements of the CAA and EPA's Regional Haze Rule (RHR)

In section 169A of the 1977 Amendments to the CAA, Congress created a program for protecting visibility in the nation's national parks and wilderness areas. This section of the CAA establishes ''as a national goal the prevention of any future, and the remedying of any existing, impairment of visibility in mandatory class I Federal areas which impairment results from manmade air pollution.'' [11] On

[8] Visual range is the greatest distance, in kilometers or miles, at which a dark object can be viewed against the sky.

[9] 64 FR 35715, 35716 (July 1, 1999).

[10] *Id.*

[11] 42 U.S.C. 7491(a). Areas designated as mandatory Class I Federal areas consist of national parks exceeding 6000 acres, wilderness areas and national memorial parks exceeding 5000 acres, and all international parks that were in existence on August 7, 1977. 42 U.S.C. 7472(a). In accordance with section 169A of the CAA, EPA, in consultation with the Department of Interior, promulgated a list of 156 areas where visibility is identified as an important value. 44 FR 69122 (Nov. 30, 1979). The extent of a mandatory Class I area includes subsequent changes in boundaries, such as park expansions. 42 U.S.C. 7472(a). Although states and tribes may designate as Class I additional areas which they consider to have visibility as an important value, the requirements of the visibility program set forth in section 169A of the CAA apply only to ''mandatory Class I Federal areas.'' Each mandatory Class I Federal area is the responsibility of a ''Federal Land Manager.'' 42 U.S.C. 7602(i). When we use the term ''Class I area'' in this section, we mean a ''mandatory Class I Federal area.''

December 2, 1980, EPA promulgated regulations to address visibility impairment in Class I areas that are ''reasonably attributable'' to a single source or small group of sources, *i.e.,* reasonably attributable visibility impairment.[12] These regulations represented the first phase in addressing visibility impairment. EPA deferred action on regional haze that emanates from a variety of sources until monitoring, modeling and scientific knowledge about the relationships between pollutants and visibility impairment were improved.

Congress added section 169B to the CAA in 1990 to address regional haze issues. EPA promulgated a rule to address regional haze on July 1, 1999.[13] The RHR revised the existing visibility regulations to integrate into the regulation provisions addressing regional haze impairment and established a comprehensive visibility protection program for Class I areas. The requirements for regional haze, found at 40 CFR 51.308 and 51.309, are included in EPA's visibility protection regulations at 40 CFR 51.300 through 309. Some of the main elements of the regional haze requirements are summarized later in section III.C of this preamble. The requirement to submit a regional haze SIP applies to all 50 states, the District of Columbia, and the Virgin Islands. 40 CFR 51.308(b) requires states to submit the first implementation plan addressing regional haze visibility impairment no later than December 17, 2007.[14]

Once EPA has found that a state has failed to make a required submission, EPA is required to promulgate a FIP within two years unless the state submits a SIP and the Agency approves it within the two-year period.[15]

3. Roles of Agencies in Addressing Regional Haze

Successful implementation of the regional haze program requires long-term regional coordination among states, tribal governments, and various federal agencies. As noted previously, pollution affecting the air quality in Class I areas can be transported over long distances, even hundreds of kilometers. Therefore, to effectively address the problem of visibility impairment in Class I areas, states need to develop strategies in coordination with one another, taking into account the effect of emissions from one jurisdiction on the air quality in another.

Because the pollutants that lead to regional haze can originate from sources located across broad geographic areas, EPA has encouraged the states and tribes across the United States to address visibility impairment from a regional perspective. Five regional planning organizations (RPOs) were created to address regional haze and related issues. The RPOs first evaluated technical information to better understand how their states and tribes impact Class I areas across the country, and then pursued the development of regional strategies to reduce emissions of pollutants that lead to regional haze.

The Western Regional Air Partnership (WRAP) RPO is a collaborative effort of state governments, tribal governments, and various federal agencies established to initiate and coordinate activities associated with the management of regional haze, visibility and other air quality issues in the western United States. WRAP member state governments include: Alaska, Arizona, California, Colorado, Idaho, Montana, New Mexico, North Dakota, Oregon, South Dakota, Utah, Washington, and Wyoming. Tribal members include Campo Band of Kumeyaay Indians, Confederated Salish and Kootenai Tribes, Cortina Indian Rancheria, Hopi Tribe, Hualapai Nation of the Grand Canyon, Native Village of Shungnak, Nez Perce Tribe, Northern Cheyenne Tribe, Pueblo of Acoma, Pueblo of San Felipe, and Shoshone-Bannock Tribes of Fort Hall.

4. Development of the Requirements for 40 CFR 51.309

EPA's RHR provides two paths to address regional haze. One is 40 CFR 51.308, requiring states to perform individual point source BART determinations and evaluate the need for other control strategies. These strategies must be shown to make ''reasonable progress'' in improving visibility in Class I areas inside the state and in neighboring jurisdictions. The other method for addressing regional haze is through 40 CFR 51.309, and is an option for nine states termed the ''Transport Region States,'' which include: Arizona, California, Colorado, Idaho, Nevada, New Mexico, Oregon, Utah, and Wyoming. By meeting the requirements under 40 CFR 51.309, states can be deemed to be making reasonable progress toward the national goal of achieving natural visibility conditions for the 16 Class I areas on the Colorado Plateau.

Section 309 requires participating states to adopt regional haze strategies that are based on recommendations from the Grand Canyon Visibility Transport Commission (GCVTC) for protecting the 16 Class I areas on the Colorado Plateau.[16] The EPA established the GCVTC on November 13, 1991. The purpose of the GCVTC was to assess information about the adverse impacts on visibility in and around the 16 Class I areas on the Colorado Plateau and to provide policy recommendations to EPA to address such impacts. Section 169B of the CAA called for the GCVTC to evaluate visibility research, as well as other available information, pertaining to adverse impacts on visibility from potential or projected growth in emissions from sources located in the region. The GCVTC determined that all Transport Region States could potentially impact the Class I areas on the Colorado Plateau. The GCVTC submitted a report to EPA in 1996 with its policy recommendations for protecting visibility for the Class I areas on the Colorado Plateau. Provisions of the 1996 GCVTC report include: Strategies for addressing smoke emissions from wildland fires and agricultural burning; provisions to prevent pollution by encouraging renewable energy development; and provisions to manage clean air corridors (CACs), mobile sources, and wind-blown dust, among other things. The EPA codified these recommendations as an option available to states as part of the 1999 RHR.[17]

EPA determined that the GCVTC strategies would provide for reasonable progress in mitigating regional haze if supplemented by an annex containing quantitative emission reduction milestones and provisions for a trading program or other alternative measure.[18] Thus, the 1999 RHR required that western states submit an annex to the GCVTC report with quantitative milestones and detailed guidelines for an alternative program in order to establish the GCVTC recommendations as an alternative approach to fulfilling the section 308 requirements for compliance with the RHR. In September

[12] 45 FR 80084, 80084 (Dec. 2, 1980).

[13] 64 FR 35714, 35714 (July 1, 1999) (codified at 40 CFR part 51, subpart P).

[14] EPA's RHR requires subsequent updates to the regional haze SIPs. 40 CFR 51.308(g) through (i).

[15] 42 U.S.C. 7410(c)(1).

[16] The Colorado Plateau is a high, semi-arid tableland in southeast Utah, northern Arizona, northwest New Mexico, and western Colorado. The 16 mandatory Class I areas are as follows: Grand Canyon National Park, Mount Baldy Wilderness, Petrified Forest National Park, Sycamore Canyon Wilderness, Black Canyon of the Gunnison National Park Wilderness, Flat Tops Wilderness, Maroon Bells Wilderness, Mesa Verde National Park, Weminuche Wilderness, West Elk Wilderness, San Pedro Parks Wilderness, Arches National Park, Bryce Canyon National Park, Canyonlands National Park, Capital Reef National Park, and Zion National Park.

[17] 64 FR 35714, 35749 (July 1, 1999).

[18] 64 FR 35714, 35749, 35756.

2000, the WRAP, which is the successor organization to the GCVTC, submitted an annex to EPA. The annex contained $SO_2$ emissions reduction milestones and detailed provisions of a backstop trading program to be implemented automatically if voluntary measures failed to achieve the $SO_2$ milestones. EPA codified the annex on June 5, 2003 at 40 CFR 51.309(h).[19]

Five western states, including Utah, submitted implementation plans under section 309 in 2003. EPA was challenged by the Center for Energy and Economic Development (CEED) on the validity of the annex provisions. In *CEED* v. *EPA,* the DC Circuit Court of Appeals vacated EPA approval of the WRAP annex.[20] In response to the court's decision, EPA vacated the annex requirements adopted under 40 CFR 51.309(h), but left in place the stationary source requirements in 40 CFR 51.309(d)(4).[21] The requirements under 40 CFR 51.309(d)(4) contain general requirements pertaining to stationary sources and market trading, and allow states to adopt alternatives to the point source application of BART.

5. SIP and FIP Background

The CAA requires each state to develop plans to meet various air quality requirements, including protection of visibility.[22] The plans developed by a state are referred to as SIPs. A state must submit its SIPs and SIP revisions to EPA for approval. Once approved, a SIP is enforceable by EPA and citizens under the CAA, which is also known as being federally enforceable. If a state fails to make a required SIP submittal or if we find that a state's required submittal is incomplete or not approvable, then we must promulgate a FIP to fill this regulatory gap.[23] As discussed elsewhere in this preamble, one of the proposals would disapprove aspects of Utah's regional haze SIP and promulgate a FIP to address the deficiencies in Utah's regional haze SIP, should we disapprove the SIP in our final action.

*B. Requirements for Regional Haze SIPs Applicable to This Proposal*

1. The CAA and the Regional Haze Rule

Regional haze SIPs must assure reasonable progress towards the national goal of achieving natural visibility conditions in Class I areas. Section 169A of the CAA and EPA's implementing regulations require states to establish long-term strategies for making reasonable progress toward meeting this goal. Implementation plans must also give specific attention to certain stationary sources that were in existence on August 7, 1977, but were not in operation before August 7, 1962, and require these sources, where appropriate, to install BART controls for the purpose of eliminating or reducing visibility impairment. The specific regional haze SIP requirements are discussed in further detail later on.

2. Determination of Baseline, Natural, and Current Visibility Conditions

The RHR establishes the deciview (dv) as the principal metric or unit for expressing visibility.[24] This visibility metric expresses uniform changes in the degree of haze in terms of common increments across the entire range of visibility conditions, from pristine to extremely hazy conditions. Visibility expressed in deciviews is determined by using air quality measurements to estimate light extinction and then transforming the value of light extinction using a logarithmic function. The dv is a more useful measure for tracking progress in improving visibility than light extinction itself because each dv change is an equal incremental change in visibility perceived by the human eye. Most people can detect a change in visibility at one dv.[25]

The dv is used in expressing reasonable progress goals (RPGs, which are interim visibility goals towards meeting the national visibility goal), in defining baseline, current, and natural conditions; and in tracking changes in visibility. The regional haze SIPs must contain measures that ensure ''reasonable progress'' toward the national goal of preventing and remedying visibility impairment in Class I areas caused by anthropogenic emissions that cause or contribute to regional haze. The national goal is a return to natural conditions, *i.e.* to reach a state at which anthropogenic sources of air pollution no longer impair visibility in Class I areas.

To track changes in visibility over time at each of the 156 Class I areas covered by the visibility program,[26] and as part of the process for determining reasonable progress, states must calculate the degree of existing visibility impairment at each Class I area at the time of each regional haze SIP submittal and review progress every five years, midway through each 10-year implementation period. To do this, the RHR requires states to determine the degree of impairment (in deciviews) for the average 20 percent least impaired (''best'') and 20 percent most impaired (''worst'') visibility days over a specified time period at each of their Class I areas. In addition, states must also develop an estimate of natural visibility conditions for the purpose of comparing progress toward the national goal. Natural visibility is determined by estimating the natural concentrations of pollutants that cause visibility impairment and then calculating total light extinction based on those estimates. In 2003, EPA provided guidance to states regarding how to calculate baseline, natural and current visibility conditions.[27] Subsequently, the Natural Haze Levels II Committee developed updated estimates of natural haze for average natural conditions and for the averages of the best 20% and worst 20% natural condition days [28] that have been used by states and EPA in visibility assessments.

For the first regional haze SIPs that were due by December 17, 2007, ''baseline visibility conditions'' were the starting points for assessing ''current'' visibility impairment. Baseline visibility conditions represent the five-year averages of the degree of visibility impairment for the 20 percent least impaired days and the 20 percent most impaired days for each calendar year from 2000 to 2004. Using monitoring data for 2000 through 2004, states are required to calculate the average degree of visibility impairment for each Class I area, based on the average of annual values over the five-year period. The comparison of initial baseline visibility conditions to natural visibility conditions indicates the amount of improvement necessary to attain natural visibility, while the future comparison of baseline conditions to the then current conditions will indicate the

[19] 68 FR 33764, 33767 (June 5, 2003).

[20] *Ctr. for Energy & Econ. Dev. v. EPA,* 398 F.3d 653, 654 (D.C. Cir. 2005).

[21] 71 FR 60612, 60612 (Oct. 13, 2006).

[22] 42 U.S.C. 7410(a), 7491, and 7492(a), 169A, and 169B.

[23] 42 U.S.C. 7410(c)(1).

[24] *See* 70 FR 39104, 39118 (July 6, 2005).

[25] The preamble to the RHR provides additional details about the deciview (dv) scale. 64 FR 35714, 35725 (July 1, 1999).

[26] 40 CFR 81.401–437.

[27] *Guidance for Estimating Natural Visibility Conditions Under the Regional Haze Rule,* EPA–454/B–03–005, available at *http://www3.epa.gov/ttn/caaa/t1/memoranda/rh_envcurhr_gd.pdf,* (hereinafter referred to as ''our 2003 Natural Visibility Guidance'') (Sept. 2003) (documents identified with Internet addresses are available in the docket) ; *Guidance for Tracking Progress Under the Regional Haze Rule,* EPA–454/B–03–004, available at *http://www3.epa.gov/ttnamti1/files/ambient/visible/tracking.pdf* (hereinafter referred to as our ''2003 Tracking Progress Guidance'') (Sept. 2003).

[28] ''Natural Haze Levels II: Application of the New IMPROVE Algorithm to Natural Species Concentrations Estimates'', Final Report by the Natural Haze Levels II Committee to the RPO Monitoring/Data Analysis Workgroup, power point presentation included in the docket.

Appellate Case: 21-9509 Document: 101-2 Date Filed: 06/10/2022 Page: 51


amount of progress made. In general, the 2000–2004 baseline period is considered the time from which improvement in visibility is measured.

3. Best Available Retrofit Technology

Section 169A of the CAA directs states to evaluate the use of retrofit controls at certain larger, often uncontrolled, older stationary sources in order to address visibility impacts from these sources. Specifically, section 169A(b)(2)(A) of the CAA requires states to revise their SIPs to contain such measures as may be necessary to make reasonable progress towards the natural visibility goal, including a requirement that certain categories of existing major stationary sources [29] built between 1962 and 1977 procure, install, and operate the ''Best Available Retrofit Technology'' as determined by the state. Under the RHR, states are directed to conduct BART determinations for such ''BART-eligible'' sources that may be anticipated to cause or contribute to any visibility impairment in a Class I area. Rather than requiring source-specific BART controls, states also have the flexibility to adopt an emissions trading program or other alternative program as long as the alternative provides greater reasonable progress towards improving visibility than BART.

On July 6, 2005, EPA published the ''Guidelines for BART Determinations Under the Regional Haze Rule'' at appendix Y to 40 CFR part 51 (hereinafter referred to as the ''BART Guidelines'') to assist states in determining which of their sources should be subject to the BART requirements and in determining appropriate emission limits for each applicable source.[30] In making a BART determination for a fossil fuel-fired electric generating plant with a total generating capacity in excess of 750 megawatts (MW), a state must use the approach set forth in the BART Guidelines. A state is encouraged, but not required, to follow the BART Guidelines in making BART determinations for other types of sources. Regardless of source size or type, a state must meet the requirements of the CAA and our regulations for selection of BART, and the state's BART analysis and determination must be reasonable in light of the overarching purpose of the regional haze program.

The process of establishing BART emission limitations can be logically broken down into three steps: First, states identify those sources that meet the definition of ''BART-eligible source'' set forth in 40 CFR 51.301; [31] second, states determine which of such sources ''emits any air pollutant which may reasonably be anticipated to cause or contribute to any impairment of visibility in any such area'' [32] (a source that fits this description is ''subject-to-BART''); and third, for each source subject-to-BART, states then identify the best available type and level of control for reducing emissions.

States must address all visibility-impairing pollutants emitted by a source in the BART determination process. The most significant visibility impairing pollutants are $SO_2$, $NO_X$, and PM. EPA has stated that states should use their best judgment in determining whether VOC or $NH_3$ compounds impair visibility in Class I areas.

Under the BART Guidelines, states may select an exemption threshold value for their BART modeling, below which a BART-eligible source would not be expected to cause or contribute to visibility impairment in any Class I area. The state must document this exemption threshold value in the SIP and must state the basis for its selection of that value. Any source with emissions that model above the threshold value would be subject to a BART determination review. The BART Guidelines acknowledge varying circumstances affecting different Class I areas. States should consider the number of emission sources affecting the Class I areas at issue and the magnitude of the individual sources' impacts. Any exemption threshold set by the state should not be higher than 0.5 dv.[33]

In their SIPs, states must identify the sources that are subject-to-BART and document their BART control determination analyses for such sources. In making their BART determinations, section 169A(g)(2) of the CAA requires that states consider the following factors when evaluating potential control technologies: (1) The costs of compliance; (2) the energy and non-air quality environmental impacts of compliance; (3) any existing pollution control technology in use at the source; (4) the remaining useful life of the source; and (5) the degree of improvement in visibility which may reasonably be anticipated to result from the use of such technology.

A regional haze SIP must include source-specific BART emission limits and compliance schedules for each source subject-to-BART. Once a state has made its BART determination, the BART controls must be installed and in operation as expeditiously as practicable, but no later than five years after the date of EPA approval of the regional haze SIP.[34] As noted previously, the RHR allows states to implement an alternative program in lieu of BART so long as the alternative program can be demonstrated to achieve greater reasonable progress toward the national visibility goal than would BART.

4. Monitoring, Recordkeeping and Reporting

The CAA requires that SIPs, including the regional haze SIP, contain elements sufficient to ensure emission limits are practically enforceable. CAA section 110(a)(2) requires in part that the monitoring, recordkeeping and reporting (MRR) provisions of states' SIPs must include enforceable emission limitations, control measures, and compliance timeframes. It also requires SIPs to provide for enforcement of these measures, installation, maintenance, and replacement of equipment, emissions monitoring, periodic emissions reports and availability of emissions reports for public inspection.

Accordingly, 40 CFR part 51, subpart K, Source Surveillance, requires the SIP to provide for monitoring the status of compliance with the regulations in it, including ''[p]eriodic testing and inspection of stationary sources,'' [35] and ''legally enforceable procedures'' for recordkeeping and reporting.[36] Furthermore, 40 CFR part 51, appendix V, Criteria for Determining the Completeness of Plan Submissions, states in section 2.2 that complete SIPs contain: ''(g) Evidence that the plan contains emission limitations, work practice standards and recordkeeping/reporting requirements, where necessary, to ensure emission levels''; and ''(h) Compliance/enforcement strategies, including how compliance will be determined in practice.''

5. Consultation With States and Federal Land Managers (FLMs)

The RHR requires that states consult with FLMs before adopting and submitting their SIPs.[37] States must

[29] *See* 42 U.S.C. 7491(g)(7) (listing the set of ''major stationary sources'' potentially subject-to-BART).

[30] 70 FR 39104, 39104 (July 6, 2005).

[31] BART-eligible sources are those sources that have the potential to emit 250 tons or more of a visibility-impairing air pollutant, were not in operation prior to August 7, 1962, but were in existence on August 7, 1977, and whose operations fall within one or more of 26 specifically listed source categories. 40 CFR 51.301.

[32] 42 U.S.C. 7491(b)(2)(A).

[33] 40 CFR part 51, appendix Y, § III.A.1.

[34] 42 U.S.C. 7491(g)(4); 40 CFR 51.308(e)(1)(iv).

[35] 40 CFR 51.212(a).

[36] 40 CFR 51.211.

[37] 40 CFR 51.308(i).

provide FLMs an opportunity for consultation, in person and at least 60 days prior to holding any public hearing on the SIP. This consultation must include the opportunity for the FLMs to discuss their assessments of impairment of visibility in any Class I area and to offer recommendations on the development of the RPGs and on the development and implementation of strategies to address visibility impairment. Further, a state must include in its SIP a description of how it addressed any comments provided by the FLMs. Finally, a SIP must provide procedures for continuing consultation between the state and FLMs regarding the state's visibility protection program, including development and review of SIP revisions, five-year progress reports, and the implementation of other programs having the potential to contribute to impairment of visibility in Class I areas.

*C. Requirements for Regional Haze SIPs Submitted Under 40 CFR 51.309*

The following is a summary and basic explanation of the regulations covered under section 51.309 of the RHR that are addressed in this notice.[38]

1. Projection of Visibility Improvement

For each of the 16 Class I areas located on the Colorado Plateau, the SIP must include a projection of the improvement in visibility expressed in deciviews.[39] An explanation of the deciview metric is provided in section III.C.2. States need to show the projected visibility improvement for the best and worst 20 percent days through the year 2018, based on the application of all section 309 control strategies.

2. Stationary Source Reductions

a. Sulfur Dioxide Emission Reductions

Rather than requiring source-specific BART controls as explained previously in section III.C.4, states have the flexibility to adopt an emissions trading program or other alternative program as long as the alternative provides greater reasonable progress than would be achieved by the application of BART pursuant to 40 CFR 51.308(e)(2). Under 40 CFR 51.309, states can satisfy the $SO_2$ BART requirements by adopting $SO_2$ emission milestones and a backstop trading program.[40] Under this approach, states must establish declining $SO_2$ emission milestones for each year of the program through 2018. The milestones must be consistent with the GCVTC's goal of 50 to 70 percent reduction in $SO_2$ emissions by 2040.

Pursuant to 40 CFR 51.309(d)(4)(ii) through (iv), states must include requirements in the SIP that allow states to determine whether the milestone has been exceeded. These requirements include documentation of the baseline emission calculation, monitoring, recordkeeping, and reporting of $SO_2$ emissions, and provisions for conducting an annual evaluation to determine whether the milestone has been exceeded. SIPs must also contain requirements for implementing the backstop trading program in the event that the milestone is exceeded and the program is triggered.[41]

The WRAP, in conjunction with EPA, developed a model for a backstop trading program. In order to ensure consistency between states, states opting to participate in the 309 program needed to adopt rules that are substantively equivalent to the model rules for the backstop trading program to meet the requirements of 40 CFR 51.309(d)(4). The trading program must also be implemented no later than 15 months after the end of the first year that the milestone is exceeded, require that sources hold allowances to cover their emissions, and provide a framework, including financial penalties, to ensure that the 2018 milestone is met.

b. Provisions for Stationary Source Emissions of Nitrogen Oxides and Particulate Matter

Pursuant to 40 CFR 51.309(d)(4)(vii), a section 309 SIP must contain any necessary long term strategies and BART requirements for PM and $NO_X$. These requirements, including the process for conducting BART determinations either based on the consideration of the five statutory factors or based on an alternative program, are explained previously in section III.C.4 and in section III.E, respectively.

*D. General Requirements for $PM_{10}$ and $NO_X$ Alternative Programs Under the Regional Haze Rule and the "Better-Than-BART Demonstration"*

States opting to submit an alternative program must meet requirements under 40 CFR 51.308(e)(2) and (e)(3). These requirements for alternative programs relate to the "better-than-BART" test and fundamental elements of any alternative program.

In order to demonstrate that the alternative program achieves greater reasonable progress than source-specific BART, a state must demonstrate that its SIP meets the requirements in 40 CFR 51.308(e)(2)(i) through (v). States submitting section 309 SIPs or other alternative programs are required to list all BART-eligible sources and categories covered by the alternative program. States are then required to determine which BART-eligible sources are "subject-to-BART." The SIP must provide an analysis of the best system of continuous emission control technology available and the associated reductions for each source subject-to-BART covered by the alternative program, or what is termed a "BART benchmark." Where the alternative program has been designed to meet requirements other than BART, states may use simplifying assumptions in establishing a BART benchmark.

Pursuant to 40 CFR 51.308(e)(2)(i)(E), the State must also provide a determination that the alternative program achieves greater reasonable progress than BART under 40 CFR 51.308(e)(3) or otherwise based on the clear weight of evidence. 40 CFR 51.308(e)(3), in turn, provides a specific test for determining whether the alternative achieves greater reasonable progress than BART. If the distribution of emissions for the alternative program is not substantially different than for BART, and the alternative program results in greater emission reductions, then the alternative program may be deemed to achieve greater reasonable progress. If the distribution of emissions is significantly different, the differences in visibility between BART and the alternative program, must be determined by conducting dispersion modeling for each impacted Class I area for the best and worst 20 percent of days. The modeling would demonstrate "greater reasonable progress" if both of the two following criteria are met: (1) Visibility does not decline in any Class I area, and (2) there is overall improvement in visibility when comparing the average differences between BART and the alternative program over all of the affected Class I areas.

Alternately, pursuant to 40 CFR 51.308(e)(2) States may show that the BART alternative achieves greater reasonable progress than the BART benchmark "based on the clear weight of evidence" determinations, which "attempt to make use of all available information and data which can inform a

[38] Utah addressed some of the requirements of 40 CFR 51.309 in 2008 and 2011 SIP submissions. EPA took final action on some of the provisions in the 2008 and 2011 SIP submissions in earlier notices. See 40 CFR 51.309 for a complete listing of the regulations under which the 2008 and 2011 SIP submissions were evaluated.

[39] 40 CFR 51.309(d)(2).

[40] 40 CFR 51.309(d)(4).

[41] 40 CFR 51.309(d)(4)(v).

decision while recognizing the relative strengths and weaknesses of that information in arriving at the soundest decision possible. Factors which can be used in a weight of evidence determination in this context may include, but not be limited to, future projected emissions levels under the program as compared to under BART, future projected visibility conditions under the two scenarios, the geographic distribution of sources likely to reduce or increase emissions under the program as compared to BART sources, monitoring data and emissions inventories, and sensitivity analyses of any models used. This array of information and other relevant data may be of sufficient quality to inform the comparison of visibility impacts between BART and the alternative program. In showing that an alternative program is better than BART and when there is confidence that the difference in visibility impacts between BART and the alternative scenarios are expected to be large enough, a weight of evidence comparison may be warranted in making the comparison. The EPA will carefully consider the evidence before us in evaluating any SIPs submitted by States employing such an approach.'' [42]

Finally, in promulgating the final regional haze program requirements and responding to concerns regarding ''impermissibly vague'' language in § 51.308(e)(3) that would allow a State to ''approve alternative measures that are less protective than BART,'' we explained that ''[t]he State's discretion in this area is subject to the condition that it must be reasonably exercised and that its decisions be supported by adequate documentation of its analyses.'' [43]

Under 40 CFR 51.308(e)(2)(iii) and (iv), all emission reductions for the alternative program must take place by 2018, and all the emission reductions resulting from the alternative program must be surplus to those reductions resulting from measures adopted to meet requirements of the CAA as of the baseline date of the SIP. Pursuant to 40 CFR 51.309(e)(2)(v), states have the option of including a provision that the emissions trading program or other alternative measure include a geographic enhancement to the program to address the requirement under 40 CFR 51.302(c) related to BART for reasonably attributable visibility impairment from the pollutants covered under the emissions trading program or other alternative measure.

*E. Summary of State Regional Haze Submittals and EPA Actions*

1. 2008 and 2011 Utah RH SIPs

On May 26, 2011, the Governor of the State of Utah submitted to EPA a Regional Haze SIP under 40 CFR 51.309 of the RHR (''2011 Utah RH SIP''). This submittal included BART determinations for $NO_X$ and $PM_{10}$ at Utah's four subject-to-BART sources: PacifiCorp's Hunter Units 1 and 2 and Huntington Units 1 and 2. All four units are tangentially fired fossil fuel fired EGUs each with a net generating capacity of 430 MW, permitted to burn bituminous coal. This submittal also included a backstop trading program under 40 CFR 51.309 intended to meet the requirement for controlling $SO_2$ by establishing a cap on emissions. The trading program covers Utah, Wyoming, New Mexico and the City of Albuquerque.

Utah also submitted SIPs on December 12, 2003, August 8, 2004 and September 9, 2008, to meet the requirements of the RHR. These submittals were, for the most part, superseded and replaced by the May 26, 2011 submittal as further explained in the next section discussing our action on these submittals.

2. 2012 EPA Action on 2011 and 2008 Utah RH SIPs

On December 14, 2012, EPA partially approved and partially disapproved the 2011 Utah RH SIP.[44] We approved all sections of the 2011 Utah RH SIP as meeting the requirements of 40 CFR 51.309, with the exception of the requirements under 40 CFR 51.309(d)(4)(vii) pertaining to $NO_X$ and $PM_{10}$ BART. EPA's partial disapproval action was based on the following: (1) Utah did not take into account the five statutory factors in its BART analyses for $NO_X$ and $PM_{10}$; and (2) the 2011 Utah RH SIP did not contain the provisions necessary to make the BART limits practically enforceable as required by section 110(a)(2) of the CAA and 40 CFR 51, appendix V.[45]

We also approved two sections of the 2008 Utah RH SIP. Specifically, we approved UAR R307–250—*Western Backstop Sulfur Dioxide Trading Program* and R307–150—*Emission Inventories.* We took no action on the rest of the 2008 submittal as the 2011 submittal superseded and replaced the remaining sections of the 2008 submittal. We also took no action on the December 12, 2003 and August 8, 2004 submittals as these were superseded by the 2011 submittal.

On November 8, 2011, we separately proposed approval of Section G—Long-Term Strategy for Fire Programs of the May 26, 2011 submittal and finalized our approval of that action on January 18, 2013.[46]

3. 2013 Litigation

In 2013, conservation groups sued EPA in the U.S. Court of Appeals for the Tenth Circuit on our approval of the $SO_2$ backstop trading program as an alternative to BART. On October 21, 2014, the court upheld EPA's finding that the trading program was better than BART.[47]

4. 2015 Utah RH SIPs

On June 4, 2015, the Governor of the State of Utah submitted to EPA a revision to its Regional Haze SIP under 40 CFR 51.309 of the RHR (''June 2015 Utah RH SIP''), specifically to address the requirements under 40 CFR 51.309(d)(4)(vii) pertaining to $NO_X$ and $PM_{10}$ BART. Utah developed the June 2015 Utah RH SIP in response to EPA's December 14, 2012 partial disapproval of the 2011 Utah RH SIP. The June 2015 Utah RH SIP evolved from a draft SIP on which Utah sought public comment in October 2014. After receiving extensive public comments, Utah decided to pursue a BART alternative (''Utah BART Alternative,'' ''BART Alternative,'' or ''Alternative'') under 40 CFR 51.308(e)(2) that takes credit for early $NO_X$ reductions due to combustion controls installed at PacifiCorp's Hunter and Huntington power plants in addition to $NO_X$, $SO_2$, and $PM_{10}$ reductions from the August 2015 retirement of PacifiCorp's nearby Carbon power plant. The June 2015 Utah RH SIP also includes measures to make the SIP requirements practically enforceable and includes additional information pertaining to the $PM_{10}$ BART determinations for Hunter and Huntington to address deficiencies identified by EPA in our December 2012 partial disapproval.

On October 20, 2015, Utah submitted to EPA an additional revision to its Regional Haze SIP under 40 CFR 51.309 of the RHR (''October 2015 Utah RH SIP''). This SIP includes an enforceable commitment to provide an additional SIP revision by mid-March 2018 to address concerns raised in public comments that the State would be double counting certain emissions reductions under the Utah BART Alternative in respect to milestone reporting for the $SO_2$ backstop trading program.

Sections 110(a)(2) and 110(l) of the CAA require that a state provide reasonable notice and public hearing

[42] 71 FR 60612, 60622 (Oct. 13, 2006).

[43] 71 FR 60612, 60621.

[44] 77 FR 74355, 74357 (Dec. 14, 2012).

[45] *Id.*

[46] 78 FR 4071, 4072 (Jan. 18, 2013).

[47] *Wildearth Guardians* v. *United States EPA,* 728 F.3d 1075, 1083–84 (10th Cir. 2013).

before adopting a SIP revision and submitting it to us. Utah, after providing notice, accepted comments on the June 2015 Utah RH SIP in April 2015 and accepted comments on the October 2015 Utah RH SIP in mid-August through mid-September 2015. Following the comment period and legal review by the Utah Attorney General's Office, the Utah Air Quality Board adopted the June 2015 Utah RH SIP on June 3, 2015 and the October 2015 Utah RH SIP on October 7, 2015. The Governor submitted the SIP revisions to EPA on June 4, 2015 and October 20, 2015.

## IV. Utah's Regional Haze SIP

### *A. Summary of Elements Under EPA's Previous Actions Upon Which We Are Relying*

Several SIP elements that we previously approved in our December 2012 final rule and upon which we are relying in our current action include the following:

#### 1. Affected Class I Areas

Utah provided two maps in Section XX of its 2011 RH SIP, one showing the locations of the 16 Class I areas on the Colorado Plateau and one showing the locations of the five in Utah (Arches National Park, Bryce Canyon National Park, Canyonlands National Park, Capitol Reef National Park, and Zion National Park).[48] Utah also provided a comparison of the monitored 2000–2004 baseline visibility conditions in deciviews for the 20 percent best and 20 percent worst days to the projected visibility improvement for 2018 for the 16 Class I areas.[49]

We determined that the State's SIP satisfies the requirements of 40 CFR 51.309(d)(2) for this element in our December 14, 2012 rulemaking.

#### 2. BART-Eligible Sources

Pursuant to 40 CFR 51.308(e)(2)(i)(A), the 2011 Utah RH SIP listed the BART-eligible sources covered by the backstop trading program (see Table 1). The State identified the following BART-eligible sources in Utah: PacifiCorp Hunter Units 1 and 2 and PacifiCorp Huntington Units 1 and 2.

PacifiCorp's Hunter Power Plant (Hunter), is located in Castle Dale, Utah and consists of three electric utility steam generating units. Of the three units, only Units 1 and 2 are subject to BART. Hunter Units 1 and 2 have a nameplate generating capacity of 488.3 MW each.[50] The boilers are tangentially fired pulverized coal boilers, burning bituminous coal from the Deer Creek Mine in Utah.

PacifiCorp's Huntington Power Plant (Huntington), is located in Huntington City, Utah, and consists of two electric utility steam generating units. Huntington Units 1 and 2 have a nameplate generating capacity of 498 MW each.[51] The boilers are tangentially fired pulverized coal boilers, burning bituminous coal from the nearby Deer Creek Mine.

We determined that the State's SIP satisfies the requirements of 40 CFR 51.309(e)(2)(i)(A) in our December 14, 2012 rulemaking.

#### 3. Sources Subject-to-BART

Pursuant to 40 CFR 51.308(e)(2)(i)(B), the 2011 Utah RH SIP described the State's source modeling that determined which of the BART-eligible sources within Utah cause or contribute to visibility impairment and are thus subject-to-BART (more information on subject-to-BART sources and modeling can be found in Section XX.D.6 of the 2011 Utah RH SIP and section V.F of our May 16, 2012 proposed rulemaking).

Table 1 shows Utah's BART-eligible sources covered by the 309 $SO_2$ backstop program, Hunter Units 1 and 2, and Huntington Units 1 and 2, and indicates that all are subject-to-BART.

We determined that the State's SIP satisfies the requirements of 40 CFR 51.308(e)(2)(i)(B) in our December 14, 2012 rulemaking.

TABLE 1—SUBJECT-TO-BART STATUS FOR UTAH'S SECTION 309 BART-ELIGIBLE SOURCES

| Company | Source | Unit ID | Service date | BART Category | Generating capacity (MW) | Coal type | Boiler type | Subject-to-BART? |
|---|---|---|---|---|---|---|---|---|
| PacifiCorp | Hunter | 1 | 1978 | Fossil Fuel EGU | 430 | Bituminous | Tangential | Yes. |
| PacifiCorp | Hunter | 2 | 1980 | Fossil Fuel EGU | 430 | Bituminous | Tangential | Yes. |
| PacifiCorp | Huntington | 1 | 1977 | Fossil Fuel EGU | 430 | Bituminous | Tangential | Yes. |
| PacifiCorp | Huntington | 2 | 1974 | Fossil Fuel EGU | 430 | Bituminous | Tangential | Yes. |

We note that Section XX.D.6 in the June 2015 Utah RH SIP supersedes Section XX.D.6 in the 2011 Utah RH SIP and that some reformatting occurred. As Utah did not make substantive revisions to the SIP provisions addressing BART-eligible sources and subject-to-BART sources, XX.D.6.b and XX.D.6.c, in the 2011 SIP, we are not proposing any additional action on these provisions in this preamble.

### *B. Summary of Utah's BART Alternative and $PM_{10}$ BART SIP Revision*

Utah's June 2015 RH SIPs include the following SIP provisions:

- Revised R307–110–17, General Requirements: State Implementation Plan. Section IX, Control Measures for Area and Point Sources, Part H, Emissions Limits (incorporates by reference most recently amended SIP Section IX, Part H into state rules)
- Revised R307–110–28, General Requirements: State Implementation Plan, Regional Haze (incorporates by reference most recently amended SIP Section XX into state rules)
- Revised SIP Section XX.D.6 Regional Haze. Long-Term Strategy for Stationary Sources. Best Available Retrofit Technology (BART) Assessment for $NO_X$ and PM (supersedes Section XX.D.6 in the 2011 Utah RH SIP)
- New SIP Section IX.H.21 General Requirements: Control Measures for Area and Point Sources, Emission Limits and Operating Practices, Regional Haze Requirements
- New SIP Section IX.H.22 Source Specific Emission Limitations: Regional Haze Requirements, Best Available Retrofit Technology.

The June 2015 Utah RH SIP, including the five SIP revisions listed previously, consists of the following three components: (1) a $NO_X$ BART alternative that includes $NO_X$ and $SO_2$, and $PM_{10}$ emission reductions from

[48] *See* Utah Regional Haze State Implementation Plan, § XX.B.8, pp. 8–9 (Figures 1 and 2) (2011).

[49] *See id.,* at § XX.K.2, p. 116 (Table 24).

[50] *See* U.S. Energy Information Administration, Electric Generating Capacity for 2011 (taken from Form EIA–860). *See* ''EIA existing generating units 2011.xls'' spreadsheet in the docket.

[51] *Id.*

Appellate Case: 21-9509 Document: 101-2 Date Filed: 06/10/2022 Page: 55


Hunter Units 1–3, Huntington Units 1 and 2, and Carbon Units 1 and 2 and $PM_{10}$ emission reductions from Carbon Units 1 and 2; (2) BART determinations for $PM_{10}$ at Hunter Units 1 and 2 and Huntington Units 1 and 2 based on a streamlined analysis; and (3) monitoring, recordkeeping and reporting requirements for the Utah BART Alternative and $PM_{10}$ BART emission limits to make the SIP requirements practically enforceable. The emission limits in the June 2015 Utah RH SIP are provided in Table 2. We further explain the three components of the SIP.

TABLE 2—EMISSION LIMITS AND SHUTDOWN IN UTAH'S BART ALTERNATIVE AND $PM_{10}$ SIP[1]

| Source | Unit | $PM_{10}$ Limit[2] (lb/MMBtu, three-run test average) | $NO_X$ Limit[3] (lb/MMBtu, 30-Day Rolling Average) | $SO_2$ Limit |
|---|---|---|---|---|
| Hunter | 1 | 0.015 | 0.26 | NA. |
| | 2 | 0.015 | 0.26 | NA. |
| | 3 | NA | 0.34 | NA. |
| Huntington | 1 | 0.015 | 0.26 | NA. |
| | 2 | 0.015 | 0.26 | NA. |
| Carbon | 1 | Shutdown by August 15, 2015 | Shutdown by August 15, 2015 | Shutdown by August 15, 2015. |
| | 2 | Shutdown by August 15, 2015 | Shutdown by August15, 2015 | Shutdown by August 15, 2015. |

[1] Obtained from the June 2015 Utah RH SIP, Section IX.H.22.
[2] Based on annual stack testing.
[3] Based on continuous emission monitoring system (CEMS) measurement.

1. Utah BART Alternative

Utah has opted to establish an alternative measure for $NO_X$ under 40 CFR 51.308(e)(2). The State compared the Utah BART Alternative against a BART Benchmark of selective catalytic reduction (SCR) on all four BART units at Hunter and Huntington (Units 1 and 2 at both plants). Utah's BART Alternative consists of the shutdown of Carbon Units 1 and 2 and the installation of upgraded $NO_X$ combustion controls (new low-$NO_X$ burners [LNB] and overfire air [OFA]) on Hunter Unit 3 (all non-BART units). The Utah BART Alternative also includes the $NO_X$ reductions from installation of upgraded combustion controls (new LNB and separated overfire air [SOFA]) at Hunter Units 1 and 2 and Huntington Units 1 and 2 (all BART units). The BART Benchmark includes the four BART units with combustion controls and SCR, Carbon's baseline emissions, and Hunter Unit 3's emissions with original combustion controls. The Utah BART Alternative is generally described in SIP Section XX.D.6 with a detailed demonstration included in Chapter 1 of Utah's Technical Support Document (TSD) to support the State's assertion that the alternative achieves greater reasonable progress than BART. The State's demonstration is also described in more detail in section IV.C.

A summary of the State's estimates of emissions for the Utah BART Alternative and the BART Benchmark is provided in Table 3. EPA developed a summary of the emissions reductions based on Utah's emission estimates and this is presented in Table 4.

Utah indicated that PacifiCorp announced plans to shut down the Carbon Power Plant in 2015 due to the high cost to control mercury to meet the requirements of EPA's Mercury and Air Toxics Standards (MATS).[52] The State noted that the MATS rule was finalized in 2011, and the Utah RH SIP contains the requirement for the Carbon Power Plant to shut down in August 2015. Therefore, the emission reductions occur after the 2002 base year for Utah's RH SIP and thus, Utah asserts, the reductions may be considered as part of an alternative strategy under 40 CFR 51.308(e)(2)(iv).

2. $PM_{10}$ BART Determinations

Utah included a streamlined analysis for $PM_{10}$ BART determinations in accordance with section D.9 of the BART Guidelines for the BART units at Hunter and Huntington in the SIP TSD in Chapter 1, Section III and referenced this analysis in SIP Section XX.D.6. In the TSD, Utah summarized the BART analysis submitted by PacifiCorp in an August 5, 2014 report.[53]

PacifiCorp's analysis identified three available technologies: Upgraded ESP and flue gas conditioning (0.040 lb/MMBtu); polishing fabric filter (0.015 lb/MMBtu); and replacement fabric filter (0.015 lb/MMBtu). The 2008 Utah RH SIP and BART determination had required PacifiCorp to install a fabric filter baghouse with a $PM_{10}$ emission limit of 0.015 lb/MMBtu at the Hunter and Huntington BART units. Utah staff reviewed PacifiCorp's 2012 analysis and determined that the baghouse technology required in 2008 is still the most stringent technology available and that 0.015 lb/MMBtu represents the most stringent emission limit. Utah cited EPA's BART Guidelines and regional haze actions in Colorado, Wyoming, North Dakota and Montana to support these assertions.

Utah determined that the $PM_{10}$ BART emission limit for Hunter Units 1 and 2 and Huntington Units 1 and 2 was 0.015 lb/MMBtu based on a three-run test average. Utah noted that because the most stringent technology is in place at these units and that the $PM_{10}$ emission limits have been made enforceable in the SIP, no further analysis was required.

3. Monitoring, Recordkeeping and Reporting

To address EPA's partial disapproval of the 2011 Utah RH SIP for lack of enforceable measures and monitoring, recordkeeping and reporting requirements for the Utah BART Alternative and the $PM_{10}$ BART determinations, Utah added two new subsections to SIP Sections IX, General H.21 and 22. Under H.21, Utah has detailed general requirements for sources subject to its regional haze program. Under H.22, Utah has listed source-specific regional haze requirements for Hunter, Huntington and Carbon.

Specifically, under H.21, Utah added a new definition for boiler operating day. Utah noted that state rules R307–107–1 and R307–107–2 (applicability, timing and reporting of breakdowns) apply to sources subject to regional haze requirements under H.22. Utah required that information used to determine compliance shall be recorded for all periods when the source is in operation, and that such records shall be kept for a minimum of five years. Under H.21, Utah specified that emission limitations listed in H.22 shall apply at all times

[52] Utah Regional Haze State Implementation Plan, p. 7 (TSD Chapter 1) (2011).

[53] For PacifiCorp BART analyses reports, *see* TSD Chapter 2 of the SIP.

and identified stack testing requirements to show compliance with those emission limitations. Finally, under H.21, Utah also specified the requirements for continuous emission monitoring by listing the requirements and cross-referencing the State's rule for continuous emission monitoring system requirements, R307–170 as well as 40 CFR part 13 and 40 CFR part 60, appendix B—Performance Specifications. Utah included the requirements to calculate hourly average $NO_X$ concentrations for any hour in which fuel is combusted and a new 30-day rolling average emission rate at the end of each boiler operating day. Utah also noted that the hourly average $NO_X$ emission rate is valid only if the minimum number of data points specified in R307–170 is acquired for both the pollutant concentration monitor and diluent monitor.

Under H.21, Utah did not provide for reporting of violations of $PM_{10}$ emissions limitations for instances other than breakdowns (*e.g.,* stack test violations). However, the State provided a commitment letter on December 10, 2015 to address this deficiency with a SIP revision within one year of EPA's final action on the June 4, 2015 RH SIP.[54]

Under H.22, Utah provided the $NO_X$ and $PM_{10}$ emission limitations for Hunter Units 1 through 3 and Huntington Units 1 and 2, a requirement to perform annual stack testing for $PM_{10}$, and a requirement to measure $NO_X$ via continuous emission monitoring for the sources covered under the Utah BART Alternative. Under H.22, Utah also listed the enforceable conditions related to closing Carbon Units 1 and 2 by August 15, 2015 including PacifiCorp's and Utah's notification and permit rescission obligations.

*C. Summary of Utah's Demonstration for Alternative Program*

As discussed previously in background section III.A, a state may opt to implement an alternative measure rather than to require sources subject to BART to install, operate, and maintain BART. Utah has included the following information in its June and October 2015 RH SIPs to address the regulatory criteria for an alternative program:

1. A List of All BART-Eligible Sources Within the State

Pursuant to 40 CFR 51.308(e)(2)(i)(A) and (B), the SIP must include a list of all BART-eligible sources within the State. Utah included a list of BART-eligible sources and noted the following sources are all covered by the alternative program:

- PacifiCorp Hunter, Unit 1
- PacifiCorp Hunter, Unit 2
- PacifiCorp, Huntington, Unit 1
- PacifiCorp, Huntington, Unit 2

Utah provided the same list of BART-eligible sources in the 2011 RH SIP. We determined that the State's SIP satisfies the requirements of 40 CFR 51.309(e)(2)(i)(A) in our December 14, 2012 rulemaking.

2. A List of All BART-Eligible Sources and All BART Source Categories Covered by the Alternative Program

Pursuant to 40 CFR 51.308(e)(2)(i)(B), each BART-eligible source in the State must be subject to the requirements of the alternative program or have a federally enforceable emission limitation determined by the State and approved by EPA as meeting BART. In this instance, the alternative program covers all the BART-eligible sources in the state, Hunter Units 1 and 2 and Huntington Units 1 and 2, in addition to three non-BART units, PacifiCorp's Hunter Unit 3 and Carbon Units 1 and 2.

Utah provided the same list of BART sources subject to an alternative program in the 2011 RH SIP. We determined that the State's SIP satisfies the requirements of 40 CFR 51.309(e)(2)(i)(B) in our December 14, 2012 rulemaking.

3. Analysis of BART and Associated Emission Reductions Achievable

Pursuant to 40 CFR 51.308(e)(2)(i)(C), the SIP must include an analysis of BART and associated emission reductions at Hunter and Huntington. In the June 2015 Utah RH SIP, the State compared the Utah BART Alternative to a BART Benchmark that included the most stringent $NO_X$ BART controls, SCR plus new LNBs and SOFA, at the four BART units.

4. Analysis of Projected Emissions Reductions Achievable Through the BART Alternative

Pursuant to 40 CFR 51. 308(e)(2)(D), the SIP must include ''[a]n analysis of the projected emissions reductions achievable through the . . . alternative measure.'' A summary of the State's estimates of emissions in tons per year (tpy) for the Utah BART Alternative and the BART Benchmark is provided in Table 3. A summary of the emissions reductions based on those emission estimates is presented in Table 4.

TABLE 3—ESTIMATED EMISSIONS UNDER UTAH'S BART BENCHMARK AND THE BART ALTERNATIVE [55]

| Units | $NO_X$ emissions (tpy) | | $SO_2$ emissions (tpy) | | $PM_{10}$ emissions (tpy) [4] | | Combined | |
|---|---|---|---|---|---|---|---|---|
| | Benchmark [2] | Alternative [3] | Benchmark [2] | Alternative [3] | Benchmark | Alternative | Benchmark | Alternative |
| Carbon 1 | 1,408 | 0 | 3,388 | 0 | 221 | 0 | 5,016 | 0 |
| Carbon 2 | 1,940 | 0 | 4,617 | 0 | 352 | 0 | 6,909 | 0 |
| Hunter 1 [1] | 775 | 3,412 | 1,529 | 1,529 | 169 | 169 | 2,473 | 5,100 |
| Hunter 2 | 843 | 3,412 | 1,529 | 1,529 | 169 | 169 | 2,541 | 5,110 |
| Hunter 3 | 6,530 | 4,622 | 1,033 | 1,033 | 122 | 122 | 7,685 | 5,777 |
| Huntington 1 | 809 | 3,593 | 1,168 | 1,168 | 176 | 176 | 2,153 | 4,937 |
| Huntington 2 | 856 | 3,844 | 1,187 | 1,187 | 200 | 200 | 2,243 | 5,231 |
| Total | 13,161 | 18,882 | 14,451 | 6,446 | 1,409 | 836 | 29,020 | 26,164 |

[1] Hunter 1 controls were installed in the spring of 2014, therefore Hunter 2 actual emissions are used as a surrogate.
[2] Most stringent $NO_X$ rate for BART-eligible units (see email and spreadsheet, ''Attachment to Utah September 16, 2015 email, BART Analysis.pdf'' in the docket, inadvertently omitted from Utah TSD), 2012–2013 actual emissions Carbon, 2001–2003 actual emissions Hunter 3 (EPA Acid Rain Program).
[3] Average actual emissions 2012–13 for Hunter and Huntington units, EPA Acid Rain Program.
[4] Actual emissions for 2012, Utah Department of Air Quality annual inventory.

[54] Letter from Department of Environmental Quality, State of Utah to EPA, DAQP–120–15 (Dec. 10, 2015).

[55] Utah Regional Haze State Implementation Plan, Technical Support Document, Ch. 1 (Reference Table 2) (2015).

TABLE 4—EPA SUMMARY OF EMISSION REDUCTIONS ACHIEVABLE WITH THE UTAH BART ALTERNATIVE AS COMPARED TO THE BART BENCHMARK

| Description | Combined emissions for all units (tpy) | | | |
|---|---|---|---|---|
| | $NO_X$ | $SO_2$ | $PM_{10}$ | Combined |
| BART Benchmark | 13,161 | 14,451 | 1,409 | 29,020 |
| BART Alternative | 18,882 | 6,446 | 836 | 26,164 |
| Emission Reduction (BART Benchmark minus BART Alternative) [1] | −5,721 | 8,005 | 573 | 2,856 |

[1] A negative value indicates the BART Alternative results in more emissions of the specified pollutant in comparison to the BART Benchmark.

5. A Determination That the Alternative Achieves Greater Reasonable Progress Than Would Be Achieved Through the Installation and Operation of BART

Pursuant to 40 CFR 51.308(e)(2)(i)(E), the State must provide a determination under 40 CFR 51.308(e)(3) or otherwise based on the clear weight of evidence that the alternative achieves greater reasonable progress than BART. 40 CFR 51.308(e)(3), in turn, provides two different tests for determining whether the alternative achieves greater reasonable progress than BART.

Utah first used the ''greater emission reductions'' test in 40 CFR 51.308(e)(3) to support its assertion that the BART Alternative achieves greater reasonable progress. In the June 2015 Utah RH SIP, the State noted that the Hunter, Huntington and Carbon plants are all located within 40 miles of each other in Central Utah. Utah stated that because of the close proximity of the three plants, the distribution of emissions would not be substantially different under the Utah BART Alternative than under BART. With the alternative measure resulting in greater aggregate emission reductions by 2,856 tons/year (tpy) (described in Table 4), Utah asserted that the alternative measure may be deemed to achieve greater reasonable progress than BART under 51.308(e)(3).

Utah also chose to conduct a weight-of-evidence analysis under 51.308(e)(2) based on emissions from the Hunter, Huntington, and Carbon power plants and considered the following evidence: [56]

a. Annual Emissions Comparison for Visibility-impairing Pollutants

The emissions of visibility-impairing pollutants from both the Utah BART Alternative and the BART Benchmark, as estimated by the State, are summarized in Table 3. Compared with the Utah BART Benchmark, the State projects that the Utah BART Alternative will result in 5,721 tpy more $NO_X$ emissions, 8,005 tpy fewer $SO_2$ emissions and 573 tpy fewer $PM_{10}$ emissions. Utah also found that the combined emissions of $NO_X$, $SO_2$ and $PM_{10}$ will be 2,856 tpy lower under the Utah BART Alternative.

b. Improvement in the Number of Days With Significant Visibility Impairment

Utah provided modeling results to assess the improvement in the number of days with significant visibility impairment—that is, the improvement in the number of days with impacts that either cause (> 1.0 dv) or contribute (> 0.5 dv) to visibility impairment. The State presented this information in a number of ways, including: (1) the average number of days per year for three years modeled (2001–2003) with impacts above the cause and contribute thresholds for the nine affected Class I areas under the BART Alternative as compared to under the BART Benchmark; and (2) the total number of days for the three years modeled with impacts above the thresholds for the nine Class I areas under the two scenarios.[57]

On average for the three years modeled, the Utah BART Alternative causes visibility impairment (>1.0 dv) on fewer days than the BART Benchmark (258 days vs. 264 days, for the nine affected Class I areas). Similarly, on average for the three years modeled, the Utah BART Alternative also contributes to visibility impairment (>0.5 dv) on fewer days than the BART Benchmark (441 days vs. 499 days for the nine affected Class I areas). See Tables 5 and 6.

TABLE 5—AVERAGE (2001–2003) NUMBER OF DAYS >1.0 dv IMPACT [58]

| Class I area | Basecase | BART alternative | BART benchmark |
|---|---|---|---|
| Arches | 128 | 68 | 77 |
| Black Canyon of the Gunnison | 36 | 10 | 9 |
| Bryce Canyon | 19 | 9 | 8 |
| Canyonlands | 141 | 87 | 87 |
| Capitol Reef | 68 | 42 | 41 |
| Flat Tops | 46 | 13 | 15 |
| Grand Canyon | 22 | 11 | 10 |
| Mesa Verde | 40 | 13 | 12 |
| Zion | 11 | 6 | 6 |

[56] Utah referenced that greater reasonable progress can be demonstrated using one of two methods: (1) greater emission reductions than under BART (40 CFR 51.308(e)(3)); or (2) based on the clear weight of evidence (40 CFR 51.308(e)(2)(i)(E)). Utah further explained that: As the U.S. Circuit Court of Appeals for the 10th Circuit recently observed, the state is free to choose one method or the other. *WildEarth Guardians* v. *E.P.A.*, 770 F.3d 919, 935–37 (10th Cir. 2014). Finally, Utah noted that the court characterized the former approach as ''quantitative'' and the latter as ''qualitative,'' and specifically sanctioned the use of qualitative factors under the clear weight of evidence.

[57] Utah noted that EPA has proposed approval of an Alternative Measure for the Apache Generating Station in Arizona on similar ''weight of evidence'' grounds. 79 FR 56322, 56327 (Sept. 19, 2014). Utah also noted that EPA has approved a similar Alternative Measure in Washington, based in part on a reduction in the number of days of impairment greater than 0.5 dv and 1.0 dv. 79 FR 33438, 33440–33442 (June 11, 2014).

[58] Utah Regional Haze State Implementation Plan, Technical Support Document, Ch. 1 (Reference Table 5) (2015).

Appellate Case: 21-9509 Document: 101-2 Date Filed: 06/10/2022 Page: 58


TABLE 5—AVERAGE (2001–2003) NUMBER OF DAYS >1.0 dv IMPACT [58]—Continued

| Class I area | Basecase | BART alternative | BART benchmark |
|---|---|---|---|
| Total | 511 | 258 | 264 |

TABLE 6—AVERAGE (2001–2003) NUMBER OF DAYS >0.5 dv IMPACT [59]

| Class I area | Basecase | BART alternative | BART benchmark |
|---|---|---|---|
| Arches | 176 | 109 | 130 |
| Black Canyon of the Gunnison | 75 | 27 | 34 |
| Bryce Canyon | 36 | 17 | 19 |
| Canyonlands | 178 | 131 | 140 |
| Capitol Reef | 96 | 63 | 65 |
| Flat Tops | 93 | 34 | 44 |
| Grand Canyon | 38 | 19 | 20 |
| Mesa Verde | 71 | 32 | 37 |
| Zion | 21 | 10 | 10 |
| Total | 784 | 441 | 499 |

As for the total number of days over the course of the three modeled years, the Utah BART Alternative causes visibility impairment (> 1.0 dv) on fewer days than the BART Benchmark (775 days vs. 793 days for the nine affected Class I areas). Similarly, in total for the three years modeled, the Utah BART Alternative also contributes to visibility impairment (> 0.5 dv) on fewer days than the BART Benchmark (1,323 days vs. 1,498 days for the nine affected Class I areas). See Tables 7 and 8.

TABLE 7—TOTAL (2001–2003) NUMBER OF DAYS >1.0 dv IMPACT [60]

| Class I area | Basecase | BART alternative | BART benchmark |
|---|---|---|---|
| Arches | 383 | 203 | 230 |
| Black Canyon of the Gunnison | 108 | 31 | 28 |
| Bryce Canyon | 57 | 26 | 25 |
| Canyonlands | 422 | 260 | 260 |
| Capitol Reef | 204 | 126 | 124 |
| Flat Tops | 138 | 38 | 44 |
| Grand Canyon | 67 | 34 | 30 |
| Mesa Verde | 121 | 40 | 35 |
| Zion | 32 | 17 | 17 |
| Total | 1,532 | 775 | 793 |

TABLE 8—TOTAL (2001–2003) NUMBER OF DAYS >0.5 dv IMPACT [61]

| Class I area | Basecase | BART alternative | BART benchmark |
|---|---|---|---|
| Arches | 529 | 327 | 391 |
| Black Canyon of the Gunnison | 224 | 81 | 103 |
| Bryce Canyon | 107 | 50 | 57 |
| Canyonlands | 533 | 393 | 420 |
| Capitol Reef | 288 | 188 | 194 |
| Flat Tops | 280 | 101 | 133 |
| Grand Canyon | 115 | 56 | 59 |
| Mesa Verde | 213 | 97 | 110 |
| Zion | 63 | 30 | 31 |
| Total | 2,352 | 1,323 | 1,498 |

[59] *See id.*, at Technical Support Document, Ch. 1 (Reference Table 6).

[60] *See id.*, at Technical Support Document, Chapter 6.b (Summary of Visibility Modeling).

Appellate Case: 21-9509 Document: 101-2 Date Filed: 06/10/2022 Page: 59


c. 98th Percentile Impact (dv)

Utah explained that the only metric it evaluated that showed greater improvement for the BART Benchmark in comparison to the BART Alternative was the 98th percentile metric when visibility impacts were averaged across all Class I areas and meteorological years modeled. Utah's comparison of the modeled visibility impacts on the 98th percentile day (8th highest impacted day in a given meteorological year) for the most impacted year shows that the BART Benchmark would result in greater visibility improvement at five of the nine Class I areas, and is better on average across all nine Class I areas (0.11 dv difference). At two of the most impacted Class I areas, Canyonlands and Capitol Reef, Utah found that the 98th percentile metric indicates the BART Benchmark has 0.76 dv and 0.57 dv, respectively, greater improvement than the Utah BART Alternative. At other Class I areas, Utah found that the 98th percentile metric indicates that the BART Alternative provides greater visibility improvement (for example, 0.44 dv at Flat Tops).

Utah noted that because high nitrate values occur primarily in the winter months, the BART Benchmark achieved greater modeled visibility improvement on certain winter days with high nitrate impacts. Utah stated its position that there is greater uncertainty regarding the effect of $NO_X$ reductions on wintertime nitrate values, and thus on visibility, because past $NO_X$ emission reductions have not resulted in corresponding reductions in monitored nitrate values during the winter months. Utah noted it has greater confidence in the visibility improvement due to reductions of $SO_2$ because past reductions have resulted in corresponding reductions in monitored sulfate values throughout the year.

d. Annual Average Impact (dv)

As modeled by Utah, which used CALPUFF modeling results, the average annual dv impact is better under the Utah BART Alternative at five of the nine Class I areas, and is better on average across all the Class I areas. The average impact was calculated by averaging all daily modeling results for each year and then calculating a three-year average from the annual average. Utah's information shows that the BART Alternative is better than the BART Benchmark by 0.009 dv on average across all nine Class I areas.

e. 90th Percentile Impact (dv)

Utah's comparison of the modeled visibility impacts at the 90th percentile (the 110th highest day across three years) dv impact shows that the Utah BART Alternative is better at seven of the nine Class I areas and is better averaged both across three years and across nine Class I areas by 0.006 dv.

f. Timing for the Emissions Reductions

Utah provided the schedule for installation of controls as noted in Table 9. Utah discussed that $NO_X$ reductions at Hunter Units 1 and 2 and Huntington Units 1 and 2 occurred between 2006 and 2014, earlier than was required by the Regional Haze Rule, providing a corresponding early and on-going visibility improvement. Utah cited the 2014 10th Circuit Court of Appeals decision regarding the 309 program to support that such early reductions are properly included as weight of evidence in the State's analysis.

TABLE 9—INSTALLATION SCHEDULE

| Source/Unit | Timing of control installation or shutdown |
|---|---|
| Hunter 1 | New LNB and SOFA–Spring 2014. |
| Hunter 2 | New LNB and SOFA–Spring 2011. |
| Hunter 3 | New LNB and OFA–Summer 2008. |
| Huntington 1 | New LNB and SOFA–Fall 2010. |
| Huntington 2 | New LNB and SOFA–December 2006. |
| Carbon 1 | Shutdown August 2015. |
| Carbon 2 | Shutdown August 2015. |

The reductions under the Utah BART Alternative are required under the State SIP by August 2015, as noted in Table 5, providing an early and on-going visibility benefit as compared to BART.[62] Installation and operation of the combustion control upgrades at Hunter and Huntington were made enforceable under Administrative Orders DAQE–AN0102370012–08 and DAQE–AN0102380021–10.[63]

g. IMPROVE Monitoring Data

Utah's SIP presents sulfate and nitrate monitoring data at the Canyonlands IMPROVE monitor that shows that ''sulfates are the dominant visibility impairing pollutant'' [64] and that sulfate levels have decreased,[65] and references similar results at other Class I areas in the TSD.[66] Utah also presents data on trends in emissions from EGUs showing substantial reductions in emissions of both $SO_2$ and $NO_X$.[67] Based on these data, Utah indicates it ''has confidence that the $SO_2$ reductions will achieve meaningful visibility improvement,'' under the Utah BART Alternative, while ''the visibility improvement during the winter months due to $NO_X$ reductions is much more uncertain.'' [68] Utah makes this point even though nitrate concentrations are highest in the winter, explaining that while there has been a reduction in $NO_X$, the ammonium nitrate values do not show similar improvement in the winter months.[69] Utah offers several possible explanations for the results, but does not provide any definitive conclusions.[70]

Utah also presents data on the seasonality of park visitation and monitoring data for nitrate and sulfates. The data show that the highest measured nitrate concentrations occur in winter during the period of lowest park visitation, and that sulfates affect visibility throughout the year and are the dominant visibility impairing pollutant from anthropogenic sources during the high visitation period of March through November. Utah concludes that it has greater confidence that reductions in $SO_2$ will be reflected in improved visibility for visitors to the Class I areas, while reductions in $NO_X$ will have a more uncertain benefit for visitors to Class I areas.

h. Energy and Non-Air Quality Benefits

Utah stated that energy and non-air quality environmental impacts are one of the factors listed in CAA section 169A(g)(2) that must be considered when determining BART. The State noted that the Utah BART Alternative would avoid the energy penalty due to operating SCR units. PacifiCorp included the energy penalty in its BART analysis as part of the total cost for installing SCR on each of the units. The energy penalty costs are provided in Table 10.

[61] *See id.*

[62] Conforming permit amendments for the Carbon plant are due under the SIP by December 15, 2015. Section IX.H.22 of Utah's SIP requires PacifiCorp to cease operation of Carbon by August 15, 2015, notify the State of the permanent closure by September 15, 2015, and request rescission of Operating Permit #700002004 and Approval Order DAQE–AN0100810005–08 by September 15, 2015. The State is then required to rescind the operating permit and approval order by December 15, 2015.

[63] Copies of Administrative Orders DAQE–AN0102370012–08 and DAQE–AN0102380021–10 are included in the docket.

[64] Utah Regional Haze State Implementation Plan, Technical Support Document, Ch. 1, p. 12 (2015).

[65] *Id.* at p. 15.

[66] *Id.* at p. 12.

[67] *Id.* at p. 14.

[68] *Id.* at p.13.

[69] *Id.*

[70] *Id.* at pp. 16–19.

[71] PacifiCorp quantified the energy penalty associated with SCR in its August 4, 2014 BART Analysis Update, Appendix A. *See id.* at p. 26 (Table 13 presents this information).

Appellate Case: 21-9509 Document: 101-2 Date Filed: 06/10/2022 Page: 60


TABLE 10—SCR ENERGY PENALTY [71]

| Source/unit | Energy penalty | |
|---|---|---|
| | kW | $/year |
| Hunter Unit 1 | 2,090 | 494,247 |
| Hunter Unit 2 | 2,090 | 494,247 |
| Huntington Unit 1 | 2,182 | 516,098 |
| Huntington Unit 2 | 2,182 | 516,098 |
| Total | 8,544 | 2,020,690 |

Utah presented additional non-air quality benefits associated with the closure of the Carbon plant. First, it noted that solid wastes in the form of fly ash from the electrostatic precipitators and bottom ash conveyors which clean the residuals from the two steam generating units (the boilers), would be eliminated. These wastes are currently landfilled. The Carbon plant also runs water through the boilers as well as two cooling towers. This uses water and has associated wastewater discharge. Hauling the ash to the landfill requires additional fuel use and water or chemical dust suppression for minimization of fugitive dust. Finally, for maintenance and emergency purposes, Utah noted that the plant has a number of emergency generators, fire pumps, and ancillary equipment—all of which must be periodically operated, tested and maintained—with associated air emissions, fuel use, painting, and the like. Utah suggests that all of these non-air quality impacts are reduced as the result of closing the Carbon plant.

i. Cost

Utah cited PacifiCorp's comments on the State's proposed SIP revision that the BART Alternative not only produces greater reasonable progress, including lower emissions and improved visibility, but that it does so at a significant capital cost savings to PacifiCorp and its customers as compared to the BART Benchmark. Utah acknowledged that it did not officially determine the cost of installing SCR on the four BART units, but that it believed the cost of installing SCR would be significant. On the other hand, Utah noted that the Carbon Plant has already been closed due to the high cost of complying with the MATS rule. Utah explained that the costs to Utah rate payers (and those in other states served by PacifiCorp) to replace the power generated by the Carbon Plant have already occurred; there will be no additional cost to achieve the co-benefit of visibility improvement. As a result, Utah asserted that the BART Alternative not only achieves better visibility improvements than would be achieved by requiring SCR as BART at the four EGUs, but at a significantly lower cost. The State believed this presents a classic ''win/win'' scenario—the BART Alternative results in greater reasonable progress that is achieved at a much lower price compared to SCR. The State also noted that cost is one of the factors listed in CAA section 169A(g)(2) that should be considered when determining BART.

6. Requirement That Emission Reductions Take Place During Period of First Long-Term Strategy

Pursuant to 40 CFR 51.308(e)(2)(iii), the State must ensure that all necessary emission reductions take place during the period of the first long-term strategy for regional haze, *i.e.,* by December 31, 2018. The RHR further provides that, ''[t]o meet this requirement, the State must provide a detailed description of the . . . alternative measure, including schedules for implementation, the emission reductions required by the program, all necessary administrative and technical procedures for implementing the program, rules for accounting and monitoring emissions, and procedures for enforcement.'' [72]

As noted previously, the Utah SIP revision incorporates the revisions to R307–110–17, Section IX, Control Measures for Area and Point Sources, Part H, Emissions Limits, which includes provisions for implementing the Utah BART Alternative. In addition to the emission limitations for $NO_X$ and $PM_{10}$, and the requirement for shutdown of the Carbon Plant listed in Table 2, the SIP includes compliance dates, operation and maintenance requirements, and monitoring, recordkeeping, and reporting requirements.

7. Demonstration That Emissions Reductions From Alternative Program Will Be Surplus

Pursuant to 40 CFR 51.308(e)(2)(iv), the SIP must demonstrate that the emissions reductions resulting from the alternative measure will be surplus to those reductions resulting from measures adopted to meet requirements of the CAA as of the baseline date of the SIP. The baseline date for regional haze SIPs is 2002.[73] Utah developed the 2002 baseline inventory in the 2008 RH SIP for regional modeling, evaluating the impact on Class I areas outside of the Colorado Plateau, and BART as outlined in EPA Guidance and the July 6, 2005 BART Rule. Utah noted that 2002 is the baseline inventory that was used by other states throughout the country when evaluating BART under the provisions of 40 CFR 51.308 and that any measure adopted after 2002 is considered ''surplus'' under 40 CFR 51.308(e)(2)(iv). Utah referenced other EPA actions that are consistent with this interpretation.[74] Utah stated that the BART Benchmark scenario includes measures required before the baseline date of the SIP but does not include later measures that are credited as part of the BART Alternative scenario.

To address potential concerns with double counting $SO_2$ emissions reductions from the Carbon plant closure under both the 308 and 309 programs, in addition to providing the explanation in the June 2015 SIP (discussed in TSD Chapter 1, Section X), Utah's October 7, 2015 SIP also includes enforceable commitments to address these concerns. The State explained how the WRAP modeling done to support the Utah RH backstop trading program SIP included regional $SO_2$ emissions based on the 2018 $SO_2$ milestone and also included $NO_X$ and $PM_{10}$ emissions from the Carbon plant. Actual emissions in the three-state region are calculated each year and compared to the milestones. Utah provided Table 11 to show that in 2011 emissions were below the 2018 milestone (141,849 tpy). Utah noted that the most recent milestone report for 2013 demonstrates that $SO_2$ emissions are currently 26 percent lower than the 2018 milestone. Utah stated that the Carbon plant was fully operational in the years 2011–2013 when the emissions were below the 2018 milestone. The State noted that the $SO_2$ emission reductions from the closure of the Carbon plant are surplus to what is needed to meet the 2018 milestone established in Utah's RH SIP.

[72] 40 CFR 51.308(e)(2)(iii).

[73] *See* Memorandum from Lydia Wegman and Peter Tsirigotis, *2002 Base Year Emission Inventory SIP Planning: 8-hr Ozone, $PM_{2.5}$, and Regional Haze Programs* (Nov. 18, 2002), available at *http://www3.epa.gov/ttnchie1/eidocs/2002baseinven_102502new.pdf.*

[74] 79 FR 33438, 33441–33442 (June 11, 2014); 79 FR 56322, 56328 (Sept. 9, 2014).

[75] *See* Utah Regional Haze State Implementation Plan, Technical Support Document, Ch. 1 (Reference Table 15) (2015).

TABLE 11—$SO_2$ MILESTONE TRENDS [75]

| Year | Milestone (tpy) | Three-Year average $SO_2$ emissions [1] (tpy) | Carbon plant $SO_2$ emissions (tpy) |
|---|---|---|---|
| 2003 | 303,264 | 214,780 | 5,488 |
| 2004 | 303,264 | 223,584 | 5,642 |
| 2005 | 303,264 | 220,987 | 5,410 |
| 2006 | 303,264 | 218,499 | 6,779 |
| 2007 | 303,264 | 203,569 | 6,511 |
| 2008 | 269,083 | 186,837 | 5,057 |
| 2009 | 234,903 | 165,633 | 5,494 |
| 2010 | 200,722 | 146,808 | 7,462 |
| 2011 | 200,722 | 130,935 | 7,740 |
| 2012 | 200,722 | 115,115 | 8,307 |
| 2013 | 185,795 | 105,084 | 7,702 |
| 2014 | 170,868 | | |
| 2015 | 155,940 | | |
| 2016 | 155,940 | | |
| 2017 | 155,940 | | |
| 2018 | 141,849 | | |

[1] The three-year average is based on the emissions averaged for the current and two preceding years.

For Hunter Unit 3, Utah also explained that PacifiCorp upgraded the LNB controls in 2008 and that the upgrade was not required under the requirements of the CAA as of the 2002 baseline date of the SIP; the emission reductions from the upgrade are therefore considered surplus and creditable for the BART Alternative under 40 CFR 51.308(e)(2)(iv). Utah noted that prior to the 2008 upgrade, the emission rate for Hunter Unit 2 was 0.46 lb/MMBtu heat input for a 30-day rolling average as required by Phase II of the Acid Rain Program.[76]

*D. Summary of Utah's Enforceable Commitment SIP Revision*

To address potential concerns that Utah would be double counting $SO_2$ emissions reductions for the Carbon plant closure under both the 40 CFR 51.308 and 309 programs, on October 7, 2015 the State adopted an enforceable commitment into the Utah RH SIP at Chapter XX, Section N. Utah submitted this SIP revision to EPA on October 20, 2015. In this commitment, the State explained that it will continue to report the historical emissions for the Carbon plant in the annual milestones reports from 2016 through the life of the backstop trading program. In addition, the State has committed to making revisions as necessary to SIP Section XX.D.3.c (''Triggering the Trading Program'') and State rule R307–150 (''Emission Inventories Program'') as well as any other applicable provisions to implement the requirement for reporting Carbon's historical emissions under the 309 program. The State notes it will follow its SIP adoption process when making these SIP revisions. The SIP will be adopted by the Governor-appointed Air Quality Board through a rulemaking process that includes public participation. Once approved into the SIP, the commitment will be enforceable by both EPA and citizens under the CAA.

The State noted that EPA has historically recognized that, under certain circumstances, issuing full approval may be appropriate for a SIP submission that consists of, in part, an enforceable commitment. Utah explained that its October 2015 submission satisfies EPA's requirements for enforceable commitments because it has adopted such a commitment for what is a small portion of its regional haze program in relation to its regional haze obligations as a whole. In addition, Carbon's 8,005 tpy $SO_2$ emissions reductions is small in comparison to the 2018 milestone of 141,849 tpy described in Table 7.

On the matter of timing, the State has committed to providing the required subsequent SIP submittal by mid-March 2018.

*E. Consultation With FLMs*

Utah's SIPs do not specifically discuss how it addressed the requirements of 40 CFR 308(i)(2) for providing the FLMs with an opportunity for consultation at least 60 days prior to holding the public hearing for the June 2015 RH SIP. However, we are aware that Utah consulted with the FLMs and explain those efforts here. The State held an initial public comment period for proposed SIP amendments from November 1 through December 22, 2014. The State provided the opportunity for the FLMs to review the preliminary draft SIP documents via email approximately 68 days prior to the public hearing that was held on a December 1, 2014. Copies of the email correspondence documenting this effort are included in the docket.

Utah received a number of comments during the public comment period in late 2014. After reviewing the comments and consulting with EPA, Utah determined additional work was needed to develop a BART alternative measure that would take credit for emission reductions from the Carbon plant shutdown among other things. Utah held an additional public comment period from April 1 through April 30, 2015. One of the FLMs, the National Park Service, provided extensive public comments to Utah during this second public comment period and Utah included responses to these comments, along with responses to other commenters, in the June 2015 RH SIP submittal along with other administrative documentation.

The October 2015 Utah RH SIP was provided for public comment August 15 through September 14, 2015, and we are not aware of any prior FLM consultation on this SIP. The FLMs did not submit comments during this public comment period.

**V. EPA's Evaluation and Proposed Approval of Utah's Regional Haze SIP**

As explained in section II.A, EPA is soliciting comments on two alternative proposals: A proposal to approve the State SIP in its entirety, and a proposal to partially approve and partially

[76] There is a typographical error in Chapter 1, section X.C, PacifiCorp Hunter Unit 3, p. 31. The reference to Hunter Unit 2 should be Unit 3 based on the section heading as well as confirmed emission limits in Utah Approval Order DAQE–AN0102370012–08.

disapprove the State SIP and to issue a FIP. The co-proposals detailed in this section and Section VI represent different conclusions regarding Utah's $NO_X$ BART Alternative and the metrics the State has proposed to support this alternative. As described in this section, EPA is proposing to approve the two Utah 2015 RH SIP revisions. Alternatively, as discussed in section VI, EPA is co-proposing to disapprove the Utah's June 2015 and October 2015 RH SIP revisions and promulgate a FIP.

This document is written as two separate proposals in order to clearly present the options and solicit comment on each. EPA intends to finalize only one of these co-proposals; however, we also acknowledge that additional information and comments may also lead the Agency to adopt final SIP and/or FIP regulations that differ somewhat from the co-proposals presented here regarding the BART Alternative, BART control technology option or emission limits, or impact other proposed regulatory provisions.

*A. Basis for Proposed Approval*

For the reasons described later on, EPA proposes to approve the two Utah 2015 RH SIP revisions. Our proposed action is based on an evaluation of Utah's regional haze SIP submittals against the regional haze requirements at 40 CFR 51.300–51.309 and CAA sections 169A and 169B. All general SIP requirements contained in CAA section 110, other provisions of the CAA, and our regulations applicable to this action were also evaluated. The purpose of this proposed action is to ensure compliance with these requirements and to provide additional rationale to support our conclusions.

*B. Utah BART Alternative*

1. Summary of Utah BART Alternative

Utah has opted to establish an alternative measure (or program) for $NO_X$ in accordance with 40 CFR 51.308(e)(2). A description of the Utah BART Alternative is provided in section IV.B.1. The RHR requires that a SIP revision establishing a BART alternative include three elements as listed later. We have evaluated the Utah BART Alternative with respect to each of these elements.

- A demonstration that the emissions trading program or other alternative measure will achieve greater reasonable progress than would have resulted from the installation and operation of BART at all sources subject to BART in the State and covered by the alternative program.[77]
- A requirement that all necessary emissions reductions take place during the period of the first long-term strategy for regional haze.[78]
- A demonstration that the emissions reductions resulting from the alternative measure will be surplus to those reductions resulting from measures adopted to meet requirements of the CAA as of the baseline date of the SIP.[79]

2. Demonstration of Greater Reasonable Progress for the Alternative Program

As discussed previously in section III.E.1, pursuant to 40 CFR 51.308(e)(2)(i), Utah must demonstrate that the alternative measure will achieve greater reasonable progress than would have resulted from the installation and operation of BART at all sources subject to BART in the State and covered by the alternative program. This demonstration, primarily included in Chapter 1 of the TSD of the Utah RH SIP,[80] must be based on five criteria which are addressed later.

a. A List of All BART-Eligible Sources Within the State

As discussed previously in section IV.A.2, Utah included a list of BART-eligible sources and noted the following sources are all covered by the alternative program:

- PacifiCorp Hunter, Unit 1
- PacifiCorp Hunter, Unit 2
- PacifiCorp, Huntington, Unit 1
- PacifiCorp, Huntington, Unit 2

EPA previously approved Utah's BART eligibility determinations in our 2012 rulemaking.[81]

b. A List of All BART-Eligible Sources and All BART Source Categories Covered by the Alternative Program

As discussed previously in section IV.A.3, the Utah BART Alternative covers all the BART-eligible sources in the state, Hunter Units 1 and 2 and Huntington Units 1 and 2, in addition to three non-BART units, PacifiCorp's Hunter Unit 3 and Carbon Units 1 and 2. EPA previously approved Utah's BART eligibility determinations in our 2012 rulemaking.[82]

c. Analysis of BART and Associated Emission Reductions

As noted in section IV.C.3, in the June 2015 Utah RH SIP, the State compared the Utah BART Alternative to a BART Benchmark that included the most stringent $NO_X$ BART controls, SCR plus new LNBs and SOFA, at the four BART units. This is consistent with the streamlined approach described in Step 1 of the BART Guidelines. The BART Guidelines note that a comprehensive BART analysis can be avoided if a source commits to a BART determination that consists of the most stringent controls available.[83]

We propose to find that Utah has met the requirement for an analysis of BART and associated emission reductions achievable at Hunter and Huntington under 40 CFR 51.308(e)(2)(i)(C).

d. Analysis of Projected Emissions Reductions Achievable Through the BART Alternative

As discussed previously in section IV.C.4, a summary of Utah's estimates of emissions for the Utah BART Alternative and the BART Benchmark is provided in Table 3. We propose to find that Utah has met the requirement for an analysis of the projected emissions reductions achievable through the alternative measure under 40 CFR 51.308(e)(2)(i)(D).

e. A Determination That the Alternative Achieves Greater Reasonable Progress Than Would Be Achieved Through the Installation and Operation of BART

Greater Reasonable Progress Based on 40 CFR 51.308(e)(3)'s Greater Emission Reductions Test

EPA's evaluation of the State's demonstration based on 40 CFR 51.308(e)(3) is located in section VI.B.2.e.

Greater Reasonable Progress Based on 40 CFR 51.308(e)(2)'s Weight-of-Evidence Test

Although Utah found that the BART Alternative demonstrates greater reasonable progress under 40 CFR 51.308(e)(3), it also chose to conduct a weight-of-evidence analysis under 40 CFR 51.308(e)(2) based on a BART Alternative involving the Hunter, Huntington, and Carbon power plants and considered the following evidence:

i. Annual Emissions Comparison for Visibility-Impairing Pollutants

The emissions of visibility-impairing pollutants from both the Utah BART Alternative and the BART Benchmark, as estimated by Utah, are summarized in Table 3 in section IV.C.4. Compared with the Utah BART Benchmark, the State projects that the Utah BART Alternative will result in 5,721 tpy more

[77] 40 CFR 51.308(e)(2)(i).

[78] 40 CFR 51.308(e)(2)(iii).

[79] 40 CFR 51.308(e)(2)(iv).

[80] As presented in this proposal, while the majority of the State's demonstration is contained in Chapter 1, EPA has identified additional information regarding the demonstration and we include references to the additional information.

[81] 77 FR 74357 (Dec. 14, 2012).

[82] 77 FR 74355, 74357 (Dec. 14, 2012).

[83] 40 CFR 51, appendix Y, section IV.D.1.9.

Appellate Case: 21-9509 Document: 101-2 Date Filed: 06/10/2022 Page: 63


$NO_X$ emissions, 8,005 tpy fewer $SO_2$ emissions, and 573 tpy fewer $PM_{10}$ emissions than the BART Benchmark. Utah also found that the combined emissions of $NO_X$, $SO_2$ and $PM_{10}$ will be 2,856 tpy lower under the BART Alternative.

We propose to concur with Utah's finding that the BART Alternative will achieve greater $SO_2$ and $PM_{10}$ emissions reductions and greater aggregate emissions reductions of all pollutants. We further propose to recognize that not all pollutants impact visibility equally and that the total emissions reductions of all pollutants is not necessarily a direct indicator of whether the BART Alternative or the BART Benchmark will achieve greater reasonable progress. However, for reasons described later in subsection vii for our evaluation of Utah's IMPROVE monitoring metric, we propose to concur with Utah's finding that $SO_2$ emissions reductions should provide visibility benefits in all seasons and that sulfate is the largest contributor to visibility impairment at the affected Class I areas. Furthermore, we propose to find that these observations suggest that the BART Alternative is likely to achieve greater reasonable progress. We note that Utah has also provided CALPUFF modeling results for the BART Benchmark and BART Alternative scenarios to assess the relative visibility benefits of each. These modeling results are considered here by EPA as part of the overall weight-of-evidence analysis.

ii. Improvement in the Number of Days With Significant Visibility Impairment

As discussed previously in section IV.C.5, Utah provided modeling results to assess the improvement in the number of days with significant visibility impairment—that is, the improvement in the number of days with impacts that either cause (>1.0 dv) or contribute (>0.5 dv) to visibility impairment.

The BART Guidelines provide that, when making a BART determination, a State may consider the number of days or hours that a threshold was exceeded.[84] In developing the BART Guidelines, our example modeling analysis of a hypothetical source examined the number of days that 1.0 dv and 0.5 dv thresholds were exceeded.[85] In addition, we have used these metrics, and in particular the total number of days for the meteorological years modeled, in previous regional haze rulemakings such as for North Dakota,[86] Montana,[87] and Washington.[88]

This metric is useful in assessing the frequency and duration of significant visibility impacts from a source or small group of sources. Therefore, for this reason and because these metrics are supported by our regulations and past practice, we propose to find the State's use of these metrics is appropriate. Moreover, we propose to find the difference in the total number of days impacted—18 fewer days greater than the causation threshold of 1.0 dv (775 days for the BART Alternative vs. 793 days for the BART Benchmark), and 175 fewer days greater than the contribution 0.5 dv threshold (1,323 days for the BART Alternative vs. 1,498 days for the BART Benchmark)—is an indication that the BART Alternative achieves greater reasonable progress.

iii. 98th Percentile Impact (dv)

As discussed previously in section IV.C.5, Utah explained that the only metric it evaluated that showed greater improvement for the BART Benchmark in comparison to the BART Alternative was the 98th percentile metric (when averaged across all Class I areas and meteorological years modeled). Utah's comparison of the modeled visibility impacts on the 98th percentile day (8th highest impacted day in a given meteorological year) for the most impacted year shows that the BART Benchmark would result in greater visibility improvement at five of the nine Class I areas, and is slightly better on average across all nine Class I areas (0.11 dv difference). At the most impacted Class I areas, Canyonlands and Capitol Reef, Utah found that the 98th percentile metric indicates the BART Benchmark has 0.76 dv and 0.57 dv, respectively, more improvement than the BART Alternative. At other Class I areas, Utah found that the 98th percentile metric indicates that the BART Alternative provides greater visibility improvement (for example, 0.44 dv at Flat Tops).

The 98th percentile visibility impact is a key metric recommended by the BART Guidelines[89] when selecting BART controls. In addition, this is one of the primary metrics that EPA has relied on in evaluating prior regional haze actions that have included BART alternatives.[90] In the BART Guidelines, EPA described this metric as an appropriate measure in determining the degree of visibility improvement expected from controls.[91] Therefore, we propose to find that it is an appropriate metric for assessing the relative benefits of the Utah BART Alternative here.

We note that when calculating visibility improvements for individual Class I areas, Utah mixed the impacts from different meteorological years between modeling scenarios (baseline, BART benchmark, and BART Alternative). This may introduce some error as the visibility improvements could be driven by year-to-year variability in meteorological conditions, as opposed to the differences in emission reductions between the BART Alternative and BART Benchmark. For this reason, in addition to considering the State's numbers, EPA also calculated the visibility improvements for each modeling scenario using consistent meteorological years.[92] Using this method, whether the BART Alternative resulted in lower 98th percentile impacts depended on both the particular Class I area and meteorological year modeled. In some years and some Class I areas, particularly some of the most impacted Class I areas, the BART Benchmark shows better visibility improvement than the BART Alternative. Notably, the BART Benchmark shows 0.93 dv greater improvement for Canyonlands in 2002 and 0.75 dv greater improvement for Capitol Reef in 2001.[93] By contrast, the BART Alternative shows 0.90 dv greater improvement for Arches in 2003 and 0.43 dv greater improvement for Flat Tops in 2002.[94] On the whole, when using this method, the BART Benchmark is better on average across all years and nine Class I areas (0.14 dv difference). See Table 12. We propose to find, consistent with the State's evaluation, that this metric favors the BART Benchmark.

[84] 40 CFR 51, appendix Y, section IV.D.5.

[85] 70 FR 39130 (July 6, 2005).

[86] 76 FR 58584 (Sept. 21, 2011).

[87] 77 FR 24006 (Apr. 20, 2012).

[88] 79 FR 33438, 33440–33441 (June 11, 2014).

[89] 40 CFR 51, appendix Y, section IV.D.5.

[90] *See, e.g.,* 78 FR 79344 (Dec. 30, 2012)(proposed rule, FIP for Tesoro Refining and Intalco Refinery BART Alternatives); 79 FR 33438 (June 11, 2014)(final rule, FIP for Tesoro Refining and Intalco Refinery BART Alternatives); 79 FR 56322, 56328 (Sept. 19, 2014)(proposed approval of Arizona Apache BART Alternative); 80 FR 19220 (April 10, 2015)(final approval of Arizona Apache BART Alternative); 77 FR 11827, 11837 (Feb. 28, 2012)(proposed approval of Maryland BART Alternative); 77 FR 39938, 39940–1 (July 6, 2012)(final approval of Maryland BART Alternative).

[91] 70 FR at 39129.

[92] *See* EPA Calculation of 98th Percentile Improvement for Utah Bart Alternative spreadsheet (in docket).

[93] *Id.*

[94] *Id.*

Appellate Case: 21-9509 Document: 101-2 Date Filed: 06/10/2022 Page: 64


TABLE 12—SUMMARY OF EPA COMPARISON OF UTAH CALPUFF 98TH PERCENTILE MODELING RESULTS BASED ON CONSISTENT METEOROLOGICAL YEARS [95]

| Class I Area | Average visibility improvement of BART benchmark over BART alternative (delta dv)[1] |
|---|---|
| Arches | −0.21 |
| Black Canyon of the Gunnison | 0.06 |
| Bryce Canyon | 0.04 |
| Canyonlands | 0.78 |
| Capitol Reef | 0.59 |
| Flat Tops | −0.15 |
| Grand Canyon | 0.06 |
| Mesa Verde | 0.12 |
| Zion | 0.02 |
| Class I Area Average | 0.14 |

[1] A negative value indicates the modeling results favor the BART Alternative. Results are based on the three-year average of results for 2001, 2002 and 2003.

iv. Annual Average Impact (dv)

As discussed previously in section IV.C.5, Utah's modeling shows that the average annual dv impact at all Class I areas is better under the Utah BART Alternative at five of the nine Class I areas, and is better on average across all the Class I areas. The average impact was calculated by averaging all daily modeling results for each year and then calculating a 3-year average from the annual average. Utah's information shows that the BART Alternative is better than the BART Benchmark by 0.009 dv on average across all nine Class I areas. While EPA has not considered this metric in the past,[96] since the State includes it, we consider it here. Furthermore, the BART Guidelines state that, ''in determining what, if any, emission controls should be required, the State will have the opportunity to consider the frequency, duration, and intensity of a source's predicted effect on visibility.'' [97] The annual average does provide an indication of the modeled visibility impacts for the entire year while the 98th percentile modeled results speak to a particular day (the 8th highest impacted day). Accordingly, and while we have typically relied primarily on the 98th percentile impacts in evaluating BART controls in other actions, we propose to find that the annual average impact provides additional useful information in considering Utah's weight of evidence. However, given that the difference in this metric is small (0.009 dv), we propose to find that it only marginally supports a conclusion that the BART Alternative achieves greater reasonable progress.

v. 90th Percentile Impact (dv)

As discussed previously in section IV.C.5, Utah's comparison of the modeled visibility impacts at the 90th percentile (the 110th highest day across three years) dv impact shows that the Utah BART Alternative is better at seven of the nine Class I areas and is slightly better averaged both across three years and across nine Class I areas (0.006 dv difference). We note that the use of the 90th percentile impacts to evaluate alternatives has not been EPA's practice for source-specific BART determinations; however, as discussed previously for the average dv impact metric, the BART Guidelines allow states to consider other visibility metrics in addition to the 98th percentile. Yet, because of the small difference between the two scenarios (0.006 dv), we propose to find that it only marginally supports a conclusion that the BART Alternative achieves greater reasonable progress.

vi. Timing for the Emissions Reductions

As discussed previously in section IV.C.5, Utah noted that reductions under the Utah BART Alternative will occur earlier than the BART Benchmark. The reductions under the Utah BART Alternative are required under the State SIP by August 2015, as noted in Table 5, providing an early and on-going visibility benefit as compared to BART. Also notable is that combustion control upgrades at the Hunter and Huntington facilities have been achieving significant $NO_X$ reductions since the time of their installation between 2006 and 2014, depending on the unit. If, as proposed in section VI.C, BART for the four units is LNB/SOFA plus SCR, BART likely would be fully implemented sometime between 2019 and 2021.

Therefore, we note that the reductions from the BART Alternative will occur before the BART Benchmark.

vii. IMPROVE Monitoring Data

Utah's SIP presents sulfate and nitrate monitoring data at the Canyonlands IMPROVE monitor that show that ''sulfates are the dominant visibility impairing pollutant'' [98] and that sulfate levels have decreased,[99] and references similar results at other Class I areas in the TSD.[100] Utah also presents data on trends in emissions from EGUs showing substantial reductions in emissions of both $SO_2$ and $NO_X$.[101] Based on these data, Utah indicates it ''has confidence that the $SO_2$ reductions will achieve meaningful visibility improvement,'' under the Utah BART Alternative, while ''the visibility improvement during the winter months due to $NO_X$ reductions is much more uncertain.'' [102] Utah makes this point even though nitrate concentrations are highest in the winter, explaining that while there has been a reduction in $NO_X$, the ammonium nitrate values do not show similar improvement in the winter months.[103] Utah offers several possible explanations for the results, but does not provide any definitive conclusions.[104]

Utah also presents data on the seasonality of park visitation and monitoring data for nitrate and sulfates. The data show that the highest measured nitrate concentrations occur in winter during the period of lowest park visitation, and that sulfates affect visibility throughout the year and are the dominant visibility impairing pollutant from anthropogenic sources during the high visitation period of March through November. Utah concludes that it has greater confidence that reductions in $SO_2$ will be reflected in improved visibility for visitors to the Class I areas, while reductions in $NO_X$ will have a more uncertain benefit for visitors to Class I areas.

We invite comment on the information and conclusions provided by Utah as summarized previously.

We propose to concur with one of the State's findings. We propose to find that visibility benefits associated with $NO_X$ reductions are much more likely to occur in the winter months because this is when aerosol thermodynamics favors nitrate formation.[105] By contrast, $SO_2$ emissions reductions should provide

[95] *Id.*

[96] EPA final actions on BART alternatives that evaluated CALPUFF modeling analysis, which did not include consideration of annual average dv impacts include: 80 FR 19220 (April 10, 2015)(Region 9, Apache); 79 FR 33438 (June 11, 2014)(Region 10, Tesoro Refining and Alcoa Intalco Operations); 77 FR 39938 (July 6, 2012)(Region 3, Maryland HAA).

[97] 70 FR 39121 (July 5, 2005).

[98] Utah Regional Haze State Implementation Plan, Technical Support Document, Ch. 1, p. 12 (2015).

[99] *Id.* at p. 15.

[100] *Id.* at p.12.

[101] *Id.* at p. 14.

[102] *Id.* at p. 13.

[103] *Id.*

[104] *Id.* at pp. 16–19.

[105] Fountoukis, C. & Nenes, A. *ISORROPIA II: A Computationally Efficient Aerosol Thermodynamic Equilibrium Model for* $K^+$, $Ca_2{}^+$, $Mg_2{}^+$, $NH_4{}^+$, $Na^+$, $SO_4{}^{2-}$, $NO_3{}^-$, $Cl-$, $H_2O$ *Aerosols*, 7 Atmos. Chem. Phys., 4639–4659 (2007).

Appellate Case: 21-9509 Document: 101-2 Date Filed: 06/10/2022 Page: 65


visibility benefits in all seasons.[106] We also propose to find that, as concluded by the GCVTC, and supported by the IMPROVE monitoring data presented by Utah, anthropogenic visibility impairment on the Colorado Plateau is dominated by sulfates.[107] [108] Therefore, we propose to concur with Utah's statement that sulfate is the largest contributor to visibility impairment at the affected Class I areas.

We propose to disagree with the State's findings related to park visitation. While the BART Guidelines do mention visitation as something that can inform a control decision,[109] EPA is proposing to place little weight on the State's correlation of emissions reductions and park visitation because nothing in the CAA suggests that visitors during busy time periods are entitled to experience better visibility than visitors during off-peak periods. On the contrary, in the Regional Haze provisions of the CAA, Congress declared a national goal of remedying all manmade visibility impairment in all class I areas, which includes both heavily-visited national parks and seldom-visited wilderness areas. We invite comment on our evaluation and the information and conclusions provided by Utah as summarized previously.

viii. Energy and Non-Air Quality Benefits

As discussed previously in section IV.C.5, the State noted that the Utah BART Alternative would avoid an annual energy penalty of approximately $2 million due to operating four SCR units at the Hunter and Huntington plants and presented additional non-air quality benefits associated with the closure of the Carbon plant such as waste reduction and decreased water usage. Because such benefits do not have direct bearing on whether the BART Alternative achieves greater reasonable progress, it is not material to our action whether we agree or disagree with Utah's assessment that they reduce energy and non-air quality impacts.

ix. Cost

As discussed previously in section IV.C.5, the State noted that the Utah BART Alternative would achieve greater reasonable progress at lower cost to PacifiCorp than the BART Benchmark. Utah also noted that cost is one of the factors listed in CAA 169A(g)(2) that should be considered when determining BART. While we propose to find that the described cost difference does not have a direct bearing on whether the BART Alternative achieves greater reasonable progress, it is not material to our action whether we agree or disagree with Utah's conclusion that the BART Alternative would have a lower cost impact to PacifiCorp than the BART Benchmark (*i.e.,* costs provided by PacifiCorp in its BART analyses of August 5, 2014, SIP TSD Chapter 2). However, we do agree.

f. Evaluation of the Weight of Evidence

In accordance with our regulations governing BART alternatives, we support the use of a weight-of evidence determination as an alternative to the methodology set forth in section 51.308(e)(3).[110] In evaluating Utah's weight-of-evidence demonstration, we have evaluated all nine elements of Utah's analysis, and as discussed later, rely primarily on the following four elements in proposing to approve the BART Alternative: Annual emissions comparison for two pollutants; improvement in the number of days with significant visibility impairment; IMPROVE monitoring data regarding sulfates; and the early timing for installation of controls. Additional elements that either marginally support or do not support our proposed approval of Utah's determination are also discussed later.

Regarding the emissions reduction comparison, the Utah BART Alternative will result in 8,005 tpy fewer $SO_2$ emissions compared to the BART Benchmark. In addition, the combined emissions of $NO_X$, $SO_2$ and $PM_{10}$ will be 2,856 tpy lower under the BART Alternative.

Regarding the improvement in the number of days with significant visibility impairment, modeling submitted by Utah shows that the Utah BART Alternative will result in improved visibility at all affected Class I areas compared with baseline conditions. The units at issue will have impacts of 1.0 dv or more at the affected Class I areas on 48 fewer days under the Utah BART Alternative as compared to BART. When considering impacts of 0.5 dv or more, the units at issue will impact the affected Class I areas on 154 fewer days under the BART Alternative as compared to BART.

Regarding the IMPROVE visibility monitoring data, we propose to agree with the State's finding that $SO_2$ emissions reductions provide visibility benefits throughout the year. We also propose to concur with Utah's statement that sulfate is the largest contributor to visibility impairment at the affected Class I areas.

Regarding the timing of emissions reductions, these $SO_2$ emissions reductions were achieved in August 2015, the date in the June 2015 Utah RH SIP requiring the closure of the Carbon plant. Combustion controls at the four BART units in addition to Hunter Unit 3 were installed between 2006 and 2014. BART likely would otherwise have been implemented sometime between 2019 and 2021. So the Utah BART Alternative provides early and on-going visibility benefits as compared to BART.

Regarding other metrics that only marginally support or do not support our proposed approval of Utah's BART Alternative, we propose to find that average annual dv impact and the 90th percentile impact are the two metrics that marginally support a conclusion that the BART Alternative achieves greater reasonable progress.

Regarding the 98th percentile visibility impact, we propose to find this metric does not support our proposed approval of Utah's BART Alternative. While the 98th percentile visibility impact is a key metric that EPA has primarily focused on in prior actions, we propose to conclude that by itself it is not a dispositive metric in weighing a BART Alternative. Nonetheless, as discussed in section VI, we have given considerable weight to this metric in previous actions where we have evaluated BART alternatives as it captures a source's likely greatest visibility impacts at a Class I area; as such, it is a useful comparison point for determining whether one emission control scenario will have a greater impact on visibility improvement than another. In those actions, the 98th percentile visibility impact favored the BART alternative and therefore there was less need to introduce and consider additional evidence to determine

[106] Seinfeld, John H., *Urban Air Pollution: State of the Science,* 243 Science Magazine, No. 4892, 745, 745–752 (1989).

[107] While natural sources of haze from wildfires or windblown dust can be the largest contributor on some of the 20% haziest days, the RHR defines ''impairment'' as anthropogenic impairment, and sulfate formed from anthropogenic $SO_2$ emissions is the dominant contributor to anthropogenic visibility impairment on the haziest days.

[108] The Grand Canyon Visibility Transport Commission Recommendations for Improving Western Vistas, June 10, 1996, p. 32. Available at *http://www.wrapair.org/WRAP/reports/GCVTCFinal.PDF* and included in the docket.

[109] 70 FR 39104, 39130 (July 6, 2005) (''Other ways that visibility improvement may be assessed to inform the control decisions would be to examine distributions of the daily impacts, determine if the time of year is important (*e.g.* high impacts are occurring during tourist season), consideration of the cost-effectiveness of visibility improvements (*i.e.* the cost per change in deciview), using the measures of deciview improvement identified by the State, or simply compare the worst case days for the pre- and post-control runs. States may develop other methods as well.'').

[110] 71 FR 60622 (Oct. 13, 2006).

Appellate Case: 21-9509 Document: 101-2 Date Filed: 06/10/2022 Page: 66


whether an alternative would provide greater reasonable progress. In the case of the Utah BART Alternative, where the 98th percentile does not favor the alternative, Utah has introduced additional evidence that we considered in order to evaluate whether the BART Alternative, on balance, achieves greater reasonable progress.

Regarding the 90th percentile visibility impact, we propose to find that consideration of this metric is appropriate in assessing the weight of evidence associated with a BART alternative. Visibility at a Class I area changes from day to day, and each emission control scenario would result in visibility improvements at the affected Class I areas that would differ from one day to another. The metrics related to the number of days with impacts greater than 0.5 dv and 1.0 dv are examples of the type of additional information that allows for consideration of the frequency and duration of visibility impacts. Similarly, the use of the 90th percentile impact metric allows for the comparison of BART and a BART alternative at a different point in the range of impacts. This can be useful, given the varying impacts of different pollutants under different meteorological conditions. The information provided by Utah for the 90th percentile shows that the BART Alternative is better at seven of the nine Class I areas for this metric, by amounts ranging from 0.019 to 0.140 dv, and is better when taking into account the impacts averaged both across three years and across nine Class I areas, but only by 0.006 dv. These values marginally support our proposed approval of Utah's BART Alternative as better than BART. We invite comment on this proposed assessment of how the 90th percentile metric should be considered in the weight of evidence determination. We also invite interested parties to submit additional information on how the impacts of the BART Alternative under various conditions compare to the impacts of the presumed BART scenario, because while the 90th percentile impact provides additional insight, it is not uniquely informative.

Regarding the energy and non-air quality impacts, as well as cost, we propose to find these metrics do not have direct bearing on whether the Utah BART Alternative achieves greater reasonable progress than the BART Benchmark; and therefore, we have not taken them into consideration.

Consistent with EPA's regulations governing BART alternatives,[111] in evaluating the weight-of-evidence demonstration, we have evaluated all of the information and data submitted by Utah, while recognizing the relative strengths and weaknesses of that information to arrive at our proposed decision. Based on the weight-of-evidence presented, we propose to approve Utah's determination that the Utah BART Alternative would achieve greater reasonable progress than BART under 40 CFR 51.308(e)(2)(i)(I).

g. Requirement That Emission Reductions Take Place During Period of First Long-Term Strategy

As discussed previously in section IV.C.6, pursuant to 40 CFR 51.308(e)(2)(iii), the State must ensure that all necessary emission reductions take place during the period of the first long-term strategy for regional haze, *i.e.,* by December 31, 2018. The RHR further provides that, to meet this requirement, the State must provide a detailed description of the alternative measure, including schedules for implementation, the emission reductions required by the program, all necessary administrative and technical procedures for implementing the program, rules for accounting and monitoring emissions, and procedures for enforcement.[112]

As noted previously, the Utah SIP revision incorporates the revisions to R307–110–17, Section IX, Control Measures for Area and Point Sources, Part H, Emissions Limits, which includes provisions for implementing the Utah BART Alternative. In addition to the emission limitations for $NO_X$ and $PM_{10}$, and the requirement for shutdown of the Carbon plant listed in Table 2, the SIP includes compliance dates, operation and maintenance requirements, and monitoring, recordkeeping, and reporting requirements. We propose to find that these provisions meet the requirements of 40 CFR 51.308(e)(2)(iii).

h. Demonstration That Emission Reductions From Alternative Program Will Be Surplus

i. June 2015 Utah RH SIP

As discussed previously in section IV.C.7, pursuant to 40 CFR 51.308(e)(2)(iv), the SIP must demonstrate that the emissions reductions resulting from the alternative measure will be surplus to those reductions resulting from measures adopted to meet requirements of the CAA as of the baseline date of the SIP. The baseline date for regional haze SIPs is 2002.[113] As discussed in section IV.C.7, all of the emission reductions required by the Utah BART Alternative result from measures applicable to Hunter, Huntington and Carbon that occur after 2002.

Furthermore, the State's SIP explains that the WRAP modeling that was done to support the Utah RH SIP included regional $SO_2$ emissions based on the 2018 $SO_2$ milestone and also included $NO_X$ and $PM_{10}$ emissions from the Carbon plant. Thus, WRAP did not rely on emission reductions from the Carbon plant in establishing the 2018 $SO_2$ milestone.

The State's SIP also includes $SO_2$ trend data that further demonstrate emission reductions from the Carbon plant do not appear to be needed for meeting the 2018 milestone of 141,849 tpy. Actual emissions in the three-state region are calculated each year and compared to the milestones. As can be seen in Table 7, $SO_2$ emissions reported for 2011 are below the 2018 milestone and the most recent milestone report for 2013 demonstrates that $SO_2$ emissions are currently 26 percent lower than the 2018 milestone. Additionally, the Carbon plant was fully operational in the years 2011–2013 when the emissions from the three-state region were below the 2018 milestone for those years. Therefore, the $SO_2$ emission reductions from the closure of the Carbon plant appear to be surplus to what is needed to meet the 2018 milestone established in Utah's RH SIP.

ii. October 2015 Utah RH SIP

As discussed previously in section IV.D, Utah submitted enforceable commitments in its October 20, 2015 SIP to address potential concerns that the State would be double counting $SO_2$ emissions reductions for the Carbon plant closure under both the 40 CFR 51.308 and 309 programs.[114]

EPA has historically recognized that under certain circumstances, it is appropriate to approve a SIP submission that consists, in part, of an enforceable commitment. Once EPA determines that circumstances warrant consideration of an enforceable commitment to meet section 110(a)(2)(A) of the Act (and other applicable sections as relevant), EPA applies three factors to determine whether to approve the enforceable commitment: (1) Whether the commitment addresses a limited portion

[111] 71 FR 60622 (Oct. 13, 2006).

[112] 40 CFR 51.308(e)(2)(iii).

[113] *See* Memorandum from Lydia Wegman and Peter Tsirigotis, 2002 Base Year Emission Inventory SIP Planning: 8-hr Ozone, $PM_{2.5}$, and Regional Haze Programs, November 18, 2002. *http://www3.epa.gov/ttnchie1/eidocs/2002baseinven_102502new.pdf.*

[114] Regional Haze Section XX, N. (1).

Appellate Case: 21-9509 Document: 101-2 Date Filed: 06/10/2022 Page: 67



of the statutorily-required program; (2) whether the state is capable of fulfilling its commitment; and (3) whether the commitment is for a reasonable and appropriate period of time. Once approved in a SIP, the commitments are enforceable by both EPA and citizens under the Act.

First, Utah's revisions address a limited portion of the statutorily-required program. The Air Quality Board adopted revisions to SIP Section XX, Regional Haze, and added a new subsection N, ''Enforceable Commitments for the Utah Regional Haze SIP'' that resolves specific identified issues. In this provision of the SIP, ''[t]he State commits to resolving this double counting issue by revising the Utah 309 plan to specifically state that the 8,005 tons of $SO_2$ emissions from the Carbon units will be added into the annual milestone reports from 2016 through the life of the backstop trading program, thereby removing any credit for that emission reduction in meeting the levels specified in the Utah 309 plan.'' [115] Reporting Carbon's emissions in this manner is reasonable and ensures that these emissions reductions are only credited under the BART Alternative.

The SIP indicates the Board is capable of fulfilling these commitments by explaining that ''[a]ll required amendments to this SIP will be done through the State's SIP adoption process'' [116] and that ''[t]he SIP is adopted by the Governor-appointed Air Quality Board through a rulemaking process that includes public comment periods and an opportunity for a public hearing.'' [117]

The SIP commits to resolve the identified issues (''SIP Section XX.D.3.c and [the State's rule] R307–150 will be revised . . .'' [118]), and any other related issues, within reasonable amount of time (''Utah will work with EPA and take appropriate action to resolve any completeness or approvability issues that arise regarding the proposed SIP revision by March 2018'' [119]). This will allow sufficient time for EPA to act on the submittal before the end of the milestone commitment.

We also propose to concur that Carbon's 8,005 tpy of $SO_2$ emissions reductions is a limited portion of the overall requirements of the 309 program and particularly in comparison to the 2018 $SO_2$ milestone of 141,849 tpy described in Table 7.[120]

Based on these considerations, we propose to approve the enforceable commitment SIP.

Therefore, based on the information presented previously from the State's SIP and enforceable commitment SIP, we propose to concur that the reductions from Carbon are surplus and can be considered as part of an alternative strategy under 40 CFR 51.308(e)(2)(iv).

*C. $PM_{10}$ BART Determinations*

As discussed previously in section IV.B.2, Utah determined that the $PM_{10}$ BART emission limit for Hunter Units 1 and 2 and Huntington Units 1 and 2 was 0.015 lb/MMBtu based on a three-run test average. Utah noted that because the most stringent technology is in place at these units and that the $PM_{10}$ emission limits have been made enforceable in the SIP, no further analysis was required.

EPA has reviewed Utah's $PM_{10}$ BART streamlined five-factor analysis and $PM_{10}$ BART determinations for Hunter Units 1 and 2 and Huntington Units 1 and 2 and proposes to find that these determinations meet the requirements of 40 CFR 51.309(d)(4)(vii). The fabric filter baghouses installed at these BART units are considered the most stringent technology available. The emission limit of 0.015 lb/MMBtu at these units represents the most stringent emission limit for $PM_{10}$. Utah's use of a streamlined approach to the five-factor analysis is reasonable as the BART Guidelines provide that a comprehensive BART analysis can be avoided if a source commits to a BART determination that consists of the most stringent controls available.[121]

Utah's regulatory text provides, ''[e]missions of particulate (PM) shall not exceed 0.015 lb/MMBtu heat input from each boiler based on a 3-run test average.'' It further states that ''[s]tack testing for the emission limitation shall be performed each year on each boiler.'' [122] We note that BART limits must apply at all times. See CAA section 302(k), 40 CFR part 51, appendix Y, section V. Furthermore, EPA's credible evidence rule requires that a state's plan must not preclude the use of any credible evidence or information, which can include evidence and information other than the test method specified in the plan, that would indicate whether a source was in compliance with applicable requirements.[123]

Consistent with these requirements, we propose to interpret Utah's regulatory text as imposing a PM limit of 0.015 lb/MMBtu that applies at all times and does not preclude the use, including the exclusive use, of any credible evidence or information, relevant to whether a source is in compliance with the limit.

*D. Monitoring, Recordkeeping, and Reporting*

EPA has reviewed Utah's monitoring, recordkeeping and reporting measures in its June 4, 2015 SIP Section IX, Part H for the BART Alternative and the $PM_{10}$ BART determinations and proposes to approve these measures as meeting the requirements of section 110(a)(2) of the CAA and 40 CFR 51, subpart K, Source Surveillance, with the exception of reporting requirements for violations of $PM_{10}$ emissions limitations. For $PM_{10}$ reporting, we are proposing to conditionally approve this element in accordance with CAA section 110(k)(4) based on Utah's commitment to submit specific measures to address the reporting requirement.[124] Utah's letter commits to adopt and submit rule language that would require sources to report any deviation from the requirements of the RH SIP provisions, which would include the $PM_{10}$ emission limitations. The specific language is detailed in Utah's commitment letter.

Otherwise, the SIP includes adequate measures that pertain to operation of Hunter and Huntington and the closure of Carbon. EPA previously approved state rule provisions that Utah has also cross referenced in these new regional haze measures, including terms, conditions and definitions in R307–101–1, R307–101–2 and R307–170–4 as well as other continuous emission monitoring system (CEMS) requirements referenced in R307–107. These measures are consistent with similar monitoring, recordkeeping, and reporting requirements that EPA has approved in other states or that we have adopted in federal plans,[125] and in particular contain the requirements that were missing from Utah's prior regional haze submittals.[126] As described previously in section IV.A.3, Utah has provided the emission limitations, work practice standards, monitoring, recordkeeping, and reporting

[115] Regional Haze SIP Section XX, N. (1).

[116] Regional Haze SIP Section XX, N. (4).

[117] Regional Haze SIP Section XX, N. (4).

[118] Regional Haze SIP Section XX, N. (3).

[119] Regional Haze SIP Section XX, N. (6), (3).

[120] Regional Haze SIP Section XX, N. (2).

[121] 40 CFR 51, appendix Y, section IV.D.1.9.

[122] June 2015 Utah RH SIP, Sections IX.H.22.a.i.A–B, IX.H.22.b.i.A–B.

[123] 40 CFR 51.212(c).

[124] Letter from Department of Environmental Quality, State of Utah to EPA, DAQP–120–15 (Dec. 10, 2015).

[125] 77 FR 57864; 79 FR 5032.

[126] 77 FR 74365–74366 (Dec. 14, 2012).

Appellate Case: 21-9509 Document: 101-2 Date Filed: 06/10/2022 Page: 68


requirements for all the units that are part of Utah's BART Alternative for the Hunter, Huntington, and Carbon plants.

If we finalize our proposed approval, the regulatory text contained in our final rule for 40 CFR part 52 subpart TT will be consistent with the relevant provisions of Utah's regional haze submittals for making the emission limits and other requirements enforceable. If EPA finalizes the conditional approval of Utah's $PM_{10}$ reporting provision, the State has one year from the date of EPA's final action on the June 4, 2015 SIP to submit the necessary SIP revisions. If the State fails to meet its commitment within the one-year period, the approval is treated as a disapproval. EPA proposes to find that the necessary SIP revisions meet EPA's criteria for conditional approvals [127] as the revisions appear to involve a limited amount of technical work, are anticipated to be non-controversial, and can reasonably be accomplished within the length of time for the State's adoption process.

*E. Consultation with FLMs*

As discussed previously in section IV.G, Utah conducted FLM consultation during late 2014, providing over 60 days prior to the December 1, 2014 public hearing. Subsequently, the National Park Service provided extensive comments in response to a second public comment period in April 2015. Based on these considerations, we propose to find that Utah has met the requirements of 40 CFR 308(i)(2).

## VI. EPA's Evaluation and Proposed Partial Approval and Partial Disapproval of Utah's Regional Haze SIP

In this section, we present the second of two alternative proposed actions on which EPA is soliciting comment. As explained previously in sections II.A and V, EPA is soliciting comments on two alternative proposals: a proposal to approve the State SIP in its entirety, and a proposal to partially approve and partially disapprove the State SIP and to issue a FIP. The co-proposals detailed in this section and Section V represent different conclusions regarding Utah's $NO_X$ BART Alternative and the metrics the State has proposed to support this alternative.

As described in this section, EPA is proposing to partially approve and partially disapprove Utah's June 2015 and October 2015 RH SIP revisions and propose a FIP. Alternatively, as discussed in section V, EPA is co-proposing in the alternative to approve Utah's June 2015 and October 2015 RH SIP revisions.

This document is written as two separate proposals in order to clearly present the options and solicit comment on each. EPA intends to finalize only one of these co-proposals; however, we also acknowledge that additional information and comments may also lead the Agency to adopt final SIP and/or FIP regulations that differ somewhat from the co-proposals presented here regarding the BART Alternative, BART control technology option or emission limits, or impact other proposed regulatory provisions.

*A. Basis for Proposed Partial Disapproval and Partial Approval*

For the reasons described later, EPA proposes to partially approve and partially disapprove the two Utah 2015 RH SIP revisions. Our proposed action is based on an evaluation of Utah's regional haze SIP submittals against the regional haze requirements at 40 CFR 51.300–51.309 and CAA sections 169A and 169B, as well as the supplemental information EPA developed, such as EPA's calculations of the visibility improvements for each modeling scenario using consistent meteorological years in evaluating the 98th percentile modeling and referencing the topographical maps in evaluating whether distribution of emissions would be substantially different under the Utah BART Alternative. All general SIP requirements contained in CAA section 110, other provisions of the CAA, and our regulations applicable to this action were also evaluated. The purpose of this action is to ensure compliance with these requirements. As discussed in section V, EPA is also co-proposing to approve the Utah's June 2015 and October 2015 RH SIP revisions.

*B. Utah BART Alternative*

1. Summary of Utah BART Alternative

Utah has opted to establish an alternative measure (or program) for $NO_X$ in accordance with 40 CFR 51.308(e)(2). A description of the Utah BART Alternative is provided in section IV.C. The RHR requires that a SIP revision establishing a BART alternative include three elements as listed later. We have evaluated the Utah BART Alternative with respect to each of these elements.

- A demonstration that the emissions trading program or other alternative measure will achieve greater reasonable progress than would have resulted from the installation and operation of BART at all sources subject to BART in the State and covered by the alternative program.[128]
- A requirement that all necessary emissions reductions take place during the period of the first long-term strategy for regional haze.[129]
- A demonstration that the emissions reductions resulting from the alternative measure will be surplus to those reductions resulting from measures adopted to meet requirements of the CAA as of the baseline date of the SIP.[130]

2. Demonstration of Greater Reasonable Progress for Alternative Program

As discussed previously in section III.E.1, pursuant to 40 CFR 51.308(e)(2)(i), Utah must demonstrate that the alternative measure will achieve greater reasonable progress than would have resulted from the installation and operation of BART at all sources subject to BART in the State and covered by the alternative program. This demonstration, primarily included in Chapter 1 of the TSD of the Utah RH SIP,[131] must be based on five criteria presented below.

a. A List of All BART-Eligible Sources Within the State

As discussed previously in section IV.C.1, Utah included a list of BART-eligible sources and noted the following sources are all covered by the alternative program:

- PacifiCorp Hunter, Unit 1,
- PacifiCorp Hunter, Unit 2,
- PacifiCorp, Huntington, Unit 1, and
- PacifiCorp, Huntington, Unit 2.

EPA approved Utah's BART eligibility determinations in our 2012 rulemaking.[132]

b. A List of All BART-Eligible Sources and All BART Source Categories Covered by the Alternative Program

As discussed previously in section IV.A.3, the Utah BART Alternative covers all the BART-eligible sources in the state, Hunter Units 1 and 2 and Huntington Units 1 and 2, in addition to three non-BART units, PacifiCorp's Hunter Unit 3 and Carbon Units 1 and 2. EPA previously approved Utah's

[127] *See* Memorandum from John Calcagni to EPA Regional Directors. ''Processing of State Implementation Plan (SIP) Submittals'' (July 1992), available at *http://www3.epa.gov/ttn/oarpg/t1/memoranda/siproc.pdf.*

[128] 40 CFR 51.308(e)(2)(i).

[129] 40 CFR 51.308(e)(2)(iii).

[130] 40 CFR 51.308(e)(2)(iv).

[131] As presented in this proposal, while the majority of the State's demonstration is contained in Chapter 1, EPA has identified additional information regarding the demonstration and we include references to the additional information.

[132] 77 FR 74357 (Dec. 14, 2012).

Appellate Case: 21-9509 Document: 101-2 Date Filed: 06/10/2022 Page: 69


BART eligibility determinations in our 2012 rulemaking.[133]

c. Analysis of BART and Associated Emission Reductions Achievable

As noted previously in section IV.C.3, in the June 2015 Utah RH SIP, Utah compared the Utah BART Alternative to a BART Benchmark which included the most stringent $NO_X$ BART controls, SCR plus new LNBs and SOFA, at the four BART units. This is consistent with the streamlined approach described in Step 1 of the BART Guidelines. The BART Guidelines note that a comprehensive BART analysis can be avoided if a source commits to a BART determination that consists of the most stringent controls available.[134]

We propose to find that Utah has met the requirement for an analysis of BART and associated emission reductions achievable at Hunter and Huntington under 40 CFR 51.308(e)(2)(i)(C).

d. Analysis of Projected Emissions Reductions Achievable Through the BART Alternative

As discussed previously in section IV.C.4, a summary of Utah's estimates of emissions for the Utah BART Alternative and the BART Benchmark is provided in Table 3. We propose to find that Utah has met the requirement for an analysis of the projected emissions reductions achievable through the alternative measure under 40 CFR 51.308(e)(2)(i)(D).

e. A Determination That the Alternative Achieves Greater Reasonable Progress Than Would Be Achieved Through the Installation and Operation of BART

Greater Reasonable Progress Based on 40 CFR 51.308(e)(3)'s Greater Emission Reductions Test

As discussed previously in section III.E.1, 40 CFR 51.308(e)(3) allows a state to satisfy the final step of the better-than-BART demonstration by showing that that ''distribution of emissions is not substantially different than under BART'' and that ''the alternative measure results in greater emission reductions.'' EPA has explained that when the BART alternative ''achieves greater emission reductions than each of the individual BART determinations'' [135] for each of the pollutants, ''as well as in the aggregate,'' [136] ''visibility modeling is not required to support a better-than-BART determination. . . .'' [137] However, as EPA explained in responding to comments in the final rule for the BART Alternative for the Apache Generating Station in Arizona's SIP, ''where BART and the BART Alternative result in reduced emissions of one pollutant but increased emissions of another, it is not appropriate to use the 'greater emission reductions' test.'' Instead, the proper approach is to employ a clear weight-of-evidence approach under 40 CFR 51.308(e)(2) in order to demonstrate that the alternative achieves greater reasonable progress than BART.'' [138] We have not considered a total emissions profile that combines emissions of multiple pollutants to determine whether BART or the alternative is ''better,'' except where every visibility impairing pollutant is reduced by a greater amount under the BART alternative.[139] A comparison of mass emissions from multiple pollutants (such as $NO_X$ and $SO_2$) is not generally informative, particularly in assessing whether the alternative approach provides for greater reasonable progress towards improving visibility. Instead, when emissions of one or more pollutants increases under an alternative, EPA has ''given the most weight to the visibility impacts based on air quality modeling'' [140] and used modeling to determine whether or not a ''BART Alternative measure that relies on interpollutant trading results in greater reasonable progress.'' [141]

The State's demonstration appears to satisfy the first part of the test under 40 CFR 51.308(e)(3) (the distribution of emissions may not be substantially different than under BART) since the Hunter, Huntington and Carbon plants are all located within close proximity of each other in central Utah, as discussed previously in section IV.C.5. EPA's interpretation of the requirement under 40 CFR 51.308(e)(3) that the alternative measure ''results in greater emission reductions'' has been that the emission reduction comparisons are pollutant specific. We have not looked at a total emissions profile that combines emissions of multiple pollutants to determine whether a BART benchmark or a BART alternative is ''better,'' except where every visibility impairing pollutant is reduced by a greater amount under the BART alternative.[142] Therefore, we propose to find that the State's demonstration does not meet the second part of the test. While in the aggregate there are fewer $SO_2$ and $PM_{10}$ emissions for the BART Alternative, the total $NO_X$ emissions are greater under the BART Alternative than the BART Benchmark. Therefore, we propose to disapprove Section XX.D.6.c of the Utah SIP under the test in 40 CFR 51.308(e)(3).

Greater Reasonable Progress Based on 40 CFR 51.308(e)(2)'s Weight-of-Evidence Test

Utah also chose to conduct a weight-of-evidence analysis under 40 CFR 51.308(e)(2) based on a BART Alternative involving certain units at the Hunter, Huntington, and Carbon power plants, which included the following nine categories of evidence.

i. Annual Emissions Comparison of all Visibility-Impairing Pollutants

The emissions of visibility-impairing pollutants from both the Utah BART Alternative and the BART Benchmark, as estimated by Utah, are summarized in Table 3 in section IV.C.4. Compared with the Utah BART Benchmark, the State projects that the Utah BART Alternative will result in 5,721 tpy more $NO_X$ emissions, 8,005 tpy fewer $SO_2$ emissions and 573 tpy fewer $PM_{10}$ emissions than the BART Benchmark. As discussed previously, Utah also

[133] 77 FR 74357 (Dec. 14, 2012).

[134] 40 CFR 51, appendix Y, section IV.D.1.9.

[135] 79 FR 9318, 9335 (Feb. 18, 2014).

[136] 79 FR 9318, 9335 (Feb. 18, 2014). *See, e.g.,* 77 FR 11827, 11837 (Feb. 28, 2012) (proposed approval of Maryland BART Alternative, which shows greater $SO_2$ and $NO_X$ reductions from the Alternative than application of BART, the two pollutants covered by the Alternative); 77 FR 39938, 39940–1 (July 6, 2012) (final approval of Maryland BART Alternative, explaining in responding to comments that because the emission reductions are greater for the Alternative than BART and the distribution of emissions is not substantially different, the Alternative was found to meet 40 CFR 51.308(e)(2) and visibility dispersion modeling was not needed).

[137] 79 FR 9318, 9335 (Feb. 18, 2014) (proposed approval of Arizona BART Alternative for Sundt Unit 4). *See also,* 79 FR 52420 (Sept. 3, 2014) (final approval of Arizona BART Alternative for Sundt Unit 4); 77 FR 18052, 18073–18075 (Mar. 26, 2012) (proposed approval of Colorado BART Alternative, no modeling required where the 40 CFR 51.308(e)(3) test was met); 77 FR 76871 (Dec. 31, 2012) (final approval of Colorado BART Alternative).

[138] 80 FR 19220, 19221 (Apr. 10, 2015). *See, e.g.,* 79 FR 56322, 56327–28 (Sept. 19, 2014); 77 FR 18052, 18075 (Mar. 26. 2012).

[139] 77 FR 18052, 18075 (Mar. 26, 2012).

[140] 79 FR 56322, 56328 (Sept. 19, 2014) (proposed approval of Arizona Apache BART Alternative); 80 FR 19220 (Apr. 10, 2015) (final approval of Arizona Apache BART Alternative).

[141] 79 FR 33438, 33441 (June 11, 2014) (final rule, FIP for Tesoro Refining BART Alternative); *See, e.g.,* 79 FR 56322, 56328 (Sept. 19, 2014) (proposed approval of Arizona Apache BART Alternative); 80 FR 19220 (Apr. 10, 2015) (final approval of Arizona Apache BART Alternative); 77 FR 11827, 11837 (Feb. 28, 2012) (proposed approval of Maryland BART Alternative); 77 FR 39938, 39940–1 (July 6, 2012) (final approval of Maryland BART Alternative).

[142] 79 FR 9318, 9335 (Feb. 18, 2014)(proposed approval of Arizona BART Alternative for Sundt Unit 4). 79 FR 52420 (Sept. 3, 2014) (final approval of Arizona BART Alternative for Sundt Unit 4); 77 FR 18052, 18073–18075 (Mar. 26, 2012) (proposed approval of Colorado BART Alternative, no modeling required where the 40 CFR 51.308(e)(3) test was met); 77 FR 76871 (Dec. 31, 2012) (final approval of Colorado BART Alternative).

noted that the combined emissions of $NO_X$, $SO_2$ and $PM_{10}$ will be 2,856 tpy lower under the BART Alternative than the BART Benchmark.

While the total emission reductions under the Utah BART Alternative are less than those under the BART Benchmark, a comparison of emissions of multiple pollutant species of emissions is generally not informative, particularly when the Agency is assessing whether an approach provides for greater reasonable progress towards improving visibility. As explained in section VI.B.e, our interpretation of the language in 40 CFR 51.308(e)(3) (''results in greater emission reductions . . . may be deemed to achieve greater reasonable progress'') has been pollutant specific. EPA has not relied on a total emissions profile that combines emissions of multiple pollutants together to determine that either BART or a BART alternative is ''better,'' because visibility modeling is the most appropriate method to assess the overall improvements in visibility impacts from control scenarios where reductions of multiple pollutants are considered, except where every visibility impairing pollutant is reduced by a greater amount under the alternative.[143] As we have explained, ''[e]ach of the five pollutants which cause or contribute to visibility impairment has a different impact on light extinction for a given particle mass, making it therefore extremely difficult to judge the equivalence of interpollutant trades in a manner that would be technically credible, yet convenient to implement in the timeframe needed for transactions to be efficient. This analysis is further complicated by the fact that the visibility impact that each pollutant can have varies with humidity, so that control of different pollutants can have markedly different effects on visibility in different geographic areas and at different times of the year.'' [144] As other Agency actions on BART alternatives have explained, modeling assesses ''both pollutants' chemical aerosol formation mechanisms and impacts on visibility,'' [145] which allows evaluation of the ''relative visibility impacts from the atmospheric formation of visibility impairing aerosols of sulfate and nitrate.'' [146] Since we find that Utah's BART Alternative provides greater emission reductions for two pollutants ($SO_2$ and $PM_{10}$), but find that $NO_X$ emissions would be greater under the BART Alternative, we propose to find that it is not appropriate to combine all three pollutants in the annual emissions comparison test to support the BART Alternative as the State has done. While we acknowledge that two of the pollutants are less under the BART Alternative, one of the pollutants is greater, therefore we further propose to find that the annual emissions comparison of all three pollutants does not show that the BART Alternative is better than the BART Benchmark.

ii. Improvement in the Number of Days With Significant Visibility Impairment

As discussed previously in section IV.C.5, Utah provided modeling results to assess the improvement in the number of days with significant visibility impairment—that is, the improvement in the number of days with impacts that either cause (>1.0 dv) or contribute (0.5 dv) to visibility impairment.

The BART Guidelines provide that, when making a BART determination, a State may consider the number of days or hours that a threshold was exceeded.[147] In developing the BART Guidelines, our example modeling analysis of a hypothetical source examined the number of days that 1.0 dv and 0.5 dv thresholds were exceeded.[148] As detailed in section IV.C.5.b, we note the difference in the total number of days impacted—18 fewer days greater than the causation threshold of 1.0 dv (775 days for the BART Alternative vs. 793 days for the BART Benchmark), and 175 fewer days greater than the contribution 0.5 dv threshold (1,323 days for the BART Alternative vs. 1,498 days for the BART Benchmark. Utah's results show that there are fewer days with impacts over 0.5 dv for the BART Alternative, which indicates greater improvement in visibility. Therefore, the results for the 0.5 dv threshold favor the BART Alternative.

However, Utah's results for the total number of days with impacts over 1.0 dv on a Class I area-by-area basis are not as clear in supporting the BART Alternative. The modeling results for the total number of days with impacts greater than 1.0 dv show that the BART Alternative would have more days with impacts greater than 1.0 dv at seven of the nine Class I areas, and that only two of the Class I areas, would have fewer days with impacts greater than 1.0 dv compared to the BART Benchmark. Therefore, the Class I area-by-area results do not show that the BART Alternative is better than the BART Benchmark. Similarly, the results for the average number of days with impacts over 1.0 dv show that most of the Class I areas have the same result under both the BART Alternative and Benchmark, or are within one day of having the same result. In this context, a difference of one day is not particularly significant. We therefore propose to find that these results do not show the BART Alternative is better.

Utah's results in applying the number of days with impacts greater than 1.0 dv show the BART Alternative is better ''on average'' across all nine Class I areas. We agree that use of average visibility impacts could be acceptable as part of assessing the multiple-area impacts and improvements. However, in this case the visibility results for the individual Class I areas do not consistently support or undermine the BART Alternative; there is variation by Class I area. Here, averaging the visibility results has the effect of obscuring the impacts on the individual Class I areas. Additionally, we propose to not the give the difference in days significant weight because by itself it does not indicate whether benefits on those days were large or small. Therefore, while we note that the BART Alternative shows fewer days with impacts greater than 1.0 dv when looking at the average over all nine areas, we propose to find that averaging the number of days with impacts greater than 1.0 dv across all affected Class I areas is not a relevant metric under these circumstances. We therefore further propose to find that this metric does not show the BART Alternative is better.

iii. 98th Percentile Impact (dv)

As discussed previously in section IV.C.5, Utah asserted that the only metric it evaluated that showed greater improvement for the BART Benchmark in comparison to the BART Alternative was the 98th percentile metric when averaged across all Class I areas and meteorological years modeled. Utah's comparison of the modeled visibility impacts on the 98th percentile day (8th highest impacted day in a given meteorological year) for the most impacted year shows that the BART Benchmark would result in greater visibility improvement at five of the nine Class I areas, and is better on average across all nine Class I areas (0.11 dv difference). At the most

[143] 79 FR 9318, 9335 (Feb. 18, 2014) (proposed approval of Arizona BART Alternative for Sundt Unit 4). 79 FR 52420 (Sept. 3, 2014) (final approval of Arizona BART Alternative for Sundt Unit 4); 77 FR 18052, 18073–18075 (Mar. 26, 2012) (proposed approval of Colorado BART Alternative, no modeling required where the 40 CFR 51.308(e)(3) test was met); 77 FR 76871 (Dec. 31, 2012) (final approval of Colorado BART Alternative).

[144] 64 FR 35714, 35743 (July 1, 1999).

[145] 78 FR 79344, 79355 (Dec. 30, 2013).

[146] 79 FR 33438, 33440 (June 11, 2014).

[147] 40 CFR 51, appendix Y, section IV.D.5.

[148] 70 FR 39130 (July 6, 2005).

impacted Class I areas, Canyonlands and Capitol Reef, Utah found that the 98th percentile metric indicates the BART Benchmark has 0.76 dv and 0.57 dv, respectively, more improvement than the BART Alternative. At other Class I areas, such as Arches, Utah found that the 98th percentile metric indicates that the BART Alternative provides greater visibility improvement (for example, 0.44 dv at Flat Tops).

The 98th percentile visibility impact is a key metric recommended by the BART Guidelines when selecting BART controls.[149] As noted previously, we described this metric as an appropriate measure for determining the degree of visibility improvement to be expected from controls.[150] In addition, this is one of the primary metrics that EPA has relied on in evaluating prior regional haze actions that have included BART alternatives.[151]

We note that when calculating visibility improvements for individual Class I areas, Utah mixed the impacts from different meteorological years between modeling scenarios (baseline, BART benchmark, and BART Alternative). As discussed in section V.B.2.e, the State's use of different meteorological years may introduce some error as the visibility improvements could be driven by year-to-year variability in meteorological conditions, as opposed to the differences in emission reductions between the BART Alternative and BART Benchmark. For this reason, in addition to the information from the State, EPA has also calculated the visibility improvements for each modeling scenario using paired-in-time meteorological and emissions data.[152] Using this method, whether the BART Alternative resulted in lower 98th percentile impacts depends on both the particular Class I area and meteorological year modeled. In some years and some Class I areas, particularly some of the most impacted Class I areas, the BART Benchmark shows better visibility improvement than the BART Alternative (for example, 0.93 dv greater improvement for Canyonlands and 0.75 in 2002 dv greater improvement for Capitol Reef in 2001).[153] At other Class I areas, the 98th percentile metric indicates that the BART Alternative provides greater visibility improvement (for example, by 0.90 dv at Arches in 2003 and 0.43 dv at Flat Tops in 2002).[154] On the whole, when using this method, the BART Benchmark is slightly better on average across all years and nine Class I areas (0.14 dv difference).[155] We propose to find, consistent with the State's evaluation, that this metric favors the BART Benchmark.

iv. Annual Average Impact (dv)

As discussed previously in section IV.C.5, Utah's modeling shows that the average annual dv impact at all Class I areas is better under the Utah BART Alternative at five of the nine Class I areas, and is better on average across all the Class I areas. The average impact was calculated by averaging all daily modeling results for each year and then calculating a three-year average from the annual average. Utah's information shows that the BART Alternative is better than the BART Benchmark by 0.009 dv on average across all nine Class I areas. While EPA has not considered this metric in the past,[156] since the State includes it,[157] we consider it here. Furthermore, the BART Guidelines state that, ''in determining what, if any, emission controls should be required, the State will have the opportunity to consider the frequency, duration, and intensity of a source's predicted effect on visibility.'' [158] We note that the difference in the annual average metric of 0.009 dv only marginally supports the BART Alternative and that this metric shows less or equal visibility improvement at four of the nine Class I areas. Because the annual average metric averages over all days, it does not represent the benefits of the BART Alternative on the maximum impact days. In previous evaluations of BART alternatives we have relied on either the 98th percentile metric or the average improvement for the worst 20% IMPROVE monitoring days to evaluate greater reasonable progress. Therefore, we propose to find that the information from the annual average metric does not support a conclusion that the BART Alternative achieves greater reasonable progress than the BART Benchmark.

v. 90th Percentile Impact (dv)

As discussed previously in section IV.C.5, Utah's comparison of the modeled visibility impacts at the 90th percentile (the 110th highest day in a year) dv impact shows that the Utah BART Alternative is better at seven of the nine Class I areas and is slightly better averaged both across three years and across nine Class I areas (0.006 dv difference). We note that the use of the 90th percentile impacts to evaluate alternatives has not been EPA's practice for source-specific BART determinations; however, as discussed previously for the average dv impact metric, the BART Guidelines allow states to consider other visibility metrics in addition to the 98th percentile. Yet, because of the small difference between the two scenarios (0.006 dv), we propose to find that it is questionable whether the 90th percentile supports a conclusion that the BART Alternative achieves greater reasonable progress.

**vi. Timing for the Emissions Reductions**

As discussed previously in section IV.C.5, assuming the four BART units receive five years to come into compliance, Utah noted that reductions under the Utah BART Alternative will occur earlier than the BART Benchmark. The reductions under the Utah BART Alternative are required under the State SIP by August 2015, as noted in Table 5, and would provide an early and ongoing visibility benefit as compared to BART. Also notable is that combustion control upgrades at the Hunter and Huntington facilities have been achieving significant $NO_X$ reductions since the time of their installation between 2006 and 2014, depending on the unit.[159] Finally, if, as proposed in section VI.C, BART for the four units is LNB/SOFA plus SCR, BART likely would be fully implemented sometime between 2019 and 2021.

Therefore, we recognize that the reductions from the BART Alternative would occur before the BART Benchmark.

---

[149] 40 CFR 51, appendix Y, section IV.D.5.

[150] 70 FR at 39129.

[151] *See, e.g.,* 78 FR 79344 (Dec. 30, 2012)(proposed rule, FIP for Tesoro Refining and Intalco Refinery BART Alternatives); 79 FR 33438 (June 11, 2014)(final rule, FIP for Tesoro Refining and Intalco Refinery BART Alternatives); 79 FR 56322, 56328 (Sept. 19, 2014)(proposed approval of Arizona Apache BART Alternative); 80 FR 19220 (Apr. 10, 2015)(final approval of Arizona Apache BART Alternative); 77 FR 11827, 11837 (Feb. 28, 2012)(proposed approval of Maryland BART Alternative); 77 FR 39938, 39940–1 (July 6, 2012)(final approval of Maryland BART Alternative).

[152] *See* EPA Calculation of 98th Percentile Improvement for Utah Bart Alternative spreadsheet (in docket).

[153] *Id.*

[154] *Id.*

[155] *Id.*

[156] EPA final actions on BART Alternatives that evaluated CALPUFF modeling analysis, which did not include consideration of annual average dv impacts include: 80 FR 19220 (Apr. 10, 2015)(Region 9, Apache); 79 FR 33438 (June 11, 2014)(Region 10, Tesoro Refining and Alcoa Intalco Operations); 77 FR 39938 (July 6, 2012)(Region 3, Maryland HAA).

[157] *See* Utah Regional Haze State Implementation Plan, Technical Support Document, Ch. 1, p. 23 (2015).

[158] 70 FR 39121 (July 5, 2005).

[159] Copies of Administrative Orders DAQE–AN0102370012–08 and DAQE–AN0102380021–10 are included in the docket, and include information regarding the schedule for installation of combustion controls at Hunter and Huntington.

Appellate Case: 21-9509 Document: 101-2 Date Filed: 06/10/2022 Page: 72


vii. IMPROVE Monitoring Data

Utah's SIP presents sulfate and nitrate monitoring data at the Canyonlands IMPROVE monitor that show that ''sulfates are the dominant visibility impairing pollutant'' [160] and that sulfate levels have decreased,[161] and references similar results at other Class I areas in the TSD.[162] Utah also presents data on trends in emissions from EGUs showing substantial reductions in emissions of both $SO_2$ and $NO_X$.[163] Based on these data, Utah indicates it ''has confidence that the $SO_2$ reductions will achieve meaningful visibility improvement'', under the Utah BART Alternative,[164] while ''the visibility improvement during the winter months due to $NO_X$ reductions is much more uncertain,'' [165] Utah makes this point even though nitrate concentrations are highest in the winter, explaining that while there has been a reduction in $NO_X$, the ammonium nitrate values do not show similar improvement in the winter months. Utah offers several possible explanations for the results, but does not provide any definitive conclusions.[166]

Utah also presents data on the seasonality of park visitation and monitoring data for nitrate and sulfates. These data show the highest measured nitrate concentrations occur in winter during the period of lowest park visitation, and that sulfates affect visibility throughout the year and are the dominant visibility impairing pollutant from anthropogenic sources during the high visitation period of March through November. Utah concludes that it has greater confidence that reductions in $SO_2$ will be reflected in improved visibility for visitors to the Class I areas, while reductions in $NO_X$ will have a more uncertain benefit for visitors to Class I areas. We invite comment on the information and conclusions provided by Utah as summarized earlier.

We propose to concur with one of the State's findings. We propose to find that visibility benefits associated with $NO_X$ reductions are much more likely to occur in the winter months because this is when aerosol thermodynamics favors nitrate formation.[167] By contrast, $SO_2$ emissions reductions should provide visibility benefits in all seasons.[168] We also propose to find that, as concluded by the GCVTC, and supported by the IMPROVE monitoring data presented by Utah, anthropogenic visibility impairment on the Colorado Plateau is dominated by sulfates. Therefore, we propose to concur with Utah's statement that sulfate is the largest contributor to visibility impairment at the affected Class I areas.

We propose to disagree with the State's findings related to park visitation. While the BART Guidelines do mention visitation as something that can inform a control decision,[169] EPA is proposing to place little weight on the State's correlation of emissions reductions and park visitation because nothing in the CAA suggests that visitors during busy time periods are entitled to experience better visibility than visitors during off-peak periods. On the contrary, in the Regional Haze provisions of the CAA, Congress declared a national goal of remedying all manmade visibility impairment in all class I areas, which includes both heavily-visited national parks and seldom-visited wilderness areas. We invite comment on our evaluation and the information and conclusions provided by Utah as summarized previously.

viii. Energy and Non-Air Quality Benefits

EPA's evaluation of the State's information on energy and non-air quality benefits is located earlier in section V.B.2.e.viii.

ix. Cost

EPA's evaluation of the Utah's cost information is located in section V.B.2.e.ix.

f. Evaluation of the Weight of Evidence

In this section we evaluate Utah's SIP under 40 CFR 51.308(e)(2), to determine whether the State met the final step of the better-than-BART analysis ''based on the clear weight of evidence that the trading program or other alternative measure achieves greater reasonable progress than would be achieved through the installation and operation of BART at the covered sources.'' 40 CFR 51.308(e)(2)(i)(E).

As discussed previously, we evaluated Utah's demonstration and all available information and data presented by the State, as well as additional information and data EPA developed and presented in this notice. We propose to find that this information and data do not meet the requirements of 40 CFR 51.308(e)(2)(i)(E). Specifically, we propose that Utah's demonstration does not show by the ''clear weight of evidence'' that the BART alternative ''measure achieves greater reasonable progress than would be achieved through the installation and operation of BART at the covered sources.'' 40 CFR 51.308(e)(2)(i)(E). We have evaluated the relative strengths and weakness of the information and propose to find that the State's analysis and conclusions do not clearly show that the BART Alternative results in greater reasonable progress than the BART Benchmark for the following reasons: (1) The key metric EPA has used in evaluating alternatives (98th percentile) on average across all the Class I areas favors the BART Benchmark by 0.14 dv and not the BART Alternative; (2) the majority of information and data that the State asserts favor the BART Alternative over BART show small differences; (3) the comparison of net emissions reductions across three pollutants, which the State relies on significantly is not appropriate because not all pollutants are reduced under the BART Alternative and each pollutant may have different effects on visibility; and (4) while some information may show the Alternative is better than BART, the information is not adequate to meet the ''clear weight of evidence'' test.

First, consistent with the Agency's practice, we have considered all information, but have given most weight to the visibility impacts based on air quality modeling.[170] Here, the 98th percentile impacts from the State's CALPUFF modeling show that the

[160] Utah Regional Haze State Implementation Plan, Technical Support Document, Ch. 1, p. 12 (2015).

[161] *Id.* at p. 15.

[162] *Id.* at p. 12.

[163] *Id.* at p. 14.

[164] *Id.* at p. 13.

[165] *Id.*

[166] *Id.* at pp. 16–19.

[167] Fountoukis, C. & Nenes, A., *ISORROPIA II: A Computationally Efficient Aerosol Thermodynamic Equilibrium Model for* $K^+$, $Ca_2{}^+$, $Mg_2{}^+$, $NH_4{}^+$, $Na^+$, $SO_4{}^{2-}$, $NO_3{}^-$, $Cl^-$, $H_2O$ Aerosols, 7 Atmos. Chem. Phys., 4639–4659 (2007).

[168] Seinfeld, John H., *Urban Air Pollution: State of the Science,* 243 Science Magazine, no. 4892, 745, 750 (1989).

[169] 70 FR 39104, 39130 (July 6, 2005) (''Other ways that visibility improvement may be assessed to inform the control decisions would be to examine distributions of the daily impacts, determine if the time of year is important (*e.g.,* high impacts are occurring during tourist season), consideration of the cost-effectiveness of visibility improvements (*i.e.,* the cost per change in deciview), using the measures of deciview improvement identified by the State, or simply compare the worst case days for the pre- and post-control runs. States may develop other methods as well.'').

[170] *See, e.g.,* 78 FR 79344 (Dec. 30, 2012) (proposed rule, FIP for Tesoro Refining BART Alternative); 79 FR 33438, 33441 (June 11, 2014) (final rule, FIP for Tesoro Refining BART Alternative); 79 FR 56322, 56328 (Sept. 19, 2014) (proposed approval of Arizona Apache BART Alternative); 80 FR 19220 (Apr. 10, 2015) (final approval of Arizona Apache BART Alternative); 77 FR 11827, 11837 (Feb. 28, 2012) (proposed approval of Maryland BART Alternative); 77 FR 39938, 39940–1 (July 6, 2012) (final approval of Maryland BART Alternative).

BART Alternative is not better than the BART Benchmark because the BART Benchmark would provide a 0.14 dv greater average improvement than the BART Alternative. In addition, Table 12 lists a comparison of 2001–2003 three-year average 98th percentile visibility improvement for each of the nine Class I areas; and the results for seven of the Class I areas favor BART over the Alternative (Black Canyon of the Gunnison (0.06 dv), Bryce Canyon (0.04 dv), Canyonlands (0.78 dv), Capitol Reef (0.59 dv), Grand Canyon (0.06 dv), Mesa Verde (0.12 dv), and Zion (0.02 dv)).

Second, several metrics that the State suggests favor the BART Alternative over BART show only small improvements as compared to BART. We propose to find that the slight comparative benefits in the annual average impacts are not compelling evidence that the BART Alternative will provide for greater reasonable progress than BART. Additionally, we propose to find that it is questionable whether the 90th percentile supports a conclusion that the BART Alternative will provide for greater reasonable progress than BART.

Third, regarding the energy and non-air quality impacts, as well as cost, for the reasons presented previously, we propose to find that because these metrics do not have a direct bearing on whether the Utah BART Alternative achieves greater reasonable progress, it is not material to our action whether we agree or disagree with Utah's assessment that they reduce energy and non-air quality impact.

As explained previously in this section, in the aggregate the $SO_2$ and $PM_{10}$ emissions are lower for the BART Alternative. However, the $NO_X$ emissions are greater under the BART Alternative. Additionally, while Utah's results show that some of the metrics support the Alternative (*e.g.*, there are fewer days with impacts over 0.5 dv for the Alternative indicating greater improvement in visibility under the BART Alternative; emission reductions would occur earlier under the Alternative; the Alternative will result in 8,005 tpy lower $SO_2$ emissions and 573 tpy lower $PM_{10}$ emissions compared to the BART Benchmark; sulfate is the largest contributor to visibility impairment at the affected Class I areas), we propose to find that these metrics are not enough by themselves to meet the ''clear weight of evidence'' test.

Thus, we propose to find that the BART Alternative does not meet the requirements in the RHR because it does not show the BART Alternative would achieve greater reasonable progress than the BART Benchmark, and therefore, we are proposing to disapprove the resultant BART Alternative SIP.

g. Evaluation That Emission Reductions Take Place During Period of First Long-Term Strategy

EPA's evaluation of Utah's information regarding the timing of implementation of controls is located in section V.B.2.g.

h. Demonstration That Emission Reductions From Alternative Program Will Be Surplus

EPA's evaluation of Utah's information regarding whether the emission reductions are surplus is located in section V.B.2.h.

*C. Monitoring, Recordkeeping and Reporting for Utah's BART Alternative*

As discussed previously in section IV.B.3, Utah's June 2015 RH SIP includes enforceable measures and monitoring, recordkeeping and reporting requirements for the Utah BART Alternative and the State's $PM_{10}$ BART determinations. Because in this co-proposal we are proposing to disapprove Utah's BART Alternative, we are also proposing to disapprove (in other words, to not make federally enforceable as part of the SIP) the monitoring, recordkeeping and reporting requirements located in SIP Sections IX.H.22 associated with the BART Alternative. This includes SIP Section IX.H.22, subsections a.ii, a.iii, b.ii, and c.i.

Concurrently, as described earlier in section V.C, we are proposing to approve the remainder of the monitoring, recordkeeping and reporting requirements associated with Utah's $PM_{10}$ BART determinations. This includes SIP Section IX.H.21 in its entirety and Section IX.H.22, subsections a.i and b.i.

*D. Proposed Federal Implementation Plan*

The following explanation details the support for EPA's FIP proposed in conjunction with the proposed partial approval and partial disapproval of Utah's SIP. This FIP constitutes EPA's proposed determination of $NO_X$ BART for Utah's four subject-to-BART sources.

1. BART Evaluations

In determining BART, the state, or EPA if promulgating a FIP, must consider the five statutory factors in section 169A(g)(2) of the CAA: (1) The costs of compliance; (2) the energy and non-air quality environmental impacts of compliance; (3) any existing pollution control technology in use at the source; (4) the remaining useful life of the source; and (5) the degree of improvement in visibility which may reasonably be anticipated to result from the use of such technology. See also 40 CFR 51.308(e)(1)(ii)(A). Our evaluation of BART for Hunter and Huntington follows the Guidelines for BART Determinations Under the Regional Haze Rule.

Following the identification of subject-to-BART sources as described in section IV.A.3, the next step of a BART evaluation is to perform the BART analysis. The BART Guidelines describe the BART analysis as consisting of the following five steps:[171]

- Step 1: Identify All Available Retrofit Control Technologies;
- Step 2: Eliminate Technically Infeasible Options;
- Step 3: Evaluate Control Effectiveness of Remaining Control Technologies;
- Step 4: Evaluate Impacts and Document the Results; and
- Step 5: Evaluate Visibility Impacts.

The results of this five step analysis are then used to select BART, taking into consideration the five factors listed earlier.[172]

Immediately following this, we provide background information that is common to our cost of compliance analysis (under Step 4) and visibility impacts analysis (step 5) for all BART sources. This is followed by the five step analysis and proposed selection of BART specific to each BART source.

a. Costs of Compliance

In accordance with the BART Guidelines, we have estimated the costs of compliance consistent with the EPA Air Pollution Control Cost Manual (CCM).[173] In addition, we have utilized portions of the draft 2015 revisions to the CCM chapters for the post-combustion $NO_X$ control technologies, selective non-catalytic reduction (SNCR) and selective catalytic reduction (SCR).[174] In addition, we rely on the

[171] 40 CFR 51, appendix Y, section IV.D.

[172] *See id.* section IV.E.

[173] EPA's CCM Sixth Edition, January 2002, EPA 452/B–02–001.

[174] Chapter 1, Selective Noncatalytic Reduction, —6/5/2015—Draft for Public Comment (''the 2015 SNCR CCM''); Chapter 2 Selective Catalytic Reduction, —6/5/2015—Draft for Public Comment (''the 2015 SCR CCM''). The draft CCM SNCR and SCR revisions were made available for public comment in a Notice of Data Availability (NODA) on June 12, 2015, 80 FR 33515, and on July 17, 2015, 80 FR 42491, the public comment period was extended to September 10, 2015. In this co-proposal for Utah's regional haze SIP, we are not taking comment on the revisions to the CCM. We are only taking comment on the application of those revisions of the CCM to the particular facts and circumstances for the two subject-to-BART sources, Hunter and Huntington, at issue in this action.

cost of compliance estimates supplied to EPA by Andover Technology Partners (ATP).[175] These estimates in turn rely on the cost estimates that PacifiCorp submitted to Utah in 2012 and 2014, but with those cost estimates adjusted in a number of cases for reasons described in the ATP report. All costs are presented in 2014 dollars. Refer to the ATP report and associated spread sheets for details on how the costs of compliance are calculated.

b. Visibility Impact Modeling

The BART Guidelines provide that states may use the CALPUFF modeling system or another appropriate model to determine the visibility improvement expected at affected Class I areas from potential BART control technologies. The BART Guidelines also recommend that states develop a modeling protocol for modeling visibility improvement, and suggest that states may want to consult with EPA and their RPO to address any issues prior to modeling. In consultation with EPA, Utah developed a CALPUFF modeling protocol titled ''Air Quality Modeling Protocol: Utah Regional Haze State Implementation Plan'', February 13, 2015, to support its BART Alternative analysis (see Chapter 6 of the State's TSD). The Utah protocol follows recommendations for long-range transport described in appendix W to 40 CFR part 51, Guideline on Air Quality Models, and in the federal Interagency Workgroup on Air Quality Modeling (IWAQM) Phase 2 Summary Report and Recommendations for Modeling Long Range Transport Impacts, as recommended by the BART Guidelines (40 CFR part 51, appendix Y, section III.D.5). Utah's protocol also follows Federal Land Managers' Air Quality Related Values Workgroup—Phase I Report (revised 2010). In section VI.B.e, we evaluate the State's modeling approach in consideration of the purpose for which it is intended (*i.e.*, analyzing the BART Alternative). However, because Utah's modeling is not meant to support analysis of control options for individual BART sources under a five factor analysis, EPA developed separate CALPUFF modeling for this purpose. While the Utah modeling assesses the combined impacts of all of the BART and non-BART sources included in the BART Alternative—Carbon, Hunter, and Huntington—our modeling assesses the impacts of the individual BART sources. In addition, our modeling assesses the visibility impacts of all of the $NO_X$ BART control technologies found to be technologically feasible in Step 2: LNB and OFA, LNB and OFA with SNCR, and LNB and OFA with SCR. Beyond assessing impacts from individual BART sources and evaluating all technologically feasible control options, our modeling methodology is otherwise very similar to that employed by Utah. Our modeling protocol, and visibility impact results, can be found in the docket.[176] Also, the visibility impacts for each BART source are provided later in the respective five factor analyses.

EPA notes that, in considering the visibility improvements reflected in our revised modeling, EPA interprets the BART Guidelines to require consideration of the visibility improvement from BART applied to the entire BART-eligible source. The BART Guidelines explain that, ''[i]f the emissions from the list of emissions units at a stationary source exceed a potential to emit of 250 tons per year for any visibility-impairing pollutant, then that collection of emissions units is a BART-eligible source.'' In other words, the BART-eligible source (the list of BART emissions units at a source) is the collection of units for which one must make a BART determination. The BART Guidelines state ''you must conduct a visibility improvement determination for the source(s) as part of the BART determination.'' This requires consideration of the visibility improvement from BART applied to the subject-to-BART source as a whole.

We note, however, that while our regulations require states and EPA to assess visibility improvement on a source-wide basis, they provide flexibility to also consider unit-specific visibility improvement in order to more fully inform the reasonableness of a BART determination, but that does not replace the consideration of visibility benefit from the source (facility) as a whole. In making the BART determinations in this final action we have considered visibility improvements at the source, and then also at the units that comprise the source.

2. Hunter Power Plant

As described previously in section IV.A, Hunter Units 1 and 2 were determined to be subject to BART, while Unit 3 is not subject to BART. Hunter Units 1 and 2 have a nameplate generating capacity of 488.3 MW each.[177] The boilers are tangentially fired pulverized coal boilers, burning bituminous coal from the Deer Creek Mine in Utah.

Our evaluation of BART for Hunter Units 1 and 2 follows the BART Guidelines. For Hunter Units 1 and 2, the BART Guidelines are mandatory because the combined capacity for all three units at the Hunter facility is greater than 750 MW. See 40 CFR 51.302(e)(1)(ii)(B) (''The determination of BART for fossil-fuel fired power plants having a total generating capacity greater than 750 megawatts must be made pursuant to the guidelines in appendix Y of this part''). Under the Guidelines, cost estimates for control technologies should be based on the CCM, where possible.

The BART Guidelines establish presumptive $NO_X$ limits for coal-fired EGUs greater than 200 MW located at greater than 750 MW power plants that are operating without post-combustion controls. For the tangential-fired boilers burning bituminous coal at Hunter, that presumptive limit is 0.28 lb/MMBtu.[178] The BART Guidelines provide that the five factor analysis may result in a limit that is different than the presumptive limit, and the presumptive limits do not obviate the need to determine BART on a case-by-case basis considering the five factors.[179]

PacifiCorp provided BART analyses for Hunter Unit 1 to Utah in 2012 and 2014 which we utilize in our proposed BART evaluation here.[180] Although we are using some information provided by Utah and PacifiCorp, we are independently evaluating all five statutory BART factors, as is appropriate for this co-proposed FIP.

a. Hunter Unit 1

The Hunter Unit 1 boiler is of tangential-fired design with newer generation low-$NO_X$ burners and separated overfire air which were installed in 2014. Unit 1 currently achieves an annual emission rate of approximately 0.21 lb/MMBtu with these combustion controls. Under Utah's submitted regional haze SIP, Unit 1 is subject to a state-law $NO_X$ emission

[175] Cost of $NO_X$ BART Controls on Utah EGUs, from Andover Technology Partners, to EC/R, Inc., October 22, 2015 (ATP report). Andover Technology Partners is a subcontractor to EC/R Incorporated.

[176] Air Quality Modeling Protocol: Utah Regional Haze Federal Implementation Plan, EPA Region 8, November 2015.

[177] U.S. Energy Information Administration, Electric Generating Capacity for 2011 taken from Form EIA–860. See spread sheet titled ''EIA existing generating units 2011.xls'' in the docket.

[178] 40 CFR part 51, appendix Y, IV.E.5, Table. 1.

[179] *See* 40 CFR 51.301 (definition of BART); 40 CFR 51.308(e).

[180] PacifiCorp BART Analysis for Hunter Units 1 (July 2, 2012); PacifiCorp BART Analysis for Hunter Unit 2 (June 7, 2012); Utah's Regional Haze BART Submittal, Chapter 2 of the Technical Support Document (2015); PacifiCorp's BART Analysis Update for Hunter Units 1 and 2 and Huntington Units 1 and 2 (Aug. 5, 2014).

Appellate Case: 21-9509 Document: 101-2 Date Filed: 06/10/2022 Page: 75


limit of 0.26 lb/MMBtu on a 30-day rolling average. Prior to the installation of LNB and SOFA the unit operated with an actual annual emission rate of about 0.40 lb/MMBtu.

Step 1: Identify All Available $NO_X$ Control Technologies

In its 2012 BART analysis for Hunter Unit 1, PacifiCorp identified several $NO_X$ control technologies, both for combustion controls and post-combustion controls.[181] The combustion controls identified by PacifiCorp include: low-$NO_X$ burners and separated overfire air (LNB and SOFA; already installed), rotating overfire air, neural network optimization system, flue gas recirculation, gas reburn, fuel lean gas reburn, coal switching, water injection, and others. Post-combustion control options identified by PacifiCorp include: SNCR, rich reagent injection (RRI), SCR, and others.

We note that the combustion controls, LNB and SOFA, have already been installed on Hunter Unit 1, and so we consider them here as ''any existing controls'' under the third statutory BART factor. In addition, the BART Guidelines recognize that ''[c]ombinations of inherently lower-emitting processes and add-on controls'' are a category of retrofit controls which can be considered.[182] Accordingly, the inherently lower-emitting combustion controls, LNB and SOFA, are evaluated in combination with the add-on controls, SNCR and SCR.

We have reviewed PacifiCorp's review of $NO_X$ control technologies and find it to be comprehensive. We propose to adopt it to satisfy Step 1 and we refer the reader to the 2012 PacifiCorp BART analysis for details on the available $NO_X$ control technologies.

Step 2: Eliminate Technically Infeasible Options

In its 2012 BART analysis,[183] PacifiCorp eliminated available $NO_X$ control technologies that PacifiCorp evaluated as technologically infeasible for Hunter Unit 1. The remaining technologically feasible control technologies are the combustion controls, LNB and SOFA, and the post-combustion controls, SNCR and SCR.

We agree with PacifiCorp's evaluation of technologically available controls for Hunter Unit 1 and propose to adopt it for Step 2.

Step 3: Evaluate Control Effectiveness of Remaining Control Technologies

As noted previously, Hunter Unit 1 is currently achieving an actual annual emission rate of approximately 0.21 lb/MMBtu with LNB and SOFA. This represents a 48.4 percent reduction from the baseline emission rate of 0.40 lb/MMBtu.

The post-combustion control technologies, SNCR and SCR, have been evaluated in combination with combustion controls. That is, the inlet concentration to the post-combustion controls is assumed to be 0.21 lb/MMBtu (annual). This allows the equipment and operating and maintenance costs of the post-combustion controls to be minimized based on the lower inlet $NO_X$ concentration.

Typically, SNCR reduces $NO_X$ an additional 20 to 30 percent above combustion controls without excessive $NH_3$ slip.[184] For this analysis, the control efficiency of SNCR has been calculated based on the formula in the 2015 draft CCM SNCR chapter,[185] which for Hunter Unit 1 yields an additional reduction of 21.4 percent after combustion controls. When combined with LNB and SOFA, SNCR is anticipated to achieve an annual emission rate of 0.16 lb/MMBtu, corresponding to an overall control efficiency of 59.4 percent.

SCR can achieve performance emission rates as low as 0.04 to 0.07 lb/MMBtu on an annual basis.[186] For this analysis, consistent with our actions elsewhere, as well with PacifiCorp's analysis, we use an annual emission rate of 0.05 lb/MMBtu for SCR, which when combined with LNB and SOFA achieves an overall control efficiency of 87.5 percent.

A summary of emissions projections for the control options evaluated is provided in Table 13.

TABLE 13—SUMMARY OF $NO_X$ BART ANALYSIS CONTROL TECHNOLOGIES FOR HUNTER UNIT 1

| Control option | Control effectiveness (%) | Annual emission rate (lb/MMBtu) | Emissions reduction (tpy) | Remaining emissions (tpy) |
|---|---|---|---|---|
| LNB/SOFA +SCR | 87.5 | 0.05 | 5,500 | 784 |
| LNB/SOFA +SNCR | 59.4 | 0.16 | 3,735 | 2,549 |
| LNB/SOFA | 48.4 | 0.21 | 3,042 | 3,242 |
| Baseline[1] | ........................ | 0.40 | ........................ | 6,284 |

[1] Baseline emissions were determined by averaging the annual emissions from 2001 to 2003 as reported to EPA Air Markets Program Data, available at *http://ampd.epa.gov/ampd/*. The annual emissions data is presented in Chapter 4.a of Utah's June 2015 submittal.

Step 4: Evaluate Impacts and Document Results

Under Step 4, the Guidelines list impact analyses in four parts: costs of compliance, energy impacts, non-air quality environmental impacts, and remaining useful life. For convenience, we combine energy and non-air quality environmental impacts later on.

Part 1—Costs of Compliance

We obtained capital costs for LNB and SOFA from the 2014 PacifiCorp BART analysis. PacifiCorp did not report any operating and maintenance costs for LNB and SOFA. Similarly, we obtained capital cost estimates for LNB and SOFA with SNCR from the 2014 PacifiCorp BART analysis. However, for operating and maintenance costs we propose to rely on the draft 2015 draft SNCR chapter of the CCM. Refer to the ATP report for details. Capital costs for LNB and SOFA with SCR were also obtained from the 2014 PacifiCorp BART analysis. However, PacifiCorp's capital costs were adjusted to account for items that were double-counted or should not be allowed under the CCM, such as an allowance for funds used during construction (AFUDC).[187] In

[181] 2012 PacifiCorp BART analysis for Hunter Unit 1, page 2.a–106.

[182] BART Guidelines, IV.D.1.

[183] 2012 PacifiCorp BART analysis for Hunter Unit 1, pages 2.a–106 through 2.a–123.

[184] White Paper, SNCR for Controlling $NO_X$ Emissions, Institute of Clean Air Companies, pp. 4 and 9, February 2008.

[185] 2015 SNCR CCM, Figure 1.1c: SNCR $NO_X$ Reduction Efficiency Versus Baseline $NO_X$ Levels for Coal-fired Utility Boilers.

[186] Srivastava, R., Hall, R., Khan, S., Lani, B., & Culligan, K., *Nitrogen Oxides Emission Control Options for Coal-Fired Utility Boilers,* 55 J. Air & Waste Mgmt. Assoc. 1367, 1367–88 (2005).

[187] *See* 79 FR 5032, 5133 (Jan. 30, 2014) (discussing reasons for rejecting use of AFUDC).

Appellate Case: 21-9509 Document: 101-2 Date Filed: 06/10/2022 Page: 76


addition, the capital costs were adjusted to account for a significant overestimation of the catalyst volume and related costs. These adjustments are documented in the ATP report and associated spread sheet. A discussion of operating and maintenance costs of SCR is also included in the ATP report. For the reasons given in the report, we propose to adopt the cost estimates contained in it.

A summary of our proposed cost estimates for all control options is presented in Table 14.

TABLE 14—SUMMARY OF $NO_X$ BART COSTS ON HUNTER UNIT 1

| Control option | Total capital investment | Indirect annual costs | Direct annual costs | Total annual cost | Emissions reductions (tpy) | Average cost effectiveness ($/ton) |
|---|---|---|---|---|---|---|
| LNB/SOFA | $11.6M | $1.2M | $0M | $1.2M | 3,042 | $382 |
| LNB/SOFA/SNCR | 19.0M | 1.9M | 1.9M | 3.8M | 3,735 | 1,016 |
| LNB/SOFA/SCR | 110.3M | 10.5M | 2.5M | 13.1M | 5,500 | 2,380 |

Parts 2 and 3—Energy and Non-Air Quality Environmental Impacts of Compliance

SNCR slightly reduces the thermal efficiency of a boiler as the reduction reaction uses thermal energy from the boiler, decreasing the energy available for power generation.[188] Using the CCM, we have calculated the electrical power consumption of SNCR to be 326,000 kW-hr per year for Hunter Unit 1.

For SCR, the thermal efficiency is much more reduced because the new ductwork and the reactor's catalyst layers decrease the flue gas pressure. As a result, additional fan power is necessary to maintain the flue gas flow rate through the ductwork and reactor. Using the CCM, we have calculated the electrical power consumption of SCR to be approximately 18,541,000 kW-hr per year for Hunter Unit 1.

Both SCR and SNCR also require some minimal electricity to service pretreatment and injection equipment, pumps, compressors, and control systems. The energy requirements described earlier are not significant enough to warrant elimination of either SNCR or SCR as BART. In addition, the cost of the additional energy requirements has been included in our cost effectiveness calculations.

SNCR and SCR will slightly increase the quantity of ash that will need to be disposed. In addition, transportation and storage of chemical reagents may result in spills or releases. However, these non-air quality environmental impacts do not warrant elimination of either SNCR or SCR as BART.

There are no additional energy requirements associated with the new LNB and SOFA, and no significant non-air quality environmental impacts.

In summary, we propose to determine that we have adequately considered these impacts by including cost of additional energy in cost effectiveness and assessing non-air quality environmental impacts as insufficient to eliminate or weigh against any of the BART options.

Part 4—Remaining Useful Life

PacifiCorp assumes a remaining useful life of at least 20 years for Hunter Unit 1 in its BART analysis, and has not indicated any intention to retire, or curtail generation from, Hunter Unit 1. Therefore, this factor does not preclude any of the control options considered. In addition, this factor is consistent with our BART calculation of cost effectiveness because annualized costs have been calculated over a 20 year period for each of the control options considered. We propose that this gives adequate consideration to this factor.

Step 5: Evaluate Visibility Impacts

Table 15 presents the highest of the 98th percentile visibility improvements at the affected Class I areas for the three meteorological years modeled, 2001 through 2003. Tables 16 and 17 present the number of days (summed across three years) with impacts greater than the contribution and causation thresholds—0.5 dv and 1.0 dv, respectively.

TABLE 15—HUNTER UNIT 1—VISIBILITY IMPROVEMENTS

| Class I area | LNB with SOFA (Δdv) | LNB with SOFA and SNCR (Δdv) | LNB with SOFA and SCR (Δdv) |
|---|---|---|---|
| Arches NP | 0.737 | 0.906 | 1.342 |
| Black Canyon of the Gunnison NP | 0.198 | 0.241 | 0.345 |
| Bryce Canyon NP | 0.306 | 0.372 | 0.534 |
| Canyonlands NP | 0.846 | 1.041 | 1.545 |
| Capitol Reef NP | 0.639 | 0.750 | 1.113 |
| Flat Tops WA | 0.231 | 0.280 | 0.404 |
| Grand Canyon NP | 0.349 | 0.426 | 0.618 |
| Mesa Verde NP | 0.235 | 0.286 | 0.426 |
| Zion NP | 0.184 | 0.224 | 0.323 |

[188] EPA Air Pollution Control Cost Manual p. 1–21 (6th ed. 2002), available at *http://www3.epa.gov/ttncatc1/dir1/c_allchs.pdf.*

Appellate Case: 21-9509 Document: 101-2 Date Filed: 06/10/2022 Page: 77


TABLE 16—HUNTER UNIT 1—DAYS GREATER THAN 0.5 DECIVIEW

[Three year total]

| Class I area | Baseline (days) | LNB with SOFA (days) | LNB with SOFA and SNCR (days) | LNB with SOFA and SCR (days) |
|---|---|---|---|---|
| Arches NP | 293 | 260 | 259 | 235 |
| Black Canyon of the Gunnison NP | 68 | 55 | 53 | 41 |
| Bryce Canyon NP | 42 | 37 | 36 | 28 |
| Canyonlands NP | 359 | 330 | 322 | 311 |
| Capitol Reef NP | 175 | 160 | 156 | 145 |
| Flat Tops WA | 77 | 63 | 59 | 50 |
| Grand Canyon NP | 49 | 43 | 42 | 37 |
| Mesa Verde NP | 82 | 66 | 63 | 55 |
| Zion NP | 29 | 23 | 23 | 22 |

TABLE 17—HUNTER UNIT 1—DAYS GREATER THAN 1.0 DECIVIEW

[Three year total]

| Class I area | Baseline (days) | LNB with SOFA (days) | LNB with SOFA and SNCR (days) | LNB with SOFA and SCR (days) |
|---|---|---|---|---|
| Arches NP | 170 | 141 | 139 | 122 |
| Black Canyon of the Gunnison NP | 22 | 13 | 12 | 9 |
| Bryce Canyon NP | 22 | 19 | 18 | 16 |
| Canyonlands NP | 240 | 218 | 202 | 188 |
| Capitol Reef NP | 118 | 110 | 109 | 94 |
| Flat Tops WA | 31 | 20 | 18 | 10 |
| Grand Canyon NP | 32 | 25 | 23 | 18 |
| Mesa Verde NP | 32 | 20 | 19 | 13 |
| Zion NP | 14 | 9 | 8 | 7 |

Select BART.

A summary of our impacts analysis for Hunter Unit 1 is presented in Table 18.

TABLE 18—SUMMARY OF HUNTER UNIT 1 IMPACTS ANALYSIS

| Control option | Annual emission rate (lb/MMBtu) | Emission reduction (tpy) | Total annual costs (million$) | Average cost effectiveness ($/ton) | Incremental cost effectiveness ($/ton) | Visibility impacts* | | |
|---|---|---|---|---|---|---|---|---|
| | | | | | | Improvement (dv) | Days > 0.5 dv | Days > 1.0 dv |
| LNB with SOFA | 0.21 | 3,042 | $1.2M | $382 | | 0.846 | 330 | 218 |
| LNB with SOFA and SNCR. | 0.16 | 3,735 | 3.8M | 1,016 | $3,796 | 1.041 | 322 | 202 |
| LNB with SOFA and SCR. | 0.05 | 5,500 | 13.1M | 2,380 | $5,268 (compared to LNB with SOFA and SNCR). $4,853 (compared to LNB with SOFA). | 1.545 | 311 | 188 |

* At the most impacted Class I area, Canyonlands National Park.

In determining what to co-propose as BART, we have taken into consideration all five of the statutory factors required by the CAA: The costs of compliance, the energy and non-air quality environmental impacts of compliance, any existing pollution control technology in use at the source, the remaining useful life of the source, and the degree of improvement in visibility which may reasonably be anticipated to result from the use of such technology. Later we provide a justification for our selection of BART, including an explanation of how each of the CAA factors was used in that selection.

As described in step 1 before, we have considered the existing pollution control technology in use at the source. We note that Hunter Unit 1 was equipped with LNB and SOFA in the spring of 2014 in order to meet state-law requirements in the 2011 Utah RH SIP submittal, which we did not approve. In this co-proposal we have to evaluate control technologies and baseline emissions from the correct starting point, that is, prior to the installation of the combustion controls pursuant to state-law $NO_X$ limitations.[189] As a result, we used the period 2001–2003 as the appropriate period for baseline emissions, in order to provide a realistic depiction of annual emissions for Hunter Unit 1 prior to installation of combustion controls.

We have considered the energy and non-air quality environmental impacts of compliance and propose to find that

[189] *See* 79 FR 5032, 5105 (Jan. 30, 2014).

they do not appreciably favor one control option over another, or preclude a particular control option from selection. And finally, we have considered the remaining useful life of the source and find that it is sufficiently long (greater than 20 years) so as not to favor or preclude any of the control options. As a result, the remaining factors—the costs of compliance and visibility improvement—are the primary factors that lead us to our proposed BART selection for Hunter Unit 1.

In order to select BART we propose to consider the costs of compliance and visibility impacts by generally comparing them with BART determinations that have been made elsewhere. In the context of reasonable progress determinations, a comparison with another reasonable progress determination has been upheld by the Ninth Circuit Court of Appeals as a rational explanation for that determination.[190] If this were the first BART determination under the RHR and BART Guidelines, which it is not, it would obviously be difficult to employ this precise methodology.[191] At this point, however, the EPA thinks there are sufficient examples of reasonable determinations to make this methodology feasible.

Specifically, we propose to compare the average cost-effectiveness, incremental cost-effectiveness, visibility improvement, and incremental visibility improvement for LNB and SOFA with SCR with BART determinations where the EPA and States have based their determination on the same metrics. The most comparable determination appears to be in EPA's final action for Wyoming's regional haze SIP, in which EPA promulgated a FIP for three units at Laramie River Station and determined $NO_X$ BART to be LNB and SOFA with SCR for the three units.[192] On a per-unit basis, the visibility improvement at the most impacted Class I area from this control option was 0.52 to 0.57 dv, and across all three units the sum of the improvement was 1.62 dv. Thus, the application of this control option to all three units of Laramie River Station was estimated to have a visibility benefit about the same as the application of this control option to Hunter Unit 1. The average cost-effectiveness ranged from $4,375/ton to $4,461/ton, considerably higher than the corresponding value for Hunter Unit 1, while the incremental cost-effectiveness ranged from $5,449 to $5,871/ton which is very close to the corresponding value for Hunter Unit 1. Finally, the incremental visibility improvement as compared to LNB and SOFA with SNCR was significant, as it is for Hunter Unit 1. On the other hand, at Dave Johnston Units 3 and 4 (for example), where EPA rejected LNB and SOFA with SCR, the incremental cost-effectiveness value of LNB and SOFA with SCR was much higher and incremental visibility benefit lower than at Laramie River Station and higher than the same metrics at Hunter Unit 1.[193]

There are other BART determinations in which SCR has been selected as BART (either alone or in conjunction with LNB and SOFA) based on similar metrics, although those determinations may not have explicitly discussed incremental cost-effectiveness and incremental visibility benefits on a per-unit basis. First, the State of Colorado selected, and the EPA approved, SCR as $NO_X$ BART for Public Service Company's Hayden Station, Units 1 and 2.[194] Hayden Units 1 and 2 were equipped with first generation LNB and over-fire air (OFA) installed in 1999.[195] In its BART determination, Colorado considered these existing controls as given and analyzed as feasible controls upgraded LNB, SNCR, and SCR. Based on an average cost-effectiveness of $3,385/ton and $4,064/ton, incremental cost-effectiveness (as compared with LNB and OFA with SNCR) of $5,326/ton and $7,331/ton, and visibility improvement of 1.12 dv and 0.85 dv at the most impacted Class I area, respectively, Colorado selected SCR as BART for Units 1 and 2. In this case, due to the existing controls at Hayden Station, the cost-effectiveness values for SCR for Hayden Units 1 and 2 should be compared to the incremental cost-effectiveness values (as compared with LNB and SOFA, and with LNB and SOFA with SNCR) for SCR for Hunter Unit 1, and similarly for incremental visibility benefits. We think they are comparable, particularly for Hayden Unit 2, and considering that Hunter Unit 1 significantly impacts several Class I areas, while Colorado selected SCR for Hayden based solely on the visibility improvement at the most impacted Class I area, Mt. Zirkel Wilderness.

Another comparable determination can be found in EPA's FIP for Arizona Public Service's Cholla Power Plant, Units 2, 3, and 4, in which EPA determined that $NO_X$ BART was SCR.[196] Similarly to Colorado's determination for Hayden, EPA considered the existing controls, LNB and OFA, at the three units and estimated average cost-effectiveness values for SCR of $3,114/ton, $3,472/ton, and $3,395/ton, and incremental cost-effectiveness values (as compared to LNB and OFA with SNCR) of $3,257/ton, $3,811/ton, and $3,661/ton, respectively, for Units 2, 3, and 4. EPA's modeling showed a source-wide visibility improvement for SCR of 1.34 dv at the most impacted Class I area. Based on these metrics, EPA determined $NO_X$ BART to be SCR for the three units. In this case, as with Hayden, the average cost-effectiveness of SCR at Cholla should be compared with the incremental cost-effectiveness of SCR (as compared with just LNB and SOFA) at Hunter Unit 1. The cost-effectiveness values for Hunter Unit 1 are somewhat higher than at Cholla, but on the other hand the source-wide visibility improvement at Hunter Units 1 and 2 (as obtained by summing the per-unit improvements from Units 1 and 2)[197] from LNB and SOFA with SCR is 2.759 dv at the most impacted Class I area, with incremental visibility improvements of 1.29 dv and 0.932 dv over LNB and SOFA and LNB and SOFA with SNCR, respectively. These visibility improvements are very much in line with those at Cholla, and given that the incremental cost-effectiveness of SCR at Hunter Unit 1 is still reasonable, the comparison with Cholla also supports selection of SCR for Hunter Unit 1. We invite comment on other potentially relevant BART determinations and our methodology generally.

Based on these comparisons to Laramie River Station, Hayden Station, Dave Johnston Units 3 and 4, and Cholla Power Plant, we think that selection of LNB and SOFA with SCR as BART for Hunter Unit 1 would be fully consistent with these prior actions. For Hunter

[190] *Nat'l Parks Conserv. Ass'n* v. *U.S. EPA*, 788 F.3d 1134, 1148–49 (9th Cir. 2014).

[191] Even in that initial scenario, at least cost of compliance, as expressed in cost-effectiveness in dollars per ton, can be compared with what has been found reasonable for best available control technology (BACT) and reasonably available control technology (RACT), and visibility improvement can be compared with the 0.5 dv subject-to-BART threshold that determines whether a BART-eligible source causes or contributes to visibility impairment in Class I areas. The EPA notes that this alternate methodology would also support our proposed BART determinations in this action.

[192] 79 FR 5032, 5047 (Jan. 30, 2014).

[193] 79 FR 5032, 5049.

[194] 77 FR 18069 (Mar. 26, 2012) (proposal); 77 FR 76871 (Dec. 31, 2012) (final).

[195] Colorado Department of Health and Environment, Air Pollution Control Division, *Best Available Retrofit Technology (BART) Analysis of Control Options For Public Service Company—Hayden Station*, p. 5, available at *https://www.colorado.gov/pacific/sites/default/files/AP_PO_Hayden-Power-Plant_0.pdf*.

[196] 77 FR 42834 (July 20, 2012) (proposal); 77 FR 72512, 72514–15 (Dec. 5, 2012) (final).

[197] We use the source-wide number here to compare with the Cholla determination; in addition as explained above we must consider source-wide visibility improvements.

Unit 1, LNB and SOFA with SCR is very cost-effective, at $2,380/ton on an average basis (counting the costs and emission reductions from the combination of the three control technology elements) and at $5,268/ton on an incremental basis compared to LNB with SOFA and SNCR. Compared to LNB with SOFA, the incremental cost effectiveness is $4,813/ton, which also compares favorably to the incremental cost effectiveness that supported the selection of LNB with SOFA and SCR for Laramie River Station. For Hunter Unit 1, LNB and SOFA with SCR provides substantial visibility benefits at several Class I areas that are similar to those from Laramie River Station and larger than those from Dave Johnson Units 3 and 4. For example, the visibility improvement from that control option installed on a single unit is 1.342 dv at Arches NP, 1.545 dv at Canyonlands NP, and 1.113 at Capitol Reef NP. These comparisons show that costs are justified in light of the substantial visibility benefits, both total and incremental.

In the case of Hunter, the unit level visibility improvements justify the most stringent level of control, SCR, for each of the two Hunter units. Necessarily, when we consider the source-wide visibility improvements, they will be larger and also justify the most stringent level of control. In addition, the unit level visibility improvements and source-wide visibility improvements (as derived by summing the unit level visibility improvements) at other impacted Class I areas, particularly Arches NP and Capitol Reef NP, support the most stringent level of control. Accordingly, for Hunter Unit 1, we propose to find that BART for $NO_X$ is LNB and SOFA with SCR, represented by an emission limit of 0.07 lb/MMBtu (30-day rolling average). The proposed BART emission limit of 0.07 lb/MMBtu allows for a sufficient margin of compliance for a 30-day rolling average limit that would apply at all times, including startup, shutdown, and malfunction.[198] We are also proposing monitoring, recordkeeping, and reporting requirements as described in our proposed regulatory text for 40 CFR 52.2336.

Under 40 CFR 51.308(e)(1)(iv), ''each source subject to BART [is] required to install and operate BART as expeditiously as practicable, but in no event later than five years after approval of the implementation plan revision.'' In light of the considerable effort involved to retrofit SCR, we propose that five years is as expeditiously as practicable. Therefore, we propose a compliance deadline of five years from the date our final FIP becomes effective.

b. Hunter Unit 2

Generally speaking, Hunter Unit 2 is identical to Hunter Unit 1. The Hunter Unit 2 boiler is of tangential-fired design with newer generation low-$NO_X$ burners and separated overfire air which were installed in spring 2011. Hunter Unit 2 currently achieves an annual emission rate of approximately 0.20 lb/MMBtu with these combustion controls. Under Utah's submitted regional haze SIP, Unit 1 is subject to a state-law $NO_X$ emission limit of 0.26 lb/MMBtu on a 30-day rolling average. Prior to the installation of LNB and SOFA the unit operated with an actual annual emission rate of about 0.38 lb/MMBtu.

Step 1: Identify All Available $NO_X$ Control Technologies

For the same reasons as for Hunter Unit 1, we propose to adopt the identification of available $NO_X$ control technologies in PacifiCorp's 2012 BART analysis to satisfy Step 1, and we refer the reader to the 2012 PacifiCorp BART analysis for details on those control technologies.

Step 2: Eliminate Technically Infeasible Options

In its 2012 BART analysis,[199] PacifiCorp eliminated available $NO_X$ control technologies that PacifiCorp evaluated as technologically infeasible for Hunter Unit 2. The remaining technologically feasible control technologies are the combustion controls, LNB and SOFA, and the post-combustion controls, SNCR and SCR.

As with Hunter Unit 1, we agree with PacifiCorp's evaluation of technologically available controls for Hunter Unit 2 and propose to adopt it for Step 2.

Step 3: Evaluate Control Effectiveness of Remaining Control Technologies

As noted previously, Hunter Unit 2 is currently achieving an actual annual emission rate of approximately 0.20 lb/MMBtu with LNB and SOFA. This represents a 48.2 percent reduction from the baseline emission rate of 0.38 lb/MMBtu.

SCR can achieve performance emission rates as low as 0.04 to 0.07 lb/MMBtu on an annual basis.[200] For this analysis, consistent with our actions elsewhere, as well with PacifiCorp's analysis, we use an annual emission rate of 0.05 lb/MMBtu for SCR, which when combined with LNB and SOFA achieves an overall control efficiency of 86.9 percent. For this analysis, consistent with our actions elsewhere, as well with PacifiCorp's analysis, we use an annual emission rate of 0.05 lb/MMBtu for SCR, which when combined with LNB and SOFA achieves an overall control efficiency of 86.9 percent.

As with Hunter Unit 1, we evaluated post-combustion control technologies, SNCR and SCR, in combination with combustion controls. Our evaluation is the same as for Hunter Unit 1. A summary of emissions projections for the control options evaluated is provided in Table 19.

TABLE 19—SUMMARY OF $NO_X$ BART ANALYSIS CONTROL TECHNOLOGIES FOR HUNTER UNIT 2

| Control option | Control effectiveness (%) | Annual emission rate (lb/MMBtu) | Emissions reduction (tpy) | Remaining emissions (tpy) |
|---|---|---|---|---|
| LNB/SOFA+SCR | 86.9 | 0.05 | 5,230 | 788 |
| LNB/SOFA+SNCR | 59.2 | 0.16 | 3,562 | 2,457 |
| LNB/SOFA | 48.2 | 0.20 | 2,902 | 3,117 |
| Baseline [1] | | 0.38 | | 6,018 |

[1] Baseline emissions were determined by averaging the annual emissions from 2001 to 2003 as reported to EPA Air Markets Program Data available at *http://ampd.epa.gov/ampd/*.

[198] Emission limits such as BART are required to be met on a continuous basis. *See* 70 FR 39104, 39172 (July 6, 2005) (stating that emissions limits including BART are to be met on a ''continuous basis'' in the BART Guidelines, section V); 42 U.S.C. 7602(k) (noting that emission limits are to be on ''a continuous basis'').

[199] PacifiCorp BART Analysis for Hunter Unit 2, pp. 2.b–105—2.a–122 (2012).

[200] Srivastava, R., Hall, R., Khan, S., Lani, B., & Culligan, K., *Nitrogen Oxides Emission Control Options for Coal-Fired Utility Boilers,* 55 J. Air & Waste Mgmt. Assoc. 1367, 1385–86 (2005).

Step 4: Evaluate Impacts and Document Results

Part 1—Costs of Compliance

We obtained capital costs for LNB and SOFA from the 2014 PacifiCorp BART analysis. PacifiCorp did not report any operating and maintenance costs for LNB and SOFA. Similarly, we obtained capital cost estimates for LNB and SOFA with SNCR from the 2014 PacifiCorp BART analysis. However, for operating and maintenance costs we propose to rely on the draft 2015 draft SNCR chapter of the CCM. Refer to the ATP report for details. Capital costs for LNB and SOFA with SCR were also obtained from the 2014 PacifiCorp BART analysis. However, PacifiCorp's capital costs were adjusted to account for items that were double-counted or should not be allowed under the CCM, such as AFUDC.[201] In addition, the capital costs were adjusted to account for a significant overestimation of the catalyst volume and related costs. These adjustments are documented in the ATP report and associated spread sheet. A discussion of operating and maintenance costs of SCR is also included in the ATP report. For the reasons given in the report, we propose to adopt the cost estimates contained in it.

A summary of our proposed cost estimates for all control options is presented in Table 20.

TABLE 20—SUMMARY OF $NO_X$ BART COSTS ON HUNTER UNIT 2

| Control option | Total capital investment | Indirect annual cost | Direct annual cost | Total annual cost | Emissions reductions (tpy) | Average cost effectiveness ($/ton) |
|---|---|---|---|---|---|---|
| LNB/SOFA | $8.6M | $0.9M | $0M | $0.9M | 2,902 | $298 |
| LNB/SOFA/SNCR | 16.0M | 1.6M | 1.9M | 3.5M | 3,562 | 968 |
| LNB/SOFA/SCR | 108.1M | 10.3 | 2.4M | 12.7M | 5,230 | 2,432 |

Parts 2 and 3—Energy and Non-Air Quality Environmental Impacts of Compliance

The energy and non-air quality impacts for Hunter Unit 2 are nearly identical to those for Hunter Unit 1 as discussed previously. Accordingly, for the same reasons as for Hunter Unit 1, we propose to determine that we have adequately considered these impacts by including cost of additional energy in cost effectiveness and assessing non-air quality environmental impacts as insufficient to eliminate or weigh against any of the BART options.

Part 4—Remaining Useful Life

PacifiCorp assumes a remaining useful life of at least 20 years for Hunter Unit 2 in its BART analysis, and has not indicated any intention to retire, or curtail generation from, Hunter Unit 2. Therefore, this factor does not preclude any of the control options considered. In addition, this factor is consistent with our BART calculation of cost effectiveness because annualized costs have been calculated over a 20 year period for each of the control options considered. We propose that this gives adequate consideration to this factor.

Step 5: Evaluate Visibility Impacts

Table 21 presents the highest of the 98th percentile visibility improvements at the affected Class I areas for the three meteorological years modeled, 2001 through 2003. Tables 22 and 23 present the number of days (summed across three years) with impacts greater than the contribution and causation thresholds—0.5 dv and 1.0 dv, respectively.

TABLE 21—HUNTER UNIT 2—VISIBILITY IMPROVEMENTS

| Class I area | LNB with SOFA (Δdv) | LNB with SOFA and SNCR (Δdv) | LNB with SOFA and SCR (Δdv) |
|---|---|---|---|
| Arches NP | 0.569 | 0.711 | 1.080 |
| Black Canyon of the Gunnison NP | 0.153 | 0.189 | 0.279 |
| Bryce Canyon NP | 0.234 | 0.291 | 0.429 |
| Canyonlands NP | 0.658 | 0.822 | 1.250 |
| Capitol Reef NP | 0.491 | 0.623 | 0.879 |
| Flat Tops WA | 0.180 | 0.223 | 0.328 |
| Grand Canyon NP | 0.275 | 0.340 | 0.506 |
| Mesa Verde NP | 0.182 | 0.225 | 0.344 |
| Zion NP | 0.144 | 0.178 | 0.262 |

TABLE 22—HUNTER UNIT 2—DAYS GREATER THAN 0.5 DECIVIEW

[Three Year Total]

| Class I area | Baseline (days) | LNB with SOFA (days) | LNB with SOFA and SNCR (days) | LNB with SOFA and SCR (days) |
|---|---|---|---|---|
| Arches NP | 293 | 276 | 268 | 245 |
| Black Canyon of the Gunnison NP | 68 | 57 | 55 | 49 |
| Bryce Canyon NP | 42 | 39 | 37 | 30 |
| Canyonlands NP | 359 | 336 | 331 | 317 |
| Capitol Reef NP | 175 | 163 | 161 | 152 |

[201] *See* 79 FR 5032, 5133 (Jan. 30, 2014) (discussing reasons for rejecting use of AFUDC).

TABLE 22—HUNTER UNIT 2—DAYS GREATER THAN 0.5 DECIVIEW—Continued

[Three year total]

| Class I area | Baseline (days) | LNB with SOFA (days) | LNB with SOFA and SNCR (days) | LNB with SOFA and SCR (days) |
|---|---|---|---|---|
| Flat Tops WA | 77 | 64 | 63 | 57 |
| Grand Canyon NP | 49 | 46 | 45 | 40 |
| Mesa Verde NP | 82 | 72 | 66 | 59 |
| Zion NP | 29 | 24 | 23 | 22 |

TABLE 23—HUNTER UNIT 2—DAYS GREATER THAN 1.0 DECIVIEW

[Three year total]

| Class I area | Baseline (days) | LNB with SOFA (days) | LNB with SOFA and SNCR (days) | LNB with SOFA and SCR (days) |
|---|---|---|---|---|
| Arches NP | 170 | 151 | 145 | 131 |
| Black Canyon of the Gunnison NP | 22 | 16 | 13 | 11 |
| Bryce Canyon NP | 22 | 21 | 19 | 16 |
| Canyonlands NP | 240 | 221 | 218 | 198 |
| Capitol Reef NP | 118 | 113 | 111 | 105 |
| Flat Tops WA | 31 | 20 | 20 | 14 |
| Grand Canyon NP | 32 | 25 | 25 | 22 |
| Mesa Verde NP | 32 | 22 | 20 | 14 |
| Zion NP | 14 | 11 | 9 | 8 |

Select BART.

A summary of our impacts analysis for Hunter Unit 2 is presented in Table 24.

TABLE 24—SUMMARY OF HUNTER UNIT 2 IMPACTS ANALYSIS

| Control option | Annual emission rate (lb/MMBtu) | Emission reduction (tpy) | Total annual costs (million$) | Average cost effectiveness ($/ton) | Incremental cost effectiveness ($/ton) | Visibility impacts * | | |
|---|---|---|---|---|---|---|---|---|
| | | | | | | Improvement (dv) | Days > 0.5 dv | Days > 1.0 dv |
| LNB with SOFA | 0.20 | 2,902 | $0.9M | $298 | | 0.658 | 336 | 221 |
| LNB with SOFA and SNCR. | 0.16 | 3,562 | 3.5M | 968 | $3,913 | 0.822 | 331 | 218 |
| LNB with SOFA and SCR. | 0.05 | 5,230 | 12.7M | 2,432 | $5,558 (compared to LNB with SOFA and SNCR). $5,092 (compared to LNB with SOFA). | 1.250 | 317 | 198 |

* At the most impacted Class I area, Canyonlands National Park.

In determining what to co-propose as BART, we have taken into consideration all five of the statutory factors required by the CAA: The costs of compliance, the energy and non-air quality environmental impacts of compliance, any existing pollution control technology in use at the source, the remaining useful life of the source, and the degree of improvement in visibility which may reasonably be anticipated to result from the use of such technology. Later on we provide a justification for our selection of BART, including an explanation of how each of the CAA factors was used in that selection.

We have considered the energy and non-air quality environmental impacts of compliance and propose to find that they do not appreciably favor one control option over another, or preclude a particular control option from selection. As explained for Hunter Unit 1, the existing pollution controls have been accounted for in our evaluation of BART, and also would not favor or preclude any of the control options considered. And finally, we have considered the remaining useful life of the source and find that it is sufficiently long (greater than 20 years) so as not to favor or preclude any of the control options. As a result, the remaining factors—the costs of compliance and visibility improvement—are the primary factors that lead us to our proposed BART selection for Hunter Unit 2.

In order to select BART we propose (for the same reasons as for Hunter Unit 1) to weigh the costs of compliance against visibility impacts by generally comparing them with BART determinations that have been made elsewhere. Specifically, we propose to compare the average cost-effectiveness, incremental cost-effectiveness, visibility improvement, and incremental visibility improvement for LNB and SOFA with SCR with BART determinations where the EPA and States have based their determination on the same metrics. The most comparable determinations are the same as for Hunter Unit 1: Laramie River Station, Hayden Station, and Cholla Power Plant.

Appellate Case: 21-9509 Document: 101-2 Date Filed: 06/10/2022 Page: 82


Based on these comparisons, we think LNB and SOFA with SCR for Hunter 2 is fully consistent with the other BART determinations. LNB and SOFA with SCR is very cost-effective at $2,432/ton, and provides substantial visibility benefits at several Class I areas. For example, the visibility improvement from that control option is 1.250 dv at Canyonlands NP and 1.080 dv at Arches NP. The incremental cost-effectiveness of SCR, $5,558/ton, is by comparison also reasonable. This comparison also shows that costs are justified in light of the substantial visibility benefits, both total and incremental.

In the case of Hunter, the unit level visibility improvements justify the most stringent level of control, SCR, for each of the two Hunter units. Necessarily, when we consider the source-wide visibility improvements, they will be larger and also justify the most stringent level of control. In addition, the unit level visibility improvements and source-wide visibility improvements (as derived by summing the unit level visibility improvements) at other impacted Class I areas, particularly Arches NP and Capitol Reef NP, support the most stringent level of control.

Accordingly, for Hunter Unit 2, we propose to find that BART for $NO_X$ is LNB and SOFA with SCR, represented by an emission limit of 0.07 lb/MMBtu (30-day rolling average). The proposed BART emission limit of 0.07 lb/MMBtu allows for a sufficient margin of compliance for a 30-day rolling average limit that would apply at all times, including startup, shutdown, and malfunction.[202] We are also proposing monitoring, recordkeeping, and reporting requirements as described in our proposed regulatory text for 40 CFR 52.2336.

Under 40 CFR 51.308(e)(1)(iv), ''each source subject to BART [is] required to install and operate BART as expeditiously as practicable, but in no event later than 5 years after approval of the implementation plan revision.'' In light of the considerable effort involved to retrofit SCR, we propose that five years is as expeditiously as practicable. Therefore, we propose a compliance deadline of five years from the date our final FIP becomes effective.

3. Huntington Power Plant

As described previously in section IV.A, Huntington Units 1 and 2 were determined to be subject to BART. PacifiCorp's Huntington Power Plant (Huntington), is located in Huntington City, Utah, and consists of a total of the two electric utility steam generating units. Huntington Units 1 and 2 have a nameplate generating capacity of 498 MW each.[203] The boilers are tangentially fired pulverized coal boilers, burning bituminous coal from the nearby Deer Creek Mine.

Our evaluation of BART for Huntington Unit 1 and 2 follows the *Guidelines for BART Determinations Under the Regional Haze Rule*, which are found in appendix Y to 40 CFR part 51. For Huntington Units 1 and 2, the BART Guidelines are mandatory because the combined capacity for all units at the Huntington facility is greater than 750 MW.[204] Under the Guidelines, cost estimates for control technologies should be based on the CCM, where possible.

The BART Guidelines establish presumptive $NO_X$ limits for coal-fired EGUs greater than 200 MW located at greater than 750 MW power plants that are operating without post-combustion controls. For the tangential-fired boilers burning bituminous coal at Huntington, that presumptive limit is 0.28 lb/MMBtu.[205] The BART Guidelines provide that the five factor analysis may result in a limit that is different than the presumptive limit, and the presumptive limits do not obviate the need to determine BART on a case-by-case basis considering the five factors.[206]

PacifiCorp provided BART analyses for Huntington 1 and 2 to Utah in 2012 and 2014 which we utilize in our proposed BART evaluation here.[207] Although we are using some information provided by Utah and PacifiCorp, we have independently evaluated all five statutory BART factors.

a. Huntington Unit 1

The Huntington Unit 1 boiler is of tangential-fired design with newer generation low-$NO_X$ burners and separated overfire air which were installed in fall 2010. Huntington Unit 1 currently achieves an annual emission rate of approximately 0.22 lb/MMBtu with these combustion controls. Under Utah's submitted regional haze SIP, Unit 1 is subject to a state-law $NO_X$ emission limit of 0.26 lb/MMBtu on a 30-day rolling average. Prior to the installation of LNB and SOFA the unit operated with an actual annual emission rate of about 0.37 lb/MMBtu.

Step 1: Identify All Available $NO_X$ Control Technologies

In its 2012 BART analysis for Huntington Unit 1, PacifiCorp identified several $NO_X$ control technologies, both for combustion controls and post-combustion controls.[208] The combustion controls identified by PacifiCorp include: Low-$NO_X$ burners and separated overfire air (LNB and SOFA overfire air; already installed), rotating overfire air, neural network optimization system, flue gas recirculation, gas reburn, fuel lean gas reburn, coal switching, water injection, and others. Post-combustion control options identified by PacifiCorp include: SNCR, RRI, SCR, and others.

We note that the combustion controls, LNB and SOFA, have already been installed on Huntington Unit 1, and so we consider them here as ''any existing controls'' under the third statutory factor. In addition, the BART Guidelines recognize that ''[c]ombinations of inherently lower-emitting processes and add-on controls'' are a category of retrofit controls which can be considered.[209] Accordingly, the inherently lower-emitting combustion controls, LNB and SOFA, are evaluated in combination with the add-on controls, SNCR and SCR.

We have reviewed PacifiCorp's review of $NO_X$ control technologies and find it to be comprehensive. We propose to adopt it to satisfy Step 1 and we refer to the 2012 PacifiCorp BART analysis for details on the available $NO_X$ control technologies.

Step 2: Eliminate Technically Infeasible Options

In its 2012 BART analysis,[210] PacifiCorp eliminated available $NO_X$ control technologies that PacifiCorp evaluated as technologically infeasible for Huntington Unit 1. The remaining technologically feasible control technologies are the combustion

[202] Emission limits such as BART are required to be met on a continuous basis. *See* 70 FR 39104, 39172 (July 6, 2005) (stating that emissions limits including BART are to be met on a ''continuous basis'' in the BART Guidelines, section V); 42 U.S.C. 7602(k) (noting that emission limits are to be on ''a continuous basis'').

[203] *See* U.S. Energy Information Administration, Electric Generating Capacity for 2011 (taken from Form EIA–860). *See* ''EIA existing generating units 2011.xls'' spreadsheet in the docket.

[204] *See* 40 CFR 51.302(e)(1)(ii)(B) (''The determination of BART for fossil-fuel fired power plants having a total generating capacity greater than 750 megawatts must be made pursuant to the guidelines in appendix Y of this part.'').

[205] 40 CFR part 51, appendix Y, IV.E.5, Table. 1.

[206] *See* 40 CFR 51.301 (defining BART); 40 CFR 51.308(e).

[207] *See* PacifiCorp BART Analysis for Huntington Unit 1(2012); PacifiCorp BART Analysis for Huntington Unit 2 (2012); see also Chapter 2 of the Technical Support Document for Utah's Regional Haze BART Submittal; PacifiCorp's BART Analysis Update for Hunter Units 1 and 2 and Huntington Units 1 and 2 (2014).

[208] PacifiCorp BART Analysis for Huntington Unit 1, p. 2.c-60 (2012).

[209] 40 CFR part 51 appendix Y.

[210] PacifiCorp BART Analysis for Huntington Unit 1, pp. 2.c–61—2.c–77 (2012).

controls, LNB and SOFA, and the post-combustion controls, SNCR and SCR.

We agree with PacifiCorp's evaluation of technologically available controls for Huntington Unit 1 and propose to adopt it for Step 2.

Step 3: Evaluate Control Effectiveness of Remaining Control Technologies

As noted previously, Huntington Unit 1 is currently achieving an actual annual emission rate of approximately 0.22 lb/MMBtu with LNB and SOFA. This represents a 41.5 percent reduction from the baseline emission rate of 0.37 lb/MMBtu.

The post-combustion control technologies, SNCR and SCR, have been evaluated in combination with combustion controls. That is, the inlet concentration to the post-combustion controls is assumed to be 0.22 lb/MMBtu (annual). This allows the equipment and operating and maintenance costs of the post-combustion controls to be minimized based on the lower inlet $NO_X$ concentration.

Typically, SNCR reduces $NO_X$ an additional 20 to 30 percent above combustion controls without excessive $NH_3$ slip.[211] For this analysis, the control efficiency of SNCR has been calculated based on the formula in the 2015 draft CCM SNCR chapter,[212] which for Huntington Unit 1 yields an additional reduction of 21.7 percent after combustion controls. When combined with LNB and SOFA, SNCR is anticipated to achieve an annual emission rate of 0.17 lb/MMBtu, corresponding to an overall control efficiency of 54.2 percent.

SCR can achieve performance emission rates as low as 0.04 to 0.07 lb/MMBtu on an annual basis.[213] For this analysis, consistent with our actions elsewhere, as well with PacifiCorp's analysis, we use an annual emission rate of 0.05 lb/MMBtu for SCR, which when combined with LNB and SOFA achieves an overall control efficiency of 86.7 percent.

A summary of emissions projections for the control options evaluated is provided in Table 25.

TABLE 25—SUMMARY OF $NO_X$ BART ANALYSIS CONTROL TECHNOLOGIES FOR HUNTINGTON UNIT 1

| Control option | Control effectiveness (%) | Annual emission rate (lb/MMBtu) | Emissions reduction (tpy) | Remaining emissions (tpy) |
|---|---|---|---|---|
| LNB/SOFA +SCR | 86.7 | 0.05 | 5,092 | 784 |
| LNB/SOFA +SNCR | 54.2 | 0.17 | 3,185 | 2,692 |
| LNB/SOFA | 41.5 | 0.22 | 2,440 | 3,436 |
| Baseline [1] | ........................ | 0.37 | ........................ | 5,876 |

[1] Baseline emissions were determined by averaging the annual emissions from 2001 to 2003 as reported to EPA Air Markets Program Data available at *http://ampd.epa.gov/ampd/.*

Step 4: Evaluate Impacts and Document Results

Part 1—Costs of Compliance

We obtained capital costs for LNB and SOFA from the 2014 PacifiCorp BART analysis. PacifiCorp did not report any operating and maintenance costs for LNB and SOFA. Similarly, we obtained capital cost estimates for LNB and SOFA with SNCR from the 2014 PacifiCorp BART analysis. However, for operating and maintenance costs we propose to rely on the draft 2015 draft SNCR chapter of the CCM. Refer to the ATP report for details. Capital costs for LNB and SOFA with SCR were also obtained from the 2014 PacifiCorp BART analysis. However, PacifiCorp's capital costs were adjusted to account for items that were double-counted or should not be allowed under the CCM, such as AFUDC.[214] In addition, the capital costs were adjusted to account for a significant overestimation of the catalyst volume and related costs. These adjustments are documented in the ATP report and associated spread sheet. A discussion of operating and maintenance costs of SCR is also included in the ATP report. For the reasons given in the report, we propose to adopt the cost estimates contained in it.

A summary of our proposed cost estimates for all control options is presented in Table 26.

TABLE 26—SUMMARY OF $NO_X$ BART COSTS ON HUNTINGTON UNIT 1

| Control option | Total capital investment | Indirect annual cost | Direct annual cost | Total annual cost | Emissions reductions (tpy) | Average Cost effectiveness ($/ton) |
|---|---|---|---|---|---|---|
| LNB/SOFA | $8.1M | $0.8M | $0M | $0.8M | 2,440 | $332 |
| LNB/SOFA/SNCR | 15.5M | 1.5M | 2.0M | 3.5M | 3,185 | 1,098 |
| LNB/SOFA/SCR | 107.8M | 10.3M | 2.5M | 12.8M | 5,092 | 2,515 |

Parts 2 and 3—Energy and Non-Air Quality Environmental Impacts of Compliance

SNCR slightly reduces the thermal efficiency of a boiler as the reduction reaction uses thermal energy from the boiler, decreasing the energy available for power generation.[215] Using the CCM, we have calculated the electrical power consumption of SNCR to be 361,000 kW-hr per year for Huntington Unit 1.

For SCR, the thermal efficiency is much more reduced because the new ductwork and the reactor's catalyst layers decrease the flue gas pressure. As

[211] Institute of Clean Air Companies, White Paper, SNCR for Controlling $NO_X$ Emissions, pp. 4, 9 (Feb. 2008).

[212] *See* [DRAFT] 2015 SNCR CCM (July 2015), Figure 1.1c: SNCR $NO_X$ Reduction Efficiency Versus Baseline $NO_X$ Levels for Coal-fired Utility Boilers.

[213] Srivastava, R., Hall, R., Khan, S., Lani, B., & Culligan, K., *Nitrogen Oxides Emission Control Options for Coal-Fired Utility Boilers,* 55 J. Air & Waste Mgmt. Assoc. 1367, 1367–88 (2005).

[214] *See* 79 FR 5032, 5133 (Jan. 30, 2014) (discussing reasons for rejecting use of AFUDC).

[215] *EPA Air Pollution Control Cost Manual,* pp. 1–21 (6th ed. 2002).

a result, additional fan power is necessary to maintain the flue gas flow rate through the ductwork and reactor. Using the CCM, we have calculated the electrical power consumption of SCR to be approximately 18,617,000 kW-hr per year for Huntington Unit 1.

Both SCR and SNCR require some minimal electricity to service pretreatment and injection equipment, pumps, compressors, and control systems. The energy requirements described earlier are not significant enough to warrant elimination of either SNCR or SCR as BART. In addition, the cost of the additional energy requirements has been included in our cost effectiveness calculations.

SNCR and SCR will slightly increase the quantity of ash that will need to be disposed. In addition, transportation and storage of chemical reagents may result in spills or releases. However, these non-air quality environmental impacts do not warrant elimination of either SNCR or SCR as BART.

There are no additional energy requirements associated with the new LNB and SOFA, and no significant non-air quality environmental impacts.

In summary, we propose to determine that we have adequately considered these impacts by including cost of additional energy in cost effectiveness and assessing non-air quality environmental impacts as insufficient to eliminate or weigh against any of the BART options.

Part 4—Remaining Useful Life

PacifiCorp assumes a remaining useful life of at least 20 years for Huntington Unit 1 in its BART analysis, and has not indicated any intention to retire, or curtail generation from, Huntington Unit 1. Therefore, this factor does not preclude any of the control options considered. In addition, this factor does not impact our BART calculation of cost effectiveness because annualized costs have been calculated over a 20 year period for each of the control options considered. We propose that this gives adequate consideration to this factor.

Step 5: Evaluate Visibility Impacts

Table 27 presents the highest of the 98th percentile visibility improvements at the affected Class I areas for the three meteorological years modeled, 2001 through 2003. Tables 28 and 29 present the number of days (summed across three years) with impacts greater than the contribution and causation thresholds—0.5 dv and 1.0 dv, respectively.

TABLE 27—HUNTINGTON UNIT 1—VISIBILITY IMPROVEMENTS

| Class I Area | LNB with SOFA (Δdv) | LNB with SOFA and SNCR (Δdv) | LNB with SOFA and SCR (Δdv) |
|---|---|---|---|
| Arches NP | 0.684 | 0.907 | 1.488 |
| Black Canyon of the Gunnison NP | 0.156 | 0.205 | 0.328 |
| Bryce Canyon NP | 0.222 | 0.292 | 0.473 |
| Canyonlands NP | 0.851 | 1.133 | 1.881 |
| Capitol Reef NP | 0.493 | 0.651 | 1.108 |
| Flat Tops WA | 0.181 | 0.239 | 0.383 |
| Grand Canyon NP | 0.200 | 0.262 | 0.419 |
| Mesa Verde NP | 0.215 | 0.284 | 0.462 |
| Zion NP | 0.150 | 0.198 | 0.320 |

TABLE 28—HUNTINGTON UNIT 1—DAYS GREATER THAN 0.5 DECIVIEW

[Three year total]

| Class I Area | Baseline (days) | LNB with SOFA (days) | LNB with SOFA and SNCR (days) | LNB with SOFA and SCR (days) |
|---|---|---|---|---|
| Arches NP | 237 | 221 | 210 | 180 |
| Black Canyon of the Gunnison NP | 45 | 33 | 30 | 23 |
| Bryce Canyon NP | 36 | 26 | 25 | 19 |
| Canyonlands NP | 277 | 249 | 244 | 210 |
| Capitol Reef NP | 131 | 117 | 116 | 99 |
| Flat Tops WA | 64 | 41 | 37 | 27 |
| Grand Canyon NP | 40 | 35 | 34 | 27 |
| Mesa Verde NP | 63 | 46 | 41 | 30 |
| Zion NP | 21 | 16 | 16 | 14 |

TABLE 29—HUNTINGTON UNIT 1—DAYS GREATER THAN 1.0 DECIVIEW

[Three year total]

| Class I Area | Baseline (days) | LNB with SOFA (days) | LNB with SOFA and SNCR (days) | LNB with SOFA and SCR (days) |
|---|---|---|---|---|
| Arches NP | 146 | 121 | 117 | 86 |
| Black Canyon of the Gunnison NP | 16 | 7 | 7 | 3 |
| Bryce Canyon NP | 19 | 13 | 9 | 5 |
| Canyonlands NP | 175 | 153 | 143 | 117 |
| Capitol Reef NP | 91 | 74 | 69 | 55 |

TABLE 29—HUNTINGTON UNIT 1—DAYS GREATER THAN 1.0 DECIVIEW—Continued

[Three year total]

| Class I Area | Baseline (days) | LNB with SOFA (days) | LNB with SOFA and SNCR (days) | LNB with SOFA and SCR (days) |
|---|---|---|---|---|
| Flat Tops WA | 17 | 9 | 8 | 3 |
| Grand Canyon NP | 19 | 13 | 12 | 9 |
| Mesa Verde NP | 22 | 13 | 10 | 4 |
| Zion NP | 11 | 8 | 6 | 4 |

Select BART.

A summary of our impacts analysis for Huntington Unit 1 is presented in Table 30.

TABLE 30—SUMMARY OF HUNTINGTON UNIT 1 IMPACTS ANALYSIS

| Control option | Annual emission rate (lb/MMBtu) | Emission reduction (tpy) | Total annual costs (million$) | Average cost effectiveness ($/ton) | Incremental cost effectiveness ($/ton) | Visibility impacts * | | |
|---|---|---|---|---|---|---|---|---|
| | | | | | | Improvement (dv) | Days > 0.5 dv | Days > 1.0 dv |
| LNB with SOFA | 0.22 | 2,440 | $0.8M | $332 | | 0.851 | 249 | 153 |
| LNB with SOFA and SNCR. | 0.17 | 3,185 | 3.5M | 1,098 | 3,609 | 1.113 | 244 | 143 |
| LNB with SOFA and SCR. | 0.05 | 5,092 | 12.8M | 2,515 | $4,879 (compared to LNB with SOFA and SNCR). $4,522 (compared to LNB with SOFA). | 1.881 | 210 | 117 |

* At the most impacted Class I area, Canyonlands National Park.

In determining what to co-propose as BART, we have taken into consideration all five of the statutory factors required by the CAA: The costs of compliance, the energy and non-air quality environmental impacts of compliance, any existing pollution control technology in use at the source, the remaining useful life of the source, and the degree of improvement in visibility which may reasonably be anticipated to result from the use of such technology. Later on we provide a justification for our selection of BART, including an explanation of how each of the CAA factors was used in that selection.

As described in step 1 previously, we have considered the existing pollution control technology in use at the source. We note that Huntington Unit 1 was equipped with LNB and SOFA in the fall of 2010 in order to meet state-law requirements in the 2011 Utah RH SIP submittal, which we did not approve. In this co-proposal we have to evaluate control technologies and baseline emissions from the correct starting point, that is, prior to the installation of the combustion controls pursuant to state-law $NO_X$ limitations.[216] As a result, we used the period 2001–2003 as the appropriate period for baseline emissions, in order to provide a realistic depiction of annual emissions for Huntington Unit 1 prior to installation of combustion controls.

We have considered the energy and non-air quality environmental impacts of compliance and propose to find that they do not appreciably favor one control option over another, or preclude a particular control option from selection. And finally, we have considered the remaining useful life of the source and find that it is sufficiently long (greater than 20 years) so as not to favor or preclude any of the control options. As a result, the remaining factors—the costs of compliance and visibility improvement—are the primary factors that lead us to our proposed BART selection for Huntington Unit 1.

Having already considered the other factors, in order to select BART we propose to weigh the costs of compliance against visibility impacts by generally comparing them with BART determinations that have been made elsewhere. Specifically, we propose to compare the average cost-effectiveness, incremental cost-effectiveness, visibility improvement, and incremental visibility improvement for LNB and SOFA with SCR with BART determinations where the EPA and States have based their determination on the same metrics. The most comparable determinations are the same as for Hunter Unit 1. The most comparable determination appears to be in EPA's final action for Wyoming's regional haze SIP, in which EPA promulgated a FIP for three units at Laramie River Station and determined BART to be LNB and SOFA with SCR for the three units.[217] On a per-unit basis, the visibility improvement from that control option was 0.52 to 0.57 dv, and across all three units the sum of the improvement was 1.62 dv. The average cost-effectiveness ranged from $4,375/ton to $4,461/ton, while the incremental cost-effectiveness ranged from $5,449 to $5,871/ton. Finally, the incremental visibility improvement as compared to LNB and SOFA with SNCR was significant. On the other hand, at Dave Johnston Units 3 and 4 (for example), where EPA rejected LNB and SOFA with SCR, the incremental cost-effectiveness value of LNB and SOFA with SCR was much higher and incremental visibility benefit lower than at Laramie River Station.[218]

[216] *See* 79 FR 5032, 5105–1 (Jan. 30, 2012).

[217] 79 FR 5032, 5047 (Jan. 30, 2014).

[218] 79 FR 5032, 5049.

Appellate Case: 21-9509 Document: 101-2 Date Filed: 06/10/2022 Page: 86


There are other BART determinations in which SCR has been selected as BART (either alone or in conjunction with LNB and SOFA) based on similar metrics, although those determinations may not have explicitly discussed incremental cost-effectiveness and incremental visibility benefits on a per-unit basis. First, the State of Colorado selected, and the EPA approved, SCR as $NO_X$ BART for Public Service Company's Hayden Station, Units 1 and 2.[219] Hayden Units 1 and 2 were equipped with first generation LNB and over-fire air (OFA) installed in 1999.[220] In its BART determination, Colorado considered these existing controls as given and analyzed as feasible controls upgraded LNB, SNCR, and SCR. Based on an average cost-effectiveness of $3,385/ton and $4,064/ton, incremental cost-effectiveness (as compared with LNB and OFA with SNCR) of $5,326/ton and $7,331/ton, and visibility improvement of 1.12 dv and 0.85 dv at the most impacted Class I area, respectively, Colorado selected SCR as BART for Units 1 and 2. In this case, due to the existing controls at Hayden Station, the cost-effectiveness values for SCR for Hayden Units 1 and 2 should be compared to the incremental cost-effectiveness values (as compared with LNB and SOFA, and with LNB and SOFA with SNCR) for SCR for Huntington Unit 1, and similarly for incremental visibility benefits. We think they are comparable, particularly for Hayden Unit 2, and considering that Huntington Unit 1 significantly impacts several Class I areas, while Colorado selected SCR for Hayden based solely on the visibility improvement at the most impacted Class I area, Mt. Zirkel Wilderness.

Another comparable determination can be found in EPA's FIP for Arizona Public Service's Cholla Power Plant, Units 2, 3, and 4, in which EPA determined that $NO_X$ BART was SCR.[221] Similarly to Colorado's determination for Hayden, EPA considered the existing controls, LNB and OFA, at the three units and estimated average cost-effectiveness values for SCR of $3,114/ton, $3,472/ton, and $3,395/ton, and incremental cost-effectiveness values (as compared to LNB and OFA with SNCR) of $3,257/ton, $3,811/ton, and $3,661/ton, respectively, for Units 2, 3, and 4. EPA's modeling showed a source-wide visibility improvement for SCR of 1.34 dv at the most impacted Class I area. Based on these metrics, EPA determined $NO_X$ BART to be SCR for the three units. In this case, as with Hayden, the average cost-effectiveness of SCR at Cholla should be compared with the incremental cost-effectiveness of SCR (as compared with just LNB and SOFA) at Huntington Unit 1. The cost-effectiveness values for Huntington Unit 1 are somewhat higher than at Cholla, but on the other hand the source-wide visibility improvement at Huntington Units 1 and 2 (as obtained by summing the per-unit improvements from Units 1 and 2)[222] from LNB and SOFA with SCR is 2.759 dv at the most impacted Class I area, with incremental visibility improvements of 1.29 dv and 0.932 dv over LNB and SOFA and LNB and SOFA with SNCR, respectively. These visibility improvements are very much in line with those at Cholla, and given that the incremental cost-effectiveness of SCR at Huntington Unit 1 is still reasonable, the comparison with Cholla also supports selection of SCR for Huntington Unit 1. We invite comment on other potentially relevant BART determinations and our methodology generally.

Based on these comparisons, we think LNB and SOFA with SCR is very cost-effective at $2,515/ton, and provides substantial visibility benefits at several Class I areas. For example, the visibility improvement from that control option is 1.488 dv at Arches NP, 1.881 dv at Canyonlands NP, and 1.108 dv at Capitol Reef NP. The incremental cost-effectiveness of SCR, $4,879/ton, is by comparison with the Laramie River Station BART determination also reasonable. This comparison also shows that costs are justified in light of the substantial visibility benefits, both total and incremental.

In the case of Huntington, the unit level visibility improvements justify the most stringent level of control, SCR, for each of the two Huntington units. Necessarily, when we consider the source-wide visibility improvements, they will be larger and also justify the most stringent level of control.

Accordingly, for Huntington Unit 1, we propose to find that BART for $NO_X$ is LNB and SOFA with SCR, represented by an emission limit of 0.07 lb/MMBtu (30-day rolling average). The proposed BART emission limit of 0.07 lb/MMBtu allows for a sufficient margin of compliance for a 30-day rolling average limit that would apply at all times, including startup, shutdown, and malfunction.[223] We are also proposing monitoring, recordkeeping, and reporting requirements as described in our proposed regulatory text for 40 CFR 52.2336.

Under 40 CFR 51.308(e)(1)(iv), ''each source subject to BART [is] required to install and operate BART as expeditiously as practicable, but in no event later than 5 years after approval of the implementation plan revision.'' In light of the considerable effort involved to retrofit SCR, we propose that five years is as expeditiously as practicable. Therefore, we propose a compliance deadline of five years from the date our final FIP becomes effective.

b. Huntington Unit 2

Generally, Huntington Unit 2 is identical to Unit 1. The Huntington Unit 2 boiler is of tangential-fired design with newer generation low-$NO_X$ burners and separated overfire air which were installed in winter 2006. Huntington Unit 2 currently achieves an annual emission rate of approximately 0.21 lb/MMBtu with these combustion controls. Under Utah's submitted regional haze SIP, Unit 2 is subject to a state-law $NO_X$ emission limit of 0.26 lb/MMBtu on a 30-day rolling average. Prior to the installation of LNB and SOFA the unit operated with an actual annual emission rate of about 0.39 lb/MMBtu.

Step 1: Identify All Available $NO_X$ Control Technologies

For the same reasons as for Huntington Unit 1, we propose to adopt the identification of available $NO_X$ control technologies in PacifiCorp's 2012 BART analysis to satisfy Step 1, and we refer the reader to the 2012 PacifiCorp BART analysis for details on the available $NO_X$ control technologies.

Step 2: Eliminate Technically Infeasible Options

In its 2012 BART analysis,[224] PacifiCorp eliminated available $NO_X$ control technologies that PacifiCorp evaluated as technologically infeasible for Huntington Unit 2. The remaining technologically feasible control technologies are the combustion

[219] 77 FR 18069 (Mar. 26, 2012) (proposal); 77 FR 76871 (Dec. 31, 2012) (final).

[220] Colorado Department of Health and Environment, Air Pollution Control Division, *Best Available Retrofit Technology (BART) Analysis of Control Options For Public Service Company—Hayden Station,* p. 5, available at *https://www.colorado.gov/pacific/sites/default/files/AP_PO_Hayden-Power-Plant_0.pdf.*

[221] 77 FR 42834 (July 20, 2012) (proposal); 77 FR 72512, 72514–15 (Dec. 5, 2012) (final).

[222] We use the source-wide number here to compare with the Cholla determination; in addition as explained above we must consider source-wide visibility improvements.

[223] Emission limits such as BART are required to be met on a continuous basis. *See* 70 FR 39104, 39172 (July 6, 2005) (stating that emissions limits including BART are to be met on a ''continuous basis'' in the BART Guidelines, section V); 42 U.S.C. 7602(k) (noting that emission limits are to be on ''a continuous basis'').

[224] PacifiCorp BART Analysis for Huntington Unit 2, pp. 2.a–106—2.a–124 (2012).

Appellate Case: 21-9509 Document: 101-2 Date Filed: 06/10/2022 Page: 87


controls, LNB and SOFA, and the post-combustion controls, SNCR and SCR.

We agree with PacifiCorp's evaluation of technologically available controls for Huntington Unit 2 and propose to adopt it for Step 2.

Step 3: Evaluate Control Effectiveness of Remaining Control Technologies

As noted previously, Huntington Unit 2 is currently achieving an actual annual emission rate of approximately 0.21 lb/MMBtu with LNB and SOFA. This represents a 44.6 percent reduction from the baseline emission rate of 0.39 lb/MMBtu.

The post-combustion control technologies, SNCR and SCR, have been evaluated in combination with combustion controls. That is, the inlet concentration to the post-combustion controls is assumed to be 0.21 lb/MMBtu (annual). This allows the equipment and operating and maintenance costs of the post-combustion controls to be minimized based on the lower inlet $NO_X$ concentration.

Typically, SNCR reduces $NO_X$ an additional 20 to 30 percent above combustion controls without excessive $NH_3$ slip.[225] For this analysis, the control efficiency of SNCR has been calculated based on the formula in the 2015 draft CCM SNCR chapter,[226] which for Huntington Unit 2 yields an additional reduction of 21.5 percent after combustion controls. When combined with LNB and SOFA, SNCR is anticipated to achieve an annual emission rate of 0.17 lb/MMBtu, corresponding to an overall control efficiency of 56.6 percent.

SCR can achieve performance emission rates as low as 0.04 to 0.07 lb/MMBtu on an annual basis.[227] For this analysis, consistent with our actions elsewhere, as well with PacifiCorp's analysis, we use an annual emission rate of 0.05 lb/MMBtu for SCR, which when combined with LNB and SOFA achieves an overall control efficiency of 87.0 percent.

A summary of emissions projections for the control options evaluated is provided in Table 31.

TABLE 31—SUMMARY OF $NO_X$ BART ANALYSIS CONTROL TECHNOLOGIES FOR HUNTINGTON UNIT 2

| Control option | Control effectiveness (%) | Annual emission rate (lb/MMBtu) | Emissions reduction (tpy) | Remaining emissions (tpy) |
|---|---|---|---|---|
| LNB/SOFA +SCR | 87.0 | 0.05 | 5,023 | 747 |
| LNB/SOFA +SNCR | 56.6 | 0.17 | 3,264 | 2,506 |
| LNB/SOFA | 44.6 | 0.21 | 2,576 | 3,194 |
| Baseline[1] | — | 0.39 | — | 5,770 |

[1] Baseline emissions were determined by averaging the annual emissions from 2001 to 2003 as reported to EPA Air Markets Program Data available at *http://ampd.epa.gov/ampd/.*

Step 4: Evaluate Impacts and Document Results

Part 1—Costs of Compliance

We obtained capital costs for LNB and SOFA from the 2014 PacifiCorp BART analysis. PacifiCorp did not report any operating and maintenance costs for LNB and SOFA. Similarly, we obtained capital cost estimates for LNB and SOFA with SNCR from the 2014 PacifiCorp BART analysis. However, for operating and maintenance costs we propose to rely on the draft 2015 draft SNCR chapter of the CCM. Refer to the ATP report for details. Capital costs for LNB and SOFA with SCR were also obtained from the 2014 PacifiCorp BART analysis. However, PacifiCorp's capital costs were adjusted to account for items that were double-counted or should not be allowed under the CCM, such as AFUDC.[228] In addition, the capital costs were adjusted to account for a significant overestimation of the catalyst volume and related costs. These adjustments are documented in the ATP report and associated spread sheet. A discussion of operating and maintenance costs of SCR is also included in the ATP report. For the reasons given in the report, we propose to adopt the cost estimates contained in it.

A summary of our proposed cost estimates for all control options is presented in Table 32.

TABLE 32—SUMMARY OF $NO_X$ BART COSTS ON HUNTINGTON UNIT 2

| Control option | Total capital investment | Indirect annual costs | Direct annual costs | Total annual cost | Emissions reductions (tpy) | Average cost effectiveness ($/ton) |
|---|---|---|---|---|---|---|
| LNB/SOFA | $9.4M | $0.9M | $0M | $0.9M | 2,576 | $365 |
| LNB/SOFA/SNCR | 16.7M | 1.6M | 1.9M | 3.5M | 3,264 | 1,075 |
| LNB/SOFA/SCR | 109.4M | 10.4M | 2.4M | 12.9M | 5,023 | 2,563 |

Parts 2 and 3—Energy and Non-Air Quality Environmental Impacts of Compliance

The energy and non-air quality impacts for Huntington Unit 2 are nearly identical to those for Huntington Unit 1 as discussed previously. Accordingly, for the same reasons as for Huntington Unit 1, we propose to determine that we have adequately considered these impacts by including cost of additional energy in cost effectiveness and assessing non-air quality environmental impacts as insufficient to eliminate or weigh against any of the BART options.

[225] Institute of Clean Air Companies, *White Paper, SNCR for Controlling $NO_X$ Emissions,* pp. 4 and 9 (Feb. 2008).

[226] EPA Selective Noncatalytic, Reduction Cost Manual Draft for Public Comment, p. 1–6 (Figure 1.1c: SNCR $NO_X$ Reduction Efficiency Versus Baseline $NO_X$ Levels for Coal-fired Utility Boilers) (June 5, 2015).

[227] Srivastava, R., Hall, R., Khan, S., Lani, B., & Culligan, K., *Nitrogen Oxides Emission Control Options for Coal-Fired Utility Boilers,* 55 J. Air & Waste Mgmt Assoc. 55, 1367, 1367–88 (2005).

[228] *See* 79 FR 5032, 5133 (discussing reasons for rejecting use of AFUDC).

Part 4—Remaining Useful Life

PacifiCorp assumes a remaining useful life of at least 20 years for Huntington Unit 2 in its BART analysis, and has not indicated any intention to retire, or curtail generation from, Huntington Unit 2. Therefore, this factor does not preclude any of the control options considered. In addition, this factor does not impact our BART calculation of cost effectiveness because annualized costs have been calculated over a 20 year period for each of the control options considered. We propose that this gives adequate consideration to this factor.

Step 5: Evaluate Visibility Impacts

Table 33 presents the highest of the 98th percentile visibility improvements at the affected Class I areas for the three meteorological years modeled, 2001 through 2003. Tables 34 and 35 present the number of days (summed across three years) with impacts greater than the contribution and causation thresholds—0.5 dv and 1.0 dv, respectively.

TABLE 33—HUNTINGTON UNIT 2—VISIBILITY IMPROVEMENTS

| Class I Area | LNB with SOFA (Δdv) | LNB with SOFA and SNCR (Δdv) | LNB with SOFA and SCR (Δdv) |
|---|---|---|---|
| Arches NP | 0.625 | 0.816 | 1.316 |
| Black Canyon of the Gunnison NP | 0.143 | 0.184 | 0.292 |
| Bryce Canyon NP | 0.205 | 0.266 | 0.424 |
| Canyonlands NP | 0.776 | 1.016 | 1.657 |
| Capitol Reef NP | 0.449 | 0.584 | 0.955 |
| Flat Tops WA | 0.168 | 0.217 | 0.343 |
| Grand Canyon NP | 0.183 | 0.236 | 0.371 |
| Mesa Verde NP | 0.199 | 0.258 | 0.414 |
| Zion NP | 0.136 | 0.176 | 0.281 |

TABLE 34—HUNTINGTON UNIT 2—DAYS GREATER THAN 0.5 DECIVIEW

[Three year total]

| Class I Area | Baseline (days) | LNB with SOFA (days) | LNB with SOFA and SNCR (days) | LNB with SOFA and SCR (days) |
|---|---|---|---|---|
| Arches NP | 237 | 223 | 214 | 186 |
| Black Canyon of the Gunnison NP | 45 | 35 | 32 | 26 |
| Bryce Canyon NP | 36 | 26 | 26 | 23 |
| Canyonlands NP | 277 | 254 | 244 | 220 |
| Capitol Reef NP | 131 | 119 | 116 | 104 |
| Flat Tops WA | 64 | 44 | 39 | 31 |
| Grand Canyon NP | 40 | 36 | 35 | 30 |
| Mesa Verde NP | 63 | 48 | 43 | 31 |
| Zion NP | 21 | 17 | 16 | 15 |

TABLE 35—HUNTINGTON UNIT 2—DAYS GREATER THAN 1.0 DECIVIEW

[Three year total]

| Class I Area | Baseline (days) | LNB with SOFA (days) | LNB with SOFA and SNCR (days) | LNB with SOFA and SCR (days) |
|---|---|---|---|---|
| Arches NP | 146 | 122 | 118 | 98 |
| Black Canyon of the Gunnison NP | 16 | 8 | 7 | 4 |
| Bryce Canyon NP | 19 | 15 | 13 | 6 |
| Canyonlands NP | 175 | 153 | 149 | 126 |
| Capitol Reef NP | 91 | 75 | 70 | 59 |
| Flat Tops WA | 17 | 9 | 8 | 4 |
| Grand Canyon NP | 19 | 13 | 13 | 9 |
| Mesa Verde NP | 22 | 13 | 13 | 6 |
| Zion NP | 11 | 8 | 6 | 4 |

Select BART.

A summary of our impacts analysis for Huntington Unit 2 is presented in Table 36.

Appellate Case: 21-9509 Document: 101-2 Date Filed: 06/10/2022 Page: 89


TABLE 36—SUMMARY OF HUNTINGTON UNIT 2 IMPACTS ANALYSIS

| Control option | Annual emission rate (lb/MMBtu) | Emission reduction (tpy) | Total annual costs ($) | Average cost effectiveness ($/ton) | Incremental cost effectiveness ($/ton) | Visibility impacts * | | |
|---|---|---|---|---|---|---|---|---|
| | | | | | | Improvement (dv) | Days >0.5 dv | Days >1.0 dv |
| LNB with SOFA | 0.21 | 2,576 | $0.9M | $365 | .......................... | 0.776 | 254 | 153 |
| LNB with SOFA and SNCR. | 0.17 | 3,264 | 3.5M | 1,075 | $3,730 ............. | 1.016 | 244 | 149 |
| LNB with SOFA and SCR. | 0.05 | 5,023 | 12.9M | 2,563 | $5,326 ............. (compared to LNB with SOFA and SNCR). $4,877 (compared to LNB with SOFA). | 1.657 | 220 | 126 |

* At the most impacted Class I area, Canyonlands National Park.

In determining what to co-propose as BART, we have taken into consideration all five of the statutory factors required by the CAA: The costs of compliance, the energy and non-air quality environmental impacts of compliance, any existing pollution control technology in use at the source, the remaining useful life of the source, and the degree of improvement in visibility which may reasonably be anticipated to result from the use of such technology. Later on we provide a justification for our selection of BART, including an explanation of how each of the CAA factors was used in that selection.

We have considered the energy and non-air quality environmental impacts of compliance and propose to find that they do not appreciably favor one control option over another, or preclude a particular control option from selection. The existing pollution controls have been accounted for in our evaluation of BART, and also would not favor or preclude any of the control options considered. And finally, we have considered the remaining useful life of the source and find that it is sufficiently long (greater than 20 years) so as not to favor or preclude any of the control options. As a result, the remaining factors—the costs of compliance and visibility improvement—are the primary factors that lead us to our proposed BART selection for Huntington Unit 2.

In order to select BART we propose to weigh the costs of compliance against visibility impacts by generally comparing them with BART determinations that have been made elsewhere. Specifically, we propose to compare the average cost-effectiveness, incremental cost-effectiveness, visibility improvement, and incremental visibility improvement for LNB and SOFA with SCR with BART determinations where the EPA and States have based their determination on the same metrics. The most comparable determinations are the same as for Huntington Unit 1: The Laramie River Station, Hayden Station, and Cholla Power Plant determinations.

Based on these comparisons, we think LNB and SOFA with SCR is very cost-effective at $2,563/ton, and provides substantial visibility benefits at several Class I areas. For example, the visibility improvement from that control option is 1.316 at Arches NP and 1.657 dv Canyonlands NP. The incremental cost-effectiveness of SCR, $5,326/ton, is by comparison also reasonable. This comparison also shows that costs are justified in light of the substantial visibility benefits, both total and incremental.

In the case of Huntington, the unit level visibility improvements justify the most stringent level of control, SCR, for each of the two Huntington units. Necessarily, when we consider the source-wide visibility improvements, they will be larger and also justify the most stringent level of control. In addition, the unit level visibility improvements and source-wide visibility improvements at other impacted Class I areas, particularly Arches NP and Capitol Reef NP, support the most stringent level of control.

Accordingly, for Huntington Unit 2, we propose to find that BART for $NO_X$ is LNB and SOFA with SCR, represented by an emission limit of 0.07 lb/MMBtu (30-day rolling average). The proposed BART emission limit of 0.07 lb/MMBtu allows for a sufficient margin of compliance for a 30-day rolling average limit that would apply at all times, including startup, shutdown, and malfunction.[229] We are also proposing monitoring, recordkeeping, and reporting requirements as described in our proposed regulatory text for 40 CFR 52.2336.

Under § 51.308(e)(1)(iv), ''each source subject to BART [is] required to install and operate BART as expeditiously as practicable, but in no event later than 5 years after approval of the implementation plan revision.'' In light of the considerable effort involved to retrofit SCR, we propose that five years is as expeditiously as practicable. Therefore, we propose a compliance deadline of five years from the date our final FIP becomes effective.

4. Federal Monitoring, Recordkeeping, and Reporting

We have explained earlier in section III.C.4 that the CAA and 40 CFR part 51, subpart K require that SIPs, including the regional haze SIP, contain certain elements sufficient to ensure emission limits are practically enforceable. EPA is proposing to disapprove Utah's $NO_X$ BART Alternative along with the associated monitoring, recordkeeping and reporting requirements in SIP sections IX.H.21 and H.22. EPA is proposing regulatory language as part of our FIP that specifies monitoring, recordkeeping, and reporting requirements for all BART sources. For purposes of consistency, EPA is proposing to adopt language that is the same as we have adopted for other states in Region 8.

*E. $PM_{10}$ BART Determinations*

As discussed earlier in section IV.B.2, Utah determined that the $PM_{10}$ BART emission limit for Hunter Units 1 and 2 and Huntington Units 1 and 2 was 0.015 lb/MMBtu based on a three-run test average. Utah noted that because the most stringent technology is in place at

[229] Emission limits such as BART are required to be met on a continuous basis. *See* 70 FR 39104, 39172 (July 6, 2005) (stating that emissions limits including BART are to be met on a ''continuous basis'' in the BART Guidelines, section V); 42 U.S.C. 7602(k) (noting that emission limits are to be on ''a continuous basis'').

Appellate Case: 21-9509 Document: 101-2 Date Filed: 06/10/2022 Page: 90


these units and that the $PM_{10}$ emission limits have been made enforceable in the SIP, no further analysis was required.

EPA has reviewed Utah's $PM_{10}$ BART streamlined five-factor analysis and $PM_{10}$ BART determinations for Hunter Units 1 and 2 and Huntington Units 1 and 2 and proposes to find that these determinations meet the requirements of 40 CFR 51.309(d)(4)(vii). The fabric filter baghouses installed at these BART units are considered the most stringent technology available. The emission limit of 0.015 lb/MMBtu at these units represents the most stringent emission limit for $PM_{10}$ and is within the range of $PM_{10}$ BART limits that EPA has approved in other states.[230] Utah's use of a streamlined approach to the five-factor analysis is reasonable as the BART Guidelines provide that a comprehensive BART analysis can be avoided if a source commits to a BART determination that consists of the most stringent controls available.[231]

Utah's regulatory text provides, ''[e]missions of particulate (PM) shall not exceed 0.015 lb/MMBtu heat input from each boiler based on a 3-run test average.'' [232] It further states that ''[s]tack testing for the emission limitation shall be performed each year on each boiler.'' [233] We note that BART limits must apply at all times.[234] Furthermore, EPA's credible evidence rule requires that a state's plan must not preclude the use of any credible evidence or information, which can include evidence and information other than the test method specified in the plan, that would indicate whether a source was in compliance with applicable requirements.[235]

Consistent with these requirements, we propose to interpret Utah's regulatory text as imposing a $PM_{10}$ limit of 0.015 lb/MMBtu that applies at all times and does not preclude the use, including the exclusive use, of any credible evidence or information, relevant to whether a source is in compliance with the limit.

*F. Consultation With FLMs*

As discussed previously in section IV.G, Utah conducted FLM consultation during late 2014, providing over 60 days prior to the December 1, 2014 public hearing. Subsequently, the National Park Service provided extensive comments in response to a second public comment period in April 2015. Based on these considerations, we propose to find that Utah has met the requirements of 40 CFR 308(i)(2).

**VII. EPA's Proposed Actions**

EPA is proceeding with co-proposals on Utah's June 3, 2015 and October 20, 2015 regional haze SIP revisions. Later on is a summary of our proposed actions. As noted above, EPA intends to finalize only one proposal, although it may differ from what is presented here based on any comments and additional information we receive.

*A. Proposed Approval*

We are proposing to approve the regional haze SIP revisions submitted by the State of Utah on June 3, 2015 and October 20, 2015:

1. We are proposing to approve these aspects of the State's June 4, 2015, which rely on elements from prior approvals [236]:

- $NO_X$ BART Alternative that includes $NO_X$, and $SO_2$, emission reductions from Hunter Units 1 through 3, Huntington 1 and 2, and Carbon Units 1 and 2, and $PM_{10}$ emission reductions from Carbon Units 1 and 2.
- BART determinations and emission limits for $PM_{10}$ at Hunter Units 1 and 2 and Huntington Units 1 and 2.
- Monitoring, recordkeeping and reporting requirements for units subject to the BART Alternative and the $PM_{10}$ emission limits, including conditional approval of the recordkeeping requirements for the $PM_{10}$ emission limits.

2. We are proposing to approve these elements of the State's October 20, 2015 SIP submittal:

- Enforceable commitments to revise, at a minimum, SIP Section XX.D.3.c and State rule R307–150 by March 2018 to clarify emission inventory requirements for tracking compliance with the $SO_2$ milestone and properly accounting for the $SO_2$ emission reductions due to the closure of the Carbon plant.

*B. Proposed Partial Disapproval/Approval and Federal Implementation Plan*

1. We are proposing to approve these elements of the State's SIP submittals, which rely on elements from prior approvals:[237]

- BART determinations and emission limits for $PM_{10}$ at Hunter Units 1 and 2 and Huntington Units 1 and 2.
- Monitoring, recordkeeping, and reporting requirements for units subject to the $PM_{10}$ emission limits, including conditional approval of the recordkeeping requirements for the $PM_{10}$ emission limits.

2. We are proposing to disapprove these aspects of the State's June 4, 2015 SIP:

- $NO_X$ BART Alternative that includes $NO_X$, and $SO_2$, emission reductions from Hunter Units 1 through 3, Huntington 1 and 2, and Carbon Units 1 and 2, and $PM_{10}$ emission reductions from Carbon Units 1 and 2.
- Monitoring, recordkeeping and reporting requirements for units subject to the BART Alternative.
- The enforceable commitments to revise, at a minimum, SIP Section XX.D.3.c and State rule R307–150 by March 2018.

3. We are proposing that if we finalize our co-proposal to disapprove the $NO_X$ BART Alternative, we will promulgate a FIP to address the deficiencies in the Utah regional haze SIPs. The proposed FIP includes the following elements:

- $NO_X$ BART determinations and limits for Hunter Units 1 and 2, Huntington Units 1 and 2.
- Monitoring, recordkeeping, and reporting requirements applicable to Hunter Units 1 and 2, and Huntington Units 1 and 2.

**VIII. Statutory and Executive Order Reviews**

*A. Executive Order 12866: Regulatory Planning and Review and Executive Order 13563: Improving Regulation and Regulatory Review*

This action is not a ''significant regulatory action'' under the terms of Executive Order 12866 [238] and was therefore not submitted to the Office of Management and Budget (OMB) for review. This proposed rule applies to only two facilities containing four BART units. It is therefore not a rule of general applicability.

*B. Paperwork Reduction Act*

This proposed action does not impose an information collection burden under the provisions of the Paperwork Reduction Act (PRA).[239] Because this proposed rule applies to just two facilities, the PRA does not apply.

---

[230] For example, Wyoming, Naughton Unit 3, Jim Bridger Units 1 through 4, Dave Johnston Units 3 and 4, and Wyodak Unit 1. *See* 40 CFR 52.2636; 79 FR 5220, (Jan. 30, 2014).

[231] 40 CFR 51, appendix Y, section IV.D.1.9.

[232] Utah Regional Haze State Implementation Plan: Emission Limits & Operating Practices, Sections IX.H.22.a.i.A–B, IX.H.22.b.i.A–B (2015).

[233] *Id.*

[234] *See* 42 U.S.C. 7602(k); 40 CFR part 51, appendix Y, section V.

[235] 40 CFR 51.212(c).

[236] As necessary for our proposed approval, we propose to fill gaps in the 2015 Utah RH SIP submittals with the following already-approved sections from the 2011 Utah RH SIP: Section XX.B.8, Figures 1 and 2, Affected Class I Areas, pp. 8–9; Section XX.D.6.b, Table 3, BART-Eligible Sources in Utah, p. 21; Section. XX.D.6.c, Sources Subject to BART, pp. 21–23.

[237] *Id.*

[238] 58 FR 51735, 51738 (Oct. 4, 1993).

[239] 44 U.S.C. 3501 *et seq.*

*C. Regulatory Flexibility Act*

The Regulatory Flexibility Act (RFA) generally requires an agency to prepare a regulatory flexibility analysis of any rule subject to notice and comment rulemaking requirements under the Administrative Procedure Act or any other statute unless the agency certifies that the rule will not have a significant economic impact on a substantial number of small entities. Small entities include small businesses, small organizations, and small governmental jurisdictions.

For purposes of assessing the impacts of this proposed rule on small entities, small entity is defined as: (1) A small business as defined by the Small Business Administration's (SBA) regulations at 13 CFR 121.201; (2) a small governmental jurisdiction that is a government of a city, county, town, school district or special district with a population of less than 50,000; and (3) a small organization that is any not-for-profit enterprise which is independently owned and operated and is not dominant in its field.

After considering the economic impacts of this proposed rule on small entities, I certify that this action will not have a significant economic impact on a substantial number of small entities under the RFA. This rule does not impose any requirements or create impacts on small entities as small entities are not subject to the requirements of this rule. Under the full approval approach in this proposed rule, EPA would approve all elements of the State's submittals as meeting the federal regional haze requirements and therefore EPA's action does not impose any requirements.[240] Under the partial approval approach, EPA would disapprove the state's SIP submittal and promulgate a FIP that consists of imposing federal controls to meet the BART requirement for emissions on four specific BART units at two facilities in Utah. The net result of this action is that EPA is proposing direct emission controls on selected units at only two sources, and those sources are large electric generating plants that are not owned by small entities, and therefore the owners are not a small entities under the RFA.

*D. Unfunded Mandates Reform Act (UMRA)*

Title II of the Unfunded Mandates Reform Act of 1995 (UMRA), Public Law 104–4, establishes requirements for federal agencies to assess the effects of their regulatory actions on State, local, and Tribal governments and the private sector. Under section 202 of UMRA, EPA generally must prepare a written statement, including a cost-benefit analysis, for final rules with ''Federal mandates'' that may result in expenditures to State, local, and Tribal governments, in the aggregate, or to the private sector, of $100 million or more (adjusted for inflation) in any one year. Before promulgating an EPA rule for which a written statement is needed, section 205 of UMRA generally requires EPA to identify and consider a reasonable number of regulatory alternatives and adopt the least costly, most cost-effective, or least burdensome alternative that achieves the objectives of the rule. The provisions of section 205 of UMRA do not apply when they are inconsistent with applicable law. Moreover, section 205 of UMRA allows EPA to adopt an alternative other than the least costly, most cost-effective, or least burdensome alternative if the Administrator publishes with the final rule an explanation why that alternative was not adopted. Before EPA establishes any regulatory requirements that may significantly or uniquely affect small governments, including Tribal governments, it must have developed under section 203 of UMRA a small government agency plan. The plan must provide for notifying potentially affected small governments, enabling officials of affected small governments to have meaningful and timely input in the development of EPA regulatory actions with significant federal intergovernmental mandates, and informing, educating, and advising small governments on compliance with the regulatory requirements.

Under Title II of UMRA, EPA has determined that this proposed rule does not contain a federal mandate that may result in expenditures that exceed the inflation-adjusted UMRA threshold of $100 million [241] by State, local, or Tribal governments or the private sector in any one year. The private sector expenditures that would result from the approach to promulgate a FIP would include BART controls for all four units at the Hunter and Huntington plants would be $51.5 million [242] per year. Additionally, we do not foresee significant costs (if any) for state and local governments. Thus, because the annual expenditures associated with the approach to promulgate a FIP are less than the threshold of $100 million in any one year, this proposed rule is not subject to the requirements of sections 202 or 205 of UMRA. This proposed rule is also not subject to the requirements of section 203 of UMRA because it contains no regulatory requirements that might significantly or uniquely affect small governments.

*E. Executive Order 13132: Federalism*

Executive Order 13132, *Federalism,*[243] revokes and replaces Executive Orders 12612 (Federalism) and 12875 (Enhancing the Intergovernmental Partnership). Executive Order 13132 requires EPA to develop an accountable process to ensure ''meaningful and timely input by State and local officials in the development of regulatory policies that have federalism implications.'' [244] ''Policies that have federalism implications'' is defined in the Executive Order to include regulations that have ''substantial direct effects on the States, on the relationship between the national government and the States, or on the distribution of power and responsibilities among the various levels of government.'' [245] Under Executive Order 13132, EPA may not issue a regulation ''that has federalism implications, that imposes substantial direct compliance costs, . . . and that is not required by statute, unless [the federal government provides the] funds necessary to pay the direct [compliance] costs incurred by the State and local governments,'' or EPA consults with state and local officials early in the process of developing the final regulation.[246] EPA also may not issue a regulation that has federalism implications and that preempts state law unless the Agency consults with state and local officials early in the process of developing the final regulation.

This action does not have federalism implications. Neither of the two approaches presented in this proposed rule will have substantial direct effects on the states, on the relationship between the national government and the states, or on the distribution of power and responsibilities among the various levels of government, as specified in Executive Order 13132. Under the full approval approach, this proposed action would merely approve the state SIP as federally enforceable. Under the partial approval approach, this proposed action would merely address the State not fully meeting its

[240] *See, e.g., Mid-Tex Elec. Coop., Inc.* v. *FERC,* 773 F.2d 327 (D.C. Cir. 1985) (hereinafter *Mid-Tex*).

[241] Adjusted to 2014 dollars, the UMRA threshold becomes $152 million.

[242] Andover Technology Partners, *Cost of $NO_X$ BART Controls on Utah EGUs,* to EC/R, Inc. (Oct. 22, 2015).Andover Technology Partners is a subcontractor to EC/R Incorporated.

[243] 64 FR 43255, 43255–43257 (Aug. 10, 1999).

[244] 64 FR 43255, 43257.

[245] *Id.*

[246] *Id.*

obligation under the CAA to adequately address the visibility requirements of Part C of Title I of the CAA in its SIP and to prohibit emissions from interfering with other states measures to protect visibility. Thus, Executive Order 13132 does not apply to this action.

*F. Executive Order 13175: Consultation and Coordination With Indian Tribal Governments*

Executive Order 13175, entitled ''Consultation and Coordination with Indian Tribal Governments'', requires EPA to develop an accountable process to ensure ''meaningful and timely input by tribal officials in the development of regulatory policies that have tribal implications.''[247] This proposed rule does not have tribal implications, as specified in Executive Order 13175. It will not have substantial direct effects on tribal governments. Thus, Executive Order 13175 does not apply to this rule.

*G. Executive Order 13045: Protection of Children From Environmental Health Risks and Safety Risks*

This action is not subject to Executive Order 13045 (62 FR 19885, April 23, 1997) because the environmental health or safety risks addressed by this action do not present a disproportionate risk to children. Note, however, that emissions reductions achieved as a result of this rule, under either proposal, will have a positive benefit on children's health, as they are especially vulnerable to impacts from emissions.

*H. Executive Order 13211: Actions Concerning Regulations That Significantly Affect Energy Supply, Distribution, or Use*

This action is not subject to Executive Order 13211 (66 FR 28355 (May 22, 2001)), because it is not a significant regulatory action under Executive Order 12866.

*I. National Technology Transfer and Advancement Act*

Section 12 of the National Technology Transfer and Advancement Act (NTTAA) of 1995 requires Federal agencies to evaluate existing technical standards when developing a new regulation. Section 12(d) of NTTAA, Public Law 104–113, 12(d) (15 U.S.C. 272 note) directs EPA to consider and use ''voluntary consensus standards'' in its regulatory activities unless to do so would be inconsistent with applicable law or otherwise impractical. Voluntary consensus standards are technical standards (*e.g.,* materials specifications, test methods, sampling procedures, and business practices) that are developed or adopted by voluntary consensus standards bodies. NTTAA directs EPA to provide Congress, through OMB, explanations when the Agency decides not to use available and applicable voluntary consensus standards.

This proposed rulemaking does not involve technical standards. Therefore, EPA is not considering the use of any voluntary consensus standards.

*J. Executive Order 12898: Federal Actions To Address Environmental Justice in Minority Populations and Low-Income Populations*

Executive Order 12898, establishes federal executive policy on environmental justice.[248] Its main provision directs federal agencies, to the greatest extent practicable and permitted by law, to make environmental justice part of their mission by identifying and addressing, as appropriate, disproportionately high and adverse human health or environmental effects of their programs, policies, and activities on minority populations and low-income populations in the United States.

I certify that the approaches under this proposed rule will not have potential disproportionately high and adverse human health or environmental effects on minority, low-income or indigenous/tribal populations. The results of this evaluation are available in the docket. Both approaches would result in overall emission reductions for $NO_X$, $SO_2$ and $PM_{10}$ and therefore an increase in the level of environmental protection for all affected populations. EPA, however, will consider any input received during the public comment period regarding environmental justice considerations.

**Authority:** 42 U.S.C. 7401 *et seq.*

**List of Subjects in 40 CFR Part 52**

Environmental protection, Air pollution control, Incorporation by reference, Intergovernmental relations, Nitrogen dioxide, Particulate matter, Sulfur oxides.

Dated: December 16, 2015.

**Shaun L. McGrath,**

*Regional Administrator, Region 8.*

For the reasons discussed in the preamble, the Environmental Protection Agency proposes to amend 40 CFR part 52 as follows:

**PART 52—APPROVAL AND PROMULGATION OF IMPLEMENTATION PLANS**

■ 1. The authority citation for part 52 continues to read as follows:

**Authority:** 42 U.S.C. 7401 *et seq.*

**Subpart TT—Utah**

■ 2. Add § 52.2336 to read as follows:

**§ 52.2336 Federal implementation plan for regional haze.**

(a) *Applicability.* (1) This section applies to each owner and operator of the following emissions units in the State of Utah:

(i) PacifiCorp Hunter Plant Units 1 and 2; and

(ii) PacifiCorp Huntington Plant Units 1 and 2.

(b) *Definitions.* Terms not defined here shall have the meaning given them in the Clean Air Act or EPA's regulations implementing the Clean Air Act. For purposes of this section:

(1) *BART* means Best Available Retrofit Technology.

(2) *BART unit* means any unit subject to a Regional Haze emission limit in table 1 of this section.

(3) *Continuous emission monitoring system or CEMS* means the equipment required by this section to sample, analyze, measure, and provide, by means of readings recorded at least once every 15 minutes (using an automated data acquisition and handling system (DAHS)), a permanent record of $NO_X$ emissions, diluent, or stack gas volumetric flow rate.

(4) *FIP* means Federal Implementation Plan.

(5) The term *lb/MMBtu* means pounds per million British thermal units of heat input to the fuel-burning unit.

(6) $NO_X$ means nitrogen oxides.

(7) *Operating day* means a 24-hour period between 12 midnight and the following midnight during which any fuel is combusted at any time in the BART unit. It is not necessary for fuel to be combusted for the entire 24-hour period.

(8) The *owner/operator* means any person who owns or who operates, controls, or supervises a unit identified in paragraph (a) of this section.

(9) *Unit* means any of the units identified in paragraph (a) of this section.

(c) *Emissions limitations.* (1) The owners/operators of emissions units subject to this section shall not emit, or cause to be emitted, $NO_X$ in excess of the following limitations:

[247] 65 FR 67249, 67250 (Nov. 9, 2000).

[248] 59 FR 7629, 7629 (Feb. 16, 1994).

TABLE 1—TO § 52.2336—EMISSION LIMITS FOR BART UNITS

| Source name/BART unit | $NO_X$ emission limit—lb/MMBtu (30-day rolling average) |
|---|---|
| PacifiCorp Hunter Plant/Unit 1 [1] | 0.07 |
| PacifiCorp Hunter Plant/Unit 2 [1] | 0.07 |
| PacifiCorp Huntington Plant/Unit 1 [1] | 0.07 |
| PacifiCorp Huntington Plant/Unit 2 [1] | 0.07 |

[1] The owners and operators of PacifiCorp Hunter Units 1 and 2 and Huntington Units 1 and 2, shall comply with the $NO_X$ emission limit for BART of 0.07 lb/MMBtu and other requirements of this section by [date five years from the effective date of the final rule].

(2) These emission limitations shall apply at all times, including startups, shutdowns, emergencies, and malfunctions.

(d) *Compliance date.* (1) The owners and operators of PacifiCorp Hunter Units 1 and 2 shall comply with the $NO_X$ emission limit of 0.07 lb/MMBtu and other requirements of this section by [date five years from the effective date of the final rule]. The owners and operators of PacifiCorp Huntington Units 1 and 2 shall comply with the $NO_X$ emission limit of 0.07 lb/MMBtu and other requirements of this section by [date five years from the effective date of the final rule].

(e) *Compliance determinations for $NO_X$.* (1) For all BART units:

(i) *CEMS.* At all times after the earliest compliance date specified in paragraph (d) of this section, the owner/operator of each unit shall maintain, calibrate, and operate a CEMS, in full compliance with the requirements found at 40 CFR part 75, to accurately measure $NO_X$, diluent, and stack gas volumetric flow rate from each unit. The CEMS shall be used to determine compliance with the emission limitations in paragraph (c) of this section for each unit.

(ii) *Method.* (A) For any hour in which fuel is combusted in a unit, the owner/operator of each unit shall calculate the hourly average $NO_X$ emission rate in lb/MMBtu at the CEMS in accordance with the requirements of 40 CFR part 75. At the end of each operating day, the owner/operator shall calculate and record a new 30-day rolling average emission rate in lb/MMBtu from the arithmetic average of all valid hourly emission rates from the CEMS for the current operating day and the previous 29 successive operating days.

(B) An hourly average $NO_X$ emission rate in lb/MMBtu is valid only if the minimum number of data points, as specified in 40 CFR part 75, is acquired by both the pollutant concentration monitor ($NO_X$) and the diluent monitor ($O_2$ or $CO_2$).

(C) Data reported to meet the requirements of this section shall not include data substituted using the missing data substitution procedures of subpart D of 40 CFR part 75, nor shall the data have been bias adjusted according to the procedures of 40 CFR part 75.

(f) *Recordkeeping.* The owner/operator shall maintain the following records for at least five years:

(1) All CEMS data, including the date, place, and time of sampling or measurement; parameters sampled or measured; and results.

(2) Records of quality assurance and quality control activities for emissions measuring systems including, but not limited to, any records required by 40 CFR part 75.

(3) Records of all major maintenance activities conducted on emission units, air pollution control equipment, and CEMS.

(4) Any other CEMS records required by 40 CFR part 75.

(g) *Reporting.* All reports under this section shall be submitted to the Director, Office of Enforcement, Compliance and Environmental Justice, U.S. Environmental Protection Agency, Region 8, Mail Code 8ENF–AT, 1595 Wynkoop Street, Denver, Colorado 80202–1129.

(1) The owner/operator of each unit shall submit quarterly excess emissions reports for $NO_X$ BART units no later than the 30th day following the end of each calendar quarter. Excess emissions means emissions that exceed the emissions limits specified in paragraph (c) of this section. The reports shall include the magnitude, date(s), and duration of each period of excess emissions, specific identification of each period of excess emissions that occurs during startups, shutdowns, and malfunctions of the unit, the nature and cause of any malfunction (if known), and the corrective action taken or preventative measures adopted.

(2) The owner/operator of each unit shall submit quarterly CEMS performance reports, to include dates and duration of each period during which the CEMS was inoperative (except for zero and span adjustments and calibration checks), reason(s) why the CEMS was inoperative and steps taken to prevent recurrence, and any CEMS repairs or adjustments. The owner/operator of each unit shall also submit results of any CEMS performance tests required by 40 CFR part 75.

(3) When no excess emissions have occurred or the CEMS has not been inoperative, repaired, or adjusted during the reporting period, such information shall be stated in the quarterly reports required by paragraphs (g)(1) and (2) of this section.

(h) *Notifications.* (1) The owner/operator shall promptly submit notification of commencement of construction of any equipment which is being constructed to comply with the $NO_X$ emission limits in paragraph (c) of this section.

(2) The owner/operator shall promptly submit semi-annual progress reports on construction of any such equipment.

(3) The owner/operator shall promptly submit notification of initial startup of any such equipment.

(i) *Equipment operation.* At all times, the owner/operator shall maintain each unit, including associated air pollution control equipment, in a manner consistent with good air pollution control practices for minimizing emissions.

(j) *Credible evidence.* Nothing in this section shall preclude the use, including the exclusive use, of any credible evidence or information, relevant to whether a source would have been in compliance with requirements of this section if the appropriate performance or compliance test procedures or method had been performed.

[FR Doc. 2015–33108 Filed 1–13–16; 8:45 am]
BILLING CODE 6560–50–P

United States Department of the Interior

NATIONAL PARK SERVICE
INTERMOUNTAIN REGION
12795 West Alameda Parkway
P.O. Box 25287
Denver, Colorado 80225-0287

IN REPLY REFER TO:
1A2 (SEUG-RSS)

APR 02 2015

Shaun McGrath
Regional Administrator
U.S. Environmental Protection Agency, Region 8
1595 Wynkoop Street
Denver, CO 80202-1129

Dear Mr. McGrath,

The National Park Service (NPS) is writing to urge the Environmental Protection Agency (EPA) to take strong action to restore air quality and remedy existing visibility impairment in the five Class I national parks in Utah by requiring significant reductions in emissions of NOx and particulate matter (PM) from the Hunter and Huntington coal-fired electrical power plants. EPA now is faced with a critical opportunity to do so as it considers whether to approve proposed revisions to the State of Utah's (State's) Regional Haze (RH) State Implementation Plan (SIP). The State has determined through modeling analyses that Hunter Units 1 and 2 and Huntington Units 1 and 2 emit air pollutants that can reasonably be anticipated to contribute to visibility impairment in several mandatory Class I federal areas in the Colorado Plateau region, including Utah national parks[1]. As a result of this determination, these units of the Hunter and Huntington plants are subject to EPA regulatory requirements for emission reductions through the installation of the "best available retrofit technology" (BART). Yet in SIP revisions dated 17 Feb 2015[2], and apparently following consultation with EPA, the State has proposed to claim emission reductions due to the planned closure of the Carbon power plant as an acceptable alternative to BART installation and emission reductions from the Hunter and Huntington plants. The State clearly values the importance of the five national parks in Utah and actively promotes national park tourism[3], yet at the same time it appears unprepared to fulfill its legal requirements under the Clean Air Act and associated regulations to protect and enhance the very scenic views that attract millions of visitors to the parks every year.

The purpose of this letter is not to address the technical details of the Clean Air Act and its implementing regulations, emission-control technologies, or dispersion modeling. Instead, our intent is to emphasize the fundamental importance of clean air to the purposes and visitor enjoyment of the five national parks in Utah. On an annual basis, many millions of people come from around the world to visit Arches National Park, Bryce Canyon National Park, Canyonlands National Park, Capitol Reef National Park, and Zion National Park, and they do so specifically to experience iconic scenic views that are among the most spectacular that our country has to offer. Although truly spectacular, the scenic views that characterize

---

[1] Utah SIP_XX.D.6_IX.H.21-22_memo_SIPs_Report, dated 17 Feb 2015, pp. 21-23.
[2] Acquired from http://www.airquality.utah.gov/Public-Interest/Public-Commen-Hearings/Pubrule.htm. 3/13/2015.
[3] See http://www.visitutah.com/places-to-go/most-visited-parks/the-mighty-5

these parks are degraded on many days by industrial haze that impairs visibility and dulls sensational colors and contrasts. Under the worst of conditions, anthropogenic haze can render the inspirational landscapes of our national parks and their encompassing viewsheds to be colorless and bland.

For almost 100 years, the United States Congress and our Presidents have repeatedly established protections for scenic values in federal law. The essential significance of scenic values (and thus clean air) to the national park idea was articulated clearly in the NPS Organic Act of 1916, which requires NPS "...to *conserve the scenery* and the natural and historic objects ...*unimpaired* for the enjoyment of future generations" [emphasis added]. This language is echoed in the Wilderness Act of 1964, which indicates that wilderness areas are to be administered "...in such manner as will leave them *unimpaired*..." and that these "...areas shall be devoted to the public purposes of recreational, *scenic*, scientific, educational, conservation, and historical use" [emphasis added]. These wilderness values and purposes pertain to all five national parks in Utah, as the vast majority of each park is managed as wilderness. Finally, one of the express purposes of the prevention of significant deterioration (PSD) title of the Clean Air Act itself is "to preserve, protect, and *enhance the air quality in national parks*, national wilderness areas, national monuments, national seashores, and other areas of special national or regional natural, recreational, *scenic*, or historic value" [emphasis added]. The PSD title also establishes that the federal land manager with direct responsibility for management of a Class I area "...shall have an affirmative responsibility to protect the air quality related values (including visibility) of any such lands...." All five of the national parks we write about are considered mandatory Class I areas under the Clean Air Act. Together, these several laws require that NPS, EPA, and the State work together to determine and implement those actions that are necessary for reducing the regional haze that impairs visibility and thus the quality of visitors' experiences in these remarkable Class I areas.

In addition to the NPS Organic Act, the Wilderness Act, and the Clean Air Act, the fundamental importance of scenic values (and thus clean air) to our national parks in many cases is articulated specifically in enabling legislation or Presidential proclamations that established individual park units and defined their particular purposes. When Arches National Monument was first established in 1929, President Herbert Hoover's proclamation identified the "educational and scenic value" of extraordinary geologic features as the basis for the area's reservation as a national monument. Current management documents reaffirm the great importance of scenic values today, noting that one of the important purposes of Arches National Park is to provide visitors with opportunities to experience park resources in a majestic natural setting, with striking geologic features in the foreground and the towering La Sal Mountains in the distance creating expansive views of contrasting colors and textures[4]. Clear, clean air is essential to this purpose and to the national significance of the park. In 2014, almost 1.3 million people visited the park, and the vast majority of them did so specifically to view iconic geologic features such as Delicate Arch and Balanced Rock – features that are most striking and impressive when seen against a distant, contrasting background. Unfortunately, long-term monitoring at nearby Canyonlands National Park indicates that visibility (thus the clarity of distant scenic views experienced by park visitors) at Arches is impaired by anthropogenic haze approximately 83 percent of the time relative to the annual average level of natural haze[5].

---

[4] See http://www.nps.gov/arch/learn/management/upload/ARCH_FoundationOverview_Final_2013.pdf

[5] This and corresponding values for other parks were estimated using the 2009-2013, 24-hour IMPROVE measurements following the calculation procedures outlined in the Regional Haze Rule guidance documents and assuming that an IMPROVE measurement of 1 deciview greater than average natural levels represents visibility impairment. Because of the proximity of Arches and Canyonlands National Parks to one another, monitoring data for regionally dispersed air pollutants at Canyonlands conventionally are assumed to represent conditions at Arches as well.



View of Balanced Rock, Arches National Park, in a majestic natural setting framed by the distant La Sal Mountains. This view can be seen by anyone who travels the main road through the park. (NPS photo, "Moonrise over Balanced Rock, 5/13/14.")

When Bryce Canyon National Monument was established in 1923, President Warren Harding's proclamation described the area's "unusual scenic beauty, scientific interest and importance" as the basis for the reservation. Today, park management documents indicate that the specific purpose of Bryce Canyon National Park is to protect and conserve a landscape of unusual scenic beauty for the benefit and enjoyment of the people[6]. Significant aspects of the park are its outstanding distant views and panoramic vistas of cliffs, canyons, and forested landscapes, as well as its nearly pristine night sky. Clear, clean air is essential to this purpose and to the national significance of the park. Many of the 1.5 million people who visited the park in 2014 did so specifically to enjoy remarkable scenic views and unparalleled nighttime displays of sparkling, starry skies. But long-term monitoring conducted at Bryce Canyon indicates that visibility and the clarity of distant scenic views are impaired by anthropogenic haze approximately 70 percent of the time relative to the annual average level of natural haze.



View from Yavimpa Point at the end of the scenic drive, Bryce Canyon National Park. (NPS photo.)

[6] See http://www.nps.gov/brca/learn/management/upload/BRCA_FD_SP.pdf





Views from Bryce Canyon National Park on a clear day (left) and on a hazy day (right). Under clean-air conditions, Navajo Mountain and Fiftymile Mountain can be seen in the distance, and the contrasting forms and colors of the White Cliffs in Grand Staircase Escalante National Monument can be seen clearly in the middle ground. (NPS photos.)

Canyonlands National Park was established through an act of Congress that was signed into law by President Lyndon Johnson in 1964. The enabling legislation clearly states that the purpose of the park is "...to preserve an area in the State of Utah possessing superlative scenic, scientific, and archeologic features for the inspiration, benefit, and use of the public...." The park is significant for its expansive natural setting, and for providing visitors with incomparable opportunities to view superlative scenery from a diversity of perspectives[7]. Clear, clean air is essential to the park's purpose, for maintaining its national significance, and for ensuring the quality of grand scenic vistas composed of striking geologic landscapes set against a background of the distant La Sal, Abajo, Henry, and Navajo mountains. In 2014, over 540,000 people visited the park. Of these, about 340,000 travelled to the park's Island in the Sky District to enjoy the tremendous variety of views that can be seen from overlooks such as Grand View Point and Green River Overlook. But monitoring conducted at Island in the Sky indicates that visibility and the clarity of distant scenic views seen by visitors at park overlooks are impaired by anthropogenic haze approximately 83 percent of the time relative to the annual average level of natural haze.



View of Shafer Canyon with the distant La Sal Mountains in the background, Island in the Sky District, Canyonlands National Park. (NPS photo.)

[7] See http://www.nps.gov/cany/learn/management/upload/CANY_Overview_Final_2013.pdf



Views from the top of the Shafer Trail at the Island in the Sky District of Canyonlands National Park on a clear day (left) and on a hazy day (right). Under hazy conditions, the distant horizon disappears and the contrasting forms and colors of Shafer Canyon and its rim are diminished in the middle ground. (NPS photos.)

Capitol Reef National Monument was first established by Presidential proclamation in 1937 to reserve in the public interest "...narrow canyons displaying evidence of ancient sand dune deposits of unusual scientific value, and ...various other objects of geological and scientific interest." The Monument later was expanded to encompass additional geologic features of significance, including the scenic Waterpocket Fold – recognized as the largest exposed monocline in North America. In addition to their scientific value, the remarkable geologic features in Capitol Reef National Park also are widely recognized for their great scenic value. Among the most significant aspects of the park are its striking scenic views, brilliant night skies, wilderness opportunities, and expansive vistas extending to far horizons.[8] Clear, clean air is essential to each of these. Over 785,000 people visited the park in 2014. Visitors to the park's scenic overlooks are truly astonished to clearly see the La Sal or Abajo mountains over 100 miles distant. To be able to see such a distance with clarity is an exceedingly rare experience for most visitors, and it can be an intensely emotional experience to realize how much the boundaries of their world have expanded. Unfortunately, monitoring data indicate that visibility and the clarity of distant scenic views are impaired by anthropogenic haze approximately 79 percent of the time relative to the annual average level of natural haze.

[8] See http://www.nps.gov/care/parkmgmt/upload/caregmp.pdf



Views of the Waterpocket Fold in Capitol Reef National Park as seen from Halls Overlook on a clear day (top) and a hazy day (bottom).

Scenic values also are fundamental to the origin and purpose of Zion National Park. Presidential proclamations that initially established Zion National Monument in 1909 and 1918 specifically identified the superlative nature of "geologic features … and brilliantly colored strata of unique composition…" and a "labyrinth of remarkable canyons with highly ornate and beautifully colored walls, in which are plainly recorded the geologic events of past ages." Legislation establishing the national park in 1919 goes on to state that these lands are "dedicated as such for the benefit and enjoyment of the people." Protection of scenic resources of the park were given further emphasis with the Wild and Scenic River designation of the Virgin River and tributaries within the park in 2009. Clear, clean air and the visibility it provides are fundamental to the purpose of the park, and to the enjoyment and appreciation of the park by more than three million people that visit annually[9]. Visitors to sites such as Lava Point and the Kolob Canyons Viewpoint are rewarded on clear days with distant views of prominent landforms including Mt. Trumbull 65-75 miles to the south near Grand Canyon, as well as the brilliant pink cliffs capping the Markagunt Plateau 20-30 miles north. Clear, clean air also enables enjoyment of the park from the surrounding region. The distinctive edifice of West Temple in Zion is familiar to all of the residents of Washington

[9] See http://www.nps.gov/zion/learn/management/upload/ZION_Foundation_Document_SP-2.pdf

County because it is widely visible 20-30 miles distant, as well as from scenic viewpoints along Highway 14 in Iron County 26 miles away. But like other Class I national parks in Utah, monitoring in Zion indicates that visibility and the clarity of distant scenic views are impaired by anthropogenic haze approximately 80 percent of the time relative to the annual average level of natural haze.



View of Zion Canyon from Observation Point, Zion National Park. Visibility, the clarity of distant landforms, and sharply contrasting colors of canyon walls are impaired by moderately hazy conditions. (NPS photo.)

These five spectacular national parks were established to protect and preserve magnificent scenic views for enjoyment by current and future generations. Clean air is essential for this purpose and the protection and enhancement of air quality is mandated by law. Actions are required to reduce emissions of air pollutants that contribute to anthropogenic regional haze that impairs visibility at these Class I parks most of the year. We ask that EPA carefully consider these facts, as well as their implications for millions of park visitors, as the agency reviews and determines whether to approve the State's proposed SIP amendments.

If you have any questions, please contact Susan Johnson from the NPS Air Resources Division at 303-987-6694.

Sincerely,

Tammy Whittington
Associate Regional Director
Resource Stewardship and Science

cc: Kate Cannon, Superintendent, Arches and Canyonlands National Parks
Jack Burns, Interim Superintendent, Bryce Canyon National Park
Leah McGinnis, Superintendent, Capitol Reef National Park
Jeff Bradybaugh, Superintendent, Zion National Park
Jim Ireland, NPS Utah State Coordinator
Carol McCoy, Chief, NPS Air Resources Division
Susan Johnson, Policy Branch Chief, NPS Air Resources Division
Carl Daly, Air Program Manager, EPA Region 8

# United States Department of the Interior

NATIONAL PARK SERVICE
Air Resources Division
P.O. Box 25287
Denver, CO 80225-0287

TRANSMITTED VIA ELECTRONIC MAIL - NO HARDCOPY TO FOLLOW

N3615 (2350)

March 14, 2016

Carl Daly
Air Program Director
Environmental Protection Agency (EPA), Region 8
1595 Wynkoop Street
Denver, Colorado 80202-1129

Docket ID No. EPA-R08-OAR-2015-0463

To Mr. Daly and the Docket:

Thank you for the opportunity to review and comment on EPA's proposal to either approve or to partially disapprove the Utah Division of Air Quality (UDAQ)'s proposed revisions to the Utah Regional Haze State Implementation Plan (SIP) for Best Available Retrofit Technology (BART) for PacifiCorp's Hunter Units 1 and 2 and Huntington Units 1 and 2 Power Plants. For reasons set forth below, we recommend that EPA adopt its proposal to partially disapprove UDAQ's proposed Regional Haze SIP and promulgate a Federal Implementation Plan requiring the installation of Selective Catalytic Reduction (SCR) controls to reduce nitrogen oxide ($NO_x$) emissions for the four units subject to BART at the two power plants.

The National Park Service (NPS) and UDAQ have shared interests in improving visibility in our national parks located in the State of Utah. In the Utah Regional Haze SIP,UDAQ acknowledged that emissions from the Hunter and Huntington Power Plants cause or contribute to visibility impairment at Arches, Bryce Canyon, Canyonlands, Capitol Reef, and Zion National Parks in Utah; Grand Canyon National Park in Arizona; and Mesa Verde and the Black Canyon of the Gunnison National Parks in Colorado. In addition to these eight Class I units of the National Park System, UDAQ also acknowledged that emissions from these facilities impact visibility at the Flat Tops Wilderness Area, a Class I area managed by the U.S. Forest Service.

In a letter dated April 2, 2015, the Associate Regional Director of the NPS Intermountain Region underscored the need to take strong action to restore air quality and remedy existing visibility impairment in the noted five Class I national parks in Utah, and emphasized the fundamental importance of clear visibility to the purposes for which Congress established these national

parks.[1] In 2014, national parks in Utah recorded over ten million visits, and visitors added $730 million to Utah's economy and created over 12,000 jobs.[2] In visitor surveys across the NPS, 90 percent of visitors surveyed consider clean air and scenic views very to extremely important resources to protect.[3]

UDAQ has proposed as an Alternative to BART for $NO_x$ emissions to take credit for existing emissions reductions due to $NO_x$ controls on the non-BART Unit 3 at Hunter Power Plant, and due to closure of the Carbon Power Plant in April 2015. UDAQ proposes that these existing emissions reductions have provided greater visibility improvement at Class I areas in Utah than installing SCR controls for the four subject-to-BART units at Hunter and Huntington Power Plants. For the reasons summarized below and detailed in the enclosed technical comments, we believe that UDAQ has not satisfied regulatory requirements or complied with regulatory intent. If EPA approved this alternative, it would be accepting a lower standard for BART in Utah than already approved in Arizona, Colorado, and Wyoming.

**Best Available Retrofit Technology is Selective Catalytic Reduction.**
We agree with EPA and UDAQ that BART for $NO_x$ emissions at Hunter Units 1 and 2 and Huntington Units 1 and 2 is SCR. We agree with EPA's demonstration that costs for SCR at these units are comparable to SCR costs for BART determinations in Arizona, Colorado, and Wyoming. Requiring SCRs for BART would be consistent with other EPA decisions in Regions 8 and 9.

**The BART Alternative does not provide greater reasonable progress than BART controls.**
We disagree with UDAQ that the proposed BART Alternative is better than BART and urge the EPA to partially disapprove the proposed Utah SIP revisions and implement a Federal Implementation Plan to require SCR on all four BART units.

First, total emissions reductions cannot be used to justify that the BART Alternative is better than BART if one pollutant increases while another decreases.[4] Sulfur dioxide ($SO_2$) emissions would be lower under UDAQ's BART Alternative than under BART, however $NO_x$ emissions would increase in the BART Alternative.

Second, UDAQ has not met the fundamental requirement of Section 51.308(e)(2)(i)(E) for a BART Alternative to provide:

> "[A] ***clear weight of evidence*** that the trading program or other alternative measure achieves ***greater reasonable progress*** than would be achieved through the installation and operation of ***BART at the covered sources***. [emphasis added]

---

[1]Letter from Tammy Whittington, Associate Regional Director, NPS Intermountain Region, to Amanda Smith, Executive Director, Utah Department of Environmental Quality (4-2-2015).
[2] 2014 National Park Visitor Spending Effects. Economic Contributions to Local Communities, States, and the Nation. Natural Resource Report NPS/NRSS/EQD/NRR-2015/947. April 2015. http://www.nature.nps.gov/publications/nrpm/
[3] Kulesza, C. , Y. Le, and S.J. Hollenhorst. 2013. National Park Service visitor perceptions & values of clean air, scenic views, & dark night skies; 1988-2011. Natural Resource Report NPS/NRSS/ARD/NRR-2013/632. National Park Service, Ft. Collins, Colorado.
[4] 81 FR 2028 (January 14, 2016)

UDAQ applied the CALPUFF dispersion model to determine the visibility benefits of BART controls and the proposed BART Alternative and presented several metrics to evaluate the model results. We also modeled UDAQ's BART scenario and BART Alternative to evaluate UDAQ's conclusions. Our technical analyses are enclosed with these comments. The primary metric recommended by EPA in Appendix Y of the BART Guidelines[5] is the impact on the 98th percentile day (8th highest day) in each of three modeling years. For both UDAQ and the NPS modeling, the 98th percentile metric favors the BART scenario. While EPA has sometimes used the number of days with impacts greater than 0.5 dv, this metric is imprecise as it does not describe the magnitude of the impact. The remaining measures cited by UDAQ have never previously been approved by EPA in a weight of evidence analysis and should not be approved in this application. UDAQ has not provided a clear weight of evidence supporting the BART Alternative.

Third, at Canyonlands National Park peak ammonium nitrate concentrations on winter days can be much higher than ammonium sulfate and frequently cause those days to be among the 20% haziest days. Therefore we do not agree that $SO_2$ reductions at the Carbon Power Plant are preferred to $NO_x$ reductions at the nearer power plants. Further, IMPROVE monitoring data alone are not sufficient to discern the visibility benefits at Canyonlands National Park of previously installed NOx controls at the Hunter and Huntington Power Plants. The monitoring data represents a synthesis of contributions from local, regional, national, and international sources. As discussed in the enclosed technical comments, we analyzed meteorological back trajectories on winter days in January 2008- February 2015 and found that on roughly 50% of the highest nitrate days, there was transport from the vicinity of Hunter and Huntington Power Plants to Canyonlands National Park. While the trajectory analyses do not define the relative contributions of emissions from these specific sources compared to all other contributing sources in the region, these analyses provide strong evidence that emissions from these power plants affect the park.

Fourth, we do not agree with UDAQ that available ammonia is limiting ammonium nitrate formation. Ammonium nitrate particles are formed in the atmosphere through the reaction of ammonia and nitric acid, which is a byproduct of the oxidation of NOx emissions. If there is insufficient "free" ammonia in the atmosphere to react with available nitric acid, ammonium nitrate particles will not form; this condition is referred to as being ammonia limited. Ammonia measurements at Canyonlands indicate that there is sufficient free ammonia available during the winter months, when high ammonium nitrate concentrations are measured, to form additional ammonium nitrate particles if nitric acid resulting from NOx emissions is present in the atmosphere. Therefore, the region is not ammonia limited.

We urge the EPA to determine that the BART Alternative has not been demonstrated to achieve greater reasonable progress than the BART controls for Hunter Units 1 and 2 and Huntington Units 1 and 2.

**We question crediting $SO_2$ emissions reductions toward the $NO_x$ BART Alternative.**
This is the first time a state has proposed a BART Alternative that not only would trade $SO_2$ for $NO_x$ emissions reductions, but also would trade $SO_2$ emissions at a geographically separate facility that is not subject to BART for $NO_x$ reductions at the BART units. Under 40 CFR

[5] Appendix Y to 40 CFR Part 51 - Guidelines for BART Determinations under the Regional Haze Rule.

51.309, Utah's 2003 Regional Haze SIP implements a regional $SO_2$ Milestones Program with New Mexico, Utah, Wyoming and Albuquerque, NM. All $SO_2$ actual emissions from stationary sources greater than 100 tons/year statewide in Utah are covered by the $SO_2$ Milestones Program. In our May 1, 2015 comments to UDAQ on the proposed BART Alternative,[6] we questioned how UDAQ could take credit for $SO_2$ reductions from Carbon Units 1 and 2 under 40 CFR 51.308(e) when these emissions are already accounted for through the $SO_2$ Milestone Program under 40 CFR 51.309(d). Subsequently, UDAQ proposed to remove $SO_2$ emissions from Carbon Units 1 and 2 from the accounting of state-wide $SO_2$ emissions and credit those emissions as a BART Alternative for $NO_x$ controls at Hunter and Huntington Power Plants. Now instead of double-counting $SO_2$ emissions under two separate regulatory programs, it appears that UDAQ is proposing to change the intent of the Section 51.309 $SO_2$ Milestone Program.

Transfer of $SO_2$ emissions reductions from Section 51.309 to Section 51.308 is unprecedented and contrary to the applicable regulations. The regional haze regulations state that Utah's 309 plan "must include provisions requiring the monitoring, recordkeeping, and annual reporting of ***actual*** stationary source $SO_2$ emissions within the State."[7] UDAQ's proposal violates this provision by including over 8,000 tons of $SO_2$ emissions from Carbon in future inventory reports, when in fact the ***actual*** emissions from Carbon from 2016-2018 will be zero.
We urge EPA to disapprove changes to the $SO_2$ Milestone Program and disapprove the BART Alternative.

**Consultation with Federal Land Managers**
Following public comment in May 2016, UDAQ revised the Regional Haze SIP and reopened public comment in August 2016. UDAQ did not provide the Federal Land Managers an opportunity to consult on the revision nor provide notice of availability for public comment as required by regulation. We are now relying on EPA to act to protect visibility in these iconic national parks.

Our technical comments are further described in the enclosed documents. If you have questions, please contact Don Shepherd at 303-969-2075 or don_shepherd@nps.gov.

Sincerely,

Carol McCoy
Chief, Air Resources Division

Enclosures __ NPS Air Resources Division Technical Comments and supporting documents

cc: Bryce Bird, Director, Utah Division of Air Quality
Gail Fallon, Air Program, EPA Region 8
Patrick Walsh, Acting Associate Regional Director, Intermountain Region, NPS
Kate Cannon, Superintendent, Southeast Utah Group (Canyonlands and Arches National Parks, and Natural Bridges and Hovenweep National Monuments), NPS

---

[6] Letter from Susan Johnson, Air Resources Division, NPS, to Mark Berger, Utah Division of Air Quality, May 1, 2015.
[7] 40 CFR 51.309(d)(4)(i).

Jack Burns, Interim Superintendent, Bryce Canyon National Park
Leah McGinnis, Superintendent, Capitol Reef National Park
Jeff Bradybaugh, Superintendent, Zion National Park
Jim Ireland, Utah State Coordinator, Intermountain Region, NPS
Mike George, Air Resource Specialist, Intermountain Region, NPS

**National Park Service (NPS)**
**Air Resources Division**
**Technical Comments**
**March 14, 2016**

***Environmental Protection Agency (EPA) Proposed Approval or Partial Disapproval of Utah BART Alternative for Utah Regional Haze State Implementation Plan Revisions, June and October 2015***

**NPS Conclusions Regarding Best Available Retrofit Technology (BART) and Utah Division of Air Quality (UDAQ)'s BART Alternative**

- EPA cost estimates show that both the combined cost of Low-NOx Burners and Overfired Air plus Selective Catalytic Reduction (LNB/OFA + SCR) and the incremental cost of adding SCR to LNB/OFA are cost-effective and represent BART.
- Even if we take UDAQ's results at face value, the BART Alternative does not show the "clear weight of evidence" that it provides greater reasonable progress than BART, as required by § 51.308 (e)(3)(E).
  - Application of EPA's "key metric," the average of the 98th percentile impacts, favors selection of BART.
  - Despite EPA's assertion that it intends to be "consistent with our actions elsewhere" in previous regional haze rulemakings, EPA accepted metrics that it had previously rejected elsewhere.
  - UDAQ's BART Alternative trading program neither "include(s) all sources within a source category," nor does it "…apply to all stationary sources…" as suggested by the 2006 Alternative BART rule.
- Addition of SCR on Hunter Units 1 and 2 and on Huntington Units 1 and 2 would reduce visibility impacts by six deciviews across eight national parks.
- UDAQ did not comply with the procedural requirements of the Regional Haze Rule (RHR) with respect to provision of sufficient notification and information to the Federal Land Manager (FLM) prior to the December 1, 2014 public hearing, and the August 15 through September 14, 2015 public comment period.
- UDAQ's proposal to keep the Carbon Plant's hypothetical emissions in the $SO_2$ Milestone program does not comply with the procedural requirements of the Regional Haze Rule with respect to "annual reporting of *actual* stationary source $SO_2$ emissions within the State."

## I. BACKGROUND

### Facility Descriptions

The Hunter Plant (Hunter) is a coal-fired steam-electric generating facility located near Castle Dale, Utah and consists of three electricity generating units (EGUs). Units 1 and 2 are 480 MW (gross) units constructed prior to September 18, 1978, and Unit 3 is a 495 MW (gross) unit constructed in 1983. Bituminous and sub-bituminous coal supplied from

Deer Creek Mine[1], as well as from Sufco, Westridge and Dug Out mines is the primary fuel source for the boilers. Units 1 and 2 are tangentially-fired, dry-bottom units, and Unit 3 is a wall-fired, dry-bottom unit. All three units are equipped with wet scrubbers to control sulfur dioxide ($SO_2$), combustion controls to reduce emissions of nitrogen oxides ($NO_X$),[2] and fabric filters to control particulate matter ($PM_{10}$).[3] Of 1,222 plants, EPA Clean Air Markets (CAM) data for 2014 rank the Hunter facility #27 for $NO_X$ at 11,595 tons. On an emission per unit of electrical output basis, Hunter ranked #188 worst for $SO_2$ and #197 worst for $NO_X$. Hunter also ranked #273 for emissions of $CO_2$ per unit of electricity produced.

The Huntington Plant (Huntington) is a coal-fired steam-electric generating facility located near Huntington City, Utah and consists of two units. Unit 1 is a 480 MW (gross) unit constructed in October 1973; Unit 2 is a 480 MW (gross) unit that commenced construction in April 1970. In 2010, installation of a new turbine added 18 megawatts of generating capacity to Unit 1.Bituminous and sub-bituminous coal supplied from Deer Creek Mine has been the primary fuel source for these dry-bottom, tangentially-fired boilers. Both units are equipped with wet scrubbers to control $SO_2$, combustion controls to reduce emissions of $NO_X$ and fabric filters to control $PM_{10}$.[4] Of 1,222 plants, CAM data for 2014 rank the Huntington facility #72 for $NO_X$ at 6,864 tons. On an emission per unit of electrical output basis, Huntington ranked #233 worst for $SO_2$ and #235 worst for $NO_X$. Huntington also ranked #309 for emissions of $CO_2$ per unit of electricity produced.

The Carbon Plant (Carbon) is a coal-fired steam-electric generating facility located near Helper, Utah and consists of two units. Unit 1 is an 80 MW (gross) unit that commenced operation in 1954; Unit 2 is a 120 MW (gross) unit that commenced operation in 1957. Electrostatic precipitators were added between 1974 and 1976. Neither unit is equipped with $SO_2$ or $NO_X$ controls. Bituminous and sub-bituminous coal supplied from the local West Ridge and Bear Canyon mines has been the primary fuel source for these dry-bottom, tangentially-fired boilers. Of 1,222 plants, CAM data for 2014 rank the Carbon facility #104 for $SO_2$ at 9,241 tons and #157 for $NO_X$ at 3,270 tons. The Carbon Plant's high emissions relative to its size can be attributed to its lack of emission controls for $SO_2$ and $NO_X$. On an emission per unit of electrical output basis, Carbon ranked #34 worst for $SO_2$ and #31 worst for $NO_X$. Carbon also ranked #165 for emissions of $CO_2$ per unit of electricity produced.

[1] PacifiCorp recently announced that it will close the Deer Creek Mine and purchase coal from other mines in the area.

[2] Improved LNB were installed on Unit 3 in 2008. Advanced LNB and separated over-fire air (SOFA) were installed on Unit 2 in 2011 and on Unit 1 in 2014.

[3] Electrostatic precipitators were replaced by fabric filters on Unit 2 in 2011 and on Unit 1 in 2014.

[4] In 2006, Unit 2 added a new $SO_2$ scrubber, added advanced LNB with SOFA, and replaced the electrostatic precipitator with a fabric filter. In 2010, Unit 1 added a new 18 MW turbine, upgraded the $SO_2$ scrubber, added advanced LNB with SOFA, and replaced the electrostatic precipitator with a fabric filter.

There are eight Class I areas[5] within 300 km of Hunter, Huntington, and Carbon that are administered by the National Park Service (NPS), and one more administered by the US Forest Service.[6]

**Utah Division of Air Quality Actions**

Although the RHR required states to submit State Implementation Plans (SIPs) addressing regional haze no later than December 17, 2007, the UDAQ initially proposed its $NO_X$ BART determinations in 2008.

On May 26, 2011, UDAQ submitted its first regional haze SIP that included BART determinations for Hunter and Huntington's $NO_X$ and particulate matter emissions. In that plan, UDAQ adopted the existing permitted emission limits for Hunter Units 1 and 2 and Huntington Units 1 and 2 as BART for $NO_X$ and PM. UDAQ's plan received extensive criticism from the NPS and others for failing to conduct a five-factor BART analysis for the Hunter Units 1 and 2 and Huntington Units 1 and 2 and for failure to reduce visibility impacts to Class I areas.

On December 14, 2012, EPA rejected UDAQ's 2011 SIP submittal. Specifically, EPA disapproved UDAQ's BART emission limits for $NO_X$ and PM at Hunter Units 1 and 2 and Huntington Units 1 and 2 because the State did not perform a proper five-factor BART analysis for these pollutants at these units. EPA also disapproved the BART emission limits as practically unenforceable. EPA's disapproval triggered a two-year deadline for the State to submit an acceptable Regional Haze SIP or else EPA would be forced to issue its own Federal Implementation Plan (FIP).

Utah and PacifiCorp sued EPA challenging its disapproval of the Utah BART determinations. Utah and PacifiCorp's lawsuit was dismissed by the Tenth Circuit Court of Appeals.[7] In July 2012, PacifiCorp submitted revised BART analyses for the Hunter and Huntington BART units. In August of 2014, PacifiCorp submitted a BART analysis update for Hunter Units 1 and 2 and Huntington Units 1 and 2. In the 2014 update, PacifiCorp submitted updates to its 2012 cost analysis for SCR.

On October 1, 2014, UDAQ formally announced its proposal to the Utah Air Quality Board to retain its 2008 $NO_X$ BART emission limits for the BART-subject units at Hunter and Huntington Power Plants. UDAQ also proposed to adopt lower PM limits for BART at these units, and to adopt measures to make these requirements enforceable. UDAQ relied on PacifiCorp's five-factor BART analyses in making this determination. A public comment period was held from November 1 - December 22, 2014. During the public comment period, the UDAQ completed additional visibility modeling that was made available for public review on November 25, 2014.

---

[5] Arches NP, Black Canyon NP, Bryce Canyon NP, Canyonlands NP, Capitol Reef NP, Grand Canyon NP, Mesa Verde NP, and Zion NP.

[6] Flat Tops Wilderness Area

[7] See Utah ex rel. Utah Dep't of Envtl. Quality v. U.S. EPA, 750 F.3d 1182, 1184 (10th Cir.) rehearing denied sub nom. Utah v. U.S. Envtl. Prot. Agency, 765 F.3d 1257 (10th Cir. 2014).

On January 29, 2015, EarthJustice, HEAL Utah, National Parks Conservation Association, and Sierra Club filed a Notice of Intent to Sue EPA Under the Clean Air Act for failure of the Administrator to promulgate a Regional Haze FIP for Utah by January 14, 2015.[8]

The Utah Air Quality Board re-proposed revisions to the Regional Haze SIP at their March 4, 2015 meeting including these major changes from the October proposal:

- The visibility benefits due to the expected closure of the Carbon plant and the benefits of LNB that were installed on Hunter Unit 3 are formally considered as an alternative to BART as provided under 40 CFR 51.308(e)(2).
- UDAQ made some improvements to the first round of modeling that was completed in November 2014, most notably the inclusion of better estimates for $SO_4$ emissions from the three PacifiCorp plants, and the inclusion of two additional Class I areas, Grand Canyon National Park and Flat Tops Wilderness Area, which are within 300 km of at least one of the PacifiCorp plants.

A new public comment period was established from April 1 through May 1, 2015.[9] The Regional Haze SIP was considered for final adoption at the June 3, 2015 Board meeting.

On June 4, 2015, the Governor of the State of Utah submitted to EPA a revision to its Regional Haze SIP to pursue a BART Alternative that takes credit for $NO_X$ reductions due to combustion controls previously installed at Hunter and Huntington power plants in addition to $NO_X$, $SO_2$, and $PM_{10}$ reductions from the April 2015 retirement of the Carbon power plant. The June 2015 Utah RH SIP also included measures to make the SIP requirements practically enforceable and included additional information pertaining to the $PM_{10}$ BART determinations for Hunter and Huntington to address deficiencies identified by EPA in its December 2012 partial disapproval.

On October 20, 2015, Utah submitted to EPA an additional revision to its Regional Haze SIP to include an enforceable commitment to provide an additional SIP revision by mid-March 2018 to address concerns raised in public comments that the State would be double-counting certain emissions reductions at Carbon under the Utah BART Alternative in respect to milestone reporting for the $SO_2$ backstop trading program.

**UDAQ's BART and BART Alternative**

The fundamental requirement of a BART Alternative is that it provides:

[8] The Clean Air Act requires the EPA Administrator to promulgate a FIP within two years of a finding that a state has failed to make a required a SIP submittal. 42 U.S.C. § 7410(c). Specifically:

> (1) The Administrator shall promulgate a Federal implementation plan at any time within 2 years after the Administrator—
>
> > (A) finds that a State has failed to make a required submission or finds that the plan or plan revision submitted by the State does not satisfy the minimum criteria established under section 110(k)(1)(A).

[9] NPS submitted comments to UDAQ dated 5/1/2015.

> (E) A determination under paragraph (e)(3) of this section or otherwise based on the ***clear weight of evidence*** that the trading program or other alternative measure achieves ***greater reasonable progress*** than would be achieved through the installation and operation of ***BART at the covered sources***. [emphasis added][10]

In order to determine if a BART Alternative meets this test, one must first establish the BART benchmark. EPA's review of UDAQ's BART proposal has provided extensive information to support UDAQ's BART determinations for the BART-eligible sources, Hunter Units 1 and 2 and Huntington Units 1 and 2. We agree with EPA's five-factor BART analyses and its selection of technically feasible control options. We also agree with EPA that:

> SCR can achieve performance emission rates as low as 0.04 to 0.07 lb/MMBtu on an annual basis. For this analysis, consistent with our actions elsewhere, as well with PacifiCorp's analysis, we use an annual emission rate of 0.05 lb/MMBtu for SCR . . . .[11]

EPA, and its contractor, Andover Technology Partners (ATP), estimated the costs of compliance consistent with the EPA Air Pollution Control Cost Manual (CCM). In addition, EPA appropriately utilized portions of the draft 2015 revisions to the CCM. However, we note that the draft revised CCM for SCR now assumes a 30-year equipment life instead of the 20-year life cited in the current CCM and used by EPA in its Utah analyses; [12] the effect of the shorter amortization period used by EPA is to increase annual costs by 13% (when applied to the ATP estimates). Thus, EPA has overestimated the costs of SCR (which it nevertheless considers reasonable).

We agree that EPA appropriately compared average cost-effectiveness of the entire control strategies (combustion controls plus post-combustion controls) to other, similar actions. We especially appreciate that EPA also included estimates of the costs of adding SCR to the combustion control scenario. In situations like Hunter and Huntington, where modern combustion controls have already been installed, this provides a useful real-world estimate of the cost of these add-on controls. Of course, it is essential that in evaluating the reasonableness of these additional costs, they must be compared to similar add-ons elsewhere.

EPA proposed that the costs of adding SCR to Hunter Units 1 and 2 and Huntington Units 1 and 2 compare favorably with the costs of adding SCR at Hayden Station Units 1 and 2 which Colorado determined to represent BART. It appears that the costs to install SCR at the Hayden Station were based upon 2006 dollars while the costs to install SCR at

[10] 40 CFR § 51.308 (e)(3)(i)(E) (Regional haze program requirements).

[11] ENVIRONMENTAL PROTECTION AGENCY, 40 CFR Part 52, [EPA–R08–OAR–2015–0463; FRL—9939–43–Region 8], Approval, Disapproval and Promulgation of Air Quality Implementation Plans; Partial Approval and Partial Disapproval of Air Quality Implementation Plans and Federal Implementation Plan; Utah; Revisions to Regional Haze State Implementation Plan; Federal Implementation Plan for Regional Haze, ACTION: Proposed rule. January 14, 2016, p2034

[12] Revised CCM, page 2-69, "…broadly speaking, a representative value of the equipment life for SCR at power plants can be considered as 30 years."

Hunter and Huntington were based upon 2014 dollars. A comparison of the Chemical Engineering Plant Cost Index (CEPCI) values for these two years shows that the 2014 costs are 15% higher than the same 2006 costs, due to inflation. A more accurate comparison would be obtained by increasing the Hayden costs to reflect 2014 dollars; as a result, the comparison to SCR costs at Hunter and Huntington would be even more favorable there.

Likewise, it appears that the costs to install SCR at the Cholla Power Plant, for which EPA determined that BART was SCR in its Arizona FIP, were based upon 2009 dollars while the costs to install SCR at Hunter and Huntington were based upon 2014 dollars. A comparison of the CEPCI values for these two years shows that the 2014 costs are 10% higher than the 2009 costs, due to inflation. A more accurate comparison would be obtained by increasing the Cholla costs to reflect 2014 dollars; as a result, the comparison to SCR costs at Hunter and Huntington would be even more favorable there.

EPA should also have adjusted the costs it cited for SCR at the Laramie River Station (determined to represent BART in its Wyoming FIP) to reflect the 2% increase in costs since the 2013 cost year used there. Once again, the comparison to SCR costs at Hunter and Huntington would be even more favorable there.

We suggest that EPA also consider the determination made by Wyoming that SCR should be added to all four units at the Jim Bridger power plant where the 2013 dollar cost-effectiveness values estimated by EPA also exceed EPA's 2014 dollar cost estimates for Hunter and Huntington.

EPA proposed that the cost of adding SCR at Hunter Units 1 and 2 and Huntington Units 1 and 2 are reasonable when compared to the cost of adding SCR at the Cholla, Hayden, and Laramie River power plants where SCR had been determined to represent BART. We are also pleased that EPA considered the impacts on visibility from the entire BART-eligible source and at multiple Class I areas in its analyses of visibility benefits and in its BART proposals.

Consequently, we agree with EPA that:

> [T|he unit level visibility improvements justify the most stringent level of control, SCR, for each of the [BART-eligible] units. (And) BART for $NO_X$ is LNB and SOFA with SCR, represented by an emission limit of 0.07 lb/MMBtu (30-day rolling average). The proposed BART emission limit of 0.07 lb/MMBtu allows for a sufficient margin of compliance for a 30-day rolling average limit that would apply at all times, including startup, shutdown, and malfunction.[13]

[13] ENVIRONMENTAL PROTECTION AGENCY, 40 CFR Part 52, [EPA–R08–OAR–2015–0463; FRL—9939–43–Region 8], Approval, Disapproval and Promulgation of Air Quality Implementation Plans; Partial Approval and Partial Disapproval of Air Quality Implementation Plans and Federal Implementation Plan; Utah; Revisions to Regional Haze State Implementation Plan; Federal Implementation Plan for Regional Haze, ACTION: Proposed rule. January 14, 2016

UDAQ's BART Alternative scenario consists of current LNB with SOFA on all units at Hunter and Huntington and Carbon shut down. UDAQ's BART Alternative is unique in that it was specially created to include emission units (Hunter Unit 3 and Carbon Units 1 and 2) that are not BART-eligible and, in the case of the Carbon plant, not within the fence lines of the facilities that are subject to BART. The UDAQ does not include any other EGUs within that source category or any other emission units statewide. These unique properties of the UDAQ BART Alternative are discussed later.

## II. NPS TECHNICAL ANALYSIS of BART and UDAQ's BART ALTERNATIVE

It is our understanding that EPA did not evaluate all of UDAQ's model inputs and results—instead, EPA accepted them at face value. NPS did evaluate UDAQ assumptions and model results to check their validity. Although NPS does not agree with the inclusion of the Carbon Plant in the UDAQ BART analysis, we included it in our evaluation.

### Model Scenarios

NPS modeled three scenarios for Hunter, Huntington, and Carbon:

- The BART Alternative scenario consisted of current (2012 – September 2015) emissions from LNB with SOFA on all units at Hunter and Huntington, and with Carbon shut down.
- The BART scenario consisted of addition of SCR on Units 1 and 2 at Hunter and Huntington, 2006 – 2007 pre-combustion–control emissions at Hunter Unit 3, and Carbon emissions from 2012 until shut down in mid-April 2015.
- Our 4SCR scenario consisted of current emissions from LNB with SOFA on all units at Hunter and Huntington, Carbon shut down, and addition of SCR on units 1 and 2 at Hunter and Huntington.

### Emissions Data for Modeling[14]

It is essential to recognize that the BART Guidelines were not developed to explicitly address a situation in which we are evaluating the impacts of emission controls installed after the baseline period and currently in operation versus additional controls not yet installed. Instead, it is appropriate to apply the intent of the BART Guidelines in the evaluation of UDAQ's BART Alternative versus BART.

<u>BART Alternative</u>

[14] $SO_2$. Particulate emissions were calculated by applying EPRI methodology to the particle speciation workbooks found on our website to account for condensable particulate removal in the wet scrubbers. $SO_2$ emissions are held constant for both scenarios. Sulfate created by SCR was added to the condensable inorganic particulate emissions. We used the UDAQ CALPUFF model inputs for stack data (location, height, diameter, exit gas temperature, and exit gas velocity).

The BART Guidelines recommend determining the 24-hour average actual emission rate from the highest emitting day of the pre-control baseline period. The post-control emission rates would then be calculated as a percentage of pre-control baseline emission rates. However, in this case, it is appropriate to instead consider the actual emissions from the current BART Alternative as the de facto “pre-control baseline” and apply any reduction percentages that would result from additional controls under BART. In this respect, our approach is similar to that used by UDAQ:[15]

> The LNB/OFA scenario for Hunter Units 1 &2 and Huntington Units 1 & 2 was developed by treating it, in part, as though it were a new baseline scenario. BART Guidelines recommend that the post-control emission rates be calculated as a percentage of the baseline hourly emissions.

Also by PacifiCorp:[16]

> The LNB/OFA emission rates are based on the actual emission rates from CAMD for the years post LNB/OFA installation. The controlled emission rates for SNCR and SCR were based on expected efficiency of these control technologies.

And by EPA:

> Percent reduction and tons of NOx removed were based upon actual emission rates reported to EPA’s Air Markets Program Data from 1) 2001-2003, and 2) after installation of new combustion controls using data from 2014 and 2015.

In effect, we are taking advantage of our knowledge of the benefit of the combustion controls already added at Hunter and Huntington. We plotted emissions data obtained from CAM to determine when the combustion controls added at Hunter and Huntington had stabilized emissions. Our review of those results leads us to concur with UDAQ’s use of recent emissions data:[17]

> Therefore, UDAQ has elected to use an actual annual average rate from emission years 2012-2013 as the basis of comparison.[18] Secondly, as Hunter Unit 1 had not yet completed installation of these emission controls until the spring of 2014, UDAQ is treating this unit as a clone of Hunter Unit 2. The two units are, for all practical purposes, identical in design, and therefore can be treated as such for modeling purposes.
>
> As this is the first “post-control” scenario for the four primary BART eligible units (Hunter Units1 & 2 and Huntington Units 1 & 2) more than just NOx

[15] Air Quality Modeling Protocol: Utah Regional Haze State Implementation Plan, February 13, 2015
[16] PacifiCorp’s [8/5/2014] BART Analysis Update for Hunter Units 1 and 2 and Huntington Units 1 and 2
[17] Air Quality Modeling Protocol: Utah Regional Haze State Implementation Plan, February 13, 2015
[18] UDAQ also used 2012 – 2013 for the Carbon plant, “However, as both Carbon units are being shut down, the most recent two-year period of operation (calendar years 2012 and 2013) are being used to determine baseline emissions.”

> controls are being applied. This initial scenario also includes the installation of fabric filter particulate control and upgrades/installation of dry lime injection $SO_2$ control at each of the four units. These controls have also already been installed and operating for some time.

Because CAM data is now available for Hunter, Huntington, and Carbon through September of 2015, we expanded the new baseline period to provide a more robust data set by including 2012 – September 30, 2015. We used UDAQ's hourly $SO_2$ and $NO_X$ emission rates for Hunter Unit 1, but used higher daily $SO_2$ and $NO_X$ emissions from Hunter Units 2 and 3 found in CAM data.[19] The most significant difference in emissions was the much higher (by 536 lb/hr) daily $NO_X$ emission rate from Hunter Unit 3 that occurred on February 10, 2012.[20] Using these higher emission rates from the CAM data results in higher visibility impacts in the baseline and greater visibility benefits from SCR. We used UDAQ's hourly $SO_2$ and $NO_X$ emission rates for Huntington Units 1 and 2.We assumed Carbon's emissions to be zero.

<u>Best Available Retrofit Technology</u>

We agree with EPA and UDAQ that:

> The SCR scenario is a projected emissions scenario. In this case the emissions are determined by selecting the anticipated annual average SCR emission rate as it would appear in any permit issued to the source in question.

Both UDAQ and EPA assumed that SCR could achieve an annual average emission rate of 0.05 lb/mmBtu; this represents a:

- 76% reduction from 2012 – 2014 annual average $NO_X$ emissions at Hunter Units 1 and 2.
- 77% reduction from 2012 – 2014 annual average $NO_X$ emissions at Huntington Unit 1.
- 78% reduction from 2012 – 2014 annual average $NO_X$ emissions at Huntington Unit 2.

We applied these $NO_X$ reduction percentages to the daily emissions modeled under the BART Alternative for the corresponding units. Our results were almost identical to the daily $NO_X$ emission rates modeled by UDAQ for these units.

For Hunter Unit 3, we used CAM data for 2006 – 2007 to represent $NO_X$ emissions just prior to the installation of combustion controls there in 2008. We modeled the highest daily $NO_X$ emission rate at Hunter Unit 3 during 2006 – 2007, which was 2,015.4 lb/hr,[21]

[19] For Hunter #2, the UDAQ $SO_2$ emission rate was equaled exceeded on five days and the $NO_X$ rate on eleven days. For Hunter #3, the UDAQ $SO_2$ emission rate was exceeded on 720 days and the $NO_X$ rate on 483 days.

[20] On 2/11/2012 $NO_X$ emissions were higher by 12 lb/hr.

[21] on November 26, 2007, versus 2,038.3 lb/hr modeled by UDAQ

just slightly lower than the UDAQ value of 2,038.3 lb/hr. Although the median daily $NO_X$ emission rate for Hunter Unit 3 was about 1,500 lb/hr, we modeled the maximum daily emission rate of 2,015.4 lb/hr that occurred on November 26, 2007; this biases the results against BART and in favor of the BART Alternative by inflating the emission rate for Hunter Unit 3 prior to installation of combustion controls represented by the BART Alternative.

We modeled UDAQ's emissions for Carbon. Although the median daily $SO_2$ emission rate for Carbon Unit 1 was 835 lb/hr, we modeled the maximum daily emission rate of 1,348 lb/hr that occurred on September 10, 2012. Although the median daily $NO_X$ emission rate for Carbon Unit 1 was 337 lb/hr, we modeled the maximum daily emission rate of 438 lb/hr that occurred on November 11, 2012. Although the median daily $SO_2$ emission rate for Carbon Unit 2 was 1,190 lb/hr, we modeled the maximum daily emission rate of 1,812 lb/hr that occurred on September 13, 2012. Although the median daily $NO_X$ emission rate for Carbon Unit 2 was 482 lb/hr, we modeled the maximum daily emission rate of 696 lb/hr that occurred on January 1, 2012.

The following charts illustrate our concerns about crediting reductions in abnormally high $SO_2$ emissions at Carbon.






Use of these abnormally high short-term emission rates biases[22] the modeling results against BART and in favor of the BART Alternative by inflating the emission rate for Carbon Units 1 and 2 prior to their shut-down as part of the BART Alternative. In effect, PacifiCorp is being "rewarded" for having short periods of unusually high emissions. EPA should consider use of more representative emission rates when accounting for emission reductions.

**NPS Modeling Methodology**

NPS Air Resources Division conducted long range transport modeling analyses to evaluate the impacts from the different proposed UDAQ and NPS BART alternatives on visibility at eight NPS Class I areas. The NPS air quality impact analysis used the EPA CALPUFF 5.8 suite of models. (CALPUFF version 5.8 Level 070623, CALMET Level 070623, POSTUTIL Level 070623, and CALPOST Version 6.221.) The modeling was performed in the regulatory mode with the switch MREG=1. The pollutants modeled were $SO_2$, $SO_4$, $NO_x$, elemental carbon, organic carbon, $PM_{2.5}$, and $PM_{10}$, in pounds per hour units. The stack parameters and locations were from the UDAQ's BART modeling analysis for the Carbon, Hunter and Huntington EGU units. The discrete receptors for

[22] These unusually high $SO_2$ emission rates occurred in September of 2012 and July of 2014 simultaneously at both units, probably due to high sulfur coal.

the eight NPS Class I areas were from the NPS Class I receptor program which is available online from the NPS web site.

The three years of CALMET data (2001-2003) were obtained from UDAQ and had been used in its Regional Haze SIP. The NPS re-ran the CALMET data years following the settings recommended in the EPA OAQPS CALMET memorandum of August 31, 2009. Each of the three years of CALMET used 12 months of MM5 prognostic data, one upper air station, 12 surface stations and 54 precipitation stations. The model domain consists of 138 four-kilometer east-west grid cells and 136 north-south four-kilometer grid cells with ten vertical layers.

The outputs from CALPUFF were run through the post processor POSTUTIL. In the POSTUTIL post processor, the option switch MNITRATE, which recomputes the $HNO_3/NO_3$ partition, was set = 1 so as not to overestimate the formation of particulate nitrate.

The visibility impacts were modeled with CALPOST version 6.221 following the methodology found in the FLM's 2010 FLAG using Method 8, Mode 5. This Method incorporates background extinction coefficients which are computed from monthly concentrations representative of the eight NPS Class I areas for ammonium sulfate (BKSO4), ammonium nitrate (BKNO3), coarse particulates (BKPMC), organic carbon (BKOC), soil (BKSOIL), elemental carbon (BKEC) and sea salt (BKSALT). Monthly Relative Humidity Adjustment Factors for small and large $SO_4$ and $NO_3$ and sea salt specific to the eight NPS Class I areas from FLAG 2010 were also applied.

**NPS Modeling Results**

Our analyses show that:

- UDAQ's BART Alternative would result in less visibility improvement on the 98th percentile days than BART at seven of the eight Class I areas we modeled,[23] and that about 73% of the impairment resulting from the BART Alternative is attributed to nitrate.
- The cumulative total improvement across the nine Class I areas for BART relative to the BART Alternative would be more than 1.5 dv, with average improvement for BART compared to the BART Alternative of 0.17 dv.
- UDAQ results (Table 12 in Fed Reg) indicate that BART is 0.14 dv better across the nine Class I areas than the BART Alternative.

[23] We were unable to include Flat Tops in our analyses, so we used UDAQ's results instead—which favored the BART Alternative.

| Comparison of Utah Alternative | | | | | | | |
|---|---|---|---|---|---|---|---|
| Blue favors BART Alternative; Red favors BART | | | | | | | |
| based on NPS modeling | | | | | | | |
| | | BART Alternative | | BART | | | |
| Class I Area | Year | 98th Percentile Value (delta dv) | Average 98th Percentile Value (delta dv) | 98th Percentile Value (delta dv) | Average 98th Percentile Value (delta dv) | Visibility Improvement of BART over BART Alternative by Year (delta dv) | Visibility Improvement of BART over BART Alternative 3 Year Avg. (delta dv) |
| Arches | 2001 | 3.67 | 3.46 | 3.00 | 3.47 | 0.68 | -0.01 |
| | 2002 | 3.57 | | 3.60 | | -0.03 | |
| | 2003 | 3.13 | | 3.81 | | -0.68 | |
| Black Canyon | 2001 | 0.66 | 0.89 | 0.79 | 0.87 | -0.14 | 0.02 |
| | 2002 | 1.14 | | 0.97 | | 0.16 | |
| | 2003 | 0.89 | | 0.86 | | 0.03 | |
| Bryce Canyon | 2001 | 0.73 | 0.86 | 0.79 | 0.86 | -0.07 | 0.00 |
| | 2002 | 1.41 | | 1.31 | | 0.10 | |
| | 2003 | 0.45 | | 0.47 | | -0.02 | |
| Canyonlands | 2001 | 4.54 | 4.76 | 3.64 | 4.04 | 0.90 | 0.72 |
| | 2002 | 4.97 | | 4.18 | | 0.79 | |
| | 2003 | 4.78 | | 4.31 | | 0.47 | |
| Capitol Reef | 2001 | 3.43 | 3.89 | 2.98 | 3.26 | 0.45 | 0.63 |
| | 2002 | 4.65 | | 3.86 | | 0.79 | |
| | 2003 | 3.59 | | 2.93 | | 0.66 | |
| Flat Tops | 2001 | 1.09 | 1.28 | 1.22 | 1.43 | -0.13 | -0.15 |
| | 2002 | 1.37 | | 1.81 | | -0.43 | |
| | 2003 | 1.37 | | 1.27 | | 0.11 | |
| Grand Canyon | 2001 | 1.58 | 1.58 | 1.37 | 1.39 | 0.21 | 0.18 |
| | 2002 | 1.81 | | 1.56 | | 0.25 | |
| | 2003 | 1.34 | | 1.26 | | 0.08 | |
| Mesa Verde | 2001 | 1.54 | 1.39 | 1.41 | 1.28 | 0.13 | 0.10 |
| | 2002 | 1.38 | | 1.16 | | 0.23 | |
| | 2003 | 1.25 | | 1.29 | | -0.04 | |
| Zion | 2001 | 0.73 | 0.62 | 0.83 | 0.62 | -0.10 | 0.01 |
| | 2002 | 0.84 | | 0.71 | | 0.14 | |
| | 2003 | 0.30 | | 0.32 | | -0.02 | |
| Class I Area Average | 2001 | 1.99 | 2.08 | 1.78 | 1.91 | 0.21 | 0.17 |
| | 2002 | 2.35 | | 2.13 | | 0.22 | |
| | 2003 | 1.90 | | 1.83 | | 0.06 | |
| Totals | | | 18.72 | | 17.22 | | 1.50 |

If our 4SCR scenario (SCR on the four BART-eligible EGUs) is applied, as would be the case if EPA issues the proposed FIP, the cumulative improvement across the eight Class I areas (relative to the BART Alternative) would be more than 6 dv and about 55% of the resulting impairment is attributed to nitrate[24] and 35% sulfate.

[24] The relatively high nitrate contribution may be due to high $NO_X$ emissions from Hunter Unit 3.

| Comparison of Utah Alternative | | | | | | | |
|---|---|---|---|---|---|---|---|
| Blue favors BART Alternative; Red favors 4SCR | | | | | | | |
| based on NPS modeling | | | | | | | |
| | | BART Alternative | | NPS 4SCR | | | |
| **Class I Area** | **Year** | **98th Percentile Value (delta dv)** | **Average 98th Percentile Value (delta dv)** | **98th Percentile Value (delta dv)** | **Average 98th Percentile Value (delta dv)** | **Visibility Improvement of BART over BART Alternative by Year (delta dv)** | **Visibility Improvement of BART over BART Alternative 3 Year Avg. (delta dv)** |
| Arches | 2001 | 3.67 | 3.46 | 2.40 | 2.26 | 1.27 | 1.20 |
| | 2002 | 3.57 | | 2.34 | | 1.22 | |
| | 2003 | 3.13 | | 2.02 | | 1.11 | |
| Black Canyon | 2001 | 0.66 | 0.89 | 0.37 | 0.51 | 0.28 | 0.38 |
| | 2002 | 1.14 | | 0.65 | | 0.49 | |
| | 2003 | 0.89 | | 0.52 | | 0.38 | |
| Bryce Canyon | 2001 | 0.73 | 0.86 | 0.42 | 0.52 | 0.30 | 0.34 |
| | 2002 | 1.41 | | 0.84 | | 0.57 | |
| | 2003 | 0.45 | | 0.30 | | 0.15 | |
| Canyonlands | 2001 | 4.54 | 4.76 | 2.93 | 3.14 | 1.61 | 1.62 |
| | 2002 | 4.97 | | 3.15 | | 1.81 | |
| | 2003 | 4.78 | | 3.34 | | 1.45 | |
| Capitol Reef | 2001 | 3.43 | 3.89 | 2.29 | 2.73 | 1.14 | 1.16 |
| | 2002 | 4.65 | | 3.42 | | 1.23 | |
| | 2003 | 3.59 | | 2.48 | | 1.11 | |
| Grand Canyon | 2001 | 1.58 | 1.58 | 0.90 | 0.94 | 0.67 | 0.63 |
| | 2002 | 1.81 | | 1.11 | | 0.70 | |
| | 2003 | 1.34 | | 0.81 | | 0.53 | |
| Mesa Verde | 2001 | 1.54 | 1.39 | 0.92 | 0.81 | 0.61 | 0.58 |
| | 2002 | 1.38 | | 0.80 | | 0.59 | |
| | 2003 | 1.25 | | 0.71 | | 0.54 | |
| Zion | 2001 | 0.73 | 0.62 | 0.41 | 0.36 | 0.32 | 0.26 |
| | 2002 | 0.84 | | 0.49 | | 0.35 | |
| | 2003 | 0.30 | | 0.19 | | 0.10 | |
| Class I Area Average | 2001 | 2.11 | 2.18 | 1.33 | 1.41 | 0.78 | 0.77 |
| | 2002 | 2.47 | | 1.60 | | 0.87 | |
| | 2003 | 1.96 | | 1.29 | | 0.67 | |
| Totals | | | 17.45 | | 11.27 | | 6.18 |

## III. BART ALTERNATIVE "CLEAR WEIGHT OF EVIDENCE" REQUIREMENT

In its October 13, 2006 rulemaking,[25] EPA provided new guidance on "Alternative to Source-Specific Best Available Retrofit Technology (BART) Determinations." UDAQ has proposed a "BART Alternative" for the four BART EGUs, but to our knowledge its approach is unique and does not appear to conform to EPA regulations, guidance, or precedent. The fundamental requirement of a BART Alternative is that it provides:

> (E) A determination under paragraph (e)(3) of this section or otherwise based on the ***clear weight of evidence*** that the trading program or other alternative measure achieves ***greater reasonable progress*** than would be achieved through the installation and operation of ***BART at the covered sources***. [emphasis added][26]

It does not appear that UDAQ's proposed BART Alternative, taken at face value, meets this requirement to show, based on the "clear weight of evidence," that it achieves greater reasonable progress than would be achieved with BART. Furthermore, we have concerns with some assumptions that UDAQ has made in its analysis of the proposed BART Alternative.

### BART Alternative Evaluation Metrics

In its February 13, 2015 "Review of 2008 PM Determination and Recommended Alternative to BART for $NO_X$," UDAQ presented CALPUFF modeling results in the form of nine different metrics. As part of its proposal to approve UDAQ's BART Alternative, EPA evaluated each metric. We agree with EPA that "this is a complicated analysis" and that EPA should consider "the State's BART Alternative in the context of other previous decisions we [EPA] and the states have made." EPA has stated that it intends to be ***"consistent with our actions elsewhere"*** in previous regional haze rulemakings such as for Arizona, North Dakota, Montana, and Washington—we agree with that principle, and shall discuss, where appropriate, how those examples, and others, apply to Utah. However, if EPA were to approve the Utah BART Alternative, that position would be inconsistent with its approaches in other cases, as we shall discuss below.

A central issue in deciding whether to approve the State SIP entails an evaluation of Utah's SIP revision with respect to "[a] demonstration that the emissions trading program or other alternative measure will achieve greater reasonable progress than would have resulted from the installation and operation of BART at all sources subject to BART in the State and covered by the alternative program."[27] EPA states that:

> [S]everal of the metrics in the State's analyses appear to support a determination that a BART Alternative presented by the State achieves greater reasonable

[25] ENVIRONMENTAL PROTECTION AGENCY, Revisions to Provisions Governing Alternative to Source-Specific Best Available Retrofit Technology (BART) Determinations, Final rule.
[26] § 51.308 (e) (3) (i)(E) (Regional haze program requirements).
[27] 40 CFR 51.308(e)(2)(i)

> progress than BART. However, several other metrics in the State's analyses do not appear to support a conclusion that the BART Alternative achieves greater reasonable progress.[28]

In fact, the metrics that appear to support the BART Alternative are not appropriate because they have been rejected by EPA in past evaluations or have not been previously used by EPA, or are not statistically valid. We urge EPA not to approve new statistical tests that, in effect, simply "outnumber" those tests that have previously been used by EPA. We do not believe that EPA should be encouraging such an exercise in "creative statistics."[29]

**98th Percentile Impact (dv)**

In every EPA BART FIP, EPA has relied upon the 98th percentile value as a primary metric. The 98th percentile visibility impact is, as EPA states in its Utah proposal, a "key metric" recommended by the BART Guidelines when selecting BART controls. The 98th percentile value test is essentially the "gold standard" for comparing visibility impacts, and is the only metric that has been consistently applied by EPA.

For example, EPA stated in its Arizona FIP, "As recommended in the BART Guidelines, the 98th percentile daily impact in deciviews is used as the ***basic metric*** of visibility impact." In addition, this is one of the primary metrics that EPA has relied on in evaluating prior regional haze actions (discussed below) that have included BART alternatives. In the BART Guidelines, EPA described this metric as an appropriate measure in determining the degree of visibility improvement expected from controls. We agree with EPA that it is a "key metric" for assessing the relative benefits of the Utah BART Alternative here.

Some of EPA's earliest regional haze actions occurred on Navajo Nation tribal lands where EPA has responsibility. In its evaluation of BART and a BART Alternative at the Four Corners Power Plant, EPA rejected a proposal by Arizona Public Service, the plant owner, to average the visibility improvement over 16 Class I areas.[30] Instead, EPA relied

---

[28] ENVIRONMENTAL PROTECTION AGENCY, 40 CFR Part 52, [EPA–R08–OAR–2015–0463; FRL—9939–43–Region 8], Approval, Disapproval and Promulgation of Air Quality Implementation Plans; Partial Approval and Partial Disapproval of Air Quality Implementation Plans and Federal Implementation Plan; Utah; Revisions to Regional Haze State Implementation Plan; Federal Implementation Plan for Regional Haze, ACTION: Proposed rule. January 14, 2016, p2006

[29] A consequence of this EPA approach would be efforts by parties to see who can generate the most statistical tests favoring their position. For example, we could propose that EPA consider the maximum impacts and the 99th percentile impacts (and everything in between) of these alternative scenarios, but we believe it is best to be consistent with past practices so that the "rules of the game" do not change arbitrarily.

[30] EPA-R09-OAR-2008-0454-0013.3

upon “visibility impacts of the 98th percentile of daily maxima for each Class I area for each year, averaged over 2001–2003.”[31]

For the Navajo Generating Station, EPA again rejected a proposal from Salt River Project, the plant operator, which “demonstrated visibility improvements across the 11 parks … with an average of about 0.10 deciviews.”[32] Instead, “…EPA generally relied on the 98th percentile of all three years' data taken together…”[33] In its Technical Support Document, EPA stated:

> Under the BART guidelines, the measure of the visibility improvement to be used in comparisons between various control scenarios is the 98th percentile of impacts is expressed as 24-hour averages of delta deciviews relative to natural background, as estimated using the CALPUFF air quality modeling system.[34]

EPA also introduced a “…second metric, '$/cumulative dv', [which] divides annual cost by the cumulative 98th percentile deciview improvement. In assessing the degree of visibility improvement from controls, EPA relied heavily on the maximum deciview improvement among the Class I areas and the number of areas showing improvement (i.e., all 11 Class I areas), with cumulative improvement providing a supplemental measure that combines information on the number of areas and on individual area improvement.”[35]

---

[31] ENVIRONMENTAL PROTECTION AGENCY, 40 CFR Part 49, [EPA–R09–OAR–2010–0683; FRL–9213–7], Source Specific Federal Implementation Plan for Implementing Best Available Retrofit Technology for Four Corners Power Plant: Navajo Nation, ACTION: Proposed rule. October 19, 2010

[32] EPA-R09-OAR-2008-0454-0014 revised SRP BART analysis Jan 09

[33] Approval of Air Quality Implementation Plans; Navajo Nation; Regional Haze Requirements for Navajo Generating Station, Technical Support Document for Proposed Rule, Docket Number: EPA-R09-OAR-2013-0009 For each day, the model finds the maximum visibility impact of all locations (receptors) in the Class I area. From among these daily values, the BART Guidelines recommend use of the 98th percentile, roughly equivalent to the 8th highest day, for comparing the base case and the effects of various controls. The 98th percentile is recommended rather than the maximum value to avoid undue influence from unusual meteorological conditions (BART Guidelines, 70 FR at 39121). For this proposal, EPA generally relied on the 98th percentile of all three years' data taken together, but results for the average of the three individual years' 98th percentiles are also provided in spreadsheet tables in the docket.

[34] Approval of Air Quality Implementation Plans; Navajo Nation; Regional Haze Requirements for Navajo Generating Station Technical Support Document for Proposed Rule Docket Number: EPA-R09-OAR-2013-0009

[35] ENVIRONMENTAL PROTECTION AGENCY, 40 CFR Part 49, [EPA–R09–OAR–2013–0009; FRL–9774–1], Approval of Air Quality Implementation Plans; Navajo Nation; Regional Haze Requirements for Navajo Generating Station, ACTION: Proposed rule. February 5, 2013. Table 9 presents the visibility impacts of the 98th percentile of 24-hour delta deciviews for each Class I area for each year, averaged over 2001–2003. For each Class I area, the table shows the deciview impact for the base case, and the deciview improvement from that baseline impact when controls are applied. Also shown are the cumulative deciview impacts, which are the simple sum of impacts or improvements over all the Class I areas. Table 10 shows the average number of days with a baseline impact or improvement of at least 0.5 dv; it also shows two ''dollars per deciview'' measures of cost effectiveness, both of which divide the total annual cost of the control in millions of dollars per year by an improvement in deciviews. For the first metric, ''$/max dv'', annual cost (Table 2) is divided by the 98th percentile deciview improvement at the Class I area with the greatest improvement (Table 9). The second metric, ''$/cumulative dv'', divides annual cost by the cumulative 98th percentile deciview improvement. In assessing the degree of visibility improvement from

In its approval of the Apache BART Alternative in Arizona, EPA stated:

> In evaluating ADEQ's weight-of evidence demonstration, we have considered all elements of ADEQ's analysis, but we have given the most weight to the visibility impacts based on air quality modeling. In order to evaluate whether the Apache BART Alternative is indeed better than BART, we have applied a modified version of the two-prong modeling test set forth in 40 CFR 51.308(e)(3), using the air quality modeling results. In particular, rather than considering the best twenty percent days and worst twenty-percent days, as provided for under 40 CFR 51.308(e)(3), *we have considered the 98th percentile impacts (averaged across three years), consistent with the approach recommended by the BART Guidelines for comparing control alternatives* at a single source. Under the first prong of the test (the ''no degradation prong''), we compared the Apache BART Alternative to baseline conditions to ensure that the alternative will not result in worsened conditions anywhere than would otherwise exist. The Apache BART Alternative clearly meets this prong, as the visibility modeling results indicated that the Alternative will result in improved visibility at all affected Class I areas compared with baseline conditions... Under the second prong, we compared the average differences between BART and the Apache BART Alternative over all affected Class I areas to ensure that there is an overall improvement in visibility. The Apache BART Alternative also meets this prong, as the modeling results indicated that the Alternative would result in improved visibility, on average, across all Class I Areas, compared with BART. Based on the weight-of-evidence presented, we propose to approve ADEQ's determination that the Apache BART Alternative would achieve greater reasonable progress than BART under 40 CFR 51.308(e)(2)(i)(E).(emphasis added)[36]

In its approval of the Tesoro BART Alternative in Washington, EPA considered the number of days over the three-year period that the Tesoro facility is predicted to cause visibility impacts of greater than 0.5 dv and the *98th percentile visibility impacts*[37] of Tesoro at the seven Class I areas within 300 km of the Tesoro facility.[38]

---

controls, EPA relied heavily on the maximum deciview improvement among the Class I areas and the number of areas showing improvement (i.e., all 11 Class I areas), with cumulative improvement providing a supplemental measure that combines information on the number of areas and on individual area improvement.

[36] ENVIRONMENTAL PROTECTION AGENCY, 40 CFR Part 52, [EPA–R09–OAR–2014–0647, FRL–9916–85-Region 9], Approval and Promulgation of Air Quality Implementation Plans; Arizona; Regional Haze State and Federal Implementation Plans; Reconsideration, ACTION: Proposed rule. September 19, 2014, p56328

[37] Daily Haze Index, based on the 22nd highest value in three years within a Class I Area

[38] ENVIRONMENTAL PROTECTION AGENCY, 40 CFR Part 52, [EPA–R10–OAR–2010–1071; FRL–9911–83–Region 10], Approval and Promulgation of Implementation Plans; State of Washington; Regional Haze State Implementation Plan; Federal Implementation Plan for Best Available Retrofit Technology for Alcoa Intalco Operations, Tesoro Refining and Marketing, and Alcoa Wenatchee, ACTION: Final rule. June 11, 2014

In its North Dakota FIP,[39] EPA consistently and repeatedly supported use of the 98th percentile and rejected use of the 90th percentile; EPA stated:

> When the *90th percentile* is used to assess predicted visibility improvement from a potential control option, the 37th or 38th highest predicted improvement value from 365 predicted daily values is selected; higher predicted improvement values on 36 or 37 days a year are ignored. This *is not rational*. In the actual BART determination, a state could so dilute the predicted visibility improvement, one of the very goals of CAA section 169A, as to nullify its initial determination using the 98th percentile that the source is subject to BART. *Accordingly, the BART guidelines specifically mention the use of the 98th percentile as an option to compare pre- and post-control modeling runs; use of the 90th percentile is not mentioned.* 70 FR 39170. Moreover, the FLMs have affirmed the use of the 98th percentile in their most recent guidance for evaluating visibility impacts at Class I areas. FLAG 2010, p. 23. As discussed elsewhere, we find it reasonable to use the 98th percentile, worst-of-three-year modeled benefit over all receptors.
> (emphasis added)[40]

In its Montana FIP,[41] EPA consistently and repeatedly supported use of the 98th percentile (and number of days above 0.5 deciviews); EPA stated:

> *The BART Guidelines recommend comparing visibility improvements between control options using the 98th percentile of 24-hour delta deciviews, which is equivalent to the facility's 8th highest visibility impact day.*
>
> The ''delta deciviews'' for control options estimated by the modeling represents a BART source's impact on visibility at the Class I areas under different control scenarios. Each modeled day and location in the Class I area will have an associated delta deciviews for each control option. For each day, the model finds the maximum visibility impact of all locations (*i.e.*, receptors) in the Class I area.

---

[39] ENVIRONMENTAL PROTECTION AGENCY, 40 CFR Part 52, [EPA–R08–OAR–2010–0406; FRL–9648–3], Approval and Promulgation of Implementation Plans; North Dakota; Regional Haze State Implementation Plan; Federal Implementation Plan for Interstate Transport of Pollution Affecting Visibility and Regional Haze, ACTION: Final rule. April 6, 2012

[40] In section 3.5, "Visibility Calculation," of its February 2015 modeling protocol, UDAQ states that: The methodology for performing visibility calculations with the CALPUFF modeling system is described in several documents, including:

- Interagency Workgroup on Air Quality Modeling (IWAQM) Phase 2 Summary Report and Recommendations for Modeling Long Range Transport Impacts,
- **Federal Land Manager's Air Quality Related Values Workgroup (FLAG): Phase I Report**, and
- A User's Guide for the CALPUFF Dispersion Model

[41] ENVIRONMENTAL PROTECTION AGENCY, 40 CFR Part 52, [EPA–R08–OAR–2011–0851; FRL–9655–7], Approval and Promulgation of Implementation Plans; State of Montana; State Implementation Plan and Regional Haze Federal Implementation Plan, ACTION: Proposed rule. April 20, 2012

> From among these daily values, *the BART Guidelines recommend use of the 98th percentile, for comparing the base case and the effects of various controls.*
>
> The visibility improvement described in this table represents the change in the maximum 98th percentile impact over the modeled 3-year meteorological period (2006 through 2008) at the Class I area that showed the greatest improvement, Gates of the Mountains, WA. Similarly, the number of days above 0.5 deciviews is the total for the modeled 3-year meteorological period at Gates of the Mountains WA. (emphasis added)

We are puzzled by EPA's statement (highlighted in bold below) which does not appear to be consistent with results reported in Table 8 of Utah SIP revision[42] or Table 12 of Federal Register:

> Utah reported that the only metric it evaluated that showed greater improvement for the BART Benchmark in comparison to the BART Alternative was the 98th percentile metric (when averaged across all Class I areas and meteorological years modeled). Utah's comparison of the modeled visibility impacts on the 98th percentile day (8th highest impacted day in a given meteorological year) for the most impacted year shows that **the BART Benchmark would result in greater visibility improvement at five of the nine Class I areas, and is slightly better on average across all nine Class I areas (0.11 dv difference)**. At the most impacted Class I areas, Canyonlands and Capitol Reef, Utah found that the 98th percentile metric indicates the BART Benchmark has 0.76 dv and 0.57 dv, respectively, more improvement than the BART Alternative. At other Class I areas, Utah found that the 98th percentile metric indicates that the BART Alternative provides greater visibility improvement (for example, 0.44 dv at Flat Tops).

UDAQ's SIP Table 8 shows that BART would result in greater visibility improvement at six of the nine Class I areas and is better on average across all nine Class I areas (0.15 dv difference).

Our modeling analysis (see table below) shows that BART would result in greater visibility improvement at seven of the eight Class I areas we modeled, and is better on average across all nine Class I areas (0.17 dv difference) when UDAQ's results for Flat Tops are included. At the most-impacted Class I areas, Canyonlands and Capitol Reef, we found that the 98th percentile metric indicates BART has 0.72 dv and 0.63 dv, respectively, more improvement than the BART Alternative.

EPA's own modeling analysis for Utah's BART Alternative relied upon the 98th percentile values—not the 90th percentile or the numbers of days above a certain threshold.

EPA noted that:

---

[42] Air Quality Modeling Protocol: Utah Regional Haze State Implementation Plan, February 13, 2015

> [W]hen calculating visibility improvements for individual Class I areas, Utah mixed the impacts from different meteorological years between modeling scenarios (baseline, BART benchmark, and BART Alternative). This may introduce some error as the visibility improvements could be driven by year-to-year variability in meteorological conditions, as opposed to the differences in emission reductions between the BART Alternative and BART Benchmark. For this reason, in addition to considering the State's numbers, EPA also calculated the visibility improvements for each modeling scenario using consistent meteorological years. Using this method, whether the BART Alternative resulted in lower *98th percentile impacts* depended on both the particular Class I area and meteorological year modeled. In some years and some Class I areas, particularly some of the most impacted Class I areas, the BART Benchmark shows better visibility improvement than the BART Alternative. Notably, the BART Benchmark shows 0.93 dv greater improvement for Canyonlands in 2002 and 0.75 dv greater improvement for Capitol Reef in 2001. By contrast, the BART Alternative shows 0.90 dv greater improvement for Arches in 2003 and 0.43 dv greater improvement for Flat Tops in 2002. On the whole, when using this method, the BART Benchmark is better on average across all years and nine Class I areas (0.14 dv difference).[43] (emphasis added)

Furthermore, EPA's "Comparison of Utah Alternative" Table 12 shows that the BART Benchmark is better than BART at seven of nine Class I areas (0.14 dv difference).

We agree with EPA's proposal to find, consistent with the State's evaluation, that the 98th percentile metric favors the BART Benchmark.

**Annual Emissions Comparison for Visibility-Impairing Pollutants**

We agree with EPA's observations that:

- The BART Alternative will achieve greater $SO_2$ and $PM_{10}$ emissions reductions and greater aggregate emissions reductions of all pollutants,
- Not all pollutants impact visibility equally and that the total emissions reductions of all pollutants is not necessarily a direct indicator of whether the BART Alternative or the BART Benchmark will achieve greater reasonable progress, and
- $SO_2$ emissions reductions should provide visibility benefits in all seasons and that sulfate is the largest contributor to visibility impairment at the affected Class I areas.

[43] ENVIRONMENTAL PROTECTION AGENCY, 40 CFR Part 52, [EPA–R08–OAR–2015–0463; FRL—9939–43–Region 8], Approval, Disapproval and Promulgation of Air Quality Implementation Plans; Partial Approval and Partial Disapproval of Air Quality Implementation Plans and Federal Implementation Plan; Utah; Revisions to Regional Haze State Implementation Plan; Federal Implementation Plan for Regional Haze, ACTION: Proposed rule. January 14, 2016, p2022

However, EPA's proposal "to find that these observations suggest that the BART Alternative is likely to achieve greater reasonable progress" undermines the BART process and is inconsistent with its own comments. When evaluated objectively on their merits, EPA's observations do not "suggest" that, as EPA states, "the BART Alternative is *likely* to achieve greater reasonable progress." (emphasis added). EPA's valuation of the importance of the BART Alternative achieving "greater $SO_2$ and $PM_{10}$ emissions reductions" is contradicted by its own statement:

> However, as EPA explained in responding to comments in the final rule for the BART Alternative for the Apache Generating Station in Arizona's SIP, ''where BART and the BART Alternative result in reduced emissions of one pollutant but increased emissions of another, it is not appropriate to use the 'greater emission reductions' test.'' Instead, the proper approach is to employ a clear weight-of-evidence approach under 40 CFR 51.308(e)(2) in order to demonstrate that the alternative achieves greater reasonable progress than BART.[44]

Furthermore, in evaluating a BART Alternative for the Tesoro Refinery in Washington, even though there would be a greater reduction in annual $SO_2$ than in $NO_X$, EPA required a modeling analysis to demonstrate that the greater $SO_2$ BART Alternative reductions did, indeed, result in greater visibility improvement than the lesser $NO_X$ BART reductions.

The Utah BART Alternative is just such a case where one pollutant ($SO_2$) decreased but another pollutant ($NO_X$) increased, and, as EPA states, "…it is not appropriate to use the 'greater emission reductions' test.''

Based upon EPA's previous statements, policies, and precedents, EPA should not consider this comparison of annual emissions in its analysis.

While EPA's comment that "$SO_2$ emissions reductions should provide visibility benefits in all seasons and that sulfate is the largest contributor to visibility impairment at the affected Class I areas" is true, the Clean Air Act states

> Congress hereby declares as a national goal the prevention of any future, and the remedying of any existing, impairment of visibility in mandatory class I Federal areas which impairment results from manmade air pollution. [45]

The Clean Air Act goal is not limited to improving visibility in general and on average across broad areas. Instead, in order to remedy "any existing impairment," it is necessary

---

[44] ENVIRONMENTAL PROTECTION AGENCY, 40 CFR Part 52, [EPA–R08–OAR–2015–0463; FRL—9939–43–Region 8], Approval, Disapproval and Promulgation of Air Quality Implementation Plans; Partial Approval and Partial Disapproval of Air Quality Implementation Plans and Federal Implementation Plan; Utah; Revisions to Regional Haze State Implementation Plan; Federal Implementation Plan for Regional Haze, ACTION: Proposed rule. January 14, 2016, p2028

[45] 42 U.S. Code § 7491(a)(1).

to consider the impact of $NO_X$ emissions at specific times and locations as demonstrated by the modeling analysis.

As will be shown by an actual modeling analysis that takes into account the fact that "not all pollutants impact visibility equally," EPA's suggestion that "the BART Alternative is *likely* to achieve greater reasonable progress" is not supported by the ultimate test of actual visibility modeling and does not pass the "clear weight of evidence" test. EPA should withdraw this statement.

**Improvement in the Number of Days with Significant Visibility Impairment**

Although EPA used "Improvement in the Number of Days With Significant Visibility Impairment" in North Dakota, Montana, and Washington, it did not do so in Arizona and Wyoming,[46] nor did it present "number of days" in its own modeling results for Utah. And, where EPA did include "number of days" in its analysis in some states, it used 0.5 dv as its criterion—not 1.0 dv as EPA proposes to accept in Utah.

"Number of days" is not a meaningful comparative statistic because it does not accurately account for improvements in visibility. For example, if the results of hypothetical control Scenario A show ten days at 0.9 dv impairment and hypothetical control Scenario B show ten days at 0.6 dv impairment, there would be no change in the number of days exceeding either 1.0 or 0.5 dv between the two scenarios, even though visibility has improved by 0.3 dv. On the other hand, if the results of Scenario A show ten days at 0.6 dv and Scenario B show ten days at 0.4 dv, the metric would show a reduction of ten days above the 0.5 dv impairment metric, even though the amount of visibility improvement is less (0.2 dv versus 0.3 dv).

EPA's statement is incorrect:

> Therefore, for this reason and because these metrics are supported by our regulations and past practice, we propose to find the State's use of these metrics is appropriate.

We do not find evidence where EPA in past practice has considered number of days greater than 1.0 dv in regional haze BART decisions; and "number of days greater than 0.5 dv" has been used by EPA only occasionally.

In the case of the UT BART Alternative, although UDAQ's Table 8 shows that BART achieves more visibility improvement at six (of nine) Class I areas, the numbers of days

---

[46] In its Wyoming FIP, EPA stated, "The BART Guidelines recommend that visibility impairment be evaluated for the 98th percentile contribution for each BART source." EPA used the 98th percentile impacts but did not consider "number of days."

In its Arizona FIPs, EPA stated, "As recommended in the BART Guidelines, the 98th percentile daily impact in deciviews is used as the basic metric of visibility impact." EPA made no mention of "number of days" in its Federal Register notices.

exceeding 0.5 dv (UDAQ Table 5) actually increase for each of those six improving Class I areas. Furthermore, the five Class I areas in UDAQ's Table 4 that shows a decrease in the number of days above 1.0 dv under BART all show an increase in the number of days above 0.5 dv in Table 5. This "number of days" method cannot be used to compare control strategies because it is too sensitive to the relationship of the model result versus the metric threshold and presents misleading results.

Our modeling analysis shows a similar "disconnect" at Canyonlands between 98th percentile impairment (see below) and "number of days." Even though the 98th percentile impairment drops from 4.8 dv under the BART Alternative to 4.0 dv under BART, the number of "days per year greater than 0.5 dv" increases from 122 to 127.

EPA has given undue weight and credence in Utah to misleading metrics that are not statistically valid and that it has previously ignored (number of days greater than 1.0 dv) elsewhere.

**Annual Average Impact (dv)**

In its evaluation of BART and a BART Alternative at the Four Corners Power Plant, EPA rejected a proposal by APS, the plant owner, to average the visibility improvement over 16 Class I areas.[47] For the Navajo Generating Station, EPA rejected a proposal from SRP, the plant operator, which "demonstrated visibility improvements across the 11 parks … with an average of about 0.10 deciviews."[48] Despite having rejected similar averaging proposals on the Navajo Nation (as discussed above), EPA is now willing to consider this approach in Utah:

> Utah's modeling shows that the average annual dv impact at all Class I areas is better under the Utah BART Alternative at five of the nine Class I areas, and is better on average across all the Class I areas. The average impact was calculated by averaging all daily modeling results for each year and then calculating a 3-year average from the annual average. Utah's information shows that the BART Alternative is better than the BART Benchmark by 0.009 dv on average across all nine Class I areas. While EPA has not considered this metric in the past, since the State includes it, we consider it here. Furthermore, the BART Guidelines state that, "in determining what, if any, emission controls should be required, the State will have the opportunity to consider the frequency, duration, and intensity of a source's predicted effect on visibility." The annual average does provide an indication of the modeled visibility impacts for the entire year while the 98th percentile modeled results speak to a particular day (the 8th highest impacted day). Accordingly, and while we have typically relied primarily on the 98th percentile impacts in evaluating BART controls in other actions, we propose to find that the annual average impact provides additional useful information in considering Utah's weight of evidence. However, given that the difference in this

47 EPA-R09-OAR-2008-0454-0013.3

48 EPA-R09-OAR-2008-0454-0014 revised SRP BART analysis Jan 09

> metric is small (0.009 dv), we propose to find that it only marginally supports a conclusion that the BART Alternative achieves greater reasonable progress.[49]

We disagree with EPA's statement that this approach, which EPA rejected elsewhere and is contrary to EPA's stated intent to be ***"****consistent with our actions elsewhere"* in previous regional haze rulemakings, now provides "useful information."

UDAQ's Table 6 shows the results of using an average delta-dv across all Class I areas. Under this approach, for example, the 4.1 dv (98th percentile) impact at Capitol Reef NP becomes a 0.4 dv impact averaged across Capitol Reef NP. In effect, UDAQ has artificially diluted an impact that would be clearly perceptible to an impact that is considered imperceptible.

UDAQ's approach has been consistently rejected by EPA because it does not capture the magnitude of the impacts, but, instead, simply dilutes an impact by spatially and temporally spreading it across the Class I area. Instead of supporting this averaging metric and thus implying that is has some validity in Utah, EPA should clearly reject it.

**90th Percentile Impact (dv)**

UDAQ's Table 7 presents 90th percentile values which have never before been allowed by EPA and were explicitly rejected by EPA in North Dakota as "not rational"[50] and also explicitly rejected in the BART Guidelines:

> The use of 90th percentile value would effectively allow visibility effects that are predicted to occur at the level of the threshold (or higher) on 36 or 37 days a year. We do not believe that such an approach would be consistent with the language of the statute.[51]

For example, this approach converts a perceptible 1.3 dv (98th percentile) impact at Mesa Verde NP to an imperceptible 0.4 dv impact.

Now, EPA "propose[s] to find that it [90th percentile] only marginally supports a conclusion that the BART Alternative achieves greater reasonable progress." Such a

---

[49] ENVIRONMENTAL PROTECTION AGENCY, 40 CFR Part 52, [EPA–R08–OAR–2015–0463; FRL—9939–43–Region 8], Approval, Disapproval and Promulgation of Air Quality Implementation Plans; Partial Approval and Partial Disapproval of Air Quality Implementation Plans and Federal Implementation Plan; Utah; Revisions to Regional Haze State Implementation Plan; Federal Implementation Plan for Regional Haze, ACTION: Proposed rule. January 14, 2016, p2030

[50] "When the 90th percentile is used to assess predicted visibility improvement from a potential control option, the 37th or 38th highest predicted improvement value from 365 predicted daily values is selected; higher predicted improvement values on 36 or 37 days a year are ignored. This is not rational. In the actual BART determination, a state could so dilute the predicted visibility improvement, one of the very goals of CAA section 169A, as to nullify its initial determination using the 98th percentile that the source is subject to BART."

[51] ENVIRONMENTAL PROTECTION AGENCY, 40 CFR Part 51, [FRL–7925–9] RIN 2060–AJ31, Regional Haze Regulations and Guidelines for Best Available Retrofit Technology (BART) Determinations, ACTION: Final rule. July 6, 2005, p39121

proposal is inconsistent with the BART Guidelines and all previous EPA BART actions and should not be given any weight.

In conclusion, we recommend that EPA rely on the 98th percentile "key metric" as consistent with previous decisions. The other metrics do not provide clear weight of evidence that the BART Alternative provides greater reasonable progress than the BART scenario. The BART Alternative is not better than BART.

**IMPROVE Monitoring Data do not Provide Additional Weight of Evidence Supporting the BART Alternative is Better than BART.**

The IMPROVE monitoring network collects 24-hour aerosol samples every third day; daily aerosol concentrations and contributions to visibility are reported on the IMPROVE website[52] and the Federal Land Manager Environmental Database.[53] Monitors are operated at four Class I National Parks (NP) in Utah: Bryce Canyon NP, Canyonlands NP, Capitol Reef NP, and Zion NP. Arches NP is represented by the Canyonlands NP monitor. Discussion of IMPROVE monitoring data below focuses on Canyonlands NP which is located less than 150 km southeast of the Hunter and Huntington power plants and is projected by the CALPUFF analyses to have the highest impacts in both the BART scenario and the BART Alternative.

[52] Interagency Monitoring of Protected Visual Environments (IMPROVE). http://vista.cira.colostate.edu/improve/

[53] Federal Land Managers Environmental Database. http://views.cira.colostate.edu/fed/
Hand, J.L., Copeland, S.A., Day, D.E., Dillner, A.M., Indresand, H., Malm, W.C., McDade, C.E., Moore, C.T., Pitchford, M.L., Schichtel, B.A., Watson, J. G. 2011. Spatial and Seasonal Patterns and Temporal Variability of Haze and its Constituents in the United States: Report V, Interagency Monitoring of Protected Visual Environments (IMPROVE). http://vista.cira.colostate.edu/improve/Publications/Reports/2011/2011.htm

Class I Areas within 300 km of Carbon, Hunter & Huntington PPs




Gaseous emissions of sulfur dioxide and nitrogen oxides and their byproducts react in the atmosphere with available ammonia to form the secondary aerosols, ammonium sulfate and ammonium nitrate. At Canyonlands NP, the contribution of ammonium sulfate to light extinction (haze) on the 20% haziest days has decreased over the period of record 1990 to 2014. The trends for ammonium nitrate contributions on the 20% haziest days are not as clear. Ammonium nitrate formation is thermodynamically favored at lower temperatures; therefore nitrate levels are higher in the winter[54] than in the summer.

[54] We agree with EPA, and disagree with UDAQ, that park visitation should not be used to prioritize $SO_2$ controls over $NO_X$ controls. Peak ammonium nitrate concentrations and contributions to haze demonstrate the potential benefit of nitrate reductions to improve visibility during periods of low visitation.




Statistical analyses show that annual average nitrate concentrations have decreased at a rate of 2% per year (significant at the 90th percentile level) between 2000 and 2014.[55] Average nitrate concentration in 2013 was notably higher than in other years.




Considering nitrate trends for just the winter months January, February, November and December, the highest nitrate values occurred in December and January with high inter-annual variability. Nitrate decreased in all four winter months over the period 2000-2014,

55 Jenny Hand, Cooperative Institute for Research in the Atmosphere, Colorado State University, Ft. Collins, CO; personal communication February 2016.

but due to the smaller monthly data sets and high variability, these trends are not statistically significant.

Monthly nitrate levels were highest in 2013.




In 2013, ammonium nitrate contributions to light extinction in the winter months dominated the 20% haziest days (below) with values up to 20 inverse megameters ($mm^{-1}$). In contrast, ammonium sulfate contributed to light extinction throughout the year but at much lower levels (less than 7 $mm^{-1}$) than the nitrate peaks in 2013. Sulfate levels since 2010 are comparable to those illustrated for 2013, while the wintertime nitrate contributions are more variable between years.




UDAQ's September 2014 Staff Review of 2008 BART Determination suggests that the 98th percentile nitrate values are increasing over time, despite decreases in NOx emissions. As shown above, this is clearly not the case; nitrate concentrations are showing a downward trend. Because ammonium sulfate is decreasing, they suggest that availability of ammonia may be limited and as less ammonia reacts with sulfuric acid (the oxidation product of $SO_2$ emissions), more ammonia is available to react to form nitrate particles. This may well be the case, which emphasizes the importance of nitrate into the future. The data from the ammonia monitoring site at Canyonlands indicate that even in the winter, there is sufficient available free ammonia to produce additional ammonium nitrate. Data do not support a conclusion that ammonia is rate-limiting to nitrate particle formation and in fact would support the need for further $NO_X$ controls to reduce the deleterious effects of ammonium nitrate on visibility.

IMPROVE monitoring data alone are not sufficient to interpret the contributions of specific emission sources or the benefits of emission reductions at those sources that contribute to measured pollutant concentrations. Rather, monitoring data represent a synthesis of contributions from local, regional, national, and international sources. Meteorological conditions and existing background concentrations determine the atmospheric chemical transformation and transport of pollutants, and their byproducts, from a source to a Class I area. UDAQ did not evaluate how frequently meteorological conditions on high nitrate days supported atmospheric transport of emissions from Hunter and Huntington power plants and their byproducts to Canyonlands.

To evaluate potential source regions contributing to nitrate particles at the IMPROVE monitor, we applied the Hysplit model[56] to project air mass trajectories backwards in time and space for all monitoring days in January, February, November, and December in

[56] R. R. Draxler and G. D. Hess, "An overview of the HYSPLIT_4 modeling system of trajectories, dispersion, and deposition," *Aust. Meteor. Mag.*, 47, 295-308, 1998.

2008-February 2015. The Hysplit model was run in backwards ensemble mode using North American Mesoscale Model output at 12 km grid resolution (NAM12) with trajectories starting at a height of 10 m for every hour and running for the previous 72 hours.




On many winter days with the highest nitrate values (days when nitrate was greater than the 90th percentile value of 0.92 μg/m$^3$), atmospheric dispersion was generally poor and transport distances were comparatively short. On roughly 50% of the highest nitrate days in 2008-February 2015, trajectories indicate that emissions from Hunter and Huntington could be transported to Canyonlands and could be contributing to the elevated nitrate levels. Because emissions from other sources in the same transport sector could also be contributing to Canyonlands on the highest nitrate days, back-trajectory analyses cannot discern contributions from the Hunter and Huntington power plants relative to other sources.

To evaluate how transport might be different on highest nitrate days compared to all winter days, trajectories were compiled into differential probability plots for each year individually and for the composite of all years. These are calculated by subtracting the probability of transport during all days from the probability of transport from the same area during high nitrate days. Illustrated below is the differential probability plot for the winter days in the period January 2008- February 2015. The areas in red indicate the areas from which emissions would be much more likely to be transported on highest nitrate days, compared to all days; while the areas in blue indicate areas from which emissions are much less likely to originate on highest nitrate days compared to all days. For the period 2008-February 2015, areas to the northwest, northeast, east and south and relatively close to Canyonlands NP have the highest probability of contributing to aerosol concentrations on the highest nitrate days. These areas include regions of Utah, Colorado

and New Mexico where power plants and oil and gas fields are located. Areas to the west and at a greater distance are less likely to contribute on highest nitrate days compared to all days. Also included below are differential probability plots for 2013, a year with many high nitrate episodes, and 2014, a year with lower and fewer high nitrate episodes. In 2013, the area where the Hunter and Huntington power plants are located is highly likely to contribute to pollutant concentrations at the monitor. In 2014, there are fewer days that exceed the 90th percentile nitrate value; the longer trajectories that pass over the vicinity of the Hunter and Huntington facilities indicate that there is greater ventilation and potentially greater dispersion. These data do not identify contributions specifically from the Hunter and Huntington power plants on high nitrate days, but do indicate the potential for their contributions.




Transport difference map = (Probability of Transport During High Nitrate Days) – (Probability of Transport During All Days) showing areas where air masses were more likely than average to arrive from when the nitrate concentration was in the highest 10% of measured concentrations at Canyonlands during Nov-Feb, 2008-2014.




Transport difference map = (Probability of Transport During High Nitrate Days) – (Probability of Transport During All Days) showing areas where air masses were more likely than average to arrive from when the nitrate concentration was in the highest 10% of measured concentrations at Canyonlands during Nov-Feb, 2013.




Transport difference map = (Probability of Transport During High Nitrate Days) – (Probability of Transport During All Days) showing areas where air masses were more likely than average to arrive from when the nitrate concentration was in the highest 10% of measured concentrations at Canyonlands during Nov-Feb, 2014.

**Conclusions regarding implications of IMPROVE monitoring data for NOx Controls:**

- We agree with UDAQ and EPA that ammonium sulfate occurs year round and that sulfur dioxide reductions "will achieve meaningful visibility improvement."
- We disagree with UDAQ that IMPROVE monitoring data support a conclusion that the installation of low $NO_X$ burners to reduce emissions between 2006 and 2014 at Hunter and Huntington power plants has not improved visibility at Canyonlands NP; nitrate concentrations are trending down.
- Because emissions from other sources also could be transported to Canyonlands NP on the highest nitrate days it is not possible to quantify, using the monitoring data alone, the benefit of $NO_X$ emissions reductions at Hunter and Huntington. However, back trajectory analysis indicates that the Hunter and Huntington facilities are likely contributors when high nitrate is observed at Canyonlands NP.

## IV. EVALUATION OF THE WEIGHT OF EVIDENCE

In evaluating Utah's weight-of-evidence demonstration, EPA says it evaluated all nine elements of Utah's analysis. However, it is our understanding that EPA did not evaluate all of UDAQ's model inputs and results—instead, EPA simply accepted them at face value and we have shown that some of UDAQ's model inputs are improperly biased in favor of its BART Alternative. Nevertheless, EPA relies primarily on the following four elements in proposing to approve the BART Alternative:

- Annual emissions comparison for two pollutants;
- Improvement in the number of days with significant visibility impairment;
- IMPROVE monitoring data regarding sulfates; and
- The early timing for installation of controls.

We have shown that EPA's first primary element, annual emissions comparison for two pollutants, is not valid because one pollutant ($NO_X$) is increasing while another pollutant ($SO_2$) is decreasing. EPA cannot use this element to support UDAQ's BART Alternative.

EPA's second primary element, improvement in the number of days with significant visibility impairment, is not a meaningful comparative statistic and has not been consistently applied by EPA in other actions.

EPA's third primary element, IMPROVE monitoring data supports the benefit of $SO_2$ reductions for reducing sulfates, does not negate the value of reducing $NO_x$ emissions. EPA has only once previously approved substituting $SO_2$ for $NO_x$ reductions, and that substitution occurred within the same facility (Tesoro). IMPROVE data indicate that nitrate is being reduced in all months at Canyonlands NP.

Although EPA did not discuss the "early timing for installation of controls" element prior to its weight-of-evidence discussion, it has introduced this element with little explanation or evaluation. Utah's regional haze SIP was due in late 2007, but its complete SIP was not submitted until 2015. The "early" actions that EPA is crediting to the Hunter and Huntington power plants would likely have occurred well before "between 2019 and 2021" (as EPA speculates), and certainly before the 2018 deadline for BART implementation, had Utah complied with the 2007 deadline. As for the Carbon Plant shutdown, PacifiCorp waited until the last allowable day to close the plant rather than comply with the Mercury and Air Toxics Standard.

Despite EPA's finding that "the 98th percentile visibility impact is a '*key metric'* that EPA has primarily focused on in prior actions" it "proposes to conclude that by itself it is not a dispositive metric in weighing a BART Alternative." However, the most appropriate comparative statistical metrics consistently used by EPA are the 98th percentile values presented in UDAQ Tables 8 & 9,[57] both of which show that the cumulative impact of UDAQ's BART Alternative does not make more reasonable

[57] Air Quality Modeling Protocol: Utah Regional Haze State Implementation Plan, February 13, 2015

progress than the BART $NO_x$ scenario. Furthermore, Table 8 shows that UDAQ's BART Alternative fails this test at seven of nine Class I areas, while Table 9 shows failure at five of nine Class I areas.

In a clear weight of evidence demonstration, the burden is on UDAQ to show unequivocally that it has met that test—it has not done so because it has failed to show that the "key metric" favors its position, even when inflated emissions from Hunter Unit 3 and Carbon are included in the hypothetical BART scenario. EPA should not marginalize its most consistently applied and most valuable decision metric in favor of metrics that are either invalid, rejected, never before used, or of minor importance. The only two metrics that EPA has consistently used in other actions—the 98th percentile and the number of days with greater than 0.5 dv impact—yield a "split decision" even if given equal weight (which they should not). A "split decision" does not demonstrate a "clear weight of evidence." Thus the UDAQ BART Alternative does not meet current regulatory "clear weight of evidence" requirements, and EPA should reject this alternative in favor of BART.

**The UDAQ NOx BART Alternative Relies on $SO_2$ Reductions Already Credited under 40 CFR 51.309**

In modeling the impacts of the "Most Stringent NOx" BART control scenario and the UT BART Alternative for NOx, UDAQ included $SO_2$ and PM emissions in addition to $NO_X$ emissions from each facility to account for interactions among pollutants and total impacts. However, $SO_2$ reductions statewide are already being credited under Utah's 2003 Regional Haze SIP and the 40 CFR 51.309 (Section 309) $SO_2$ Milestone program. Because Utah participates in the Western Backstop Trading Program to satisfy its regional haze obligations for $SO_2$, any reductions in $SO_2$ attributed to the Carbon Plant closure would be proper to consider solely in the context of Utah's obligations under that program. Crediting the same $SO_2$ emissions under UDAQ's $NO_X$ BART Alternative appears to be double-counting.

In 2011, UDAQ submitted an $SO_2$ regional haze SIP to EPA, which EPA approved. UDAQ's $SO_2$ RH SIP took credit for the Carbon Plant $SO_2$ emission reductions in its justification for the SIP's BART alternative for $SO_2$. That alternative program, developed under Section 309, relied on the Western $SO_2$ Backstop Trading Program to achieve greater emission reductions than would source-by-source application of the $SO_2$ BART requirements. That alternative program was found to be "better than BART" expressly because emissions reductions projected by those inventories would be ***exceeded*** through voluntary measures at "smaller, non-BART sources."

On October 7, 2015 UDAQ committed to report the historical emissions for the Carbon Plant in the annual milestones reports from 2016 through the life of the backstop trading program. UDAQ also committed to making revisions as necessary to its SIP as well as any other applicable provisions to implement the requirement for reporting Carbon's historical emissions under the 309 program. UDAQ proposes to amend its $SO_2$ RH SIP by extracting the previously relied upon Carbon $SO_2$ reductions and apply these

reductions to its BART Alternative. But UDAQ's proposal would effectively undermine EPA's legal justification for approving the Section 309 alternative program. Having touted the 309 Program's ability to garner $SO_2$ emission reductions from "smaller, non-BART sources" such as Carbon, EPA should not allow UDAQ to now extract such sources from the program. Doing so would appear to nullify its previous "better than BART" determination and the legal underpinnings for the 309 Program approval.

Section 309 of the Regional Haze regulations establishes the rules for the accounting of $SO_2$ emissions under the Western $SO_2$ Backstop Trading Program. The regional haze regulations state that Utah's 309 plan "must include provisions requiring the monitoring, recordkeeping, and annual reporting of ***actual*** stationary source $SO_2$ emissions within the State. UDAQ's proposal violates this provision by including over 8,000 tons of hypothetical $SO_2$ emissions from Carbon in future inventory reports, when in fact the ***actual*** emissions from Carbon from 2016-2018 will be zero. Thus, UDAQ's proposal violates the mandatory requirement to report "***actual*** stationary source $SO_2$ emissions within the State."

UDAQ's proposal also ignores that there are two other states participating in the $SO_2$ Western Backstop Trading Program, namely Wyoming and New Mexico. Section 309 specifically recognizes that, "…all States in the program [must] use the same methodology." Unless Wyoming and New Mexico revise their $SO_2$ SIPs to discount the Carbon $SO_2$ emission reductions, this requirement of Section 309 will be violated.

We have seen several BART Alternatives accepted by states and/or EPA. The BART Alternatives listed below all conformed to the Preamble discussion to the 2006 rule (p. 60620):

> In the case of ***programs designed solely to satisfy BART requirements***, which ***may arguably be limited to BART sources only***, the approach set forth in the final rule provides the opportunity for an individual source not to be regulated by a trading program. [emphasis added]

We request that EPA explain what it means by use of the term "may arguably be limited to BART sources only." If the UDAQ BART Alternative, which is designed "solely to satisfy BART requirements," is, indeed, "limited to BART sources only," then Hunter Unit 3 and Carbon cannot be included. This would drastically change the results of the "better than BART" analyses.

The following alternatives are limited to emissions from units that are subject to BART and within the facility fence line:

- The Four Corners Power Plant (Navajo Nation) shut down three coal-fired EGUs in exchange for delayed installation of SCR on two remaining EGUs.
- The Navajo Generating Station will effectively shut down one coal-fired EGU in exchange for delayed reductions at the two remaining coal-fired EGUs.

- The Boardman Power Plant (OR) will shut down its coal-fired EGU by 2020 in exchange for less stringent interim $SO_2$ and $NO_x$ controls.
- The Centralia Power Plant (WA) will shut down one coal-fired EGU in 2020 in exchange for delaying shut down of the second EGU to 2025.
- Alcoa agreed to limit sulfur content of its petroleum coke at its Intalco (WA) primary aluminum smelter.
- Under the Apache BART Alternative, one BART EGU would be converted from a primarily coal-fired unit to a unit that combusts pipeline-quality natural gas, while a second BART EGU would remain as a coal-fired unit and would be retrofitted with Selective Non-Catalytic Reduction.

We have also seen BART Alternatives that stay within the fence line of an affected facility but include emission units and/or pollutants not subject to BART, and are based on CALPUFF modeling:

- Tesoro Refinery (WA) traded $SO_2$ reductions in lieu of $NO_x$ reductions.
- Georgia Pacific (WI) traded $SO_2$ and $NO_X$ reductions among BART and non-BART boilers at its Green Bay (WI) Kraft pulp mill.[58] WI incorporated provisions of EPA's Economic Incentive Program.

The 1999 Regional Haze Rule provides that, "…States may elect to adopt alternative measures, such as a regional emissions trading program…" and this provided the basis for the WRAP trading program for $SO_2$, in which UT is a participant. And, the preamble to the 2006 Alternative BART rule (pp. 60619-20) provides examples of trading programs [emphasis added]:

- …trading programs generally include all sources within a ***source category*** in a trading region…
- States in the WRAP designed their program to apply to ***all stationary sources*** with actual emissions of 100 tons per year or more, regardless of the type of source or the age of the facility.

CAIR/CSAPR, Colorado,[59,60] Maryland, Massachusetts and North Carolina went beyond the fence line to use emission trading programs to satisfy BART reductions. These are

---

[58] Under the state BART rule, s NR 433.06, Wis. Adm. Code, sources may trade emissions in complying with BART requirements. In using a trading approach, a facility is not allowed to trade with other facilities and must account for other sources at the facility serving the same function - thus avoiding load shifting. The rule also requires that any trading program fulfill two criteria: first, an additional 10% reduction beyond the BART requirement for the pollutant being offset with emissions trading. Second, any trading of emissions must result in visibility improvement equivalent to BART emission requirements plus the 10% additional reduction.

[59] "…the State's BART alternative program was designed to meet requirements other than BART." ENVIRONMENTAL PROTECTION AGENCY, 40 CFR Part 52, [EPA–R08–OAR–2011–0770, FRL–9650–7], Approval and Promulgation of Implementation Plans; State of Colorado; Regional Haze State Implementation Plan, ACTION: Proposed rule. March 26, 2012

examples of "…a trading program or other similar alternative program has been designed primarily to meet a Federal or State requirement other than BART…"[61]

The UDAQ BART Alternative is unique in that it is not a pre-existing state program (like CO, MA, MD and NC) and goes beyond the fence line of the BART-eligible Hunter and Huntington facilities to include a facility (Carbon Power Plant) not eligible for BART and a pollutant ($SO_2$) already covered under a separate BART trading program.[62] For these reasons, it is our understanding that the UDAQ approach is more similar to the trading programs previously cited than the BART Alternatives listed above. To conform to the intent of the 1999 Regional Haze Rule, it seems the UT trading program should include all significant sources within a ***source category*** (EGUs) in a trading region (UT).

## V. PROCEDURAL ISSUES

According to 40 CFR 51.302(2) and 40 CFR 51.308(2), "The State must provide opportunity for consultation, in person and at least 60 days prior to holding any public hearing on the plan, with the Federal Land Manager on the proposed SIP revision required by this subpart. This consultation must include the opportunity for the affected Federal Land Managers to discuss their:

**(i)** Assessment of impairment of visibility in any mandatory Class I Federal area, and
**(ii)** Recommendations on the development of the long-term strategy."

On 9/23/2014, UDAQ sent an email advising that, "The Utah Division of Air Quality (DAQ) has prepared a draft revision to the Utah Regional Haze SIP to address the EPA's December 14, 2012 disapproval of the BART determinations for NOx and PM for four EGUs in Southern Utah… A hearing on the proposed revisions to the RH SIP and the 5-Year Progress report has been scheduled for Tuesday, December 1, 2014…We are still compiling the technical support document for this SIP revision and plan to post all of the documents online prior to the start of the public comment period."

However, the technical support document referenced above for this SIP revision, which is a critical part of the BART process, was not posted until we received an email from UDAQ on 11/25/2014, advising that, "The Utah Division of Air Quality has completed some additional CALPUFF modeling to supplement the modeling completed by

---

[60] "In 2010, the Colorado General Assembly adopted legislation authorizing the Air Quality Control Commission and the Public Utilities Commission to develop a comprehensive plan for coal-fired electric generating units in the state that would address not only regional haze but also potential new ozone standards and mercury standards, as well as other requirements that, in the State's view, could apply to coal-fired electric generation units in the foreseeable future. The State desired to address these issues in a coordinated way in order to achieve the most cost-effective strategy that accounted for not only current, but other imminent regulatory requirements." ENVIRONMENTAL PROTECTION AGENCY, 40 CFR Part 52, [EPA–R08–OAR–2011–0770, FRL–9734–8], Approval and Promulgation of Implementation Plans; State of Colorado; Regional Haze State Implementation Plan. ACTION: Final rule. December 31, 2012
[61] ENVIRONMENTAL PROTECTION AGENCY, Revisions to Provisions Governing Alternative to Source-Specific Best Available Retrofit Technology (BART) Determinations, Final rule. October 13, 2006
[62] 40CFR 51.309

PacifiCorp in 2012. A summary of the results and the modeling protocol have been posted as part of the technical support documentation for the proposal…The public comment period has been extended through December 22nd to allow time for public review of this additional information."

UDAQ failed to provide the 60-days (prior to the 12/1/2014 public hearing) required for us to evaluate critical information provided on 11/25/2014 and, as a result, NPS was unable to complete and make public its assessment of impairment of visibility in the mandatory Class I Federal areas affected by the proposal.

EPA is incorrect in asserting that, "The State provided the opportunity for the FLMs to review the preliminary draft SIP documents via email approximately 68 days prior to the public hearing that was held on a December 1, 2014." While we were provided some of the draft SIP documents on 9/23/2014, we did not receive the critical "additional CALPUFF modeling to supplement the modeling completed by PacifiCorp in 2012. A summary of the results and the modeling protocol have been posted as part of the technical support documentation for the proposal…" until six days before the public hearing. Partial consultation via incomplete information does not fulfill UDAQ's obligation to provide the "Assessment of impairment of visibility in any mandatory Class I Federal area…" required by the regulation.

EPA notes that, "The October 2015 Utah RH SIP was provided for public comment August 15 through September 14, 2015, and we are not aware of any prior FLM consultation on this SIP. The FLMs did not submit comments during this public comment period." NPS did not submit comments because we were not notified until we received an email[63] from EPA on 9/6/2015 advising that. "There is another public comment period which closes on 9/14/15..." UDAQ's failure to provide notice to the FLM of the August 15 through September 14, 2015 public comment period is another example of its failure to meet its consultation requirements.

---

[63] From: **Fallon, Gail** <fallon.gail@epa.gov>Date: Wed, Sep 9, 2015 at 8:13 AM, Subject: RE: EPA UT regional haze public comment letter, To: "Brewer, Patricia" <patricia_f_brewer@nps.gov>
Cc: "Tim Allen (Tim_Allen@fws.gov)" <Tim_Allen@fws.gov>, "Anderson, Bret A -FS" baanderson02@fs.fed.us> Pat – There is another public comment period which closes on 9/14/15. Sorry, I didn't realize that UT hadn't alerted you.

# TECHNICAL SUPPORT DOCUMENT
# TO COMMENTS OF CONSERVATION ORGANIZATIONS

**Review of EPA's Proposed Rule Regarding Utah's Regional Haze State Implementation Plan (SIP) Submittal of an Alternative to Best Available Control Technology (BART)**
**And**
**Review of EPA's Determination of Best Available Control Technology (BART) for Nitrogen Oxide Emissions at Units 1 and 2 of the Hunter Power Plant and Units 1 and 2 of the Huntington Power Plant**

**March 14, 2016**

Table of Contents.

I. EPA's Proposed Approval of Utah's NOx BART Alternative. ....4

A. Evaluation of NOx BART and Associated NOx Emission Reductions for the BART-Subject Units in Utah. ....5

1. Review of PacifiCorp's Five Factor BART Analysis for NOx at Hunter Units 1 and 2 and Huntington Units 1 and 2 ....6

2. Analysis of SCR Plus LNB/OFA Cost Effectiveness for Hunter Units 1 and 2 and Huntington Units 1 and 2 Using the Sargent & Lundy Integrated Planning Model SCR Cost Module ....20

3. The Cost Effectiveness of SCR Plus LNB/OFA Are Reasonable at Hunter 1 and 2 and Huntington 1 and 2. ....31

B. Utah's Methods of Evaluating Whether its BART Alternative Will Achieve Greater Reasonable Progress than Implementation of NOx BART ....32

1. Utah's Modeling of the Carbon Units Based on 2012-2013 Emissions is Reflective of the Units Burning Higher Sulfur Coal than was Typical for the Carbon Plant's Historical Operations. ....33

2. In Comparing the BART Alternative to the BART Benchmark, Utah Should Have Accounted for Carbon Units 1 and 2 Operating in Compliance with the Mercury and Air Toxics Standards. ....43

3. Utah's Modeling of NOx Emissions From Hunter Unit 3 in the BART Alternative is Flawed. ....46

4. Utah's Evaluation of Projected Emission Reductions Under its BART Alternative ....50

II. Review of EPA's Proposed NOx BART FIP Requirements. ....59

A. Comments on EPA's Cost Effectiveness Analyses for Low NOx Burners/Separated Overfire Air Plus SCR ....59

B. EPA Should Set the NOx BART Limit at 0.05 lb/MMBtu on a 30-Day Average. ....60

C. Summary: EPA's Proposed NOx BART Determinations of LNB/SOFA/SCR at Hunter Units 1 and 2 and Huntington Units 1 and 2 Are Justified, with the Exception that EPA's Proposed BART Emission Limit Should be Lower to Reflect the Capabilities of the Pollution Controls. ....62

III. Review of EPA's Proposed Approval of Utah's PM10 BART Requirements. ....62

### 2. In Comparing the BART Alternative to the BART Benchmark, Utah Should Have Accounted for Carbon Units 1 and 2 Operating in Compliance with the Mercury and Air Toxics Standards.

As part of its comments to the UDAQ April 2015 proposal to adopt the BART alternative, the Conservation Organizations submitted a modeling analysis of UDAQ's "Most stringent NOx" scenario but with changed emissions for Carbon Units 1 and 2. The Conservation Organizations are submitting that modeling to EPA as part of its comments on EPA's January 14, 2016 co-proposal on the Utah regional haze plan. This section of my report explains how the emissions were derived for the Carbon Power Plant in the Conservation Organizations' modeling analyses.

As previously stated, Utah's modeling of the BART Benchmark was based on 2012-2013 actual emissions for Carbon Units 1 and 2, and also was based on 2001-2003 actual emissions for Hunter Unit 3 and UDAQ's determination of the most stringent NOx rate for the BART-eligible units of Hunter Units 1 and 2 and Huntington Units 1 and 2.[151]

UDAQ failed to account for other air pollution controls that would apply to the Carbon units beginning in 2015. Specifically, if the Carbon Power Plant units had not shut down in 2015, the units would have had to comply with EPA's Mercury and Air Toxics Standards (MATS) by April 15, 2015. Thus, any BART alternative should be compared to NOx and PM BART at Hunter Units 1 and 2 and Huntington Units 1 and 2, as well as MATS compliance at Carbon Units 1 and 2. UDAQ did not model this scenario, and thus the Conservation Organizations have provided its modeling of this scenario into the record for consideration by EPA.

The MATS rule would have imposed emission limits on Carbon Units 1 and 2 emissions of mercury, filterable particulate matter or specific non-mercury metal hazardous air pollutants (HAPs), and hydrogen chloride (HCl) or sulfur dioxide (SO2) as a surrogate for acid gas HAPs.[152] In order to assess the impacts of MATS rule compliance on visibility impairment caused by Carbon Units 1 and 2, SO2 emissions were projected based on compliance with the acid gas MATS surrogate limit of 0.20 lb SO2 per MMBtu. The Carbon units have no SO2 pollution controls and as shown in Table 9 above, have emitted SO2 at rates of 0.63 lb/MMBtu and higher in the last 15 years. Thus, the units would need to reduce SO2 to the acid gas HAPs surrogate limit of 0.20 lb/MMBtu to comply with MATS, and compliance would have been required by April 15, 2015.[153] Although NOx emissions also may be reduced somewhat due to the work practice standards of the MATS rule (in 40 C.F.R. Part 63, Subpart UUUUU, Table 2), there is no specific NOx emission limit mandated by the MATS rule.

---

[151] See Table 2 of Utah's May 13, 2015 Staff Review of 2008 PM BART Determination and Recommended Alternative to BART for NOx, at page 9. (Docket ID EPA-R08-OAR-2015-0463-0002).
[152] 40 C.F.R. Part 63, Subpart UUUUU, Table 2.
[153] Alternatively, the Carbon units could have complied with the 0.002 lb/MMBtu hydrogen chloride MATS limit instead of the 0.20 lb/MMBtu SO2 acid gas surrogate limit but, either way, a reduction in SO2 would be expected as a co-benefit of controlling HCl emissions or through direct compliance with the SO2 acid gas surrogate limit. Thus, it was assumed that the Carbon units if operated under MATS would comply with the 0.2 lb/MMBtu SO2 MATS limit.

With respect to PM emissions, it is possible that the PM emission rates at Carbon Units 1 and 2 would need to be reduced more to comply with MATS. However, the record does not include PM stack test data for Carbon Units 1 and 2, making it difficult to ascertain whether the units would need reduce PM to meet the 0.03 lb/MMBtu particulate matter MATS surrogate limit for non-mercury metal HAPs. Even if PM emissions did not have to be reduced to comply with the non-mercury metal HAPs limits, compliance with the mercury MATS limit may have necessitated the addition of a baghouse at each unit to be used with activated carbon injection, which would greatly reduce PM emissions from the current levels of control with ESPs at Carbon Units 1 and 2. However, because of the lack of PM stack test data for Carbon Units 1 and 2, no attempt was made to predict PM emissions reductions under MATS. This means that the Conservation Organizations' modeling of the BART/MATS compliance scenario in the revised BART Benchmark modeling likely overstated visibility impacts by not reducing the Carbon units' PM emissions to reflect MATS compliance.

To determine appropriate emission rates to model for the Carbon units in the Conservation Organizations' scenario of MATS compliance in the BART benchmark modeling, the maximum daily emission rates for Carbon Units 1 and 2 had to be determined. UDAQ modeled maximum daily NOx rates for Carbon Units 1 and 2 based on 2012-2013 data in its Most Stringent NOx BART scenario. Those same rates were modeled in the Conservation Organizations' scenario of MATS compliance and BART compliance although, as stated above, compliance with the work practice standards of the MATS rule may have resulted in somewhat lower NOx rates. For the reasons discussed above, no reductions in PM emissions were assumed for MATS compliance at Carbon Units 1 and 2, so UDAQ's assumed PM emission rates were modeled on the Conservation Organizations' modeling for the MATS/BART scenario. The Conservation Organizations' modeling only made changes to the SO2 emissions for Carbon Units 1 and 2.

It must be noted that, in deriving maximum daily SO2 emission rates reflective of MATS compliance, I used the maximum daily SO2 rates from the same 2012-2013 timeframe as used by Utah in its BART benchmark modeling, but then determined a controlled maximum daily SO2 emissions rate for Carbon Units 1 and 2 reflective of compliance with the 0.20 lb/MMBtu SO2 surrogate limit for acid gases under the MATS rule. However, as described in great detail above, the Carbon units were burning coal during the 2012-2013 timeframe that was untypical for the plant in that the coal had higher sulfur content relative to the other coals historically utilized at the Carbon units. None-the-less, the projected maximum daily SO2 emission rates under MATS for Carbon Units 1 and 2 would be very similar whether based on the 2012-2013 emissions data or whether based on the median emission rates over 2001-2014. Further, using the 2012-2013 emissions data as a starting point for developing maximum daily SO2 emission rates reflective of MATS compliance more readily provides for direct comparison of BART Benchmark/MATS Compliance modeling to Utah's BART Benchmark modeling results.

For SO2, the maximum daily SO2 emission rates in tons per day during 2012-2013 at each unit were determined, and also the three-year average annual SO2 rate in terms of lb/MMBtu was determined. Then, to project the maximum daily SO2 emission rates reflective of compliance with the SO2 limit in the MATS rule, the percent reduction required from the 2012-2013 annual average lb/MMBtu SO2 rate to achieve the 0.20 lb/MMBtu MATS limit was calculated, and it was assumed that the maximum daily pound SO2 per hour emission rate at

each unit during 2012-2013 would decrease by the same percent reduction with SO2 controls to meet MATS. This is a commonly-applied method for predicting maximum daily emissions under control scenarios for BART modeling.

Specifically, Carbon Units 1 and 2 would have to reduce SO2 by 82.6% and 82.2%, respectively, from 2012-2013 average lb/MMBtu emission rates to achieve the 0.20 lb/MMBtu SO2 MATS limit.[154] These percent reductions were applied to the maximum daily SO2 rates during 2012 to 2013 to project the maximum daily pound per hour SO2 rates of the units expected under compliance with the SO2 MATS limit.

Tables 11 and 12 below provide the maximum daily SO2 and NOx rates during the 2012 to 2013 and under compliance with MATS. Note that the pound per hour rates are simply based on multiplying the maximum ton per day emission rates by 2000 pounds per ton and dividing by 24 hours per day to arrive at a pound per hour rate that is used in the visibility modeling.

**Table 11. Carbon 2012-2013 Baseline Max Daily SO2 and NOx Emission Rates[155]**

| | SO2, Max Daily Rate, 2012-2013, ton/day | SO2, Max Day 2012-2013, lb/hr | NOx, Max Daily Rate, 2012-2013, ton/day | NOx, Max Day 2012-2013, lb/hr |
|---|---|---|---|---|
| Carbon Unit 1 | 16.2 tpd | 1,348 lb/hr | 5.3 tpd | 438 lb/hr |
| Carbon Unit 2 | 21.7 tpd | 1,812 lb/hr | 8.4 tpd | 696 lb/hr |

**Table 12. Carbon Projected Maximum Daily NOx and SO2 Emissions Under MATS[156]**

| | SO2, Projected Max Daily Rate under MATS, ton/day | SO2, Projected Max Daily Rate under MATS, lb/hr | NOx, Max Daily Rate, 2012-2013, ton/day | NOx, Max Day 2012-2013, lb/hr |
|---|---|---|---|---|
| Carbon Unit 1 | 2.8 tpd | 234 lb/hr | 5.3 tpd | 438 lb/hr |
| Carbon Unit 2 | 3.9 tpd | 323 lb/hr | 8.4 tpd | 696 lb/hr |

The projected SO2 emission rates under MATS as shown in Table 12 above are significantly lower than the SO2 emission rates modeled for the Carbon units in the BART Benchmark. Consequently, Utah's modeling analysis of the BART Benchmark overstates the visibility impacts under the BART Benchmark scenario. The Carbon units could not have continued operating without SO2 controls past April 2015 pursuant to the MATS rule.[157] Indeed, the units would have had to install SO2 controls to meet the MATS standard much

[154] *See* Ex. 46, spreadsheet with 2012 to 2013 CAMD data for Carbon Units 1 and 2 at Summary tab.
[155] *Id.*
[156] *Id.*
[157] In 2015 the U.S. Supreme Court found that EPA erred when it determined that costs was irrelevant to its "necessary and appropriate" finding in adopting the MATS rule. *Michigan v. EPA*, 135 S. Ct. 2699 (2015). However, the Supreme Court did not issue a stay of the MATS rule or otherwise invalidate or alter the emission standards promulgated in the rule. EPA has issued a proposed supplemental finding on costs in response to the Supreme Court decision. 80 Fed. Reg. 75025. Thus, the MATS standards remain in effect and the Carbon plant would have been required to meet the MATS standards if it continued operating beyond April 15, 2015.

**HEAL UTAH * NATIONAL PARKS CONSERVATION ASSOCIATION * SIERRA CLUB**

March 14, 2016

Gail Fallon
U.S. Environmental Protection Agency,
Region 8, Air Program
Mailcode 8P-AR
1585 Wynkoop St.
Denver, CO 80202-1129

Via email to Fallon.Gail@epa.gov and submitted to www.regulations.gov[1]

**Re: Comments on EPA Proposed Rule on Utah Regional Haze State Implementation Plan Docket EPA-R08-OAR-2015-0463**

Dear Ms. Fallon:

On behalf of the HEAL Utah, National Parks Conservation Association, and Sierra Club (collectively referred to herein as the "Conservation Organizations"), we respectfully submit the following comments on EPA's Proposed Rule on the Utah Regional Haze State Implementation Plan, Docket EPA-R08-OAR-2015-0463 (entitled "Approval, Disapproval, and Promulgation of Air Quality Implementation Plans; Partial Approval and Partial Disapproval of Air Quality Implementation Plans and Federal Implementation Plan; Utah; Revisions to Regional Haze State Implementation Plan; Federal Implementation Plan for Regional Haze").

Our organizations represent tens of thousands of Utahns and people throughout the nation that care deeply about protecting the air quality in our national parks and wilderness areas in Utah and the Intermountain West. We strongly encourage EPA to adopt its proposed federal implementation plan to require significant reductions nitrogen oxide emissions from the four BART units at the Hunter and Huntington coal fired power plants to reduce visibility impairment as required by the Clean Air Act's regional haze program.

Utah's latest re-proposal of its regional haze state implementation plan ("SIP") is the third attempt since 2008 to exempt Hunter Units 1 and 2 and Huntington Units 1 and 2 from appropriate pollution controls from the Clean Air Act-mandated BART requirements for nitrogen oxide emissions.[2] In lieu of significant future NOx emissions reductions that are

---

[1] All documents referred to in this comment letter were filed under the appropriate docket number at www.regulations.gov. However, to avoid confusion, the March 14, 2016 Technical Support Document by Vicki Stamper, along with all attachments thereto, was filed separately. Likewise, the March 16, 2016 Expert Report by Dr. Andrew Gray, along with all attachments thereto, was also filed separately. Finally, the Conservation Organizations filed this comment letter separately, along with all exhibits hereto.

[2] 40 C.F.R § 51.308(e).

emissions reductions mandated by the MATS rule that would have restricted such emissions at Carbon after April 15, 2015.[119]

Utah's SIP submission concedes that Carbon's future emissions would be lower than past emissions upon which Utah relied in calculating its BART benchmark. Specifically, Utah claims that "PacifiCorp could choose to meet the MATS requirements through other measures…" than retirement.[120] Thus, Utah admits that: 1) had PacifiCorp continued to operate the Carbon plant, it would have had to meet MATS requirements; and 2) PacifiCorp would have had to implement "other measures" (i.e., SO2 pollution controls) to continue operating. Despite these admissions, Utah's emissions reduction analysis and visibility modeling use false and inflated SO2 emissions data from 2012-2013 that ignores the admitted SO2 emissions reductions that would have to occur for Carbon to operate into the future. As such, Utah's emissions reduction analysis and visibility modeling is inaccurate, and has no basis in reality.

Utah nonetheless assigns credit to its BART Alternative for eliminating 100 percent of Carbon's SO2 emissions from 2012-2013 levels on the erroneous ground that PacifiCorp was under no enforceable requirement to permanently close and retire the Carbon units.[121] This statement is factually inaccurate for a number of reasons. First, the requirement to permanently retire Carbon Units 1 and 2 by April 15, 2015 was made enforceable through public service commission filings in several states. For example,

- On August 7, 2012 PacifiCorp (through Rocky Mountain Power) entered into a stipulation filed with the Utah Public Service Commission regarding an accounting order to defer costs related to the decommissioning of the Carbon Plant.[122] The stipulation allowed for recovery from Utah ratepayers of Utah's allocated shares of the prudently incurred Carbon Removal Costs from the retirement date of the Carbon Plant, currently estimated to occur in April 2015 …."[123] The retirement of the Carbon plant in fact occurred on April 15, 2015. The stipulation was entered as an Order of the Utah Public Service Commission.[124]

- As PacifiCorp informed the Idaho Public Utilities Commission, "[t]he current emissions profiles of the Carbon units do not meet MATS limits for all pollutants regulated under that rule. The Carbon units have not been, and cannot economically

[119] Even if PacifiCorp had elected to operate the Carbon units in violation of MATS, the CAA authorizes either EPA or citizens to seek injunctive relief requiring closure of the units or compliance with the MATS emission limits. 42 U.S.C. §7602(a)(1). Thus, Utah's assumption that these units could have defied the law in perpetuity is arbitrary and capricious.

[120] UDAQ Staff Review, Exhibit 15, at 7.

[121] *Id.*

[122] Report and Order dated September 19, 2012 Utah Public Service Commission attached hereto as Exhibit 16 hereto.

[123] *Id.* at pp. 15-16.

[124] *Id.*

be, retrofitted with scrubbers, baghouses, or other significant emissions control equipment investments that would foster the Carbon plant's ability to comply."[125]

- As PacifiCorp reported to the California Public Utilities Commission, an air pollution control upgrade may be impossible, as "[t]he Carbon plant is located in the mouth of a canyon with no room to install significant environmental retrofits."[126]

- On August 21, 2014 PacifiCorp responded to a bench request by the Oregon Public Utilities Commission ("Oregon PUC") by representing it would retire the Carbon plant and that such retirement would "reduce its ability to make wholesale sales."[127] PacifiCorp entered into a stipulation with parties to that proceeding to address this financial issue and others.[128] The stipulation was approved as an Order of the Oregon PUC.[129]

- On January 23, 2015, the Wyoming Public Service Commission entered its "Findings of Fact, Conclusions of Law, Decision and Order *nunc pro tunc"* authorizing, among other things, a one time recovery to PacifiCorp of "non-labor operations and maintenance expenses required to operate the Carbon plant until its April 2015 retirement…" [130]

- PacifiCorp never procured the necessary technology for MATS compliance nor sought any extension of the April 15, 2015 MATS deadline, because the company never had any intention of operating the plant beyond that date.

- Indeed, the company applied for and received regulatory approval for an accounting order that enabled the shutdown.[131]

---

[125] In the Matter of the Application of Rocky Mountain Power for a Deferred Accounting Order Authorizing the Creation of a Regulatory Asset Associated with the Remaining Book Value of the Carbon Plant, Case No. PAC-E-12-08, Application for Accounting Order, ¶ 4 (Id. Pub. Util. Comm'n May 3, 2012) attached hereto as Exhibit 17. In addition to Carbon's inability to meet MATS requirements, PacifiCorp also anticipates difficulty demonstrating attainment of the 1-hour $NO_X$ or 1-hour $SO_2$National Ambient Air Quality Standards. *Id.* ¶ 5.

[126] *Id.* ¶ 5; *see also* Pacific Power, Advice Letter 496-E to Calif. Pub. Util. Comm'n, at 2 (Dec. 4, 2013), attached as Exhibit 18.

[127] Oregon Public Utilities Commission Order 14-331, p. 2, attached hereto as Exhibit 19.

[128] *Id.*

[129] *Id.*

[130] Wyoming Public Service Commission "Findings of Fact, Conclusions of Law, Decision and Order *nunc pro tunc*, p. 39, ¶179, attached hereto as Exhibit 20.

[131] Exhibit 20 hereto.

Accordingly, the Carbon retirement (and corresponding emissions reductions) is enforceable regardless of Utah's BART alternative and statements to the contrary in Utah's latest Regional Haze SIP are factually and legally erroneous. Indeed, the retirement not only was enforceable, it was inevitable given PacifiCorp's professed inability to make the retrofits needed to comply with MATS at the Carbon Plant because of the physical constraints the facility faces.

In summary, Utah's latest Regional Haze SIP does not require any legitimate or new emissions reductions from the Carbon Plant that do not already exist. The Carbon Plant retirement was mandated by pre-existing public service commission orders and agreements adopted over the past three years. Indeed, the Carbon Plant is being dismantled. Even if the Carbon Plant had continued to operate, it would have had to reduce its SO2 and/or PM emissions to comply with the MATS rule and any SO2 reductions could not be credited in any case because of the state's participation in the 309 program. For all of these reasons, Utah's latest Regional Haze SIP and corresponding visibility modeling is arbitrary, capricious, and unsupported by the administrative record.

Moreover, Utah should not be allowed any more emissions-reduction credit for the shutdown of the Carbon units than existed at the time of the baseline date of the regional haze SIP. Those emissions are most properly reflected in the 2001-2003 average, the same averaging period that Utah used to measure emission reductions from for Hunter Unit 3.[132] In the table below (Table 17 of the 2016 Stamper TSD), the 2001-2003 average for SO2 and NOx emissions at each Carbon unit is provided.

**Table 3. 2001-2003 Annual Average SO2 and NOx Emissions From Carbon Units 1 and 2**[133]

| Year | Carbon Unit 1 SO2, tons/year | Carbon Unit 1 NOx, tons/year | Carbon Unit 2 SO2, tons/year | Carbon Unit 2 NOx, tons/year |
|---|---|---|---|---|
| 2001 | 2,088 | 1,282 | 3,100 | 1,844 |
| 2002 | 2,721 | 1,377 | 4,043 | 2,001 |
| 2003 | 2,048 | 1,278 | 3,440 | 2,087 |
| | | | | |
| **2001-2003 average** | **2,286** | **1,312** | **3,528** | **1,977** |
| *Compare to 2012-2013 Average used by Utah* | *3,388* | *1,408* | *4,617* | *1,940* |

[132] 81 Fed. Reg. 2,015, Table 3, n.2.

[133] Data from EPA's Air Markets Program Database.

PACIFICORP

1407 WEST NORTH TEMPLE, SUITE 210 • SALT LAKE CITY, UTAH 84116 • (801) 220-4581 • FAX (801) 220-4725

March 14, 2016

Submitted via email and electronically to www.regulations.gov

Gail Fallon
Director, Air Program
U.S. EPA, Region 8
Mailcode 8P-AR
1595 Wynkop Street
Denver, Colorado 80202-1129
Email:Fall.Gail@epa.gov

Re: Docket ID No. EPA-R08-OAR-2015-0463
Approval, Disapproval and Promulgation of Air Quality Implementations Plans; Partial Approval and Partial Disapproval of Air Quality Implementation Plans and Federal Implementation Plan; State of Utah; Revisions to Regional Haze State Implementation Plan; Federal Implementation Plan for Regional Haze (Docket ID No. EPA-R08-OAR-2015-0463)("Proposed Rule")

Dear Ms. Fallon,

PacifiCorp appreciates the opportunity to offer these comments (including the extended comments, attachments and exhibits) in the above matter. PacifiCorp strongly encourages EPA to approve Utah's BART Alternative, thereby guaranteeing "reasonable progress" towards Utah's regional haze goals in a cost-effective manner. Utah's BART Alternative meets all "applicable requirements" of the Clean Air Act; therefore it should be approved by EPA. PacifiCorp strongly opposes EPA's proposed federal implementation plan, which would result in hundreds of millions of dollars in costs with less "reasonable progress" than the BART Alternative.

Because of the length of PacifiCorp's expanded comments, we have summarized for emphasis some of those comments as follows. The below summary is not intended to be a summation of PacifiCorp's expanded comments; those stand on their own in their complete form. Rather, this summary is provided as a convenience and as part of our overall comments.

**UTAH'S SIP PROPOSAL SATIFIES THE REGIONAL HAZE REQUIREMENTS AND SHOULD BE APPROVED**

- *Utah's SIP Proposal meets all applicable requirements.* Through proper application of each applicable requirement in the regional haze rules, Utah determined – and so did EPA –that the weight of the evidence demonstrates that the Utah SIP Proposal makes greater reasonable progress than installation and operation of BART; and it does so at a substantially lower cost.

- *EPA arbitrarily refuses to consider the dramatic cost difference between the two co-proposals.* EPA has made clear that the BART Alternative program is intended to achieve greater visibility progress in the most cost-effective manner. The Utah SIP does just that. EPA, however, refused to consider the cost savings associated with the Utah SIP proposal. This not only violates the foundational premise of its own BART alternative rule, but it also violates one of the fundamental tenets of reasonable regulation.

- *EPA should evaluate all visibility metrics under the weight of the evidence test.* Although EPA does an adequate job in identifying and weighing most of the available metrics, data and information under its weight of evidence analysis, it gives far too much weight to certain metrics (like the 98th Percentile metric) and not enough to other metrics (like cost and the timing of emission reductions under the BART Alternative analysis). By properly considering evidence, data and information and assigning the proper weight to each, EPA's approval of the Utah SIP Proposal will become even stronger.

- *EPA arbitrarily and capriciously applies two inappropriate standards to the Utah SIP Proposal.* In an attempt to replace Utah's determination with its own, EPA imposes a "Reasonableness Standard" without concluding the Utah SIP Proposal contains data or methodological flaws – the limited circumstances under which courts have upheld use of this standard – and also imposes a "Complexity of Evaluation" standard which finds no support in the CAA or applicable regulations.

- *EPA unfairly minimizes the timing of emissions reductions.* EPA glosses over the benefits of the timing of the BART Alternative emissions reductions. The emissions reductions associated with the BART Alternative began in 2007 and have continued to this day, long before any emissions reductions would occur under the FIP Proposal. Further, by attempting to impose BART controls EPA is actually requiring both the BART Alternative and BART – reaching well beyond the scope of its authority.

**EPA's FIP PROPOSAL IS NOT LEGALLY SUSTAINABLE**

- *Illegal treatment of existing controls.* EPA failed to properly consider existing controls by calculating a baseline emissions rate that did not include previously installed combustion

controls. This flawed baseline emissions rate led to incorrect and inflated cost and visibility data that EPA cannot rely on to implement its FIP Proposal.

- *Grossly flawed analysis of cost.* EPA's cost analysis is wrong for the numerous reasons, including the following: (1) it utterly fails to provide *any* rationale for the 70 million dollar difference between its cost estimate for SCR and PacifiCorp's cost estimate for SCR; (2) EPA failed to follow its own the Cost Control Manual – one that EPA has compulsively required utilities' to use – by disallowing material costs that are specifically included and allowed by the CCM. Finally, EPA's expert inexplicably and incorrectly redesigned the SCR technology – without any engineering support – to "show" that only one reactor is necessary instead of two and that less catalyst could be used, thereby further skewing the SCR cost analysis.

- *Improper accounting of Energy and Non-Air Quality Impacts*. EPA did not identify or quantify the solid, liquid, and gaseous discharges from the SCR control devices under review, or the discharges with potential for causing adverse environmental effects. Also, EPA should have considered multiple energy impacts of installing SCR, but it did not. These impacts are supposed to carry greater weight in situations like the one at hand, where the visibility improvement of a particular option is marginal at best.

- *Visibility Improvements.* The visibility improvements of EPA's FIP Proposal are not reasonably anticipated from the installation of SCR because (1) EPA failed to account for the margin of error in the CALPUFF model and other material limitations of CALPUFF; (2) EPA summed up the per unit improvements rather than modeling all four BART units together; and (3) EPA failed to properly account for the limited impact of additional NOX reductions.

Again, the above summary is provided only as a tool of convenience in regard to PacifiCorp's overall comments. Please feel free to contact me with any questions.

Sincerely,

William K. Lawson

William K. Lawson

# ATTACHMENT 1
# - CORRECTED -

PACIFICORP

Pacific Power |
Rocky Mountain Power
1407 West North Temple
Salt Lake City, Utah 84116

Bryce Bird
Director, Utah Division of Air Quality
P.O. Box 144820
Salt Lake City, Utah 84114-482

**RE: Proposed Utah Regional Haze State Implementation Plan Revision**

Dear Mr. Bird:

PacifiCorp submits these comments in support of the proposal by the state of Utah ("Utah") to revise the Utah regional haze state implementation plan ("SIP Revision"). The proposed SIP Revision is described in the memorandum of the Utah Division of Air Quality ("Division") to the Utah Air Quality Board dated February 19, 2015, the accompanying amendments to Section XX and Section IX of the Utah SIP dated February 17, 2015, the Division's Review of 2008 PM BART Determination and Recommended Alternative to BART for $NO_X$ dated February 13, 2015 ("Staff Review"), and related supporting documents as included on the Division's "Regional Haze" webpage at:
http://www.airquality.utah.gov/Planning/regionalhaze/index.htm.

PacifiCorp supports the SIP Revision for the reasons explained by the Division and for the additional reasons stated below, which PacifiCorp asks Utah to include as further justification for a final decision to adopt the SIP Revision.

PacifiCorp

PacifiCorp is the majority owner and operator of Hunter Units 1 and 2, and is the owner and operator of Huntington Units 1 and 2 (collectively "Units"). The Units are the only sources that the Division has determined to be subject to the Clean Air Act's ("CAA") Best Available Retrofit Technology ("BART") requirements. As a result, PacifiCorp and its customers will be directly affected by final action regarding the proposed SIP Revision.

As the Division is aware, PacifiCorp has installed, and operates, particulate matter ("PM") and nitrogen oxide ("$NO_X$") controls at the Units as a result of previous BART determinations by the State of Utah. As EPA itself recognized in its review of Utah's previous regional haze ("RH") SIP, these controls on the Units "are projected to decrease $SO_2$ emissions by 13,200 tons and $NO_X$ emissions by 6,200 tons between 2002 and 2018." 77 Fed. Reg. 74,355, 74,367 (Final Rule, December 14, 2012). In other words, emission reductions at these Units – and the corresponding improvements in visibility – are well under way. EPA also stated that Utah's previous RH SIP, specifically the $SO_2$ Backstop Trading program and other EPA-approved elements, "are deemed to have met the requirements for reasonable progress for the Class I areas on the Colorado Plateau." *Id.* at 74,367.